**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

```
-------------------------------------------------- X
ALEXANDER KESTENBAUM and           :
STUDENTS AGAINST ANTISEMITISM,     :
INC.,                              :        Case No.
                                   :
            Plaintiffs,            :
                                   :
       v.                          :        COMPLAINT
                                   :
PRESIDENT AND FELLOWS OF           :
HARVARD COLLEGE,                   :        Jury Trial Demanded
                                   :
            Defendant.             :
-------------------------------------------------- X
```

Plaintiffs Alexander Kestenbaum ("Kestenbaum") and Students Against Antisemitism,

Inc. ("SAA"), for their complaint against defendant President and Fellows of Harvard College

("Harvard"), allege as follows:

**PRELIMINARY STATEMENT**

1.      Harvard, America's leading university, has become a bastion of rampant anti-

Jewish hatred and harassment.  Since October 7, 2023, when Hamas terrorists invaded Israel and

slaughtered, tortured, raped, burned, and mutilated 1,200 people—including infants, children,

and the elderly—antisemitism at Harvard has been particularly severe and pervasive.  Mobs of

pro-Hamas students and faculty have marched by the hundreds through Harvard's campus,

shouting vile antisemitic slogans and calling for death to Jews and Israel.  Those mobs have

occupied buildings, classrooms, libraries, student lounges, plazas, and study halls, often for days

or weeks at a time, promoting violence against Jews and harassing and assaulting them on

campus.  Jewish students have been attacked on social media, and Harvard faculty members have

promulgated antisemitism in their courses and dismissed and intimidated students who object.

What is most striking about all of this is Harvard's abject failure and refusal to lift a finger to

stop and deter this outrageous antisemitic conduct and penalize the students and faculty who perpetrate it.

2.      Harvard's antisemitism cancer—as a past Harvard president termed it—manifests itself in a double standard invidious to Jews.  Harvard selectively enforces its policies to avoid protecting Jewish students from harassment, hires professors who support anti-Jewish violence and spread antisemitic propaganda, and ignores Jewish students' pleas for protection.  Those professors teach and advocate through a binary oppressor-oppressed lens, through which Jews, one of history's most persecuted peoples, are typically designated "oppressor," and therefore unworthy of support or sympathy.  Harvard permits students and faculty to advocate, without consequence, the murder of Jews and the destruction of Israel, the only Jewish country in the world.  Meanwhile, Harvard requires students to take a training class that warns that they will be disciplined if they engage in sizeism, fatphobia, racism, transphobia, or other disfavored behavior.

3.      Harvard's double standard starts at the top.  Whereas almost twenty years ago, a Harvard president was run out of his position for merely suggesting a disfavored hypothesis concerning the underrepresentation of women in the sciences—a hypothesis he said he wanted proven wrong—Harvard's most recent president testified before Congress that calls for the genocide of the Jewish people do not necessarily violate Harvard's policies, and then received the unanimous backing of Harvard's governing body.  Following that testimony on December 5, 2023, the only rabbi on Harvard's recently appointed Antisemitism Advisory Group resigned because, as he said, "both events on campus and the painfully inadequate testimony reinforced the idea that I cannot make the sort of difference I had hoped."  Only after the disclosure of

plagiarism allegations and a month of intense public scrutiny did Harvard's president finally resign.

4.      Kestenbaum, SAA's members, and numerous others have explicitly and repeatedly warned Harvard that its severe and pervasive hostile environment endangers Jewish students.  In fact, Harvard has been aware of its antisemitism problem for years, but its response has been, to say the least, clearly unreasonable and totally unacceptable in not just tolerating, but enabling antisemitism.  Harvard has abjectly failed to enforce its policies and discipline those responsible for turning Harvard's campus into a severely hostile environment for its Jewish students, including Kestenbaum and other SAA members.  Its faculty members have gone so far as to cancel classes so students can attend antisemitic rallies and harass and intimidate Jews without consequence.  When, in clear violation of Harvard policies, a mob of students took over a campus building to further their antisemitic agenda, Harvard's response was not to remove and discipline them, but to supply them with burritos and candy.

5.      Harvard's longtime practice of refusing to enforce its own policies against antisemitism ensured that the October 7 terrorist attack would enormously intensify the anti-Jewish abuse on campus.  Numerous students and faculty members at Harvard have openly endorsed Hamas's October 7 massacre, issuing public statements blaming Jews for their own murders, or otherwise excusing or supporting Hamas's actions, notwithstanding Hamas's history since its founding in 1987 of perpetrating numerous suicide bombings and other terrorist attacks, Hamas's explicit vows to kill and destroy Jews and Israel, the U.S. State Department's designation of Hamas as a foreign terrorist organization, and Hamas's repeated public proclamations of its determination to repeat the October 7 atrocities until its genocidal aims are achieved.  In supporting Hamas and condemning Israel, Harvard students and faculty harass,

discriminate, and assault Jewish students—including on October 18, when a mob of protesters attacked a Jewish student, and the next day, when a mob trapped a group of Jewish students in a study room—but they are never heard to condemn, let alone rally against, Syria and Yemen, which have killed hundreds of thousands of Arab civilians, or Pakistan, which is currently expelling almost two million Afghan Muslims, or China, which has imprisoned its Muslims in reeducation camps, or countries like Somalia and Nigeria, where Christians are regularly murdered.

6.      Harvard's purported excuse for refusing to take disciplinary measures and sitting by idly as the Jew-bashing on campus escalates—that antisemitic harassment is protected by free expression principles—confirms its antisemitic double standard.  Considering that Harvard aggressively enforces policies to address bias against other minorities and regularly disciplines students and faculty members who harass other groups or espouse viewpoints Harvard deems inappropriate, its refusal to discipline students attacking, harassing, or intimidating Jews is glaring.  Based on its track record, it is inconceivable that Harvard would allow any group other than Jews to be targeted for similar abuse or that it would permit, without response, students and professors to call for the annihilation of any country other than Israel.

7.      Subjected to intense anti-Jewish vitriol, including from their own professors and Harvard administrators, Kestenbaum and other Jewish students, including SAA members, have been deprived of the ability and opportunity to fully participate in Harvard's educational and other programs and have been placed at severe emotional and physical risk.  Moreover, over the past ten years, Harvard has instituted admissions policies that have severely reduced—by as much as sixty percent—the number of Jewish students, an enormous decline that evinces an intentional effort, much like Harvard's quotas one hundred years ago, to exclude Jews.  The

severe and pervasive hostile environment for Jews on campus leaves Harvard's remaining Jewish population even more isolated and unsafe against their abusers.

8.      Harvard's deliberate indifference to, and indeed enabling of, antisemitism on its campus constitutes an egregious violation of Title VI of the Civil Rights Act of 1964.  Harvard must now be compelled to implement institutional, far-reaching, and concrete remedial measures, including, among other things: (i) disciplinary measures, including the termination of, deans, administrators, professors, and other employees responsible for antisemitic discrimination and abuse, whether because they engage in it or permit it; (ii) disciplinary measures, including suspension or expulsion, against students who engage in such conduct; (iii) declining and returning donations, whether from foreign countries or elsewhere, implicitly or explicitly conditioned on the hiring or promotion of professors who espouse antisemitism or the inclusion of antisemitic coursework or curricula; (iv) adding required antisemitism training for Harvard community members; and (v) payment of appropriate damages for lost or diminished educational opportunities, among other things.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 over claims arising under Title VI of the Civil Rights Act of 1964 ("Title VI") (42 U.S.C. § 2000d *et seq.*).  This Court has supplemental jurisdiction over plaintiffs' related state law claims under 28 U.S.C. § 1367(a) because those claims arise out of the same case or controversy as plaintiffs' federal claim.

10.      This Court has personal jurisdiction over Harvard because it is based and operates in Cambridge, Massachusetts.

5

11.     Venue in the District of Massachusetts is proper under 28 U.S.C. § 1391 because it is the judicial district in which a substantial part of the events or omissions giving rise to plaintiffs' claims occurred and where Harvard is located.

## PARTIES

12.     Plaintiff Students Against Antisemitism, Inc. is a not-for-profit corporation organized under the laws of the State of Delaware, formed for the purpose of defending human and civil rights, including the right of individuals to equal protection and to be free from antisemitism in higher education, through litigation and other means.

13.     SAA is comprised of voluntary members, including students at higher education institutions, who support SAA's mission and who have been personally aggrieved or otherwise impacted by antisemitism and discrimination in higher education.  SAA's members include current Jewish students who are experiencing a severe and pervasive hostile educational environment at Harvard that causes them to lose the benefits of Harvard's educational and extracurricular opportunities.

14.     Plaintiff Alexander Kestenbaum is a Jewish student at Harvard University, enrolled in the Masters in Theological Studies program at Harvard Divinity School ("Harvard Divinity").  He is also a member of SAA.

15.     SAA Member #1 is a Jewish student at Harvard University, enrolled in Harvard Law School ("Harvard Law").

16.     SAA Member #2 is a Jewish student at Harvard University, enrolled in Harvard Law.

17.     SAA Member #3 is a Jewish student at Harvard University, enrolled in Harvard Law.

18.     SAA Member #4 is a Jewish Ph.D. student at Harvard University, taking courses at Harvard T.H. Chan School of Public Health ("Harvard Public Health").

19.     SAA Member #5 is a Jewish student at Harvard University, enrolled in Harvard Law.

20.     Defendant President and Fellows of Harvard College is the legal name of Harvard University, a private educational institution based in Cambridge, Massachusetts.

21.     Despite its endowment of nearly $50.7 billion—the largest among American universities—Harvard accepts substantial direct financial assistance from the federal government through, among other things, grants and loans, including in fiscal years 2022 and 2023, at least $642 million and $676 million, respectively, and will receive substantial direct federal financial assistance in fiscal year 2024, as well as substantial indirect federal financial assistance through, among other things, tuition paid with federal financial aid.  As a recipient of federal financial assistance, Harvard is subject to Title VI.

## FACTS

### A.     Title VI Protects Jewish Students Against Antisemitism

22.     Title VI prohibits discrimination on the basis of race, color, or national origin in any program or activity that receives federal funding or other federal financial assistance, and protects all students, including Jewish students, in such programs or activities.

23.     Since at least September 2004, it has been the policy of the Office of Civil Rights ("OCR") of the U.S. Department of Education ("DOE") to investigate Title VI complaints against universities related to antisemitism.  In an October 26, 2010 letter to federally funded schools, OCR confirmed that such schools are "responsible for addressing harassment incidents about which [they] know[] or reasonably should have known," and must address "anti-Semitic harassment," stating that such harassment violates Title VI when it creates a "hostile

environment" based on "actual or perceived shared ancestry or ethnic identity as Jews," in which "the conduct is sufficiently severe, pervasive, or persistent so as to interfere with or limit a student's ability to participate in or benefit from the services, activities, or opportunities offered by a school," or when the "harassment is encouraged, tolerated, not adequately addressed, or ignored by school employees."  OCR further clarified that schools must take "immediate and appropriate action to investigate" harassment claims and "must take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment and its effects, and prevent the harassment from recurring."

24.     Both the Trump and Biden administrations have confirmed the urgent need to combat antisemitism in educational institutions.  In December 2019, President Donald Trump issued Executive Order 13899 on "Combating Anti-Semitism," directing the executive branch to enforce Title VI against discrimination "rooted in anti-Semitism as vigorously as against all other forms of discrimination prohibited by Title VI," and in doing so, to consider the definition of antisemitism promulgated by the International Holocaust Remembrance Alliance ("IHRA"), an intergovernmental organization comprised of thirty-five member countries.  On January 4, 2023, DOE, citing the "rise in reports of anti-Semitic incidents," released a fact sheet, "Protecting Students from Discrimination Based on Shared Ancestry or Ethnic Characteristics," which reiterates that Title VI protects "students who experience discrimination, including harassment, based on their . . . (i) shared ancestry or ethnic characteristics; or (ii) citizenship or residency in a country with a dominant religion or distinct religious identity."

25.     In May 2023, President Joseph Biden released the U.S. National Strategy to Counter Antisemitism, described as the "most ambitious and comprehensive U.S. government-led effort to fight antisemitism in American history," and DOE launched its Antisemitism

Awareness Campaign.  As part of that campaign, on November 7, 2023, OCR reminded schools of their "[l]egal responsibility under Title VI" to "provide all students a school environment free from discrimination based on race, color, or national origin, including shared ancestry or ethnic characteristics," to "address prohibited discrimination against students and others on your campus—including those who are or are perceived to be Jewish [or] Israeli," and to "take immediate and effective action to respond to harassment that creates a hostile environment."  On September 28, 2023, as part of President Biden's National Strategy to Counter Antisemitism, eight federal agencies confirmed yet again that Title VI prohibits antisemitic forms of discrimination in federally funded programs and activities.

26.      The IHRA definition of antisemitism provides, among other things, that the following are "contemporary examples of antisemitism":

- "Calling for, aiding, or justifying the killing or harming of Jews in the name of a radical ideology or an extremist view of religion";

- "Making mendacious, dehumanizing, demonizing, or stereotypical allegations about Jews as such or the power of Jews as collective—such as, especially but not exclusively, the myth about a world Jewish conspiracy or of Jews controlling the media, economy, government, or other societal institutions";

- "Accusing Jews as a people of being responsible for real or imagined wrongdoing committed by a single Jewish person or group, or even for acts committed by non-Jews";

- "Denying the fact, scope, mechanisms (e.g. gas chambers) or intentionality of the genocide of the Jewish people at the hands of National Socialist Germany and its supporters and accomplices during World War II (the Holocaust)";

- "Accusing the Jews as a people, or Israel as a state, of inventing or exaggerating the Holocaust";

- "Accusing Jewish citizens of being more loyal to Israel, or to the alleged priorities of Jews worldwide, than to the interests of their own nations";

- "Denying the Jewish people their right to self-determination, e.g., by claiming that the existence of a State of Israel is a racist endeavor";

- "Applying double standards by requiring of [Israel] a behavior not expected or demanded of any other democratic nation";

- "Using the symbols and images associated with classic antisemitism (e.g., claims of Jews killing Jesus or blood libel) to characterize Israel or Israelis";

- "Drawing comparisons of contemporary Israeli policy to that of the Nazis"; and

- "Holding Jews collectively responsible for actions of the state of Israel."

27.     As the historical birthplace of the Jewish people, the land of Israel is at the core of Jewish identity, ancestral tradition, religion, and culture.  The movement for the reestablishment, development, and protection of the Jewish nation in the land of Israel, known as Zionism, arises from Jews' ethnic and historic roots in that land and their right to self-determination.  Zionism is a crucial component of Kestenbaum's and SAA members' Jewish identities, and many of them are descendants of survivors of the Nazis, with family and friends in Israel.

28.     Anti-Zionism is discriminatory and antisemitic when expressed in terms of, for example: applying double standards not applicable to other countries or peoples in assessing Israel's legitimacy and conduct; denying the Jewish people's right to self-determination or the right of the State of Israel to exist; denying that Israel has the right to self-defense against terrorism, invasion, or the murder, rape, and kidnapping of its citizens; accusing Israel of being inherently racist or comparable to the Nazis; or invoking classic antisemitic canards against Israel and its people.  "When people criticize Zionists," Dr. Martin Luther King, Jr. explained, "they mean Jews.  You're talking antisemitism."

29.     The widespread anti-Israel hate that has gripped Harvard and other colleges since October 7, 2023 confirms that anti-Zionism is antisemitism.  At rallies and events across the country, and especially at Harvard, known or visibly Jewish students have been maligned as "murderers," "colonizers," "racists," "white supremacists," "killers and rapists of children," "genocidal," and "Zionists."

30.     Antisemitism is a core tenet of Harakat al-Muqawama al-Islamiya, known by its Arabic acronym, Hamas—an extreme Islamist terrorist group explicitly committed to the destruction of Israel and its Jewish inhabitants, the creation of an Islamic state in Israel's place, and the annihilation of all Jews around the world.  Hamas's 1988 charter states: "The Day of Judgment will not come about until Muslims fight the Jews and kill them."  In October 1997, the U.S. State Department designated Hamas, which has controlled Gaza since 2007, a Foreign Terrorist Organization.

31.     In keeping with its charter and goals, since its inception, Hamas has carried out numerous indiscriminate terror attacks on Israeli civilians, including bombings, rocket barrages, shootings, and stabbings, including during two so-called "Intifadas" against Jews in Israel, effectuated mostly by suicide bombs, many of which included nails dipped in rat poison.  During the Second Intifada, from approximately September 2000 through February 2005, Hamas claimed responsibility for over fifty suicide bombings, including the August 9, 2001 bombing of a Jerusalem pizzeria, which killed seven children; the December 2, 2001 double-suicide bombing in the crowded Ben Yehuda pedestrian mall in Jerusalem, killing eleven; and the March 27, 2002 suicide bombing at a Passover Seder at the Park Hotel in Netanya, killing thirty.  Over the next twenty years, Hamas killed scores more through similar suicide bombings, public bus attacks, booby traps, shootings, and other acts of terror.

**B.     Harvard Fails to Enforce Its Own Policies to Protect Jewish Students**

32.     Harvard has issued at least five applicable sets of policies ostensibly to protect students from discrimination, harassment, and intimidation: (i) the Harvard University Non-Discrimination and Anti-Bullying Policy; (ii) the University-Wide Statement on Rights and Responsibilities; (iii) the Free Speech Guidelines; (iv) Harvard's Student Organization Policies; and (v) Harvard's various student handbooks, which often adopt and expand on University-wide

policies.  Harvard, however, refuses to apply these policies in a non-discriminatory manner to protect Jewish students and prevent antisemitism on campus, and selectively enforces its own rules, deeming Jewish victims unworthy of the protections it readily affords non-Jewish ones. Harvard's clearly unreasonable response to antisemitic discrimination and harassment reflects an egregious double standard, as it is at odds with Harvard's aggressive enforcement of its policies concerning alleged misconduct not involving antisemitism.

### i.   Non-Discrimination and Anti-Bullying Policy

33.   On September 1, 2023, Harvard adopted a University-wide Non-Discrimination Policy and an Anti-Bullying Policy (together, the "Non-Discrimination Policy"), which applies to alleged discrimination, harassment, and bullying "by any member of the Harvard community," both on- and off-campus (including on social media), that "may have the effect of creating a hostile or abusive work or learning environment for a member of the University community."

34.   The Non-Discrimination Policy prohibits "discriminatory disparate treatment" and "discriminatory harassment" on the basis of race, color, national origin, ancestry, religion, or creed, among other protected classes.  "Discriminatory disparate treatment" is defined as "singling out or targeting an individual for less favorable treatment because of their protected characteristic," which "unreasonably interfere[s] with or limit[s] the student's ability to participate in or benefit from the institution's programs and activities."  Harvard defines "discriminatory harassment" as "unwelcome and offensive conduct that is based on an individual or group's protected status" that interferes with "a student's academic performance or ability to participate in or benefit from academic/campus programs and activities."  The Non-Discrimination Policy similarly defines "bullying" as "harmful interpersonal aggression by words or actions that humiliate, degrade, demean, intimidate, or threaten," which is "sufficiently severe or pervasive, and objectively offensive, that it creates a[n] . . . educational[] or living

environment that a reasonable person would consider intimidating, hostile, or abusive and denies the individual an equal opportunity to participate in the benefits of the workplace or the institution's programs and activities."

35.     The Non-Discrimination Policy also sets forth governing principles, including that all those at Harvard "with responsibility for implementing [the policy] will discharge their obligations with fairness, rigor, and impartiality," as well as timeliness and transparency, and sets forth procedures, including specified timeframes for reviewing, investigating, and acting upon complaints of violations.  Examples of possible sanctions for violations include suspension, probation, expulsion, termination, or a recommendation that a faculty member's tenure be terminated.

36.     Harvard's constituent schools also promulgate student handbooks, which set forth misconduct policies and procedures.  For instance, the Harvard College and Harvard Divinity handbooks provide that the school retains broad rights to protect the Harvard community "as it deems necessary in extraordinary circumstances to protect the health and safety of the Harvard community," including "conditions posing broad threats to community health and safety or significantly disrupting campus life or learning."  The handbooks also adopt versions of Harvard's Non-Discrimination Policy.  Harvard Divinity's handbook "prohibit[s]," and declares "unlawful and contrary to Harvard University[] policy," acts that "discriminate on the basis of race, color, . . . religion, creed, . . . [or] national or ethnic origin."  The Harvard College handbook states that protected-class discrimination "is contrary to the principles and policies of Harvard University," and that harassment based on these protected classes is "unacceptable." Harvard Law's handbook provides notice of the Harvard Non-Discrimination Policy and confirms that all "students, faculty, staff," and others at Harvard Law are bound by it and that

"[s]tudents [and] faculty . . . agree to respect the rights, dignity, and differences of others . . . and accept personal responsibility in these efforts."

37.     While these clear and unambiguous statements purport to signal Harvard's commitment to prohibiting discrimination and harassment, the reality is that Harvard has treated Jews as unworthy of the respect and protection it affords other groups.

### ii.  Statement on Rights and Responsibilities

38.     Harvard's University-Wide Statement on Rights and Responsibilities (the "Statement on Rights and Responsibilities") guarantees "freedom from personal force and violence, and freedom of movement," and provides, among other things, that interference with such freedoms, with any Harvard member's "performance of their normal duties and activities," or any "[t]heft or willful destruction of property" is a "serious violation" of "personal rights." The Statement on Rights and Responsibilities provides that intense personal harassment and unauthorized occupation of buildings violate Harvard policy:

> It is implicit in the language of the Statement on Rights and Responsibilities that intense personal harassment of such a character as to amount to grave disrespect for the dignity of others be regarded as an unacceptable violation of the personal rights on which the University is based.

> It is implicit in the University-wide Statement on Rights and Responsibilities that any unauthorized occupation of a University building, or any part of it, that interferes with the ability of members of the University to perform their normal activities constitutes unacceptable conduct in violation of the Statement and is subject to appropriate discipline.

### iii. Free Speech Guidelines

39.     Harvard's Free Speech Guidelines, "intended to supplement and clarify" the Statement on Rights and Responsibilities and to "inform students of the acceptable limits of protest," define prohibited "disruption" of a campus event as "any repeated or continuous action

which effectively prevents members of the audience from adequately hearing or seeing the event" and provide that "[i]n cases of obstruction [of others' 'freedom of movement']. . . the offenders should be punished."  The Free Speech Guidelines provide that "act[s] or threat[s] of physical violence" are "regarded as a complete lack of respect for the deepest values that unite the [Harvard] community" and "[r]acial" and "intense personal harassment," as well as "[b]ehavior evidently intended to dishonor such characteristics as race [or] ethnic group," are "contrary to the pursuit of inquiry and education" and constitute "grave disrespect for the dignity of others" which will be "punished."

40.     Harvard's constituent schools have adopted similar policies.  Harvard Public Health's handbook provides that expression is not protected when it violates the Non-Discrimination Policy and that "[a]ny violation[]" by students, faculty, or other speakers constitutes "grounds for appropriate disciplinary action."  The Harvard Law handbook warns that students who "s[i]t in or obstruct[] access to administrative offices, faculty offices, and other school facilities as a form of protest"—conduct previously sanctioned by a "reprimand"—may now "result in a significant disciplinary sanction."

41.     As part of the Harvard Law handbook's Protest and Dissent Guidelines, student "dissenter[s]" are warned that it is not "acceptable" to impede access to a speaking event, that "[u]sing or threatening force or violence, such as defacing a sign or assaulting a speaker or a member of the audience, is never permitted," and that "interference with freedom of movement or with freedom from personal force or violence is a serious violation of personal rights."  It also provides that "any form of protest that disrupts the conduct of a[] class would violate the University-Wide Statement of Rights and Responsibilities' prohibition against interference with 'the performance of the normal duties and activities' of [Harvard]," that "[w]hen a meeting is

15

closed, dissent by non-attendees is limited to activity outside the meeting that does not impede

access to the meeting or substantially interfere with the communication inside," and "[c]hanting

or making other sustained or repeated noise in a manner which substantially interferes with the

speaker's communication is not permitted."

42.     Harvard's policies also provide that students' Harvard-issued identification

("HUID") cards, which grant access to Harvard facilities, are "for University purposes only . . .

[and] are not transferable; a student may not allow any other person to use their HUID card for

any purpose," that "[c]ommunity members are responsible for their identification card and for

the consequences of its misuse," and that the Harvard University Police Department ("HUPD")

has authority to request any individual's HUID card "[w]henever it is necessary to ascertain

whether a person is a member of the University community or an authorized visitor."

**iv.     Student Organization Policies**

43.     Harvard also has policies regulating student organizations, codified in Harvard's

Student Organization Resource Guide and Harvard's handbooks (collectively, the "Student

Organization Policies"), which confirm the Non-Discrimination Policy is applicable to Harvard-

recognized student organizations—those that have registered with, and are supported by and

receive benefits from, Harvard in exchange for agreeing to follow Harvard's policies—and

provide that "Harvard [] does not tolerate any behavior that constitutes harassment on the basis

of . . . any [] characteristic protected under applicable federal or state law" and that student

organizations "may not discriminate based on race, color, national or ethnic origin, [or] religion."

44.     The Student Organization Policies also provide that unrecognized student

organizations are not permitted "to conduct any activity at Harvard even though their activities

involve Harvard" students, except under "special circumstances," that Harvard will not provide

"access, support, or benefits" to unrecognized student organizations, and that students may not

use the "Harvard" name or marks in organizations' activities without permission from a dean or the provost.

45.     Harvard nevertheless regularly permits unrecognized student groups such as Harvard Boycott, Divestment, Sanctions ("Harvard BDS") and Harvard Afro to conduct, while using Harvard's name, disruptive antisemitic protests inside Harvard buildings and on Harvard grounds without consequence.  These unrecognized groups have, in recent months, extensively engaged in discrimination against, and harassment of, Jewish and Israeli students and continue to violate numerous Harvard policies by holding unauthorized events in which they recruit hundreds of students to interrupt classes with calls for "globaliz[ing] the Intifada" and violence against Jews and Israelis, among other disruptive and harassing conduct.  Harvard takes no action to prevent these organizations from regularly harassing Jewish and Israeli students in violation of Harvard's policies.

C.     **Harvard's Recent History of Antisemitism and Civil Rights Violations**

46.     Antisemitism at Harvard is hardly a new phenomenon.  In the 1920s, it was official Harvard policy, implemented by President Abbott Lawrence Lowell, and complete with quotas on admissions to "diminish the Jews" and restore Harvard as a "Gentile" college.  Over the last decade in particular, Harvard's tolerance for, and enabling of, antisemitism has caused a surge in antisemitic hate and harassment culminating in the current intolerable anti-Jewish environment at Harvard following Hamas's October 7 terrorist attack.  Rather than discipline the perpetrators of antisemitism on campus, Harvard has enabled antisemitic abuse and harassment to intensify, forsaking its Jewish students to a hostile environment that deprives them of the educational experiences other students enjoy.

47.     This hostile environment is reflected in a 2022 study conducted by the AMCHA Initiative, a non-profit organization which investigates and documents antisemitism in higher

education—finding that Harvard was the most antisemitic college in the United States—and in a

Harvard student's March 2023 senior thesis, "The Death of Discourse: Antisemitism at Harvard

College," for which she interviewed Jewish Harvard students, large percentages of whom (as

much as eighty percent or more) reported experiencing antisemitism and anti-Zionism on campus

or knowing someone who had.  The thesis provided numerous accounts reflecting the

widespread, virulent antisemitism Jewish students experience on campus, including how

Harvard's hostile environment has effectively made certain courses off-limits to Jewish students

because of the bias and harassment they face and the "degree of censorship [they] must take on

in order to protect themselves socially and academically."

### i.   Harvard's Renewed Embrace of Antisemitism Has Fostered a Hostile Environment for Jewish Students

48.     Over the past ten years, Harvard Jewish students have been subjected to numerous

antisemitic incidents, of which the following are examples.  On October 15, 2015, Harvard

College Palestine Solidarity Committee ("Harvard PSC")—a Students for Justice in Palestine

("SJP") affiliate and Harvard-recognized student group—hosted a "die-in" in front of Harvard

Hillel, a Jewish campus organization, to protest an event featuring an Israeli soldier—according

to Harvard Hillel Executive Director Jonah C. Steinberg, the "first time in my five years at

Harvard that I have seen an effort to interfere with the event of another organization."  Although

Harvard's Statement on Rights and Responsibilities proscribes such interference with campus

activities, Harvard not only failed to discipline Harvard PSC, but its administrators and faculty

members, including Dean Stephen Lassonde and Harvard Foundation for Intercultural and Race

Relations Director S. Allen Counter, attended and supported the violations.  On November 5,

2015, three weeks after the die-in, a swastika was discovered on a Harvard Law classroom desk.

49.     SJP—which has a recognized chapter at Harvard Divinity in addition to its affiliate, Harvard PSC—is one of the most vitriolic antisemitic networks on college campuses. SJP was founded by the chairman of American Muslims for Palestine ("AMP"), the leadership of which overlaps with the leadership of organizations that have been shut down by federal authorities, whose assets were frozen by the U.S. Treasury Department, or that were found liable in civil actions for providing material support to Hamas.  SJP receives funding and training from AMP as well as from universities.  SJP and its affiliates sponsor antisemitic events, host antisemitic speakers, and are leading organizers of Boycott, Divestment, and Sanctions ("BDS") campaigns against Israeli businesses.  They use confrontational tactics to target Jewish students, including disrupting Jewish events, constructing mock "apartheid walls," and disseminating anti-Jewish propaganda laced with falsehoods and blood libels.  A recent study by the Network Contagion Research Institute, an information verification think tank, found the presence of SJP on campuses "significantly correlated with antisemitic activity."  Several leading universities, but not Harvard, have banned SJP and other such hate organizations from their campuses because of their harassment of Jewish students and support for Hamas.

50.     Harvard PSC, SJP, and similar groups have harassed Jews on campus for years without consequence, exemplifying Harvard's deliberate indifference to its severe antisemitism problem.  For example, on April 14, 2016, Harvard Law held an event featuring a speech by Tzipi Livni, a leading Israeli politician.  At the event, a student SJP leader accosted Livni, asking her, echoing anti-Jewish stereotypes promoted by, among others, the Nazis: "How is that you are so smelly?  It's regarding your odor—about the odor of Tzipi Livni, very smelly."  Harvard did not discipline this student, but, instead, the then-dean of Harvard Law—while recognizing that "[m]any perceive [the incident] as anti-Semitic"—responded "that speech is and should be free,"

notwithstanding that the conduct plainly violated policies including Harvard's Statement on Rights and Responsibilities.

51.     Groups like Harvard PSC are notoriously active during "Israeli Apartheid Week," an annual world-wide program organized by virulent anti-Israel activists, which promotes BDS and targets Jewish students for harassment.  During the April 2017 Israeli Apartheid Week, a Harvard dormitory was covered with mock detention notices targeting Jewish students for their alleged mistreatment of "Palestinians in Israel-Palestine."  The mock notices were orchestrated by Harvard PSC, and co-signed by Harvard Concilio Latino, Harvard Islamic Society, and Harvard Black Students Association.  Jewish students reacted with shock and fear, but Harvard took no meaningful steps to discipline the groups responsible.

52.     In October 2017, Harvard's student-led Phillips Brooks House Association granted Nihad Awad its "Call of Service" Lecture and Award, designated for a "significant leader in public service" invited to speak at Harvard to inspire a "deeper engagement with critical social issues on campus and in the wider community"—notwithstanding that Awad had long been an open supporter of Hamas.  Awad most recently said that he was "happy to see" the people of Gaza "break the siege . . . on October 7," a statement the White House "condemn[ed]" as "shocking" and "antisemitic."

53.     On May 10, 2018, a swastika was discovered on a bulletin board at Harvard Public Health.  Harvard took no disciplinary action in response and, a few months later, on December 2, 2018, a man intentionally toppled the menorah at Harvard Chabad, a center of Jewish life and faith.  Harvard did not condemn or punish the perpetrator.

54.     In March 2019, the Harvard Undergraduate Council held a meeting to vote on whether to award University funding to Harvard PSC for its upcoming Israeli Apartheid Week.

During the meeting, Jewish students, in the words of Harvard Hillel's president, were met "with angry interjections and unfounded accusations, as well as references to age-old tropes of prejudice and bigotry," leaving her "shocked and disappointed by the way in which students were prevented from expressing their very real concerns." The council voted to award the funding to Harvard PSC through the Open Harvard College grant, even though such grants are designed to fund student initiatives on "mental health, race, culture, [] faith relations, . . . harassment prevention, social spaces, and financial accessibility." Harvard did not take disciplinary action against Harvard PSC, the council, or anyone who spewed antisemitism during the meeting, and it did not prevent the use of Harvard funds to support the antisemitic Israeli Apartheid Week.

55.      On April 2, 2019, during Israeli Apartheid Week, Harvard PSC hosted several speakers, including Boston College Professor Yamila Hussein, who declared that Zionism is a "white supremacist, European, patriarchal, heterosexist, you name it, movement . . . when you read Zionism, it is white supremacy," and Marc Lamont Hill, a former CNN commentator whom CNN fired for saying "from the river to the sea"—a genocidal call for the destruction of Israel and its Jewish inhabitants—and who is well known for his antisemitic views. Harvard allowed these influential speakers and audience members, on campus and at Harvard's expense, to spew unchecked antisemitic vitriol. A member of the audience went so far as to demand discussion of the antisemitic trope that European Jews are not "real Jews" but Turkic Khazars, a nomadic European tribe, and that the Holocaust is a "myth." Harvard took no disciplinary or remedial actions and did not condemn the event's antisemitism.

56.      In August 2020, Harvard PSC posted a graphic on Instagram calling Zionism, the belief in the right of Jews to self-determination in Israel, a "racist, sectarian, exclusionary,

21

Jewish-supremacist political ideology," using a phrase coined by Ku Klux Klan Grand Wizard David Duke.

57.     In May 2021, in response to a Jewish Israeli student's post in a WhatsApp group, a Harvard Law student, Shayaan A. Essa, messaged, "We shed your blood with stones."  A group of Jewish Israeli students reported the incident to Dean Jessica Soban, Deputy Dean I. Glenn Cohen, and Assistant Dean-appointee Catherine Peshkin.  In a meeting with the deans, the students explained how this violent threat left them "heartbroken and humiliated" and "no longer feel[ing] comfortable," and asked the deans to denounce Essa's call for violence.  The deans refused to do so, instead downplaying the message and telling the students to ignore or respond directly to such harassment.  Harvard chose to do the former, and Essa graduated without consequence.  Two of the Jewish Israeli students, who are still enrolled at Harvard Law, report that they feel unsafe and have trouble focusing as a result of Harvard's clearly unreasonable response to antisemitism, including Essa's conduct, and the increased anti-Jewish hostility on campus following Hamas's October 7 terrorist attack.  One such student told his young children not to speak Hebrew outside their home, out of fear they will be targeted by antisemitic Harvard community members.

58.     Also in May 2021, Harvard Hillel's building was vandalized twice.  Two masked individuals tied a Palestinian flag emblazoned with an anti-police slogan to Hillel's door, after which Hillel's windows were shattered.  While Harvard purports to have investigated these incidents, nothing came of it—no one was arrested or disciplined.

59.     In October 2021, the Harvard Law Program on Law & Society in the Muslim World and numerous Harvard student groups co-sponsored a pro-BDS event, "Law and Violence in Palestine," at which a speaker was Mohammed El-Kurd, who notoriously espouses antisemitic

views, has repeatedly and publicly announced his fantasy of murdering Jews, and claims that Israelis and Zionist Jews eat Palestinians' organs, a vile antisemitic blood libel.

60.     In December 2021, SAA Member #4, a Ph.D. student at Harvard, observed to Professor Bram Wispelwey that his winter semester course, The Settler Colonial Determinants of Health, in Harvard Public Health's Department of Global Health and Population, contained disturbing antisemitic topics and materials, including required readings propagating antisemitic claims and Hamas propaganda, by denying Jewish ethnic identity (which one reading calls an "invented transnational ethnic identity"), calling Jewish history a "mythology," denying Jewish indigeneity to Israel, and downplaying antisemitism and the Holocaust.  Wispelwey dishonestly dismissed these concerns in an emailed response, as "demonstrably false."  SAA Member #4 emailed Department Chair Marcia Castro to raise their concerns.  Castro, like Wispelwey, was dismissive of the student's concerns, but proposed a three-on-one meeting that would include Wispelwey and Professor Jackie Bhabha, who Castro said was leading the development of a new program on Palestine at Harvard's FXB Center for Health and Human Rights ("FXB Center"). SAA Member #4 made a formal complaint in Harvard's bias reporting system and sent their concerns to Dean for Education Erin Driver-Linn and Chief Diversity, Inclusion, and Belonging ("DIB") Officer Amarildo Barbosa.  The student met with Barbosa later that month and reported this and several other incidents of antisemitism on campus.

61.     Harvard took no steps to prevent Professor Wispelwey from promulgating antisemitism in his course or to otherwise discipline him, but instead recently promoted his course from a truncated winter-term course to a full-length spring-semester course, which, according to Harvard Public Health's website, entailed Harvard approving the course content. Following Hamas's October 7 terrorist attack, SAA Member #4 followed up with administrators,

providing resources to explain the bias in Wispelwey's course—as Chief DIB Officer Barbosa admitted that his office did not have sufficient expertise in understanding antisemitism.

62.     SAA Member #4 also raised concerns regarding Harvard's continued partnership with Birzeit University in the West Bank, which openly discriminates against Jews and promotes Hamas and its terrorism.  Among other things, Birzeit's buildings and events are named after convicted terrorists; military parades on campus feature students wearing mock explosive vests while waving Hamas flags; in May 2022, Hamas won the majority of Birzeit student government seats; and, two weeks before the October 7 massacre, eight students were arrested with weapons and plans to carry out a terrorist attack.  Rather than end its affiliation with this antisemitic, terrorism-supporting university, Harvard touts its Birzeit partnership.  In fact, since October 7, Harvard's FXB Center co-sponsored a webinar with Birzeit on December 11, Harvard's Center for Middle Eastern Studies and the Birzeit University Museum have organized at least fourteen "teach-in" sessions to put "Gaza in context"—which include discussions on "Israel's onslaught against Palestinians"—and the FXB Center recently opened applications for its Summer 2024 Palestine Social Medicine course at Birzeit.

63.     Harvard Out of Palestine ("HOOP"), another student group, led a relentless campaign against retired Israeli Major General Amos Yadlin, a senior fellow at Harvard Kennedy School of Government ("Harvard Kennedy").  For example, on February 1, 2022, HOOP organized a disruptive rally outside Yadlin's first study group of the semester.  As HOOP posted on its Instagram page, the harassment "continue[d] despite [the study group's] efforts to change rooms every week."  HOOP also shared a video that showed its members standing in two parallel rows just outside the open door of Yadlin's classroom, holding large banners and flags,

so that anyone entering or exiting would be forced to walk through the gauntlet.  The video also depicts protesters chanting and disrupting Yadlin's discussion with students in the classroom.

64.     On April 7, 2022, HOOP marched through campus, including in and out of buildings, banging on drums and using a megaphone to shout further accusations at Yadlin, charging him with personal responsibility for alleged "genocide."  Throughout the semester, Harvard did nothing to prevent HOOP from severely and pervasively harassing Yadlin and his students, notwithstanding, among other policies, Harvard's Statement on Rights and Responsibilities proscribing such conduct as "unacceptable" violations of Harvard policy.

65.     The April 2022 Israeli Apartheid Week included a display in Harvard Yard, which read: "ZIONISM IS RACISM SETTLER COLONIALISM WHITE SUPREMACY APARTHEID."  Harvard did nothing in response to these inflammatory antisemitic tropes. Similarly, when a swastika was once again found shortly after Israeli Apartheid Week—this time in the undergraduate residence Currier House—Harvard failed to publicly condemn it outside of a statement to the Currier House community or take any other steps.

66.     That same year, Harvard PSC members placed stickers on Sabra hummus (a common target for BDS) throughout Harvard's dining halls, which accused Israel of being an apartheid state and murdering Palestinians.  Rather than discipline the perpetrators, Harvard pulled Sabra products from the dining halls.  Later, when questioned at the December 5, 2023 hearing before the House Committee on Education and the Workforce, titled "Holding Campus Leaders Accountable and Confronting Antisemitism" (the "House Antisemitism Hearing"), then-Harvard President Claudine Gay refused to say whether the stickers violated Harvard's policies or to explain Sabra's disappearance from the dining halls.

67.     In August 2022, Harvard PSC members disrupted Harvard's convocation—a ceremony for incoming students that is supposed to "provide[] an understanding of the values, history, and traditions" at Harvard and help new students "develop a sense of belonging and class unity [through] inspirational messages from a current student leader and University officials"— by chanting and displaying a banner that read: "Veritas?  Here's the Real Truth: Harvard Supports Israeli Apartheid."  Harvard later shared on social media images from the convocation that prominently displayed the banner.

68.     In October 2022, Harvard PSC and other student groups brought El-Kurd back to speak on campus.  Kestenbaum, who was present for the event, wrote in a February 2023 article published on *Aish* about his shock and dismay that "El-Kurd's casual comparisons between the State of Israel and Nazi Germany," and his insistence that "Jews have begun 'internalizing the ways of the Nazis,'" did not preclude his appearance on campus.

69.     In spring 2023, Harvard PSC carried out its annual boycott campaign against Israel Trek—a ten-day trip to Israel sponsored by Harvard Hillel designed for non-Jewish students to learn more about Israeli history and culture and speak with high-ranking Israeli and Palestinian officials—during which participants and prospective participants are harassed and intimidated, with no response by Harvard.

70.     Harvard PSC organized another protest at the September 4, 2023 convocation, at which one of its members—who on October 7 would justify that day's massacre by saying the "oppressed have the right to resist"—interrupted Dean Rakesh Khurana mid-speech, shouting: "Here's the real truth: Harvard supports, upholds, and invests in Israeli apartheid, and the oppression of Palestinians."  Harvard did not discipline that or any other protester; instead, the

student who interrupted Dean Khurana was later selected as a Rhodes Scholar, after receiving Harvard's endorsement.

71.     At the 2023 convocation, which Kestenbaum attended, where protesters encircled the seated freshman class and screamed "boycott Israel," "stop supporting genocide," and "boycott Israel Trek," among other things.  Harvard did not make any attempt to stop the protesters, who interrupted multiple speakers in addition to Dean Khurana.  Kestenbaum's friend, a Jewish freshman who wears a kippah, got up and left the convocation, telling Kestenbaum he was extremely uncomfortable with his introduction to Harvard.

72.     On September 21, 2023, Harvard Divinity invited former Palestine Liberation Organization spokeswoman Diana Buttu to speak in Harvard Divinity's main building at a screening of *Israelism*, a film that argues American Jews raise their children with pro-Israel indoctrination.  Buttu claimed that Jews are trained to mistreat Palestinians, a behavior she said they learned facing Nazi extermination at Auschwitz.  Antisemitic tropes displayed during that screening drew applause rather than denunciation.  Kestenbaum, who attended the screening along with Harvard Divinity Interim Dean David Holland and nearly all of Harvard Divinity's Religion and Public Life Department faculty, was caused to have anxiety and gross discomfort as a result of that Harvard-sponsored antisemitic event.

73.     The increasing antisemitism over the last decade has coincided with a dramatic decrease in Harvard's Jewish student population—from, in 2013, approximately twenty-five percent of the undergraduate student body, to, in 2023, less than ten percent—a drop of nearly sixty percent in a single decade that could only evince a deliberate effort by Harvard to minimize its Jewish student population.

ii.  **Harvard Refuses to Discipline a Professor Who Intentionally Discriminated Against Jewish Students**

74.     In March 2023, as confirmed by an independent investigation Harvard itself commissioned, Harvard Kennedy Professor Marshall Ganz—who has long railed against what he calls the "Israeli regime," "Jewish supremacy in Israel," and Israeli "apartheid"—intentionally discriminated against three Jewish Israeli students enrolled in his Organizing: People, Power, Change course, the goal of which was for "students [to] learn to work as leadership teams to reach out to constituents to design an organizing campaign."

75.     For their organizing campaign class project, the three students examined ways "to harness and unite a majority of diverse and moderate Israelis to strengthen Israel's liberal and Jewish democracy."  Professor Ganz first pressured the students to change their project description so that it did not refer to Israel as a "liberal Jewish democracy," then told them to remove the word "Jewish" because, when used in connection with "Israel," it "creates an unsafe space" akin to describing the United States as led by "white supremacy," and ultimately prohibited them from using the phrase "liberal Jewish democracy" because, he said, the phrase is "highly controversial," "disrupt[s] the learning environment," and is "deeply offensive" to certain students.  Ganz threatened the students with academic consequences when they defended themselves and their project.  In retaliation for the students' refusal to capitulate to his intimidation, Ganz made the topic for the last day of class "Palestinian solidarity"—even though no student's project involved Palestine—and Ganz refused to let the Jewish students speak that day, rebuffing them for having "caused enough problems already."

76.     In response to a letter from the Brandeis Center asserting that Harvard violated Title VI based on Professor Ganz's conduct, Harvard initiated an investigation led by the law firm Kurker Paget.  Kurker Paget issued its findings in June 2023, concluding that Ganz violated

Harvard's Statement on Rights and Responsibility and finding that he: subjected the students to anti-Israel and antisemitic bias and discrimination on the basis of their identities as Jewish Israelis; silenced the students' speech; treated them differently and denigrated them on the basis of their Israeli national origin and Jewish ethnicity and ancestry; prioritized others' concerns over theirs; and interfered with their ability to participate in and benefit from an educational program.

77.     On June 15, 2023, Harvard Kennedy Dean Douglas W. Elmendorf accepted Kurker Paget's "findings of fact and conclusions regarding [Professor Ganz's] violations of School policies," and acknowledged that Harvard "need[s] to ensure that the School fulfills the[] commitments [in the Statement of Rights and Responsibilities] and that the violations of policies that occurred this spring are addressed fully and do not recur."  Dean Elmendorf stated that he was "convening a small group of faculty members at the School to advise" him, and he "expect[ed] that this process of consultation will take only a few weeks, and then I will decide how to proceed."  But after more than four months of Harvard's silence and failure to discipline Ganz, the Brandeis Center sent another letter on October 30, 2023, demanding immediate action. Kestenbaum and other Jewish students saw Harvard's failure to act—even after its own investigator confirmed Ganz's Title VI violations—as more evidence of Harvard's hostility towards Jewish students.

**D.     Harvard's Deliberate Indifference to Antisemitism Has Continued Despite Intense Anti-Jewish Harassment Following Hamas's Massacre**

78.     Harvard's deliberate indifference and clearly unreasonable response to anti-Jewish harassment, and its discriminatory application of its policies to exclude Jewish students from their protections, has created an environment in which antisemitic activity has flourished

and, following Hamas's October 7 massacre, has enabled yet another intolerable wave of antisemitic abuse on campus.

### i.   October 7, 2023: Hamas Terrorists Commit Horrific Atrocities Against Innocent Civilians in Israel

79.     On October 7, 2023, Hamas launched an unprovoked surprise attack on Israel, engaging in depraved acts of murder, torture, rape, violence, and kidnapping against Israeli citizens.  Thousands of armed terrorists invaded southern Israel, while others launched thousands of rockets toward Israeli civilians.  Once inside Israel, the terrorists, acting as well-armed death squads, dispersed into Israeli towns shooting, raping, torturing, burning, and mutilating unarmed civilians, including infants, children, and the elderly, taking hundreds of hostages and engaging in mass murder and rape at a music festival near Gaza's border with Israel.  The Israel Defense Forces ("IDF") eventually repelled the terrorists and regained control over the affected area.  By that time, Hamas had killed 1,200 people and abducted over 200 more.  October 7 was the single deadliest day for Jews since the Holocaust.  Since then, senior Hamas officials have hailed the slaughter and vowed that October 7 was "just the first time, and there will be a second, a third, a fourth," promising another "October 7, October 10, October one-millionth" until the complete annihilation of Israel.

80.     Shockingly, numerous students and faculty members at Harvard celebrate, justify, and excuse Hamas's mass rape, murder, and kidnapping.  Many have resorted to harassment and even violence against Jewish students in support of Hamas's attack and in condemnation of Israel's defensive response.  Harvard faculty members publicly support these students and oppose even the smallest measures to combat Harvard's antisemitism.  These faculty members and students falsely accuse the "Israeli regime" of: committing "genocide" and "ethnic cleansing" (even though the Arab population of Gaza has more than quadrupled since 1967);

creating an "open-air prison" in Gaza (even though Israel completely removed itself in 2005 from Gaza, which also shares a border with Egypt); and "apartheid" (even though all citizens in Israel enjoy equal rights).  Further evidencing the antisemitic nature of their activities, these students and the faculty members who support them do not condemn, let alone rally against, such countries as Syria and Yemen, which have killed hundreds of thousands of Arab civilians, and Pakistan, which is now expelling almost two million Afghan Muslims, or China, which has imprisoned its Muslims in reeducation camps, or Somalia and Nigeria, where Christians are regularly murdered.

### ii.  Harvard Fails to Respond to the October 7 Atrocities, While Student Groups and Faculty Members Praise Hamas

81.     In the immediate aftermath of Hamas's October 7 massacre, Harvard failed to make a public statement about the greatest loss of Jewish life since the Holocaust.  Instead, Harvard allowed the massacre to fuel anti-Jewish discrimination and harassment, as students and faculty members were permitted to justify and celebrate the slaughter.

82.     Since October 7, student organizations including Harvard PSC, Harvard Afro, Harvard Graduate Students for Palestine ("Harvard GS4P"), Harvard Divinity's Jews for Liberation, and Harvard BDS, among others, have led near-daily antisemitic protests, disruptions, and harassment campaigns, regularly calling for violence against Jews at campus events and on social media, employing genocidal chants to advocate "globaliz[ing] the Intifada," and eradicating Israel and its Jewish inhabitants "from the river to the sea."

83.     On October 8, 2023, the day after Hamas's attack, a coalition of more than thirty Harvard student groups calling themselves the Harvard Palestine Solidarity Groups, which includes Harvard PSC, Harvard GS4P, Harvard Divinity SJP, and Harvard Afro, among others, signed a statement, organized by Harvard PSC and publicized on its Instagram, blaming Israel

for Hamas's massacre: "We, the undersigned student organizations, hold the Israeli regime entirely responsible for all unfolding violence. . . . The apartheid regime is the only one to blame."

84.    Rather than suspend the student groups—a sanction provided for in many of the policies these groups violated and continue to violate—Harvard remained silent.  Harvard's abject failure to address the student organizations' antisemitic statement quickly drew public criticism, including from former Harvard President Lawrence Summers, who posted the following on Twitter on October 9:

> In nearly 50 years of @Harvard affiliation, I have never been as disillusioned and alienated as I am today. The silence from Harvard's leadership, so far, coupled with a vocal and widely reported student groups' statement blaming Israel solely, has allowed Harvard to appear at best neutral towards acts of terror against the Jewish state of Israel.

85.    On October 9, Harvard finally broke its silence on Hamas's attack, issuing a public statement containing platitudes but avoiding any condemnation of Hamas or of the antisemitic statement signed by the Harvard student organizations, any expression of solidarity with Jewish students, or any acknowledgment of the antisemitism on campus.  Compare Harvard's statement to that made by the president of the University of Florida following October 7:

> I will not tiptoe around this simple fact: What Hamas did is evil and there is no defense for terrorism. This shouldn't be hard. Sadly, too many people in elite academia have been so weakened by their moral confusion that, when they see videos of raped women, hear of a beheaded baby, or learn of a grandmother murdered in her home, the first reaction of some is to "provide context" and try to blame the raped women, beheaded baby, or the murdered grandmother. In other grotesque cases, they express simple support for the terrorists. This thinking isn't just wrong, it's sickening. It's dehumanizing. It is beneath people called to educate our next generation of Americans.

86.     Later on October 9, SAA Member #2 emailed President Gay and Harvard Law Dean John F. Manning, imploring them to condemn Hamas and release a "comprehensive statement calling out what is happening in Israel," explaining that she and other students "don't just want your support and understanding. . . .  Our friends and families are getting murdered, raped, and kidnapped.  We request that you condemn the murder and abominable crimes perpetuated by Hamas."  SAA Member #2 offered to meet with Harvard's leaders to explain her concerns in person, but received no response.  President Gay waited a week before replying by suggesting that SAA Member #2 could go to Harvard's Counseling and Mental Health Service ("CAMHS").  Dean Manning did not respond.

87.     As Professor Summers stated in his October 10 response to Harvard's October 9 statement, "[t]he delayed @Harvard leadership statement fails to meet the needs of the moment," and Harvard should have given "reassurance" to "frightened students" that it "stands squarely against Hamas terror . . . when 35 groups of their fellow students appear to be blaming all the violence on Israel."

88.     On October 10, President Gay issued another statement called "Our Choices," in which she finally "condemn[ed] the terrorist atrocities perpetuated by Hamas," but failed to condemn the students' reprehensible October 8 statement, noting only that they did not speak for Harvard or its leadership but affirming that they "have the right to speak for themselves."  Under intense criticism, President Gay later attempted to defend her failure to denounce the students: "Had I known that the statement issued by the students would have been wrongly attributed to the University, I would have spoken sooner about it."  But President Gay missed the point—the problem is not that some thought that Harvard itself sent the student statement, but rather that

Harvard failed to condemn it or take any other actions to prevent the statement from further contributing to the hostile antisemitic environment on campus.

89. On October 10 and 11, a billboard truck drove around Harvard displaying the identities of students affiliated with the groups that signed the October 8 statement. On October 24, Dean of Students Thomas Dunne emailed these students to inform them of the steps Harvard was taking to protect them from being publicly identified, including the formation of a task force—to protect the students who had publicly issued a shocking, widely condemned pro-Hamas antisemitic statement—the first step that Harvard took in response to the campus environment following October 7. Dean Dunne referred to the public identification of these students as a "repugnant assault on our community," a harsher condemnation than Harvard issued against Hamas's massacre. Harvard then removed student groups, like Harvard PSC, from Harvard's online student organization directory to protect their members from being further identified and rebuked for their antisemitic statement. Harvard PSC is still a Harvard-recognized organization.

90. On October 11, the leadership of Harvard Divinity's Religion and Public Life Department sent a statement to Harvard Divinity's student body on the "Current Spate of Violence in Palestine/Israel," signed by its associate dean, Associate Director of the Religion, Conflict, and Peace Initiative Hillary Rantisi, and Professor Atalia Omer, among others, and itself rife with antisemitic historical distortion.

91. SAA Member #2, whose mother was in Israel on October 7 and whose cousins serve in the IDF, returned to classes on October 11. She was distraught during her first class, unable to pay attention following the initial response at Harvard to the massacre. Her second class was equally difficult, as news broke that Hamas was flying drones into central Israel while

she was unable to reach anyone in her family.  After class, she was accosted by a student who—rather than expressing sympathy—told her Israel should respond leniently to Hamas's attack. SAA Member #2 left school later that week.

92.     On October 13, a group of members of Congress who are Harvard alumni wrote a letter to President Gay to express their "outrage and profound disappointment over the statement made by" the Harvard student groups that "blame[d] Israel for the Hamas terrorist attacks brutally carried out against Israeli civilians."  The letter demanded, among other things, that President Gay "immediately condemn" the "abhorrent" and "heinous" statement justifying Hamas's barbaric behavior; "investigate the origins" of the "unified hate and ignorance" among students who "have such a deep hatred for Israel that they have chosen to ignore reality, celebrate ruthless terrorists, and blame innocent civilians"; and publicly clarify that Harvard "strongly opposes this dangerous antisemitism."

### iii.     Harvard Permits Increasingly Aggressive Student-Led Disruptions Targeting Jews on Campus

93.     Harvard's repeated failure to appropriately condemn or take significant steps to ameliorate antisemitism on campus has emboldened students to engage in increasingly aggressive antisemitic protests, intensifying the hostile environment Jewish students are forced to endure.

94.     On October 14, 2023, Harvard PSC and Harvard GS4P organized an "emergency rally" at Harvard's flagship Widener Library to denounce Israel.  Hundreds of students gathered on Widener's steps to block the entire length of the building while holding signs accusing Israel of "apartheid" and "genocide," and engaging in nonstop anti-Zionist chants.  Although the organizers advertised the rally as "open to all," protesters forced a photojournalist to flee after they surrounded and pushed him.

95.     On October 16, students chalked antisemitic writings at the entrance to Harvard Law, using phrases such as "from the river to the sea" and "divest from Israeli apartheid." Notwithstanding requests to administrators, no action was taken.  Soon thereafter, "free Palestine" was painted outside Harvard Chabad.  It remains to this day.

96.     On October 18, Harvard PSC and Harvard GS4P organized a "die-in" and protest (the "Die-In") at Harvard Business School ("Harvard Business"), heavily promoted on social media as a "demand [to] end [an] ongoing genocide," with organizers repeating Hamas falsehoods that Israel bombed al-Ahli Hospital in Gaza.  After seeing this announcement in a WhatsApp group chat called "Protests around Harvard," Kestenbaum replied to the chat, asking whether the groups would still host the event even though the report blaming Israel for the hospital bombing had been proven false.  Students responded by calling Kestenbaum despicable and accused him of spreading Israeli propaganda.  Hundreds of Die-In protesters marched from outside President Gay's office to Harvard Business, where they lay on the ground playing dead while raising "from the river to the sea" signs and chanting "free, free Palestine" and other slogans.

97.     The Die-In protesters also harassed and physically assaulted Jewish students.  A video that went viral on social media shows a group of students swarming a Jewish Israeli Harvard Business student, holding their keffiyehs open to surround and physically restrain him while screaming, "shame!" over and over again.  Ibrahim Bharmal, a Harvard Law Review editor and a Civil Procedure teaching fellow, and Elom Tettey-Tamaklo, a Harvard Divinity student and residential proctor, were among the assailants and are under FBI scrutiny for their assault.  Harvard has not imposed any discipline on Bharmal and has done nothing to sanction Tettey-Tamaklo other than relieving him of his proctor responsibilities.

98.     On October 19, Harvard PSC and Harvard GS4P recruited hundreds of protesters to march through campus, invading the Science Center, Harvard Law's Caspersen Student Center and Wasserstein Hall buildings, the Harvard Kennedy courtyard, and Harvard Square, using noisemakers, drumsticks, buckets, and megaphones to chant "from the river to the sea," accuse Israel of "genocide," and demand that Harvard "divest[] from Israeli apartheid that is funding genocide in Gaza."  The mob disrupted multiple classes, leading Jewish students to flee for their safety, with some removing identifying garb to avoid attack.  Harvard failed to take steps to prevent the disruptions.

99.     During this upheaval, SAA Member #1, SAA Member #2, SAA Member #3, and SAA Member #5 were in a study room on the first floor of Harvard Law's main building, attending a small discussion session with a former assistant to the president during the Trump administration, Jason Greenblatt.  At the session, the students heard drumming outside the study room and found a mob at the entrance to Harvard Law with a giant banner reading "Stop the Genocide in Gaza."  SAA Member #2 watched as HUPD officers observed, but took no action against, the hundreds of protesters, including non-HUID cardholders, who were bypassing card scanners and infiltrating the building.  The group stormed Harvard Law's main building, marched down the length of the building's primary first-floor hallway, and blocked the hallway outside the study room where the SAA members and Greenblatt were hiding.  Fearing a violent attack, students in the study room removed indicia of their Jewishness, such as kippot, or hid under desks.

100.     Jewish students, including SAA Member #1 and SAA Member #2, immediately went to the Dean of Students and Community Engagement, Equity, and Belonging ("CEEB") offices, only to find the offices locked with staffers already safely inside.  One staffer ultimately

came to the door to tell the Jewish students to wait in another room until the administrators were ready to meet.  Eventually, Dean of Students Stephen L. Ball and Assistant Dean for CEEB Monica Monroe met with the students for thirty seconds and, without giving them any opportunity to speak, stated that they were "sorry" and that they would look into the incursion. SAA Member #2 was shocked that Harvard had effectively surrendered its campus to the mob. SAA Member #1 had to miss his class later that day and, concerned for his safety, stopped regularly attending his classes.  Kestenbaum encountered the roving mob as he was leaving his class at Harvard Kennedy.  The mob, having moved on from Harvard Law, now blocked the exit to the Harvard Kennedy building and shouted, at anyone trying to leave, "from the river to the sea" and other chants calling for the destruction of Israel and genocide of Jews.  Kestenbaum was shaken by this experience, which has made him fear for his safety on campus.

101.    SAA Member #2 emailed Assistant Director of Student Life Jeffrey Sierra after the mob stormed Harvard Law to describe what happened.  In two previous meetings with Sierra, she had asked him what could be done to stop the rampant antisemitism on campus and explained its impact on her.  In both of these meetings, and in response to her email regarding the October 19 incursion, Sierra directed SAA Member #2 to CAMHS for mental health services and, on several occasions, said he was "not in a position to do more."  When SAA Member #2 asked whom she could contact instead, Sierra said he would speak with more senior administrators, but SAA Member #2 never heard from anyone else about her concerns.

102.    After Harvard's failure to respond to their October 19 anti-Jewish harassment and incursion, Harvard PSC and Harvard GS4P organized a similar disruption on October 20, which they called a "global strike for Palestine," complete with a classroom walkout and protest.

103.    On October 27, during Family Weekend—when students' families visit campus—Harvard PSC and Harvard GS4P held another die-in and protest starting outside Harvard Law's library, advertising the protest as "[o]pen to non-HUID Holders."  Protesters lay on the ground at the library's entrance with "Boycott Divest Sanction" and "Harvard must recognize Genocide" signs, while chanting "from the river to the sea" and "hey hey, ho ho, the occupation has got to go."  In advance of the protest, SAA Member #1 had sent an email to several Harvard Law administrators, including Dean Ball, Dean Manning, and Dean Monroe, attaching the student groups' fliers advertising the protest and requesting that the administrators prevent non-HUID holders from attending, and stating: "Please protect us."  None of them responded.  SAA Member #2 left campus immediately after her last class of the day, taking a ride-share service home because she did not feel safe walking through the protest to access her usual train.

104.    These mass disturbances violated numerous Harvard policies, but Harvard has taken no action to prevent them—even when students, citing specific policy language and providing photographic evidence, warned administrators, including President Gay, Provost (and now-Interim President) Garber, Dean Manning, Dean Ball, Dean Soban, and Dean Monroe, of impending antisemitic disturbances.

105.    On October 27, President Gay attended a Harvard Hillel Shabbat dinner where she finally acknowledged that there had been a "surge in anti-Jewish incidents and rhetoric across the nation—and on our own campus," that she had "heard story after story of Jewish students feeling increasingly uneasy or even threatened on campus," and that "antisemitism has a very long and shameful history at Harvard," which "has done too little to confront its continuing presence."  Although President Gay promised that this indifference would continue "[n]o longer," Harvard has done nothing nearly sufficient to rectify its hostile environment.

106.    Three days later, on October 30, Harvard PSC and Harvard GS4P, in violation of Harvard's clear policies, began a semester-long takeover of Harvard Law's main common lounge in Caspersen Student Center, during which students orchestrated incessant antisemitic agitation and anti-Israel protests and accosted Jewish students.  Harvard ignored the pleas and concerns of Jewish students, including SAA Member #1 and SAA Member #2, who are visibly Jewish based on their religious clothing and who have been regularly stopped and targeted in the lounge.  Students like SAA Member #2 and SAA Member #5 have stopped using Caspersen lounge as a study space to avoid being harassed because they are Jewish.

107.    On October 31, SAA Member #3 was stunned to see Bharmal among the Caspersen lounge protesters, after he had assaulted a Jewish student at the October 18 Die-In, and to hear that he was unrepentant about doing so.  SAA Member #3 ran to a bathroom and cried, shaken at Bharmal's lack of remorse, the sense of danger she felt from him, and Harvard's permitting Bharmal to not only remain on campus, but to continue to participate in activities that violate Harvard's policies.  She tried to compose herself and attend her Civil Procedure class but was unable to stay more than a few minutes.

108.    The takeover of Caspersen lounge drew no Harvard intervention, for at least two weeks.  Only on November 15—when Jewish students asked Dean Ball, Dean Soban, Dean Monroe, and Title IX Program Officer Sasha Tulgan if they could also demonstrate in that same space—did Dean Ball send a Harvard Law-wide email advising that shared spaces like Caspersen lounge are only for "personal or small group study and conversation."  On November 15, the protesters ignored three separate in-person requests by administrators— prompted by repeated complaints from Jewish students that the protesters were harassing them— to stop the protest.

109.     On November 16, the next day, protesters held an unauthorized event in Caspersen lounge during class time, called a "vigil for martyrs," with a printed program outlining demands and advertised in advance on social media.  SAA Member #1, two days earlier, had sent an email to Dean Ball and other Harvard Law administrators warning them about this planned disruption, noting that Harvard GS4P organizers again intended to bring outsiders to the school and stating that he "and other Jewish students feel unsafe and [these unauthorized events] are directly interfering with our ability to attend [class] and focus on our coursework."  Dean Ball attended the "vigil," but did nothing to disperse the crowd or discipline the instigators.  SAA Member #1, SAA Member #2, and others participated in a counter-protest that day, but their "bring them home" chants—referring to hostages held by Hamas—were drowned out by anti-Jewish protesters, who yelled, among other things, "glory to the martyrs."  After Harvard again failed to stop these antisemitic threats, SAA Member #1 emailed Title IX Program Officer Tulgan, telling her that "campus felt so unsafe today" and that "I used to hope that the administration will do better but today I lost all hope."

110.     The protesters' prohibited takeover of Caspersen lounge continued through the end of the semester, and the perpetrators have faced no discipline.  Organizers have said that they will continue the takeover in the spring semester.

111.     On November 3, 2023, the Harvard Jewish Alumni Alliance—formed in the wake of Harvard's clearly unreasonable response to October 7—sent Harvard a letter, signed by over 1,800 alumni, demanding immediate action to stop the incessant antisemitism and stating that they never imagined that they would "have to argue the point that terrorism against civilians demands immediate and unequivocal condemnation," or argue "for recognition of our own humanity."

112.     On or around November 5, fliers that SAA Member #5 had hung at Harvard Law,

advertising an event hosted by the student group Alliance for Israel, were ripped down.  The

group's members, including SAA Member #5, emailed Harvard Law Campus Safety

Coordinator Collin Keyes and HUPD Lieutenant Wilmon Chipman to request video footage of

the locations where the fliers had been posted.  Chipman stated that he would pass this request to

"command staff"; however, the students heard nothing for several weeks despite repeated follow

ups, until December 15, when Keyes informed SAA Member #5 that Harvard could not find the

posters in the footage.  SAA Member #5 followed up twice with more details to help Harvard

properly search for the posters, but Harvard has still failed to locate the relevant footage.

113.     Starting on November 8 and continuing through the next week, Kestenbaum put

up posters of Israeli children kidnapped by Hamas on a bulletin board in Harvard Divinity's

common area, all of which were ripped down.  Kestenbaum reported this vandalism to Harvard

Divinity leadership, including the chaplain, the assistant and associate deans for DIB, and the

director of student life, advising that he was discouraged from further using this dedicated public

space.  Harvard did nothing to address this blatant violation of its policies, instead telling

Kestenbaum that the administration would explore the issue next semester.

114.     Also on November 8, SAA Member #1 emailed several administrators, including

Dean Ball and Dean Soban, notifying them of a Harvard PSC and Harvard GS4P "day of

mourning" walkout event planned for November 9, the anniversary of Kristallnacht.  He noted

that the last time there was an organized walkout, hundreds of people, including outsiders,

stormed through the Harvard Law building.  He asked whether there was a "safe and secure

location on the Harvard Law Campus for Jewish students to go through in case any

demonstrators break in."  None of the administrators responded to SAA Member #1 concerning

any safety measures, and the event was ultimately postponed by the student groups.

115.    On November 9, President Gay finally addressed the assault on the Jewish

Harvard Business student that had occurred at the October 18 Die-In, revealing that Harvard

would not open an investigation but would instead permit those responsible to remain on

campus, pending the completion of "law enforcement's inquiry," when the University would

"address the incident through its student disciplinary procedures to determine if University

policies or codes of conduct have been violated and, if so, take appropriate action."  No such

completion, determination or action has yet been announced.

116.    After mounting pressure from students and alumni, President Gay issued a

statement on November 9 outlining what she called "concrete steps" for "combating

antisemitism" at Harvard, but offering only vague and unspecified plans to: examine

antisemitism and address its complex history, educate community members on antisemitism,

make students aware of how to report bias, ensure physical and psychological safety, have

community sessions with the diversity office, and look for external partnerships that would assist

with efforts.  Harvard has yet to concretely implement any of these actions.

117.    Also on November 9, Harvard PSC, noting that the "future of pro-Palestinian

activism at Harvard is safe," posted a video of students disrupting a faculty dinner, shouting

through a megaphone to "raise awareness" of what they called "genocide."  On November 13,

protesters chanted "globalize the Intifada"—that is mass murder and terrorism against all Jews—

across the Harvard undergraduate campus.  SAA Member #1 reported these violent chants to

Dean Manning, Dean Monroe, the newly formed Antisemitism Advisory Group, and others, who

did nothing other than thank SAA Member #1 for informing them.

118.     As Professor Summers stated in a November 15 *Washington Post* Op-ed titled

"The Cancer of Antisemitism is Spreading. Colleges Must Take the Right Stand": Harvard was

in "a moment of moral and mortal peril"; "Harvard . . . h[as] not been swift" in its response to

antisemitism, a "cancer—a lethal adversary best addressed as rapidly, thoughtfully and

aggressively as possible"; Harvard's "[d]ouble standards" are "unacceptable," and no honest

observer could say that its "responses to antisemitism have paralleled in vigor or volume the

responses to racism or other forms of prejudice"; and "singling out Israel with calls for its

annihilation is Jew hatred."

119.     The utter inadequacy and clear unreasonableness of Harvard's response to

antisemitism on campus was further exemplified on November 16 and 17 when, for twenty-four

hours, students took over University Hall, demanding that "Harvard administrators release a call

for a ceasefire in Gaza," announce that "antisemitism [is] not the same as anti-Zionism," and

"investigate Islamophobia and suppression of pro-Palestine speech on campus."  Rather than

eject or otherwise penalize those students, nine hours into the takeover, Dean Khurana and

Adams House Faculty Dean Salmaan Keshavjee brought the occupying students burritos and

candy.  After twelve hours, Dean Khurana gave them the chance to leave without disciplinary

action; when the students refused, he allowed them to remain overnight.  When questioned at the

House Antisemitism Hearing why the deans provided food to unlawful protesters and promised

them no consequences, President Gay evaded the question, stating, "where conduct violates our

policies . . . we have processes underway."

120.     On November 27, Harvard Afro and Harvard BDS held a rally in Harvard's

Science Center plaza, where students chanted "long live the Intifada," "globalize the Intifada,"

"from the river to the sea, Palestine will be free," and "we have them outnumbered," among other antisemitic slogans.

121.    The next day, on November 28, President Gay declined an invitation to attend a December 4 campus screening of a video of forty-three minutes of Hamas's October 7 atrocities, because she was to be out of town, and declined a Harvard alumnus's offer to provide her private transportation to enable her to attend.

122.    On November 29, Harvard PSC, Harvard BDS, and Harvard Afro again organized self-proclaimed "disruptive" mass walkouts from classes across campus, targeting major lecture halls to disrupt the largest number of students and took over the Science Center's classrooms and lobby, among other locations.  During their takeover of the Science Center lobby—conduct prohibited by Harvard's Statement of Rights and Responsibilities—protesters surrounded and intimidated Jewish students, using megaphones to shout genocidal antisemitic chants, including "globalize the Intifada," "long live the Intifada," "from the river to the sea," and, in Arabic, "water to water, Palestine will be Arab."

123.    The disruption, like many before it, was led by a student recognized by Jewish students as among the primary instigators of antisemitic abuse on campus, whose presence causes considerable fear and alarm among the Jewish students who live in the same dormitory, Adams House, which he has turned into a base of operations for anti-Jewish activism.  Adams House Faculty Dean Keshavjee—who supplied burritos and candy to the University Hall occupiers—has done nothing to ameliorate the situation.

124.    On December 3, 2023, Harvard BDS posted an Instagram story publicizing a speaking event featuring convicted terrorists and attempted murderers Marah Bakir and Shorouq Dwaiat—the former was sentenced to eight years in prison for her October 2015 attempted

murder of a police officer in Jerusalem, and the latter to sixteen years in prison for her premeditated stabbing of a Jewish man in the head and attempt to stab another in Jerusalem on October 7, 2015.  Both of these terrorists were among those Israel released in late November 2023 in exchange for innocent Israeli civilians captured on October 7 and held as hostages by Hamas.  Kestenbaum emailed the December Instagram post to President Gay, Interim Dean Holland, and the Antisemitism Advisory Group, stating that it "sends a clear, dangerous message to Jews on campus," and asking Harvard to suspend Harvard BDS leaders, "disavow anti-Jewish rhetoric, and protect Jewish students."  Harvard did not respond.

125.    On December 6, rather than prevent protesters from disrupting Harvard Divinity's Seasons of Light celebration that evening—a "beloved annual multireligious service" and Harvard Divinity's only annual event that includes a celebration of the Jewish faith—Harvard canceled it.  That same day, Harvard GS4P students took over Harvard Divinity's "Holiday Tea," interrupting the Harvard administrators, faculty, staff, and students who had gathered there by unfurling a large banner alleging "genocide in Gaza," yelling about a "Zionist genocidal campaign," shrieking "there can be no peace without justice," "free, free Palestine," and "shame!"  The Harvard administrators did nothing to stop the students.  Kestenbaum, who was present, emailed the Antisemitism Advisory Group to report this blatant violation of Harvard policy—which occurred after President Gay publicly declared that Harvard would discipline this type of violation—but has not received a response.

126.    Rather than take steps to protect Jewish students, Harvard has thus required that they limit or conceal their activities.  For example, as Harvard Chabad Rabbi Hirschy Zarchi revealed, Harvard requires that he remove the Chabad Hanukkah menorah from the campus at night so that it would not be vandalized.  Rather than ensuring the safety and success of the

Seasons of Light celebration and making it unequivocally clear that vandalizing the menorah was unacceptable and would be met with harsh punishment, Harvard addresses antisemitism by canceling events that include celebrations of Jewish culture and warning celebrants to hide Jewish symbols.

127.    At the same time Jewish students were being cautioned by Harvard to abandon or conceal their identity, students celebrating the October 7 massacre and advocating death to Israelis and Jews were free to do so on campus and over social media, not deterred or punished by Harvard in any way.  On December 10, 2023, during final exam week, Harvard PSC, Harvard BDS, and Harvard Afro oversaw a disruptive, aggressive, flag- and banner-waving takeover of Harvard's Widener Library, and then marched to Massachusetts Hall, where students chanted "from the river to the sea."  Kestenbaum had intended to study at Widener but abandoned his plan, as he was concerned that his religious clothing would make him a target for abuse or violence.  Harvard took no action to stop the Widener protest or discipline the students or organizations that participated in it

128.    On December 31, 2023, a student promoted in the Harvard Divinity student group chat a virtual event called "Purplewashing: Resisting Colonial Feminism Teach-In," which was to include as a speaker a Palestinian activist named Yaffa who, on October 7, defended on social media the massacre as a "Palestinian protest" against "our oppressors."  Kestenbaum responded to the student in the Harvard Divinity chat that Yaffa "called the largest massacre of Jews since the Holocaust a valid form of protest" and that he did not think "anyone would feel comfortable promoting an event if the keynote address was given by a person who cheered on the murder of any other minority group."  The student responded, "I'm comfortable promoting this event." That day, Kestenbaum reported this exchange and event to the Antisemitism Advisory Group

and President Gay, telling them it was "deeply concerning" and reminding them, "when I told you I don't feel safe at Harvard, it's precisely because of antisemitic students like this."  Harvard has not responded.

129.     After, as a result of plagiarism accusations, President Gay resigned on January 2, 2024, antisemitic messages were plastered all over Harvard's community group on the social media app Sidechat, which requires a Harvard email address to join.  Among the messages that students, including Kestenbaum, saw are: "stfu pedo lover!  all of you Zionists are the same. Killers and rapists of children!"; "Blondie pro-doxing, pro-genocide sophomore really thinks she is the shit for going on israeli media a couple days ago.  She looks just as dumb as her nose is crooked"; "Forgot the moment where yall made it clear that the 'nova massacre' [the music festival where Hamas murdered, tortured and raped young people on October 7] that our zionist classmates were using as propaganda was carried out by the IDF."; and "I . . . support Hamas as representatives of Palestinian frustration and Oct 7 as a moment of decolonization."  One student wrote a post to her classmates that said: "I'm begging you all to recognize the 'Jewish people are controlling everything' (and are the reason Gay resigned) narrative as an antisemitic conspiracy theory.  It is a common white supremacist argument against Jewish people."  In response, another student said, "It's not a theory if it's mostly true."  Kestenbaum reported these antisemitic messages to Harvard leadership via email on January 4, 2024, including Interim President Garber, Harvard's Office for Equity, Diversity, Inclusion, and Belonging ("OEDIB"), Harvard Divinity's DIB Office, and the Antisemitism Advisory Group, warning that "[f]or every minute that Harvard does not forcefully condemn the horrific antisemitism present within the student body, the more dangerous it gets for us on campus."

130.     Reflecting its deliberate indifference to the severe and pervasive hostile environment for Jewish students on campus, Harvard had actual knowledge of each of the above recent incidents of student-led antisemitic harassment, including through personal observation by administrators, student complaints and reports, and news articles, yet unreasonably failed to adequately and appropriately investigate and address a single one.

### iv.     Harvard's Acceptance of Antisemitic Discrimination and Harassment by Its Faculty and in Its Classrooms Adds to the Hostile Educational Environment

131.     Harvard's faculty and teaching fellows have joined, encouraged, and supported severe and pervasive harassment and marginalization of Jews at Harvard.  For example, rather than condemn the scores of disruptive student-led events alleged above, several professors have canceled class to encourage students to participate.  Harvard is fully aware of, yet has taken no action to prevent, these professors' and teaching fellows' discrimination against Jewish students, even though such conduct plainly violates Harvard's policies.

132.     On October 10, 2023, a Harvard Law Civil Procedure teaching fellow, Ibrahim Bharmal—the same Harvard Law Review editor who assaulted a Jewish student at the October 18 Die-In—sent an email to his students, comprising nearly one-third of the 561 first-year law students, calling for them to bring their "whole identities and ideologies" to class, and inviting them to that evening's Harvard PSC "vigil for all civilian lives lost and in solidarity with Palestine," with no mention of the slaughter and rape of Israelis three days earlier.  One of Bharmal's law students, SAA Member #1, immediately emailed the course professor, James Greiner, copying Dean Manning, Dean Ball, and the CEEB Office, asking Professor Greiner to respond to Bharmal's email, explaining that it was "deeply inappropriate" given Jewish students' pain and fear following October 7, and that Bharmal made him and other students feel even more afraid of antisemitism at Harvard, given Bharmal's official position at Harvard Law.  Three

weeks later, after Bharmal was recorded assaulting a Jewish student on October 18, Professor Greiner instead afforded Bharmal what is considered the honor of hosting a review session for his students, which SAA Member #1 and other Jewish classmates did not attend because they were afraid of him. SAA Member #1 asked administrators at the Dean of Students Office if Jewish students would have to be killed before Harvard deemed it appropriate to finally act to protect them. SAA Member #1 filed a formal complaint with the Dean of Students on October 12, met with Director Sierra about his complaint, and repeatedly followed up, imploring them to take action to stop the constant antisemitic protests and other hostile activities at Harvard Law, but contrary to its ostensible procedures, Harvard has not provided him with updates or taken any other action.

133.    At the time of this filing, Bharmal has faced no discipline for his assault—he is still a Harvard Law student, still on the Harvard Law Review, and still employed by Harvard as a teaching fellow.

134.    SAA Member #1 and other Jewish students have also been targeted by his Torts professor, Jon Hanson, who: on October 7, promoted a podcast inviting listeners to "learn more about Israeli apartheid + occupation," and defended the Hamas attack by claiming "people on the underside of power who resist state violence and occupation will always be called terrorists"; on October 17, said, "I'm honestly stunned by how openly bigoted both Israeli and American Zionists have been since October 7th"; on November 2, maligned Israeli Jews as "colonizers" who "blow[] up" babies; on December 9, asserted there was a "depopulation campaign" in Gaza; and on December 10, derided the December 5 House Antisemitism Hearing as a "master class in bad-faith culture war bullshit."

135.    On October 19—after taking a break because of the disruptive mob charging through the halls—Professor Hanson held a section event at which he shared his anti-Israel/Jewish views and told SAA Member #1 that he would not rule out discussing the Israel-Hamas conflict during Torts class.  At another meeting less than two weeks later, Hanson discouraged SAA Member #1 from escalating his complaint against Bharmal and advised that he supported the students who had recently taken over Caspersen lounge.  Professor Hanson also planned his final exam for the fall 2023 semester to require students to write about Israel and Gaza but changed it at the last minute—after the Registrar's Office intervened.

136.    On October 20, Professor Clio Takas emailed her students stating, "[a]s many of you know, [Harvard PSC] and [Harvard GS4P] are organizing a class walk-out and general strike . . . .  I have decided to cancel section today in solidarity."  Similarly, Harvard Public Health Professor Nancy Krieger accommodated students who wanted to participate in the October 20 global strike by permitting the vast majority of students to leave class to protest.  Krieger then excused the remaining seven (which included several Jewish students) and asked them to return along with the protesting students at noon.  As it turned out, Krieger and the protesting students returned to the classroom some forty minutes earlier than the professor had said class would resume and, in the absence of the Jewish students, Krieger resumed her lecture.

137.    On November 13, over 120 Harvard professors posted a public letter to President Gay, titled "Harvard Faculty Response to 'Combating Antisemitism'" framing Harvard's Antisemitism Advisory Group appointed by President Gay as an assault on academic freedom.  The signatories include Professor Diana L. Eck who, as alleged further below, had previously demanded an Indian professor's courses be canceled because of his "call[] for violence against" mosques; Professor Walter Johnson, the faculty advisor for Harvard PSC, who regularly

participates in disruptive student groups' activities; and Harvard Divinity Professors Rantisi and

Omer, who had previously signed the October 11 Religion and Public Life statement defending

Hamas's terrorist attack.  Reflecting Harvard's antisemitic environment, the faculty letter:

- States the professors were "profoundly dismayed" by President Gay's November 9 "Combating Antisemitism" message;

- Demands Harvard resist calls to suspend and/or decertify Harvard PSC, even though it has regularly engaged in activities that violate numerous Harvard policies and is a key instigator of campus antisemitism;

- Defends students' use of the antisemitic "from the river to the sea," as "complicated" and worthy of protection; and

- Omits any mention of the deliberate targeting of Jewish civilians for murder, rape, torture, and kidnapping or the intense discrimination, harassment, and violence Jewish students face on campus.

138.    SAA Member #4 emailed one signatory, Professor Jesse Bump, who had tweeted

in spring 2021 (during another Israel-Hamas conflict) that Zionists could not work in public

health, asking Bump whether he understood the implications of what he had signed and how it

would impact the Jewish and Israeli students required to take his courses.  Instead of responding,

Bump reported SAA Member #4 to Dean Driver-Linn and Department Chair Castro.  Driver-

Linn accused SAA Member #4 of failing to uphold Harvard's values by "extrapolating views and

assuming intent" concerning the statement Professor Bump signed.

139.    On November 14, Harvard's Center for Middle Eastern Studies hosted a

conversation, "The Ongoing Nakba," in the Science Center, which included Columbia University

Professor Rashid Khalidi who, on October 9, had blamed Jews for Hamas's attack and was a

Palestine Liberation Organization spokesperson in the 1970s and 1980s, when that group

regularly committed terrorist acts, such as the Lod Airport massacre in which twenty-six people

were killed, including seventeen Christian pilgrims from Puerto Rico.

140. On December 5, the same day President Gay testified before Congress, Harvard Faculty and Staff for Justice in Palestine ("Harvard FSJP") released a statement falsely characterizing the October 18 Die-In and related events as "peaceful," minimizing the assault on a Jewish student as not even a "scuffle." Despite video evidence to the contrary, the faculty members defended Tettey-Tamaklo and other Die-In assaulters' actions as "de-escalation tactics," even though, as the video shows, such actions clearly violated Harvard's policies to protect "freedom from personal force and violence, and freedom of movement." Harvard FSJP even went so far as to assert that Harvard should not have cooperated with the FBI's investigation of the assault, and demanded that Harvard "establish an investigative committee on anti-Palestinian racism," even while many of these same faculty members, in their November 13 statement, had criticized President Gay's announcement of the Antisemitism Advisory Group.

**v. President Gay's December 5 House Antisemitism Hearing Testimony Confirms Harvard's Deliberate Indifference to Its Hostile Anti-Jewish Environment**

141. On December 5, 2023, President Gay, along with the presidents of Massachusetts Institute of Technology ("MIT") and University of Pennsylvania ("Penn"), testified at the House Antisemitism Hearing.

142. At the hearing, President Gay's repeated refusal to acknowledge that calling for the genocide of the Jewish people on campus is against Harvard policy shocked people across the nation. Representative Elise Stefanik asked President Gay: "[D]oes calling for the genocide of Jews violate Harvard's rules of bullying and harassment?" President Gay responded, "it depends on the context." Representative Stefanik asked several more times whether calling for genocide of the Jewish people violates Harvard's policies, yet each time President Gay refused to give a definitive answer, offering falsely that "antisemitic rhetoric, when it crosses into conduct

that amounts to bullying, harassment, intimidation, that is actionable conduct, . . . we do take action."

143.     President Gay also testified that she understood the meaning of the phrases "globalize the Intifada" and "from the river to the sea," calling them "hateful speech [that is] personally abhorrent" to her, but not necessarily to Harvard.  Representative Stefanik asked President Gay about the multiple protests and rallies on Harvard's campus where students were permitted to engage in such chants as "there is only one solution, Intifada revolution" and "globalize the Intifada," without any repercussions.  President Gay admitted to hearing "that thoughtless, reckless and hateful language on our campus," and admitted "it is at odds with the values of Harvard," but refused to say such "hateful" incitements to violence were contrary to Harvard's policies.  Similarly, when asked if Harvard would want an "avowed Neo-Nazi" or someone who "has called for the elimination of the state of Israel" as part of the Harvard community, President Gay repeated that such a person is "not consistent with Harvard values" and admitted that such conduct is "antisemitism," but added, "we allow a wide berth for free expression."  Yet as alleged further below, Harvard only allows a wide berth for antisemitism, but not other forms of hateful "expression."

144.     Representative James Comer asked President Gay about Harvard's acceptance of funding from "sources that support Hamas or have links to terrorist organizations, like Qatar, Lebanon, and the Palestinian Authority."  President Gay testified that "Harvard has policies that govern the acceptance of gifts and contracts beginning with respecting federal law . . . then we go further and only accept gifts that align with our mission."  Apparently, it is consistent with Harvard's mission to accept gifts from Qatar, where, to name only a few outrages, same-sex activity is criminalized, and the government permits and utilizes indentured servants and exploits

migrant workers, thousands of whom died building the infrastructure for the 2022 FIFA World Cup.

145.    Watching the testimony, Kestenbaum was appalled that Harvard's president refused to say under oath that calling for the genocide of his people violated Harvard policy, and considered leaving Harvard because he felt he was in physical danger.

### vi.   The House Education Committee Announces a Full Investigation into Harvard's Antisemitism, and Public Backlash Against President Gay's Testimony Intensifies

146.    President Gay's December 5 testimony at the House Antisemitism Hearing caused enormous public backlash.  That night, Harvard Hillel President Jacob M. Miller and Campus Rabbi Getzel Davis wrote that "President Gay's failure to properly condemn this speech calls into question her ability to protect Jewish students on Harvard's campus," and that she "fail[ed] to reassure us that the University is seriously concerned about the antisemitic rhetoric pervasive on campus."

147.    On December 7, Rabbi David Wolpe, rabbinic fellow for the Anti-Defamation League and visiting scholar at Harvard Divinity, resigned from Harvard's Antisemitism Advisory Group, stating:

> Without rehashing all of the obvious reasons that have been endlessly adumbrated online, and with great respect for the members of the committee, the short explanation is that both events on campus and the painfully inadequate testimony reinforced the idea that I cannot make the sort of difference I had hoped.
>
> However, the system at Harvard along with the ideology that grips far too many of the students and faculty, the ideology that works only along axes of oppression and places Jews as oppressors and therefore intrinsically evil, is itself evil.  Ignoring Jewish suffering is evil. Belittling or denying the Jewish experience, including unspeakable atrocities, is a vast and continuing catastrophe. Denying Israel [] self-determination as a Jewish nation accorded unthinkingly to others is endemic, and evil.

That same day, Rabbi Wolpe explained on CNN: "I resigned because I came to the conclusion that I was not going to be able to make the kind of changes that I thought Harvard needed" through the Antisemitism Advisory Group, which he described as having "accountability without authority."  On December 20, Rabbi Wolpe stated that Jewish students are the target of a "deliberate attempt" at intimidation, and that Harvard has "no sense of urgency, no sense of anger, no sense of disgust" regarding the "crisis" of "so many incidents of antisemitism" on campus.  During a December 22 podcast, he stated that he could not keep giving "legitimacy to an enterprise" that was "fruitless," as the committee was not going to "make a change," while Harvard's antisemitism "crisis" was "getting worse, not better."

148.    Rabbi Wolpe was not the only member of the Antisemitism Advisory Group to express grave concerns about the extent to which it can effect meaningful change.  Another member, former visiting lecturer of Jewish Studies at Harvard, Dara Horn, said:

> [T]he reality is that the things on my list of asks are very large things that will not make them popular and will make half the faculty and students enraged.  It will require firing a lot of people. Right now they have open Hamas apologists on the faculty. . . . Harvard is actively teaching the antisemitism it claims it wants to fight.  There are entire Harvard courses and programs and events that are premised on antisemitic lies. . . . They would have to get rid of that. And get rid of a lot of other things . . . . [E]veryone will hate them and call them evil racist colonizers if they actually do what would be required for real change. So I don't think they will do it.

149.    On December 8, seventy-four members of Congress wrote to the boards of Harvard, MIT, and Penn, demanding that they remove their presidents from office over their failures to act against antisemitism.  The letter noted that "[a]ntisemitism has been allowed to fester on campuses for years, and in the wake of the October 7th attack, the world is witnessing the consequences."  It also cited President Gay's testimony as "show[ing] a complete absence of moral clarity and illuminat[ing] the problematic double standards and dehumanization of the

Jewish communit[y] that [President Gay] enabled."  Moreover, the letter recognized that Jewish and Israeli students do not feel safe at Harvard: "It is hard to imagine any Jewish or Israeli student, faculty, or staff feeling safe when [President Gay] could not say that calls for the genocide of Jews would have clear consequences on [Harvard's] campus."

150.    On December 12, Harvard's governing body issued a "unanimous" statement "reaffirm[ing] [its] support for President Gay's continued leadership of Harvard University" because of its "confidence that President Gay is the right leader to help our community heal and to address the very serious societal issues we are facing."

151.    Despite its unwavering confidence in President Gay, Harvard's governing body admitted that her "initial statement should have been an immediate, direct, and unequivocal condemnation" of Hamas.  Moreover, it promised that it is "united in [its] strong belief that calls for violence against our students and disruptions of the classroom experience will not be tolerated."  Yet calls for violence against Harvard's Jewish and Israeli students are amplified across campus on a regular basis, and those responsible frequently disrupt classes and other educational programming without repercussion.

152.    Despite having Harvard's governing body's full support regarding her clearly deficient response to antisemitism on campus, President Gay ultimately resigned on January 2, 2024, once allegations that she plagiarized academic papers surfaced.  Harvard's email announcing President Gay's resignation condemned attacks against President Gay "in the strongest possible terms," even though it has not used similar language to condemn the antisemitism plaguing campus.

**E.    Harvard's Double Standard Towards Addressing Antisemitism**

153.    Harvard's deliberate indifference in response to antisemitism stands in stark contrast to its swift and decisive actions to address bias-related incidents when the victims are

not Jewish.  This discriminatory double standard has created and exacerbated the discrimination

and harassment that Kestenbaum, SAA's Jewish student members, and other Jewish students are

forced to endure at Harvard.  Such deliberate indifference is demonstrated by Harvard's choice

to not address anti-Jewish harassment on campus—on the ground that Harvard values open

expression above all else—even though Harvard moves decisively to address discrimination,

harassment, and bigotry when perpetrated against non-Jewish groups.  Harvard's double standard

is reflected in, among other things, its: selective application of free expression principles, official

statements and programs addressing bias or important social issues, disciplinary actions against

faculty, and disciplinary actions against students and student groups.

i.  **Harvard Only Embraces Free Expression Principles When It Can Use Them to Protect and Permit Antisemitic Harassment**

154.    At the heart of Harvard's double standard is its discriminatory application of free

expression and other principles.  Harvard's campus is a safe space for students of all protected

minority groups other than Jews.

155.    Harvard's invocation of free expression principles to justify permitting antisemitic

harassment is both hypocritical and false, especially given that Harvard is ranked dead last on

free speech, ranked "abysmal," out of the 248 colleges assessed by the Foundation for Individual

Rights and Expression.  Harvard protects speech only when it espouses positions Harvard

supports and prohibits speech adverse to the interests of other groups Harvard deems worthy of

protection.  Harvard's double standard is apparent when one compares Harvard's failure to

discipline anti-Jewish harassment with its warning to freshmen—during the Title IX training—

that "sizeism," "fatphobia," "cisheterosexism," "racism," "transphobia," "ageism," and

"ableism" are prohibited because they "contribute to an environment that perpetrates violence."

156.    Harvard also has no problem censoring controversial speakers or discussions—unless they espouse antisemitic views, in which case Harvard insists it is obligated to permit them on free expression grounds.  In 2021, for example, Harvard School of Engineering and Applied Sciences canceled a course on a policing strategy involving military tactics after student organizations expressed concerns about the subject matter.  And in 2022, the Harvard English Department disinvited Dr. Devin Buckley from speaking on campus because she is on the board of an organization that opposes incarcerating biological males with biological females or permitting them to participate in women's sports.  But, as alleged above, Harvard readily permitted El-Kurd and Hill to appear on campus spewing anti-Jewish rhetoric, Holocaust denial, and calls for Israel's extermination.

### ii.    Harvard Takes Decisive Action to Address Hate, Violence, and Harassment Unless Jews Are the Targets

157.    When bigotry impacts protected minority groups other than Jews—even when there is no actual harassment or violence—Harvard has issued forceful condemnations.  For example, in 2016, Harvard Law abandoned its longstanding shield because it displayed the family crest of Isaac Royall, Jr., a slaveholder.  Harvard Law leadership oversaw a public campaign to denounce the shield as a painful reminder of slavery, including forming a special committee, soliciting community involvement, providing regular updates, and seeking approval from Harvard's governing body to retire the shield.  That same year, Harvard changed the title of "house masters" to "faculty deans" because, it said, the former evoked slavery.  In 2022, Harvard released "Harvard & the Legacy of Slavery," a 132-page report on Harvard's racist history that provided recommendations for combating its institutional racism, and committed $100 million towards amelioration efforts.

158.     Neither the recommendations in the "Harvard & the Legacy of Slavery" report, nor then-President Lawrence S. Bacow's announcement of a plan to "address the persistent corrosive effects of those historical practices" identified therein, mentions an exception for "freedom of expression."  Yet Harvard now invokes free expression principles as a pretext to retroactively justify tolerating antisemitism and marginalizing its Jewish community.  For example, in Harvard's November 9 statement announcing the Antisemitism Advisory Group—as in many of its other statements concerning Hamas's October 7 terrorist attack and its aftermath— President Gay emphasized that Harvard is "at [its] strongest when [its members] commit to open inquiry and freedom of expression as foundational values of [Harvard's] academic community." Even though the Antisemitism Advisory Group is toothless, over one hundred faculty members signed a November 13 letter criticizing Harvard's decision to create it as an attack on "intellectual freedom."

159.     Harvard has gone to great lengths to make its campus more "inclusive" over the last few years.  Harvard's OEDIB, formed in 2021 as a "relaunch[]" of its 2018 precursor office, for example, purportedly strives "to guide Harvard's culture toward inclusive excellence." According to its website, "OEDIB views diversity, equity, inclusion, and belonging as the pathway to achieving inclusive excellence and fostering a campus culture where everyone can thrive."  Jewish students, however, are excluded from those efforts.

160.     Harvard has selectively taken forceful stands on global conflict and social justice issues that it deems worthy.  As a recent study by the AMCHA Initiative concluded, "there is a flagrant double standard in how the vast majority of school leaders treat Jewish students as compared to members of other student minority groups in the aftermath of group trauma."  Harvard embodies that double standard.  For example, Harvard has regularly issued

numerous strong statements and sponsored numerous events condemning racist police killings and Russia's invasion of Ukraine.

161.    Harvard's response to Hamas's October 7 massacre was quite different.  Rather than cancel its partnership with offending foreign institutions, as the Davis Center for Russian and Eurasian studies did at the start of Russia's invasion of Ukraine, Harvard's FXB Center maintains its partnership with Birzeit University, which is inextricably intertwined with Hamas. When asked during the House Antisemitism Hearing about her denial of a request to fly Israel's flag in Harvard Yard following October 7, despite then-President Bacow's earlier decision to fly Ukraine's flag, President Gay merely demurred that the Ukrainian flag decision was "made by [her] predecessor as an exception to a long-standing rule."

162.    Harvard's commitment to DIB and anti-racism initiatives does not include protecting or supporting Jewish students.  Harvard's DIB efforts deem Jews to be "oppressors," rather than "oppressed," which explains why anti-Israel and anti-Jewish hate speech and harassment on campus is treated far differently than similar conduct against other groups.  As Harvard Chabad Rabbi Zarchi has noted, Harvard has a "beautiful culture" where community members "don't remain silent when we experience or witness the slightest form of discrimination," but it is a "double culture in which, when it comes to matters of the Jewish community, there's nothing being said."

### iii.    Harvard Does Not Hesitate to Discipline Faculty Members Who Make Racist or Other Unpopular Statements, Except When the Statements Are Antisemitic

163.    Harvard regularly disciplines faculty members who appear to support discrimination or harassment against groups other than Jews.  For example, in 2011, Harvard removed courses taught by Professor Subramanian Swamy after he wrote an op-ed advocating that to "negate the political goals of Islamic terrorism in India," India should "[e]nact a national

law prohibiting conversion from Hinduism to any other religion," "[r]emove . . . 300 masjids [mosques]," and "declare India a Hindu Rashtra [nation] in which non-Hindus can vote only if they proudly acknowledge that their ancestors were Hindus." Professor Eck, who would later sign the November 13, 2023 faculty letter attacking President Gay's statement against antisemitism, called for Professor Swamy's discipline, arguing that his "op-ed clearly crosses the line by demonizing an entire religious community and calling for violence against their sacred places," and that "[t]here is a distinction between unpopular and unwelcome political views."

164.    In 2020, Professor David Kane invited Charles Murray, a libertarian political scientist and sociologist whose controversial books and articles are viewed by many as racist, to give an online lecture. Backed by student campaigns against Professor Kane, then-Dean Gay announced an investigation into Kane and temporarily removed him from his position before he was ultimately ousted from Harvard.

165.    Starting in March 2023, Harvard Public Health Professor Tyler VanderWeele faced extensive scrutiny after Twitter users resurfaced his 2015 participation in an *amicus* brief urging the Supreme Court not to set forth a federal constitutional view on gay marriage. Harvard's response was swift and decisive. Following student complaints, Professor VanderWeele's department hosted "listening sessions," and the dean of education and chief DIB officer made him participate in a "restorative practices process" to explain his views to the community. Harvard Public Health's deans and administrators sent multiple emails to department chairs, Harvard's Council on Academic Freedom (a faculty organization devoted to promoting free inquiry, intellectual diversity, and civil discourse), and students, noting students' feelings of harm and betrayal and setting eight "listening sessions."

166.    Harvard Public Health administrators sent more emails to large lists of community members, referring to Professor VanderWeele's views as "reprehensible," having "cause[d] deep hurt, undermine[d] the culture of belonging, and ma[d]e other members of the community feel less free and less safe," and as being "in conflict with our . . . stated goals of advancing Equity, Diversity, Inclusion, and Belonging as well as our commitment to sound public health policy."  The Harvard Public Health dean defended his remedial approach as necessary to avoid upsetting the students.

167.    Similarly, on November 28, 2023, Dr. Joan Donovan, an expert on social media disinformation, submitted a whistleblower declaration to Harvard, DOE, and the Massachusetts Attorney General's Office, accusing Harvard of terminating her position as a Harvard Kennedy research director because she sought to publish internal Facebook messages that purported to show Facebook's knowledge of the public harm it allegedly causes.  Dr. Donovan alleged that when Harvard learned of her plan, it was processing its largest donation ever: $500 million from the founder of Facebook's philanthropic organization.  Harvard thereafter began to systematically restrict Dr. Donovan and her work until ousting her in August 2023.  Dr. Donovan accused Harvard of stifling her free speech and abusing its commitment to academic freedom in order to protect Facebook, as Dean Elmendorf told her: "I want you to know that you have no academic freedom. . . .  I want to remind you that you're staff here."

168.    But Harvard does nothing to protect Jews in response to complaints concerning its faculty, including Harvard Public Health professors' antisemitic coursework and tweets, or Professors Wispelwey's and Krieger's exclusion of Jewish students from the benefits of class. Even after receiving countless reports through Harvard's anonymous bias reporting hotline, including one against Harvard FXB Center Visiting Scholar Sawsan Abdulrahim—who tweeted

a graphic glorifying a Hamas terrorist paraglider a day after Hamas's massacre and who continues to tweet messages glorifying the Intifada—Harvard continues to do nothing.  Nor has Harvard taken any action to protect Jewish students from Harvard PSC's faculty advisor, Professor Johnson who, in addition to his active participation in many students' acts of discrimination and policy violations, was the first signatory of the November 13 faculty letter, signed a 2022 statement supporting BDS, and signed a 2014 letter urging speakers to avoid the University of Illinois which had rescinded an offer to a professor because of his antisemitic tweets.

### iv.   Harvard Punishes Students for Policy Violations That Do Not Involve Antisemitism

169.    Harvard does not hesitate to discipline students who engage in discrimination or otherwise violate its policies when the targets are not Jews.  For example, while Harvard ejected students who stormed University Hall during a 1969 building takeover in protest of the Vietnam War, and arrested many of the participants, the students who took over University Hall in November 2023 have faced no true consequences; in fact, they were feted with burritos and candy.  In 2016, Harvard canceled the remainder of one of its men's soccer team's seasons for producing sexist "scouting reports" rating female soccer recruits.  In 2018, Harvard placed a Christian student group on administrative probation for asking a female student leader to resign after she started dating another woman.  In 2019, Harvard rescinded the acceptance of a mass-shooting survivor because of his past use of racial slurs.  In 2020, Harvard dismissed three freshmen for hosting a party in their campus house in violation of COVID-19 social distancing rules.  And in 2022, Harvard warned its freshmen class that "sizeism" and "fatphobia," among other harmful discriminatory behavior, perpetuate "violence" in violation of Harvard policy.

170.    On January 23, 2023, Harvard Law Deans Ball and Monroe sent out an email to all Harvard Law students informing them about a "security incident that occurred" on campus

that day, where an "individual affiliated with [Harvard Law] entered our campus and is reported to have punched a student while also uttering a homophobic slur." The deans demonstrated Harvard's ability to take swift action when they told all students that "[t]he individual is no longer at large and is barred from our campus," further noting that "[w]e condemn unconditionally all violence, hatred, and homophobia."

171.    Meanwhile Harvard tolerates not just the incitement of violence against Jewish and Israeli students, but actual violence. Harvard has not taken any meaningful disciplinary action against any students for their repeated use of antisemitic tropes or participation in antisemitic harassment and intimidation.

**F.    Plaintiffs Are Being Denied Equal Access to Harvard's Educational Opportunities**

172.    Kestenbaum and SAA's Jewish student members at Harvard are acutely aware that, solely because of their Jewish identities, Harvard views and treats them as second-class citizens in the Harvard community, undeserving of the protections that Harvard affords non-Jewish students. Because of Harvard's persistent refusal to comply with its obligations to stop discrimination and harassment against Jewish students, Kestenbaum, SAA's Jewish student members, and other Jewish students are deprived of the benefits that non-Jewish students enjoy, including, but not limited to, physical protection; emotional support; a sense of inclusion and belonging; participation in educational, extracurricular, and Harvard-sanctioned social activities; the ability to freely express their Jewish identity in class, written coursework, and on campus; and their right to express their support for and attachment to Israel, their ancestral homeland, where many, including Kestenbaum and SAA's Jewish Harvard student members, have friends and family.

173.    To the contrary, as a result of Harvard's actions and inactions alleged herein, Kestenbaum and SAA's Jewish student members at Harvard are treated differently from, and

made to feel less important than, other non-Jewish students.  Students, along with Harvard faculty members, are able to taunt, demonize, assault, harass, intimidate, ostracize, and discriminate against Kestenbaum, SAA's Jewish Harvard student members, and other Jews with impunity.  Kestenbaum, SAA's Jewish Harvard student members, and other Jewish students do not feel physically safe on Harvard's campus or in its classrooms and other facilities and avoid certain areas of campus.  Harvard permits Kestenbaum's and SAA's Jewish Harvard student members' classmates to praise Hamas, celebrate the slaughter of Israeli citizens, deny the rape and abduction of Israeli women, and call for the annihilation of Israel and its citizens.

174.    Kestenbaum and SAA's Jewish Harvard student members also justifiably fear the harassment, discrimination, and intimidation they face, on any given day, from professors and Harvard leadership—who are supposed to teach and guide them—and from their fellow students, all of whom are required to treat them with respect and dignity pursuant to Harvard's policies. As a result of Harvard's deliberate indifference to its hostile educational environment, Kestenbaum and SAA's Jewish Harvard student members are often unable to focus, study, or perform their course work to the best of their ability, thereby inhibiting their ability to take full advantage of their Harvard education.

175.    Harvard's refusal to stand against antisemitism has also inhibited Kestenbaum, SAA's Jewish Harvard student members, and other Jewish students' ability to take full advantage of non-classroom activities.  As the sole Orthodox Jewish student at Harvard Divinity, Kestenbaum made it his mission when he joined Harvard to be a model representative of Orthodox Jews and an active citizen of the Harvard community.  For example, Kestenbaum often attended events hosted by groups with different beliefs, including the weekly Halaqa hosted by one of the Muslim Harvard Divinity professors, where students and faculty would gather to read

Islamic poetry and engage with the Quran.  Harvard's refusal to stand against antisemitism has left Kestenbaum too afraid to continue to participate in Jewish activities, much less those of other cultures; many of the classmates and professors he tried so hard to befriend now shun him because he is Jewish; and he has been driven to avoid public spaces like Widener Library, fearful of unregulated antisemitic rallies and disruptions.  Harvard has abandoned Kestenbaum, treating him as a second-class citizen and an appropriate target of abuse and harassment because he is Jewish.  Kestenbaum—who regularly wears recognizably Jewish garb—never hid his Jewish identity and should not need to do so now (as many of his Jewish friends have done, trading kippot for baseball hats).

176.     SAA's Jewish student members are also not shy about their Jewish identities. SAA Member #5 always wears, and SAA Member #1 often wears, a kippah, and SAA Member #2 proudly wears a Star of David necklace and an Israel bracelet, and displays pro-Israel pins and stickers on her backpack and laptop cover.  SAA Member #3 is known at school as the "Israel girl," and used to frequently speak in Hebrew and discuss Israel with classmates. But during their time at Harvard, their Jewish identities have made Kestenbaum and SAA's Jewish student members targets for harassment, physical violence, and other acts of antisemitism perpetrated by students and faculty members.

177.     SAA Member #1 has been deeply affected by the antisemitism on campus and the administration's failure to respond.  As a Jew with family in Israel, and who has lived and worked there as an emergency medical technician, he fears for his safety at Harvard, and has withdrawn from his classmates and schoolwork.  He is ostracized for being Jewish, with some of his classmates encouraging others to shun him.  Since October 7, SAA Member #1 has not been able to fully engage in his studies or Harvard's social experiences, because nearly every day, he

is forced to confront his fears concerning uncontrolled antisemitic mobs on campus or the antisemitic ravings of his teaching fellow or professor.  As he has reported to his professors and the Dean of Students Office, he missed approximately half of his classes during the fall 2023 semester, and could not participate in many class discussions for the lectures he did attend. Instead of focusing on his studies, SAA Member #1 had to argue with Professor Hanson and the administration about whether his Torts final exam would require students to take an anti-Israel stance.  To make matters worse, Professor Hanson threatened SAA Member #1 for having to miss class, even though Hanson's refusal to avoid discussions of the war during his Torts class was a large contributor to the student's fear of, and inability to focus on, school.

178.    SAA Member #2 feels extremely isolated on campus, as her only connections now are to Harvard's small Jewish community.  She feels vulnerable walking on campus by herself because she knows at any given moment, a protest could turn violent and she could become a victim of harassment or worse.  SAA Member #2 missed nearly ten lectures during the fall 2023 semester out of safety concerns over antisemitic protests.

179.    SAA Member #3 likewise feels isolated because of Harvard's lack of interest in protecting Jewish students from the daily antisemitic disturbances and harassment.  The incessant antisemitic protests have caused SAA Member #3 to miss classes and change her study locations, which previously included Caspersen lounge.  When she cannot avoid being on campus, SAA Member #3 is forced to wear headphones to drown out the noise from the protests lest the genocidal chants interfere with her ability to focus on schoolwork.

180.    SAA Member #4 has faced years of inaction by the administrators to whom they have repeatedly reported incidents of anti-Jewish bias.  They have now given up hope that

Harvard will ameliorate antisemitism after being told by Chief DIB Officer Barbosa that his office does not have expertise in antisemitism.

181.    SAA Member #5, who considers himself an outgoing and approachable person, has been marginalized, as many classmates refuse to speak to or engage with him since the October 7 massacre.  He feels ostracized for wearing a kippah, fears for his physical safety, and has missed nearly a dozen lectures because of the antisemitic climate on campus.

182.    These students have had to spend their time at Harvard fearing for their physical safety, enduring anti-Jewish abuse and harassment, and communicating with Harvard administrators over antisemitism that Harvard is doing nothing to stop.  They have been unable to focus on their coursework or otherwise enjoy their Harvard experience.  SAA Member #1 summed up the student experience in a November 16, 2023 email to Harvard Law's Title IX program officer, following Harvard's repeated failure to stop unauthorized antisemitic student protesters from "blatantly ignor[ing]" the deans: "I'm having a really hard time attending this school as are many other Jewish students.  I used to hope that the administration will do better but today I lost all hope. . . .  [The administration] should know that [its] failure to do so is deeply hurting so many of the Jewish students on this campus."

183.    Harvard's actions and inactions described above not only deprive Kestenbaum and SAA's Jewish Harvard student members of their right to the educational and extracurricular opportunities afforded other students—which have led and will continue to lead to academic, social, and professional consequences—but also severely impact their health, mental well-being, and sense of security.

<u>**COUNT I**</u>
**Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.***
**(Intentional Discrimination and Hostile Environment Towards Jewish Students)**

184.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs as though fully stated herein.

185.    Harvard receives financial assistance from the United States Department of Education and is therefore subject to suit under Title VI of the Civil Rights Act of 1964.

186.    Discrimination against Jews and/or Israelis—including based on actual or perceived ancestry, race, ethnic characteristics, or national origin—is prohibited under Title VI, as reflected not only in decades of Title VI jurisprudence, but also in the written policies of the Office of Civil Rights of the United States Department of Education.

187.    Kestenbaum is and identifies as Jewish, and his status and identification as a Jew brings him within the scope of Title VI's protections.  SAA's members include Jewish students at Harvard, who are also within the scope of Title VI's protections.

188.    Title VI prohibits a recipient of federal funds from intentionally treating any individual worse, even in part, because of his or her ancestry, race, ethnic characteristics, or national origin.

189.    The acts and omissions of Harvard and its administrators subjected, and continue to subject, Kestenbaum and SAA's Jewish student members at Harvard to discrimination and harassment on the basis of their actual and/or perceived Jewish ancestry, race, ethnic characteristics, or national origin.

190.    Harvard and its administrators had actual notice that such discrimination and harassment, over which Harvard has substantial control and the authority to remediate, was and continues to be so severe, pervasive, and objectively offensive that it created and continues to create a hostile environment based on Jewish ancestry, race, ethnic characteristics, or national

origin that deprives Kestenbaum and SAA's Jewish Harvard student members of full access to Harvard's educational programs, activities, and opportunities.

191.    Harvard and its administrators intentionally discriminate against Kestenbaum and SAA's Jewish Harvard student members on the basis of their actual and/or perceived Jewish ancestry, race, ethnic characteristics, or national origin, as exhibited by Harvard and its administrators' deliberate indifference to the antisemitic abuse, harassment, and intimidation of Kestenbaum and SAA's Jewish Harvard student members, in violation of Title VI.  Specifically, Harvard and its administrators clearly and unreasonably failed, and continue to fail, to cure or otherwise adequately, appropriately, and meaningfully address, ameliorate, or remedy the discrimination against Kestenbaum and SAA's Jewish Harvard student members and the hostile environment that they and other Jewish students are forced to endure at Harvard because of their race, ethnic characteristics, or national origin.  Additionally, Harvard continues to grossly fail to take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment, and prevent the harassment from recurring.  Such unlawful deliberate indifference causes Kestenbaum and SAA's Jewish student members to be subjected to a hostile educational environment.

192.    The environment at Harvard, which has been rendered hostile for Kestenbaum and SAA's Jewish members as a result of their Jewish ancestry, race, ethnic characteristics, or national origin, is sufficiently severe, pervasive, persistent, and offensive such that it deprives Kestenbaum and SAA's Jewish Harvard student members of equal access to the educational opportunities and benefits that Harvard provides to non-Jewish students.

193.    Harvard and its administrators actively and intentionally engage in this pattern of severe and/or pervasive discrimination.

194. Harvard and its administrators also directly and intentionally discriminate against Kestenbaum and SAA's Jewish Harvard student members, with their actual or perceived Jewish ancestry, race, ethnic characteristics, or national origin a substantial or motivating factor in Harvard's actions.

195. Harvard continues to unreasonably fail to act, or to act grossly inadequately and discriminatorily, and with leniency, tolerance, deliberate indifference, and/or unjustifiable delay, in applying its policies to known or reported incidents involving antisemitism or where the victim or complainant is a Jewish and/or Israeli student, including Kestenbaum and SAA's Jewish Harvard student members. As detailed above, Harvard's actions, inactions, and conduct were, and continue to be, intended to treat Kestenbaum and SAA's Jewish Harvard student members differently as Jewish students as compared to other similarly situated non-Jewish and/or non-Israeli students.

196. Harvard's violations of Title VI are the actual, direct, and proximate causes of Kestenbaum and SAA's Jewish student members' injuries.

197. As a result of the foregoing, Kestenbaum and SAA's Jewish Harvard student members have suffered, and continue to suffer, substantial damages, in amounts to be determined at trial.

198. Kestenbaum and SAA's Jewish Harvard student members have been and will continue to be injured because Harvard has and will continue to deny them equal access to the educational opportunities and benefits provided to other students, and has and will continue to intentionally discriminate against them on the basis of Jewish ancestry, race, ethnic characteristics, or national origin.

199.     Plaintiffs are entitled to appropriate injunctive relief under Title VI, because Harvard has knowledge of, and has been and continues to be deliberately indifferent to, a hostile environment that is severe, persistent, and pervasive; there is no adequate or speedy remedy at law to prevent Harvard from continuing to discriminate against its students on the basis of Jewish ancestry, race, ethnic characteristics, or national origin in violation of Title VI; and the harm Kestenbaum and SAA's Jewish Harvard student members will otherwise continue to suffer is irreparable.

200.     Plaintiffs are entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT II
### Breach of Contract

201.     Plaintiffs repeat and reallege the allegations of the preceding paragraphs as though fully stated herein.

202.     At all relevant times, an express contractual relationship existed between Harvard, on the one hand, and each of Kestenbaum and SAA's Jewish Harvard student members, on the other hand, by virtue of their enrollment at Harvard and as defined by and through Harvard's written codes, policies, and procedures, including, but not limited to, the: Non-Discrimination Policy, Statement on Rights and Responsibilities, Free Speech Guidelines, Student Organization Policies, and Harvard's various student handbooks, which often adopt and expand on University-wide policies.  Through the documents and materials it publishes and provides to students, Harvard makes contractual commitments to its students concerning safety, bias-related abuse, harassment, intimidation, and discrimination.

203.     Under those contracts, Kestenbaum and each of the SAA Jewish Harvard student members agreed, among other things, to pay Harvard tuition, and Harvard agreed, among other

things, to provide them a discrimination-free environment to be achieved by Harvard abiding by, and adequately and appropriately enforcing Harvard's policies.

204.    Kestenbaum and SAA's Jewish Harvard student members have complied and continue to comply with their obligations under these contracts.

205.    Harvard breached and continues to breach its contracts with Kestenbaum and SAA's Jewish Harvard student members by, among other things, its continued failure to comply with its obligations under these contracts, including by, among other things, failing to take measures to ameliorate, prevent, and punish the discriminatory and harassing conduct that Kestenbaum and SAA's Jewish Harvard student members have endured and continue to endure, failing to enforce numerous provisions of Harvard's policies, failing to meet Kestenbaum and SAA's Jewish Harvard student members' reasonable expectations of the educational benefits to which they are entitled.

206.    As a result of Harvard's breaches, Kestenbaum and SAA's Jewish Harvard student members have been damaged and continue to sustain substantial damages, in amounts to be determined at trial.

## <u>COUNT III</u>
### Breach of the Implied Covenant of Good Faith and Fair Dealing

207.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs as though fully stated herein.

208.    Harvard has breached the implied covenant of good faith and fair dealing implied in its contracts with students, including Kestenbaum and SAA's Jewish Harvard student members.  Among other things, Harvard selectively applies or enforces its student handbooks, guidelines, policies, procedures, course catalogs, registration materials, bulletins, circulars, and regulations in bad faith and in a discriminatory way—improperly motivated by shared ancestry,

race, ethnic characteristics, or national origin bias—treating incidents of abuse, harassment, intimidation, or discrimination against Jewish students, including Kestenbaum and SAA's Jewish Harvard student members, in a more lenient, tolerant, forgiving, and nonchalant manner than it treats similar incidents against other minority groups.

209.    As a result of Harvard's breaches, Kestenbaum and SAA's Jewish Harvard student members have been damaged, and continue to sustain substantial damages, in amounts to be determined at trial.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a jury trial for all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray and request that a judgment be entered in their favor, and against Harvard awarding them:

A.    Injunctive relief preventing and enjoining Harvard from violating Title VI, including, but not limited to, preventing and enjoining Harvard and its agents from establishing, implementing, instituting, maintaining, or executing policies, practices, procedures, or protocols that penalize or discriminate against Jewish students, including plaintiffs and SAA's members, in any way, and ordering Harvard to take all necessary, adequate, and appropriate remedial, corrective, and preventative measures including by, among other things: (i) disciplinary measures, including the termination of, deans, administrators, professors, and other employees responsible for antisemitic discrimination and abuse, whether because they engage in it or permit it; (ii) disciplinary measures, including suspension or expulsion, against students who engage in such conduct; (iii) declining and returning donations, whether from foreign countries or elsewhere,

implicitly or explicitly conditioned on the hiring or promotion of professors who espouse antisemitism or the inclusion of antisemitic coursework or curricula; and (iv) adding required antisemitism training for Harvard community members;

B.    Compensatory, consequential, and punitive damages in amounts to be determined at trial;

C.    Reasonable attorneys' fees, costs of suit, and expenses;

D.    Pre-judgment interest and post-judgment interest at the maximum rate allowable by the law; and

E.    Such other and further relief as the Court deems just and proper.

Dated:    January 10, 2024                    Respectfully submitted,

ALEXANDER KESTENBAUM and STUDENTS
AGAINST ANTISEMITISM, INC.

By their attorneys,

 */s/ Timothy H. Madden*
Timothy H. Madden (BBO #654040)
**DONNELLY, CONROY & GELHAAR, LLP**
260 Franklin Street, Suite 1600
Boston, MA 02110
Tel:  (617) 720-2880
thm@dcglaw.com

Marc E. Kasowitz*
Daniel R. Benson*
Mark P. Ressler*
Andrew L. Schwartz*
Joshua E. Roberts*
Andrew C. Bernstein*
**KASOWITZ BENSON TORRES LLP**
1633 Broadway
New York, New York 10019
Tel:  (212) 506-1700
mkasowitz@kasowitz.com
dbenson@kasowitz.com
mressler@kasowitz.com
aschwartz@kasowitz.com
jroberts@kasowitz.com
abernstein@kasowitz.com

*Pro hac vice* application forthcoming