**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ALEXANDER KESTENBAUM and STUDENTS AGAINST ANTISEMITISM, INC., <br><br>        Plaintiffs, <br><br> v. <br><br> PRESIDENT AND FELLOWS OF HARVARD COLLEGE, <br><br>        Defendant. | Case No. 1:24-cv-10092-RGS |

**MEMORANDUM OF LAW IN SUPPORT OF
<u>DEFENDANT'S MOTION TO DISMISS AND MOTION TO STRIKE</u>**

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION ......................................................................................................... 1

BACKGROUND ........................................................................................................... 4

STANDARD OF REVIEW ............................................................................................ 7

ARGUMENT ................................................................................................................ 8

I.      Plaintiffs' Challenge To Harvard's Ongoing Response To Antisemitism Is
        Premature ......................................................................................................... 8

II.     Plaintiffs Lack Standing Under Rule 12(b)(1) .................................................. 10

        A.      Plaintiffs Fail To Plead An Ongoing Or Certainly Impending Future Injury
                Traceable to Harvard's Conduct ........................................................... 11

        B.      Plaintiffs' Requested Injunction Is Unavailable As A Matter of Law ..... 15

        C.      SAA Lacks Standing ............................................................................. 16

III.    Plaintiffs' Title VI Claim Should Be Dismissed Under Rule 12(b)(6) ................ 17

        A.      Plaintiffs Do Not Plausibly Allege Discriminatory Animus ................... 18

        B.      Plaintiffs Do Not Plausibly Allege That Harvard Subjected Them To A
                Hostile Educational Environment Through Deliberate Indifference ....... 19

                1.      Plaintiffs do not plausibly allege that Harvard's response to the
                        alleged harassment was "clearly unreasonable" ...................... 20

                2.      Plaintiffs do not plausibly allege that they were subject to severe and
                        pervasive harassment ............................................................ 24

IV.     The Court Should Strike Plaintiffs' Requested Injunction And Demand For
        Punitive Damages Under Rule 12(f) ................................................................. 26

V.      Plaintiffs' Contract Claims Should Be Dismissed Under Rule 12(b)(6) ........... 28

        A.      Plaintiffs Do Not Plausibly Allege A Breach Of Contract ..................... 28

        B.      Plaintiffs' Implied Covenant Claim Should Be Dismissed As Duplicative ......... 29

CONCLUSION ............................................................................................................ 30

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abbott Laboratories v. Gardner*,
  387 U.S. 136 (1967) ........................................................................................8

*Alexander v. Sandoval*,
  532 U.S. 275 (2001) ......................................................................................17

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................................7

*Aulson v. Blanchard*,
  83 F.3d 1 (1st Cir. 1996) .................................................................................8

*Barnes v. Gorman*,
  536 U.S. 181 (2002) ......................................................................................28

*Barnett v. Johnson City School District*,
  2005 WL 8178066 (N.D.N.Y. Feb. 2, 2005) ................................................17

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................................8

*Biszko v. RIHT Financial Corp.*,
  758 F.2d 769 (1st Cir. 1985) ...................................................................15, 16

*Brown v. Hot, Sexy & Safer Productions, Inc.*,
  68 F.3d 525 (1st Cir. 1995) .....................................................................17, 25

*Brown v. Suffolk University*,
  2021 WL 2785047 (D. Mass. Mar. 31, 2021) ..............................................28

*Brown v. Trustees of Boston University*,
  891 F.2d 337 (1st Cir. 1989) ...................................................................22, 27

*Califano v. Yamasaki*,
  442 U.S. 682 (1979) ......................................................................................26

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983) ........................................................................................13

*Clapper v. Amnesty International USA*,
  568 U.S. 398 (2013) ................................................................................10, 13

*Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc.*,
    958 F.3d 38 (1st Cir. 2020) ...................................................................................13

*Davis v. Monroe County Board of Education*,
    526 U.S. 629 (1999) ..................................................................................... *passim*

*DeRose v. Putnam Management Co.*,
    496 N.E.2d 428 (Mass. 1986) ..............................................................................28

*Doe v. Amherst College*,
    238 F. Supp. 3d 195 (D. Mass. 2017) ...................................................................19

*Doe v. Brown University*,
    43 F.4th 195 (1st Cir. 2022) .................................................................................18

*Doe v. Bush*,
    323 F.3d 133 (1st Cir. 2003) ..................................................................................8

*Doe v. Clark University*,
    624 F. Supp. 3d 1 (D. Mass. 2022) .......................................................................30

*Doe v. Stonehill College, Inc.*,
    55 F.4th 302 (1st Cir. 2022) .................................................................................30

*Doe v. Trustees of Bos. College*,
    892 F.3d 67 (1st Cir. 2018) ..................................................................................29

*Doe v. Trustees of Bos. College*,
    942 F.3d 527 (1st Cir. 2019) ...........................................................................28, 29

*Doe v. Wentworth Institute of Technology, Inc.*,
    2022 WL 1912883 (D. Mass. June 3, 2022) .........................................................20

*Dynamic Image Technologies, Inc. v. United States*,
    221 F.3d 34 (1st Cir. 2000) ....................................................................................7

*EEOC v. Aviation Port Services, LLC*,
    2020 WL 1550564 (D. Mass. Apr. 1, 2020) .........................................................27

*Ernst & Young v. Depositors Economic Protection Corp.*,
    45 F.3d 530 (1st Cir. 1995) ....................................................................................9

*Felber v. Yudof*,
    851 F. Supp. 2d 1182 (N.D. Cal. 2011) .....................................................22, 25, 26

*Fitzgerald v. Barnstable School Committee*,
    504 F.3d 165 (1st Cir. 2007) .................................................................18, 23, 24, 26

*G. v. Fay School*,
  931 F.3d 1 (1st Cir. 2019) ................................................................................29

*Garcia Rubiera v. Fortuno*,
  727 F.3d 102 (1st Cir. 2013) .....................................................................16, 27

*Gebser v. Lago Vista Independent School District*,
  524 U.S. 274 (1998) .......................................................................................19

*Gill v. Whitford*,
  558 U.S. 48 (2018) ..........................................................................................16

*Gonzalez v. United States*,
  284 F.3d 281 (1st Cir. 2002) .............................................................................7

*Goodman v. Bowdoin College*,
  380 F.3d 33 (1st Cir. 2004) .............................................................................19

*Guckenberger v. Boston University*,
  957 F. Supp. 306 (D. Mass. 1997) .......................................................21, 25, 29

*Harris v. University of Massachusetts Lowell*,
  43 F.4th 187 (1st Cir. 2022) ............................................................................10

*Healy v. James*,
  408 U.S. 169 (1972) ........................................................................................21

*Hochendoner v. Genzyme Corp.*,
  823 F.3d 724 (1st Cir. 2016) ...........................................................................11

*Hunt v. Washington State Apple Advertising Commission*,
  432 U.S. 333 (1977) ........................................................................................17

*Index Newspapers LLC v. City of Portland*,
  2022 WL 4466881 (D. Ore. Sept. 26, 2022) ....................................................15

*John Hancock Life Insurance Co. v. Abbott Laboratories, Inc.*,
  183 F. Supp. 3d 277 (D. Mass. 2016) ..........................................................8, 26

*Justiniano v. Walker*,
  986 F.3d 11 (1st Cir. 2021) ...............................................................................8

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ...................................................................................10, 11

*Mandel v. Board of Trustees of California State University*,
  2018 WL 5458739 (N.D. Cal. Oct. 29, 2018) ..................................................26

iv

*Mangual v. Rotger-Sabat*,
  317 F.3d 45 (1st Cir. 2003) ..........................................................................10

*McInnis-Misenor v. Maine Medical Center*,
  319 F.3d 63 (1st Cir. 2003) ............................................................................9

*Merlonghi v. United States*,
  620 F.3d 50 (1st Cir. 2010) ............................................................................7

*National Association of Government Employees v. Mulligan*,
  914 F. Supp. 2d 10 (D. Mass. 2012) .............................................................17

*New Hampshire Motor Transport Association v. Rowe*,
  448 F.3d 66 (1st Cir. 2006) ....................................................................10, 17

*Norris on behalf of A.M. v. Cape Elizabeth School District*,
  969 F.3d 12 (1st Cir. 2020) ..........................................................................22

*Pollard v. Georgetown School District*,
  132 F. Supp. 3d 208 (D. Mass. 2015) ...............................................19, 25, 26

*Porto v. Town of Tewksbury*,
  488 F.3d 67 (1st Cir. 2007) ....................................................................20, 24

*Reddy v. Foster*,
  845 F.3d 493 (1st Cir. 2017) ..........................................................................9

*Regents of University of Michigan v. Ewing*,
  474 U.S. 214 (1985) ...............................................................................16, 29

*Roe v. Healey*,
  78 F.4th 11 (1st Cir. 2023) ...........................................................................12

*Roe v. Lincoln-Sudbury Regional School District*,
  2021 WL 1132256 (D. Mass. Mar. 24, 2021) ...............................................27

*Sheffield v. City of Boston*,
  319 F.R.D. 52 (D. Mass. 2016) .................................................................8, 26

*Sonoiki v. Harvard University*,
  37 F.4th 691 (1st Cir. 2022) .........................................................................28

*Speech First, Inc. v. Fenves*,
  979 F.3d 319 (5th Cir. 2020) ........................................................................21

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) ...............................................................................10, 11

*Steel Co. v. Citizens for a Better Environment*,
  523 U.S. 83 (1998) .................................................................................15

*Sumpter v. Wayne County*,
  868 F.3d 473 (6th Cir. 2017) ...............................................................15

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) .............................................................................13

*Uno Restaurants, Inc. v. Boston Kenmore Realty Corp.*,
  805 N.E.2d 957 (Mass. 2004) ..............................................................30

*Warth v. Seldin*,
  422 U.S. 490 (1975) .............................................................................17

*Webb v. Injured Workers Pharmacy LLC*,
  72 F.4th 365 (1st Cir. 2023) ................................................................10

*Western Coal Traffic League v. Surface Transportation Board*,
  998 F.3d 945 (D.C. Cir. 2021) .............................................................15

*Zurich American Insurance Co. v. Watts Regulator Co.*,
  796 F. Supp. 2d 240 (D. Mass. 2011) ..................................................26

**Constitutional Provisions, Statutes and Rules**

First Amendment ...............................................................................16, 21

42 U.S.C. § 2000d................................................................................. *passim*

Federal Rules of Civil Procedure

  12(b)(1) ..............................................................................................7, 10

  12(b)(6) ..........................................................................................7, 17, 28

  12(f) ....................................................................................................8, 26

## INTRODUCTION

Harvard condemns antisemitism, as it does all forms of discrimination based on race, national origin, or shared ancestry.  Conduct that targets Harvard's Jewish students, faculty, or staff for discrimination or harassment is not just unacceptable but antithetical to Harvard's foundational values.  Tackling a problem as invidious and enduring as antisemitism requires a deliberate, multidimensional effort.  Harvard has marshaled the expertise and resources required to undertake this effort and is committed to doing so.  In response to the rise in reports of antisemitism following Hamas' October 7, 2023, terrorist attack and the ensuing war in Gaza, Harvard has taken concrete steps, and is actively assessing what else it can do, to protect its Jewish students, vindicate their right to pursue their education free from harassment and discrimination, and make clear that antisemitism has no place at Harvard.  Harvard continues to engage with Jewish community members, enhance mechanisms for reporting discrimination, enforce policies to prevent and address antisemitic harassment, and embark on a sustained, comprehensive approach to fighting the scourge of antisemitism.  Harvard's response necessarily is a campaign in progress, as antisemitism cannot be eliminated with a presidential proclamation or a court order.

This lawsuit is neither an effective nor legally appropriate vehicle to address antisemitism at Harvard.  It is brought by Alexander Kestenbaum, a graduate student at Harvard Divinity School, AC ¶ 15, and Students Against Antisemitism, Inc. ("SAA"), incorporated by plaintiffs' counsel shortly before filing this suit, suing on behalf of five unnamed Harvard graduate students in law and public health, *id.* ¶¶ 13, 16-20.[1]  The 107-page Amended Complaint invites the Court to superintend through a Court-appointed monitor the "termination" of "deans, administrators,

---

[1] Citations to "AC" refer to Plaintiffs' Amended Complaint.  Dkt. 32.

professors, and other employees," the "suspension or expulsion" of students, and the return of donations purportedly conditioned on the "hiring or promotion of professors who espouse antisemitism or the inclusion of antisemitic coursework," and other relief. *Id.* Prayer for Relief. While demanding this Court to, in effect, vet assigned class reading, Plaintiffs fail to plead that Harvard has fallen short of its legal obligations.

The Amended Complaint instead strings together discrete incidents—many of which Plaintiffs did not experience themselves—into an attenuated theory of institutional liability: it tries, for example, to link offensive, antisemitic remarks by a Harvard official more than a century ago to the University's alleged failure to respond to events that took place just days or weeks before the Amended Complaint was filed. In an institution dedicated to principles of academic freedom and speech, grappling with the limits of dissent and protest across a dozen undergraduate and graduate schools enrolling more than 20,000 students takes serious work, thoughtful consideration, and time. Without minimizing at all the importance of the need to address energetically antisemitism at the University, Plaintiffs' dissatisfaction with the strategy and speed of Harvard's essential work does not state a legally cognizable claim. Consequently, the Amended Complaint should be dismissed.

*First*, Plaintiffs' claims are premature and must be dismissed in their entirety because they are contingent on establishing the deficiency of Harvard's ongoing response to antisemitism. Plaintiffs speculate that the actions Harvard is taking will prove inadequate, but that is not a proper basis for this Court's jurisdiction. Their claims are not ripe.

*Second*, threshold issues defeat Kestenbaum's claims for injunctive relief and SAA's claims in their entirety. Kestenbaum's request for injunctive relief must be dismissed because allegations of past harm do not plead an ongoing or certainly impending future injury traceable

to Harvard, and do not establish that the sweeping relief he requests is likely to redress his claimed injuries.  SAA's claims fail for the same reasons and also must be dismissed because, as an associational plaintiff, it lacks standing to pursue fact-intensive, individualized claims on behalf of its members.

*Third*, Plaintiffs fail to state a claim under Title VI.  They do not plausibly allege a discriminatory double standard, and Harvard's efforts to address antisemitic harassment while also safeguarding free expression and open academic discourse negate any allegations that the University has acted with deliberate indifference.  That alone defeats Plaintiffs' claim under *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999).  Nor does the conduct Plaintiffs allege amount to "severe and pervasive" harassment actionable under the statute.

*Fourth*, even if the Court determines Plaintiffs have standing to seek injunctive relief, Plaintiffs seek an impermissible "obey the law" injunction that the Court should strike from the Amended Complaint.  If the Court permits any aspect of the claim for injunctive relief to go forward, it should strike the demand that Harvard take particular disciplinary measures, as such relief is foreclosed by both binding precedent and principles of deference to university decision-making.  And Plaintiffs' requested punitive damages are categorically unavailable.

*Finally*, Plaintiffs' contract claims must be dismissed because Plaintiffs do not identify any contractual commitment that Harvard has breached.

Harvard's response to the unprecedented and unanticipated rise in campus tensions following the October 7 attack continues to evolve.  From the beginning, Harvard has sought to combat antisemitism; prioritize the safety and wellbeing of its students, faculty, and staff; and make its community stronger and more secure.  The concrete steps the University has taken to address reports of antisemitism, its work to clarify the rights and responsibilities of students

protesting on campus, and the sustained initiatives it has launched all demonstrate that Harvard remains committed to tackling antisemitism.

## **BACKGROUND**

Harvard strives to ensure that every member of the University community is safe, valued, and free to speak openly, whether in class or in the public square. *See* AC ¶¶ 39-43, 47. No Harvard community member should experience discrimination or harassment, much less be subjected to physical force or violence on campus. Community members must also be empowered to speak out, advocate, and demonstrate on matters of public concern. Harvard has therefore adopted policies aimed to prevent "discrimination, harassment, and bullying 'by any member of the Harvard community,'" *id.* ¶ 39, and to affirm the rights of community members to speak on important issues through appropriate and respectful means, *see id.* ¶ 47. Those policies include the Non-Discrimination and Anti-Bullying Policy ("Non-Discrimination Policy"), which explicitly addresses, among other issues, harassment on the basis of religion and national origin, the University-wide Statement on Rights and Responsibilities, and student handbooks and free speech and protest guidelines issued by Harvard's individual schools. *See id.* ¶¶ 38-53.

Harvard's policies formalize its commitment to ensuring student safety and well-being while preserving the University's discretion to address improper conduct through appropriate, case-specific measures. The Non-Discrimination Policy establishes procedures for reviewing, investigating, and resolving formal complaints and outlines possible sanctions for policy violations, *see* AC ¶ 41, while entrusting designated officials at Harvard's individual schools to determine whether disciplinary measures are warranted, Declaration of Felicia Ellsworth Ex. 1 ("Ellsworth Decl."). The Statement on Rights and Responsibilities, which governs speech, demonstrations, and on-campus protest activity, makes clear that threats of violence, personal harassment, and hateful conduct under the guise of free speech violate University policy. *See*

4

AC ¶ 44; Ellsworth Decl. Ex. 2.  And as clarified by guidance released on January 19, 2024, "demonstrations and protests are ordinarily not permitted" in certain spaces, such as libraries, classrooms, dormitories, residence halls, and dining halls, where they would "interfere with the normal activities of the University."  AC ¶ 45; Ellsworth Decl. Ex. 4.  These University policies are supplemented by school-specific guidelines, which state that discrimination, harassment, and violence are "unacceptable" at Harvard.  AC ¶ 42.

Events since October 7 have revealed that Harvard's commitment to combating discrimination and harassment has not immunized the University from the rise of antisemitism that has roiled campuses and communities across the country.  Like other universities, Harvard has experienced incidents of antisemitic vitriol and vandalism.  AC ¶¶ 138, 141, 181, 211, 215. And like many other schools, Harvard has seen passionate political debates lapse into offensive rhetoric.  *Id.* ¶¶ 129, 132, 134, 139.  Fear, outrage, and grief following October 7 have unearthed new tensions in communities across the country, including at Harvard.  *See id.* ¶¶ 105, 107, 115, 131, 149, 196.  Against the backdrop of this unprecedented moment on university campuses and throughout the world, community members, including Plaintiffs, have criticized Harvard for not acting more swiftly and forcefully to address rapidly unfolding events on campus in the immediate aftermath of October 7.  While Harvard is proud of the work it has done to support its community members, the University's initial response left some feeling unheard and unprotected.  Since those initial days, however, Harvard has engaged with its Jewish community to address the challenges this turmoil has occasioned and, in some cases, laid bare.

At the University level and in individual schools, Harvard has focused on providing supportive measures, including care and support to victims of harassment, and on preventing future incidents of harassment through education on protest and debate.  Ellsworth Decl. Ex. 3;

Declaration of Meredith Weenick  ¶¶ 3-4 ("Weenick Decl.").  Harvard has undertaken extensive efforts to increase on-campus security, Weenick Decl. ¶ 3, and published and adhered to clear policies governing the conduct of on-campus events, including rallies and demonstrations, AC ¶ 45; Ellsworth Decl. Ex. 4.  Harvard also has made available multiple avenues to report harassment, bolstered resources for students making complaints, and redoubled its efforts to process complaints and take any necessary disciplinary or remedial actions.  *Id.* Ex. 3.  And when concerns about antisemitism have been raised by community members, Harvard has responded.  For example, when Harvard Hillel informed the University of antisemitic posts on the messaging platform Sidechat (which Harvard does not control), Harvard quickly met with Sidechat leadership and secured assurance from Sidechat to engage in 24/7 content moderation. Weenick Decl. ¶ 5.  And when student groups and a faculty and staff group shared an antisemitic cartoon on social media, Interim President Garber swiftly issued a statement "unequivocally condemning the posting and sharing of the cartoon" and the University initiated a review. Ellsworth Decl. Ex. 6.  Harvard also has repeatedly responded to concerns about antisemitism raised by Kestenbaum, providing him opportunities to address his concerns with administrators and directing him to supportive and remedial resources that remain available to him, should he wish to access them.  Declaration of Timothy Whelsky ¶¶ 4-14 ("Whelsky Decl.").

   Harvard's efforts have also extended beyond the important task of preventing and responding to specific instances of harassment, to include structural initiatives to uncover and eliminate antisemitism at Harvard.  Ellsworth Decl. Ex. 5.  The University is developing and implementing educational and training opportunities for students, faculty, and staff that focus on antisemitism both generally and at Harvard specifically.  *Id.* Ex. 3; Weenick Decl. ¶ 6.  Harvard has continued to build upon and expand these efforts by launching a Presidential Task Force on

Combating Antisemitism at the start of the spring semester with mandates to examine the recent history and current manifestations of antisemitism on Harvard's campus; identify the root causes of, and contributing factors to, antisemitic behaviors; evaluate the evidence regarding the characteristics and frequency of antisemitic incidents; and recommend approaches to combating antisemitism and mitigating its impact on campus. Ellsworth Decl. Ex. 5. In carrying out these duties, the Task Force has undertaken broad outreach to students, faculty, and staff to understand the causes, forms, and effects of antisemitism on Harvard's community, including by conducting a series of listening sessions with members of the Harvard community. Ellsworth Decl. Ex. 8. These crucial efforts are necessary, and they are not advanced by this lawsuit.

## STANDARD OF REVIEW

On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), the Court may "consider materials outside the pleadings." *Gonzalez v. United States*, 284 F.3d 281 (1st Cir. 2002). In addition to "consider[ing] extrinsic materials," the Court "is free to test the truthfulness of the plaintiff's allegations" when engaging in jurisdictional fact-finding. *Dynamic Image Techs., Inc. v. United States*, 221 F.3d 34, 37 (1st Cir. 2000). Plaintiffs' allegations concerning the Court's subject-matter jurisdiction may accordingly be challenged by competing evidence. *See Merlonghi v. United States*, 620 F.3d 50, 54 (1st Cir. 2010).

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plaintiffs must plead facts that permit the Court "to draw [the] reasonable inference that the defendant is liable for the misconduct alleged." *Id.* If the Court cannot "infer from the well-pleaded facts 'more than the possibility of misconduct,' then the complaint has not shown 'that the pleader is entitled to relief.'" *Justiniano v. Walker*, 986 F.3d 11, 19 (1st Cir. 2021). The Court need not credit a "'legal conclusion couched as a factual

allegation.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Nor must it accept "bald

assertions" or "unsupportable conclusions."  *Aulson v. Blanchard*, 83 F.3d 1, 3 (1st Cir. 1996).

Under Rule 12(f), the Court may strike requests for remedies to which plaintiffs are not

entitled.  *See John Hancock Life Ins. Co. v. Abbott Labs., Inc.*, 183 F. Supp. 3d 277, 303 (D.

Mass. 2016), *aff'd in relevant part*, 863 F.3d 23, 49 (1st Cir. 2017).  Courts may strike such

"unnecessary pleadings" even without a showing of prejudice to the moving party.  *Sheffield v.

City of Bos.*, 319 F.R.D. 52, 55 (D. Mass. 2016).

## ARGUMENT

### I.   PLAINTIFFS' CHALLENGE TO HARVARD'S ONGOING RESPONSE TO ANTISEMITISM IS PREMATURE

Plaintiffs' claims should be dismissed under the ripeness doctrine, which ensures the

"avoidance of premature adjudication."  *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967).

Ripeness depends on "'the fitness of the issues for judicial decision and the hardship to the

parties of withholding court consideration.'"  *Doe v. Bush*, 323 F.3d 133, 138 (1st Cir. 2003)

(quoting *Abbott Labs*, 387 U.S. at 149).  Both factors militate against considering Plaintiffs'

claims at this early stage of Harvard's response.

Plaintiffs' claims rely on allegations that Harvard has not yet taken sufficient action to

respond to recent incidents that Plaintiffs allege were antisemitic.  But almost all of the relevant

events Plaintiffs describe allegedly occurred within the past several months, *see* AC ¶¶ 1, 88, and

Harvard is still in the midst of investigations and proceedings related to incidents that took place

in the aftermath of the October 7 attack.  Weenick Decl. ¶ 7.  Harvard is enforcing its policies in

response to incidents on campus, and it is engaging directly with students—including

Kestenbaum—who raise concerns about antisemitism.  Whelsky Decl. ¶¶ 4-14.  And Harvard is

working with its Jewish community through the Task Force on Antisemitism to understand how

community members are experiencing antisemitism and to determine how the University can better combat antisemitism going forward.  Ellsworth Decl. Ex. 5.

Rather than allow Harvard to see this necessary work through, Plaintiffs ask this Court to insert itself into Harvard's response to antisemitism, including by appointing a monitor; firing deans, faculty, and administrators; suspending and expelling students; and evaluating the fitness of donations, class curricula, and course material.  While Plaintiffs understandably want Harvard to act on their preferred timeline and terms, Harvard's work is—and must be—well-considered and fair to all parties involved.  Plaintiffs cannot predict the outcomes of Harvard's ongoing initiatives, investigations, or disciplinary proceedings, nor can they assert that the results of these processes will be clearly unreasonable, without resorting to guesswork about "'contingent future events that may not occur as anticipated, or indeed may not occur at all.'"  *Reddy v. Foster*, 845 F.3d 493, 500 (1st Cir. 2017) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)).  Because "issuing opinions based on speculative facts or a hypothetical record is … at best difficult and often impossible," Plaintiffs cannot show that their claims are fit for resolution at this juncture.  *See Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 536 (1st Cir. 1995).  Nor can Plaintiffs show that "withholding judgment will impose hardship," because their impatience with Harvard's ongoing work does not present a "'direct and immediate' dilemma for the parties."  *McInnis-Misenor v. Maine Med. Ctr.*, 319 F.3d 63, 70 (1st Cir. 2003).  By contrast, Harvard will experience significant hardship if a federal court is brought in to "second-guess[] the … decisions made by school administrators" as the University works in real time to address the concerns Plaintiffs and others have raised.  *See Davis*, 526 U.S. at 648.  Because "delay may see the dissipation of the legal dispute without need for decision," "'resolution of the dispute should be postponed.'"  *See Mangual v. Rotger-Sabat*, 317 F.3d 45, 59 (1st Cir. 2003).

9

## II.   PLAINTIFFS LACK STANDING UNDER RULE 12(B)(1)

Standing requires that Plaintiffs "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  Standing must be established for each claim Plaintiffs assert and each form of relief they seek.  *Webb v. Injured Workers Pharmacy LLC*, 72 F.4th 365, 372 (1st Cir. 2023) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).  An association must establish that "'its members would otherwise have standing to sue in their own right'" and that "'neither the claim asserted nor the relief requested requires the participation of individual[] members in the lawsuit.'"  *New Hampshire Motor Transp. Ass'n v. Rowe*, 448 F.3d 66, 71 (1st Cir. 2006), *aff'd*, 552 U.S. 364 (2008).

Here, neither Kestenbaum nor SAA can establish standing to seek prospective injunctive relief.  Relying on allegations of past harm and allegations involving other students not before the Court, Plaintiffs have not shown that a future injury to themselves, traceable to Harvard, is "certainly impending."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).  That is particularly apparent in the case of Kestenbaum, whose claims for injunctive relief will become "inescapably moot" when he graduates next month and ceases to be a Harvard student, as there will be "simply 'no ongoing conduct to enjoin' presently affecting [him]."  *Harris v. University of Massachusetts Lowell*, 43 F.4th 187, 192 (1st Cir. 2022); Whelsky Decl. ¶ 3.  Nor have Plaintiffs plausibly alleged that any injury they may suffer in the future likely would be redressed by the injunction they seek.  SAA, which alleges no injury of its own, also lacks standing to sue on behalf of its members.

### A.  Plaintiffs Fail To Plead An Ongoing Or Certainly Impending Future Injury Traceable to Harvard's Conduct

To establish standing, Plaintiffs must plead injury-in-fact, meaning "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560).  There also must be "a causal connection between the injury and the conduct complained of," such that the injury is "fairly … trace[able] to the challenged action of the defendant, and not … th[e] result [of] the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560.  Plaintiffs fail to satisfy these required elements because they do not plausibly allege they are likely to be injured by Harvard's response to antisemitic harassment.

First, Plaintiffs seek to establish an ongoing or future injury by criticizing Harvard's response to incidents that they do not allege they personally experienced, *see, e.g.*, AC ¶¶ 105, 108, 114, 127, 131, 132, 134, 149, 152, 192, 198, 205, 206, 207, 215, 216, some of which predate their arrival at Harvard, *e.g.*, *id.* ¶¶ 61-69, 73-77.  A great many of the incidents alleged—for example, the hosting of speakers who had previously made controversial statements, *e.g.*, *id.* ¶ 140, 152, 183, or a community member's inflammatory social media posts, *e.g.*, *id.* ¶ 136, 150, 175, 194, 213—are on their face not directed to any individual member of the Harvard community, and unsurprisingly the Plaintiffs do not try to plead injury to any specific person as a result.  These alleged incidents, like those actually involving Plaintiffs, are of course deeply concerning, and Harvard is addressing them as appropriate.  But they do not plausibly establish an injury-in-fact because they are not "particularized" to these Plaintiffs. *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 731 (1st Cir. 2016).  Plaintiffs fail to put forward plausible allegations of an ongoing or certainly impending future injury to *them*—including, in SAA's case, its members.

Second, the only personal injuries Plaintiffs identify are tied to past incidents of alleged harassment and discrimination that cannot confer standing to seek prospective relief. Specifically, Kestenbaum alleges that he attended events where speakers or protestors have made comments he views as antisemitic, AC ¶¶ 78, 81, 82, 137—events he now avoids, *id.* ¶¶ 139, 196, 217.  He also alleges that he was criticized and ostracized by peers on several occasions in response to comments he has made.  *Id.* ¶¶ 107-108, 140, 200, 203.  And he alleges that he was sent harassing emails and social media posts by a Harvard staff member, *id.* ¶¶ 185-189, who has since been placed on leave, Weenick Decl. ¶ 8.  SAA alleges that Members 1, 2, 3, and 5 were studying in the Law School last October when protesters "marched down the length of the building's primary first-floor hallway" and "blocked the hallway outside the study room" where they were hiding, "[f]earing a violent attack."  AC ¶ 109-110.  Plaintiffs also allege that two student groups engaged in a "takeover" of a Law School lounge last fall, during which students engaged in "antisemitic agitation and anti-Israeli protests" and "regularly stopped and targeted" SAA Members 1 and 2, *see id.* ¶ 118, who later "participated in a counter-protest" in the same space, *id.* ¶ 121.  Plaintiffs further allege that SAA Member 1 feared one of his Fall 2023 teaching assistants because of the TA's conduct at the October 18 "die-in" protest, *id.* ¶ 145; that SAA Member 5 attended an event that was "disrupted by anti-Israel students," *id.* ¶ 218; and that a protest involving "antisemitic messages" prevented SAA Members 1 and 5 from using a Law School lounge, *id.* ¶ 224.

Harvard has addressed, and will continue to address, incidents like these as appropriate under its policies; but the "past injur[ies]" Plaintiffs allege "cannot support standing to seek an injunction against future harm."  *Roe v. Healey*, 78 F.4th 11, 21 (1st Cir. 2023).  "[A] person exposed to a risk of future harm may pursue forward-looking, injunctive relief" only by

establishing a "risk of harm [that] is sufficiently imminent and substantial." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 435 (2021).  To be sufficiently imminent, "the threatened injury must be *certainly impending*." *Clapper*, 568 U.S. at 410.  Allegations of "'*possible* future injury'" do not suffice.  *Id.*  Instead, Plaintiffs must plead "a sufficient likelihood that [they] will again be wronged in a similar way." *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983).

Plaintiffs do not face an ongoing or "certainly impending" future injury because, since the explosive aftermath of Hamas' October 7 terrorist attack—a time of intense turmoil in which the alleged incidents Plaintiffs rely on unfolded, *see* AC ¶ 104—Harvard has taken tangible steps to investigate and combat antisemitic conduct on campus.  Harvard's response to reports of antisemitism, including messages on Sidechat and social media posts; its clarification of the rights and responsibilities of students who wish to speak out about the Israel-Hamas war through updated guidelines explaining the time, place, and manner limitations governing on-campus protests; and the ongoing, comprehensive work of the Presidential Task Force on Combating Antisemitism all refute Plaintiffs' allegations that the incidents Plaintiffs describe or the University responses they allege to be deficient are likely to repeat themselves.  *See supra* pp.5-6.  "[S]ubjective apprehensions" of future harm do not establish legally cognizable injury—only "the *reality* of the threat of repeated injury … is relevant to the standing inquiry." *Lyons*, 461 U.S. at 107 n.8.

Plaintiffs also have not plausibly alleged that any ongoing or certainly impending injury they might suffer would be traceable to Harvard. *See Clapper*, 568 U.S. at 413.  Traceability requires a "sufficiently direct causal connection between the challenged action and the identified harm." *Dantzler, Inc. v. Empresas Berrios Inventory & Ops., Inc.*, 958 F.3d 38, 47 (1st Cir. 2020).  In this Title VI suit, Plaintiffs cannot establish an injury traceable to Harvard by simply

alleging that they experienced antisemitic incidents, or even that they may experience such incidents in the future; Plaintiffs must show that Harvard caused them injury through deliberate indifference to those incidents.  Plaintiffs attempt to portray the University's response to antisemitism as static.  But their conclusory allegations that Harvard "will continue" to violate their rights, *see* AC ¶ 275; *id.* ¶ 282, cannot be credited, particularly when the violation alleged arises under a theory of "deliberate indifference."  Harvard has increased campus security and police presence at locations and events where members of Harvard's Jewish community gather, Weenick Decl. ¶ 3; planned for new educational sessions on antisemitism for more than 200 faculty and administrators who may participate in disciplinary processes at each of Harvard's schools, *id.* ¶ 6; published new, specific guidance on permitted protest and dissent activities, Ellsworth Decl. Ex. 4; clarified that violations of Harvard policies concerning protest and dissent will be subject to appropriate process, *id.*; organized community support and listening sessions, Ellsworth Decl. Exs. 3, 8; and established new initiatives to facilitate discussion and build community through civil discourse and respectful debate, Weenick Decl. ¶ 4.  The Presidential Task Force on Combating Antisemitism has met with Jewish undergraduate and graduate students, faculty, and staff, *see supra* p.7, and will provide recommendations to University leadership "on a rolling basis" to allow Harvard to "consider, refine, and implement interventions, and to keep the community apprised as our work together proceeds."  Ellsworth Decl. Ex. 7.

Simply put, Plaintiffs cannot show that Harvard's ongoing response to antisemitic incidents on campus is unchanged from its handling of events on campus in the immediate aftermath of October 7—and certainly not that it is "deliberately indifferent."  Harvard has taken concrete actions and made significant investments to show its commitment to responding

meaningfully to antisemitic harassment—efforts that are not yet finished.  These actions refute

any claim that Plaintiffs face a "certainly impending" injury traceable to Harvard.  *See Sumpter*

*v. Wayne Cnty.*, 868 F.3d 473, 491 (6th Cir. 2017) (holding that likelihood of future injury was

diminished and plaintiffs lacked standing due to policy change prohibiting challenged practices).

The "volume, frequency, type, and location" of alleged antisemitic conduct on campus, as well

as the "response by" Harvard officials, "have all changed in significant ways" since October 7.

*See Index Newspapers LLC v. City of Portland*, 2022 WL 4466881, at *6 (D. Ore. Sept. 26,

2022).  Plaintiffs' "claimed future injuries" thus are "too conjectural or hypothetical" to establish

standing.  *See id.*

### B.    Plaintiffs' Requested Injunction Is Unavailable As A Matter of Law

Plaintiffs also lack standing to seek injunctive relief because they have not established a

"likelihood that the requested relief will redress the alleged injury."  *Steel Co. v. Citizens for a*

*Better Envm't.*, 523 U.S. 83, 103 (1998).  To satisfy the redressability requirement, the

"requested relief" cannot be "an authority [the Court] do[es] not possess."  *Western Coal Traffic*

*League v. Surface Transp. Bd.*, 998 F.3d 945, 951 (D.C. Cir. 2021).  Nor can redressability be

established where the relief requested "would clearly do violence to the fundamental legislative

scheme, and is therefore a remedy that is unavailable."  *See Biszko v. RIHT Fin. Corp.*, 758 F.2d

769, 774 (1st Cir. 1985).  Here, Plaintiffs seek an injunction requiring Harvard to make

unspecified changes to its policies and practices to avoid penalizing Jewish students "in any

way," to discipline or terminate students and faculty who engage in or permit alleged antisemitic

discrimination, to return donations purportedly conditioned on the promotion of antisemitic

professors or course materials, to institute antisemitism training, and to follow the direction of an

independent monitor overseeing Harvard's compliance.  AC, Prayer for Relief (A).  Because this

vastly overbroad injunction is not authorized by law, Plaintiffs cannot establish redressability.

"A plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 558 U.S. 48, 73 (2018).  In other words, the relief sought must be "'limited to the inadequacy that produced [the] injury in fact.'"  *Id.* at 66.  Plaintiffs' exceedingly overbroad request to enjoin Harvard "from establishing, implementing, instituting, maintaining, or executing policies, practices, procedures, or protocols that penalize or discriminate against Jewish students, including plaintiffs and SAA's members, in any way," AC, Prayer for Relief (A), flouts this fundamental principle.  And the specific items of relief Plaintiffs request are likewise "unavailable." *Biszko*, 758 F.2d at 774.  An injunction requiring Harvard to terminate, suspend, discipline, or expel unspecified administrators, faculty, or students, *see* AC, Prayer for Relief (A)(i)-(ii), would be improper under the Supreme Court's decision in *Davis*.  *See infra* pp.27-28.  Nor can Harvard be forced to "declin[e] and return[] donations … conditioned on the hiring or promotion of professors who espouse antisemitism," *see* AC, Prayer for Relief (A)(iii)—an allegation lacking any factual support—without intruding on the University's own First Amendment rights, *see Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 226 n.12 (1985).  Finally, "appointing a neutral expert monitor" to oversee Harvard's compliance with a hypothetical injunction, AC, Prayer for Relief (A)(v), is patently improper because Plaintiffs do not plead that such an appointment is authorized by statute or extraordinary circumstances.  *See Garcia Rubiera v. Fortuno*, 727 F.3d 102, 114 (1st Cir. 2013).

### C.     SAA Lacks Standing

Plaintiff SAA's claims also should be dismissed because SAA—which does not allege its own injury—lacks standing to sue on behalf of its members.  An association has standing when "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343

16

(1977).  But such standing "is inappropriate if adjudicating the merits of an association's claim requires the court to engage in a 'fact-intensive-individual inquiry.'"  *Rowe*, 448 F.3d at 72.

SAA's Title VI and contract claims require the individualized participation of its members.  SAA's Title VI claims rest on "the application of the law to a series of different factual scenarios," and thus depend on "'the particularized circumstances of each individual member.'"  *National Ass'n of Gov't Emps. v. Mulligan*, 914 F. Supp. 2d 10, 14 (D. Mass. 2012).  Courts have rejected associational standing for "claims of intentional discrimination" under Title VI absent an explanation of how those claims "could be prosecuted without the participation of the individual members."  *Barnett v. Johnson City Sch. Dist.*, 2005 WL 8178066, at *5 n.6 (N.D.N.Y. Feb. 2, 2005).  And Title VI hostile environment claims are necessarily individualized because they require, among other plaintiff-specific showings, that the plaintiff herself "subjectively perceive[d] the environment to be abusive."  *See Brown v. Hot, Sexy & Safer Prods., Inc.*, 68 F.3d 525, 540-541 (1st Cir. 1995), *abrogated on other grounds by Martinez v. Cui*, 608 F.3d 54 (1st Cir. 2010).  SAA similarly cannot sue on its members' behalf under a breach-of-contract theory as it lacks standing to seek damages on behalf of individual members, *Warth v. Seldin*, 422 U.S. 490, 515-516 (1975), and determining the existence, scope, or breach of any contract between Harvard and SAA members would involve a "'fact-intensive-individual inquiry'" that defeats associational standing.  *Rowe*, 448 F.3d at 72.

## III.   PLAINTIFFS' TITLE VI CLAIM SHOULD BE DISMISSED UNDER RULE 12(B)(6)

Title VI "prohibits only intentional discrimination."  *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001).  Intentional discrimination can be established by showing a school acted with discriminatory animus, *see Doe v. Brown Univ.*, 43 F.4th 195, 208 (1st Cir. 2022), or that the school's "deliberate indifference caused the student to be subjected to the harassment" alleged,

*see Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165, 171 (1st Cir. 2007), *rev'd on other grounds*, 555 U.S. 246 (2009).  Plaintiffs do not plead a Title VI violation under either theory.

### A.      Plaintiffs Do Not Plausibly Allege Discriminatory Animus

Plaintiffs fail to plead discriminatory animus because they do not plausibly allege that Harvard "acted with discriminatory intent" or a "racial motive."  *Brown Univ.*, 43 F.4th at 208-209.  Instead, Plaintiffs' allegations show that Harvard has stood steadfast by its Jewish community and has condemned antisemitism promptly, forcefully, and repeatedly.  *See, e.g.*, AC ¶¶ 96, 99, 117, 127-128.

Plaintiffs point to Harvard's responses to various campus controversies and assert that Harvard "selectively enforce[d] its own rules, deeming Jewish victims unworthy of the protections it readily affords non-Jewish ones."  AC ¶ 38.  To plead discrimination through comparators, however, Plaintiffs must put forward two "reasonably comparable" incidents where "the nature of the infraction and knowledge of the evidence by college officials [were] sufficiently similar" to show that Harvard acted inconsistently.  *Brown Univ.*, 43 F.4th at 207.  They fail to do so.  Instead, Plaintiffs make scattershot reference to past occasions on which Harvard issued statements—as Plaintiffs acknowledge Harvard has done here, AC ¶¶ 96, 99, 117, 127-128—or canceled speaking events or disciplined students and faculty, *id.* ¶¶ 230, 234, 235, 238-241, 244-246.  The strained comparisons Plaintiffs draw underscore the weakness of their claimed double standard: in their view, Harvard's decision to confront institutional racism by "chang[ing] the title of 'house masters' to 'faculty deans,'" *id.* ¶ 231, while declining to end academic collaboration with Birzeit University, *id.* ¶ 235, shows Harvard only acts to "protect[] minority groups other than Jews," *id.* ¶ 231.

Neither those allegations nor any others in the Amended Complaint come close to showing that Harvard discriminates against Jewish students by allowing antisemitic conduct to

go unaddressed while penalizing other forms of bias under comparable circumstances. *See Doe v. Amherst Coll.*, 238 F. Supp. 3d 195, 224 (D. Mass. 2017). None of the previous incidents Plaintiffs cite involved the exceptional levels of internecine struggle that Harvard has sought to navigate since October 7, with deep and acrid divisions between both students and faculty members—leaving Harvard to address often competing claims of antisemitic and anti-Muslim discrimination. Certainly, Plaintiffs' allegations do not support the inference that "the only possible explanation for the difference in outcomes" from prior instances is the invidious double standard Plaintiffs claim. *See Goodman v. Bowdoin Coll.*, 380 F.3d 33, 45 (1st Cir. 2004). Plaintiffs' allegations that Harvard has taken different approaches in response to dissimilar events do not constitute "direct or circumstantial evidence of racial animus" toward them; they therefore fail to plead a "necessary component" of their Title VI claim. *Id.* at 43.

### B. Plaintiffs Do Not Plausibly Allege That Harvard Subjected Them To A Hostile Educational Environment Through Deliberate Indifference

Plaintiffs also fail to plausibly allege that Harvard violated Title VI by acting with "deliberate indifference" to antisemitic conduct "so severe, pervasive, and objectively offensive" that it "ha[s] the systemic effect of denying the victim equal access to an educational program or activity." *Davis*, 526 U.S. at 651-652. The same deliberate-indifference standard applies in both Title VI and Title IX cases. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998); *Pollard v. Georgetown Sch. Dist.*, 132 F. Supp. 3d 208, 230 (D. Mass. 2015). Under this standard, universities can be held liable "only where their own deliberate indifference effectively 'cause[d]' the discrimination." *Davis*, 526 U.S. at 642-643. Deliberate-indifference plaintiffs must therefore overcome a "high" bar. *Doe v. Wentworth Inst. of Tech., Inc.*, 2022 WL 1912883, at *6 (D. Mass. June 3, 2022). They must plead that the university's response to "severe, pervasive, and objectively offensive" harassment was "clearly unreasonable in light of the

known circumstances." *Porto v. Town of Tewksbury*, 488 F.3d 67, 72-73 (1st Cir. 2007).

Allegations that the university "could or should have done more" are insufficient. *Id.* at 73.

Plaintiffs fall far short of that bar. Stripped of its allegations involving First-Amendment-protected expression concerning rallies, statements, speaker invitations, and academic decisions, the Amended Complaint is left with a handful of alleged antisemitic incidents. Those incidents are insufficient to plausibly allege that Harvard's ongoing response has been "clearly unreasonable." *Davis*, 526 U.S. at 648. That alone forecloses Plaintiffs' deliberate-indifference claim. And while the offensive remarks and disruptive actions Plaintiffs describe are contrary to Harvard's "dual commitment to free expression and mutual respect," Ellsworth Decl. Ex. 4—they do not amount to "severe, pervasive, and objectively offensive" harassment under Title VI. *Davis*, 526 U.S. at 651.

        1.     <u>Plaintiffs do not plausibly allege that Harvard's response to the alleged harassment was "clearly unreasonable"</u>

Plaintiffs' allegations of deliberate indifference fail because they do not establish that Harvard's response has been "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. Plaintiffs cannot plead deliberate indifference merely by alleging that Harvard declined to restrict speech that they oppose. But Plaintiffs do precisely that—they repeatedly allege that Harvard should have prevented or punished rallies, boycotts, and protests, *see* AC ¶¶ 58, 61, 64, 73-77, 79-81, 93, 105, 107, 109, 114-115, 118-122, 126, 129, 131, 132, 134-135, 137, 139, 196, 204, 207, 217, 218, 221, 224, and statements by students or faculty that Plaintiffs found offensive, *id.* ¶¶ 66, 94, 101, 136, 150-151, 153, 175-176, 198, 209. They assert that Harvard should have intervened to stop student groups or faculty members from inviting controversial speakers to campus. *See id.* ¶¶ 62, 65, 69, 78, 82, 140, 152, 183-184, 190, 192, 195, 205, 216, 223, 226. And they claim that Harvard should have taken action with respect to,

or overruled, academic decisions by university professors, including the assignment of particular reading materials.  *See id.* ¶¶ 70-71, 145, 146-149.  But however ill-considered or offensive one might find the views expressed on these occasions, settled free speech principles allow Harvard to determine that it may not be appropriate to discipline or otherwise coerce members of the University community, toward shielding Plaintiffs from exposure to speech that offended them.

That is because Harvard does not have a duty under Title VI to censor student or faculty speech protected by the First Amendment.  Public universities of course may not infringe upon the First Amendment rights of faculty, students, and staff.  *See Healy v. James*, 408 U.S. 169, 180-181 (1972).  Accordingly, *Davis* must be read to impose liability on universities—public or private—only when consistent with constitutionally protected expression.  *See Speech First, Inc. v. Fenves*, 979 F.3d 319, 337 n.16 (5th Cir. 2020).  The Department of Education has, moreover, made clear that private universities are not required by Title VI to punish protected expression: "Any private post-secondary institution that chooses to limit free speech in ways that are more restrictive than at public educational institutions does so on its own accord and not based on requirements imposed by" the Department.  Gerald A. Reynolds, Assistant Sec'y, Off. for Civ. Rts., U.S. Dep't of Educ., Dear Colleague Letter (July 28, 2003).  Indeed, because Plaintiffs seek to hold Harvard liable for a hostile learning environment allegedly created in large part by students engaged in protected speech, their Title VI claims have "serious First Amendment implications."  *Guckenberger v. Boston Univ.*, 957 F. Supp. 306, 316 (D. Mass. 1997).  Allegations based on remarks by professors or administrators similarly seek to force Harvard to take action that could have a "chilling effect ... on academic freedom," leading faculty to "avoid topics … for fear that one or two sentences might later be used as evidence of alleged discriminatory animus."  *Brown v. Trustees of Bos. Univ.*, 891 F.2d 337, 351 (1st Cir. 1989).

"[S]peech that can be reasonably interpreted as political," such as most of the speech Plaintiffs point to throughout their Amended Complaint, "is protected in schools." *Norris on behalf of A.M. v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 23 (1st Cir. 2020).  Plaintiffs urge the Court to adopt a rigid and capricious definition of unprotected antisemitic speech—and to hold Harvard liable for declining to discipline any expression that the Plaintiffs believe crosses this line.  AC ¶¶ 25-27, 32-33.  But the Court should not second-guess decisions Harvard may make to refrain from punishing student and faculty speech.  On the contrary, "school administrators must be permitted to exercise discretion in determining when certain speech crosses the line from merely offensive to more severe or pervasive bullying or harassment." *Norris*, 969 F.3d at 29 n.18.  Here, as in other cases dismissing deliberate indifference claims alleging flawed responses to antisemitism, "a very substantial portion of the conduct to which plaintiffs object represents pure political speech and expressive conduct." *See Felber v. Yudof*, 851 F. Supp. 2d 1182, 1187-1188 (N.D. Cal. 2011).  Because Title VI does not require Harvard to punish such speech, Harvard's response is "not 'clearly unreasonable' as a matter of law." *Davis*, 526 U.S. at 649.

The Amended Complaint confirms that Harvard did respond to many of the incidents with which Plaintiffs find fault.  In paragraph after paragraph, Plaintiffs acknowledge that Harvard officials reacted by condemning antisemitic conduct, listening to student concerns, offering supportive resources, enforcing policies, launching investigations and disciplinary proceedings where appropriate, and making long-term commitments to addressing antisemitism. *See, e.g.*, AC ¶¶ 68, 70, 84-87, 96, 97, 99, 101, 117, 120, 124, 127-128, 147, 177, 195, 217, 225. For example, Plaintiffs acknowledge that allegations that a professor at the Kennedy School discriminated against Jewish students in class resulted in Harvard initiating a formal investigation, led by outside counsel, into the allegations, and issuing a report censuring that

professor.  *See id.* ¶¶ 84-87.  And Plaintiffs describe how, in the immediate aftermath of the

October 7 terrorist attacks, Harvard issued multiple statements condemning Hamas' attacks,

expressing support for Jewish students, and making clear that student groups assigning blame to

Israel spoke only for themselves and not for the institution.  *See id.* ¶¶ 94-99.  While Plaintiffs

obviously believe that actions taken by Harvard did not "constitute[] an ideal response" to

antisemitism on campus, what Harvard said and did "cannot plausibly be characterized" as "so

deficient as to be clearly unreasonable."  *See Fitzgerald*, 504 F.3d at 174.

Plaintiffs also do not plausibly allege that Harvard's response to any of the incidents

involving Plaintiffs was "clearly unreasonable" as required by established case law.  As

explained, many of these allegations involve protected expression that Harvard may reasonably

conclude is protected speech.  *E.g.*, AC ¶¶ 78, 81, 82, 107, 109, 137, 140, 203, 218.  Plaintiffs

assert that when Kestenbaum was removed from a WhatsApp group created by Divinity School

students in February 2024, Harvard did not "provide[] a … substantive response" to his

complaint, *id.* ¶ 201—but they nowhere allege that Harvard controlled access to the group or had

authority to reinstate his access, or that its reaction was clearly unreasonable.  The same is true of

the disturbing allegations that a Harvard employee sent Kestenbaum harassing messages;

Plaintiffs allege only that the individual, who was promptly placed on leave, was not summarily

fired, which does not support the inference that Harvard responded unreasonably at the time or

that it is not taking additional steps, through its established processes, to address the matter

further.  *Id.* ¶¶ 185-189.  Plaintiffs further acknowledge that several University officials spoke to

them about their concerns after the October 19 protest in the Law School.  *Id.* ¶¶ 112-113.  And

Plaintiffs admit that Harvard safety officials investigated an alleged incident in which flyers

hung by the Alliance for Israel student group were removed.  *Id.* ¶ 124.  As for the announced

lounge "takeover" in Fall 2023, Plaintiffs acknowledge that University officials intervened and took measures to address Plaintiffs' concerns, *id.* ¶¶ 118, 120-121, and nowhere assert that the lounge—where some Plaintiffs even participated in their own counter-protest, *id.* ¶ 121—was not accessible to everyone even during those brief times when individuals leafleted or protested. While Plaintiffs do not allege that they attended the October 18 "die-in" protest, they do allege that Harvard relieved one of the protestors involved in confronting a Jewish student there from his role as a residential proctor, *id.* ¶ 108, and announced that it would let the law enforcement investigation into the incident finish before taking disciplinary measures, *id.* ¶ 127.

Although Harvard is committed resolutely to the elimination of antisemitism at the University, Title VI does not require that Harvard "'ensur[e] that … students conform their conduct' to certain rules." *See Davis*, 526 U.S. at 648.  Nor does the statute require that Harvard "take heroic measures" or "perform flawless investigations." *See Fitzgerald*, 504 F.3d at 174. Insistence that Harvard "could or should have done more" to address Plaintiffs' concerns does not state a deliberate-indifference claim. *Porto*, 488 F.3d at 73.

> 2.    Plaintiffs do not plausibly allege that they were subject to severe and pervasive harassment

Plaintiffs also fail to plausibly allege severe and pervasive harassment.  Certainly, the Amended Complaint alleges incidents that impair, rather than advance, informed dialogue and the interchange of ideas and opinions about October 7 and its aftermath.  But because schools must have flexibility to address on-campus conduct in a manner consistent with their obligations to all community members—including their obligation to safeguard protected expression—a Title VI claim "will lie only for harassment that is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Davis*, 526 U.S. at 633.  Plaintiffs' factual allegations "do not meet the high standard of severity or

pervasiveness" required to trigger liability for deliberate indifference under Title VI. *Pollard*, 132 F. Supp. 3d at 230-231.

Harvard in no way condones such conduct, but in the absence of "physically threatening or humiliating" speech, Plaintiffs' exposure to "offensive utterance[s]" does not create a hostile environment. *Brown*, 68 F.3d at 540. That is particularly so when the comments were not directed at or to any Plaintiff or made within the context of any program or activity in which Plaintiffs were participating, *id.* at 541 (comments "were not directed specifically at the plaintiffs"); *see also Guckenberger v. Boston Univ.*, 957 F. Supp. 306, 315 (D. Mass. 1997) (statements critical of disability-rights movement did not create hostile environment when they were "not focused on or addressed to particular … students"). Likewise, Plaintiffs' allegations involving "acts occurring years before [they] ever enrolled" at Harvard have at most "extremely marginal relevance to Plaintiffs' contention that they perceived a hostile environment." *See Felber*, 851 F. Supp. 2d at 1188.

Nor do Plaintiffs' allegations that they subjectively feared physical violence rise to the level of severity and pervasiveness that Title VI requires. Plaintiffs allege that they "[f]ear[ed] a violent attack" during an incident in which protestors holding a "Stop the Genocide in Gaza" banner entered a Law School building and "marched down the length of the building's primary first-floor hallway," blocking "the hallway outside the study room" where they were located. AC ¶ 110. But Plaintiffs do not allege that the protesters engaged with Plaintiffs in any way—let alone threatened physical violence—or that police or security personnel were not on scene. Courts have indicated that similar protest activity does not constitute severe and pervasive harassment. *See Mandel v. Board of Trustees of Cal. State Univ.*, 2018 WL 5458739, at *21 (N.D. Cal. Oct. 29, 2018); *Felber*, 851 F. Supp. 2d at 1184-1185. While Plaintiffs identify one

instance in which Kestenbaum was sent allegedly harassing messages (from an employee promptly placed on leave) that left him "concerned about his physical safety," AC ¶¶ 185, 189, a "single incident of harassment" may be actionable only when it has "produce[d] a 'systemic effect on educational programs or activities.'" *Fitzgerald*, 504 F.3d at 173 n.3; *see Davis*, 526 U.S. at 652-653; *Pollard*, 132 F. Supp. at 230. Plaintiffs do not plausibly allege such an effect.

## IV. THE COURT SHOULD STRIKE PLAINTIFFS' REQUESTED INJUNCTION AND DEMAND FOR PUNITIVE DAMAGES UNDER RULE 12(F)

Even if the Court determines that Plaintiffs have standing to seek prospective injunctive relief, it should strike their requested injunction and their claim for punitive damages under Rule 12(f) because they cannot establish that they are entitled to such remedies. Courts use Rule 12(f) to strike requests for remedies to which the Plaintiffs are not entitled, *John Hancock Life Ins.*, 183 F. Supp. 3d at 303, and may strike such "unnecessary pleadings" even without a showing of prejudice to the moving party, *Sheffield v. City of Bos.*, 319 F.R.D. 52, 55 (D. Mass. 2016); *see Zurich Am. Ins. Co. v. Watts Regul. Co.*, 796 F. Supp. 2d 240, 246 (D. Mass. 2011).

Plaintiffs' requested injunction should be stricken for several reasons. First, it is fatally overbroad. It would apply without limit to any policy, procedure, or practice, wresting from Harvard control over core academic, employment, and student-life decisions central to Harvard's self-governance. An injunction of that scope would violate the black-letter principle that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). The same is true of the request that the Court "appoint[] a neutral expert monitor" to superintend Harvard's university-wide response to antisemitism, AC, Prayer for Relief (A)(v)—a measure that may only be justified under narrow circumstances not alleged here. *See Fortuno*, 727 F.3d at 114.

Next, the requested relief is "tantamount to an injunction to 'obey the statute,' which the Supreme Court [has] rejected as too broad." *Trustees of Bos. Univ.*, 891 F.2d at 361.  Plaintiffs seek to enjoin "Harvard and its agents from establishing, implementing, instituting, maintaining, or executing policies, practices, procedures, or protocols that penalize or discriminate against Jewish students, including plaintiffs and SAA's members, in any way."  AC, Prayer for Relief (A).  But precisely because an injunction "should be narrowly tailored to give only the relief to which plaintiffs are entitled," an injunction that broadly enjoins Harvard "from discrimination" "has the potential to further embroil the courts in the University's internal affairs." *See Trustees of Bos. Univ.*, 891 F.2d at 361.  Because the requested injunction is "overly broad" and "essentially command[s]" Harvard to "obey the law concerning … discrimination," it should be struck. *EEOC v. Aviation Port Servs., LLC*, 2020 WL 1550564, at *12 (D. Mass. Apr. 1, 2020).

Third, Plaintiffs' request that the Court require Harvard to take particular remedial measures should be struck because such relief is barred unequivocally by the Supreme Court's holding in *Davis*.  Plaintiffs seek, among other far-reaching remedies, to compel Harvard to "take all necessary, adequate, and appropriate remedial, corrective, and preventative measures" including terminating deans and professors, suspending or expelling students, and declining or returning donations.  AC, Prayer for Relief (A).  But Title VI does not require that "administrators must engage in particular disciplinary action" to avoid liability. *See Davis*, 526 U.S. at 648.  Victims of harassment therefore have no Title VI "right to make particular remedial demands." *Id.*; *accord Roe v. Lincoln-Sudbury Reg'l Sch. Dist.*, 2021 WL 1132256, at *27 (D. Mass. Mar. 24, 2021) ("[A] plaintiff does not have the right to make particular remedial demands, and courts 'should refrain from second-guessing' the decisions of school administrators when assessing their responses.").  And in evaluating contract claims, "'courts are

chary about interfering with academic and disciplinary decisions made by private colleges and universities.'" *Doe v. Trustees of Bos. Coll.*, 942 F.3d 527, 535 (1st Cir. 2019).

Lastly, the Court should strike Plaintiffs' request for punitive damages, which are not available under Title VI, *Barnes v. Gorman*, 536 U.S. 181, 189 (2002), or Massachusetts contract law, *DeRose v. Putnam Management Co.*, 496 N.E.2d 428, 432 (Mass. 1986).

## V. PLAINTIFFS' CONTRACT CLAIMS SHOULD BE DISMISSED UNDER RULE 12(B)(6)

### A. Plaintiffs Do Not Plausibly Allege A Breach Of Contract

Plaintiffs fail to plead a breach of contract because they do not plausibly allege either that any policy they cite created an enforceable contract between them and Harvard or that Harvard "breached [their] reasonable expectations based on the explicit and implicit promises in the contract" that those policies purportedly created. *Sonoiki v. Harvard Univ.*, 37 F.4th 691, 713 (1st Cir. 2022). A student's "reasonable expectations" must be tethered to the "express terms of the contract" with the university. *Id.* at 709. To plead a breach, Plaintiffs are required to identify "definite and certain promises about the university's environment or services" that Harvard has broken. *Brown v. Suffolk Univ.*, 2021 WL 2785047, at *6 (D. Mass. Mar. 31, 2021).

Rather than plead that Harvard breached any express contractual commitment, Plaintiffs assert in conclusory fashion that Harvard failed to "provide them a discrimination-free environment" by "abiding by, and adequately and appropriately enforcing" its policies. AC ¶ 280. They block-quote a number of Harvard policies without alleging that any particular policy provision required Harvard to act in any particular circumstance. *See id.* ¶ 282. Some of the policies cited are not even alleged to apply to Plaintiffs or any specific incidents they describe. As to the policies that may apply to Plaintiffs, many of the quoted provisions point to "generalized, aspirational statements that are insufficiently definite" to establish a breach of an enforceable term. *G. v. Fay Sch.*, 931 F.3d 1, 12 (1st Cir. 2019); *see* AC ¶ 282. Even where

Plaintiffs allege that Harvard policies prohibit specific actions, they do not plead that these policies bind the University to respond within a certain timeframe or adopt particular disciplinary measures in response to the incidents they allege.  The Statement on Rights and Responsibilities, for instance, provides that interference with another community member's activities will subject a student to "appropriate discipline"—not to any predetermined penalty.  AC ¶ 182.  Elsewhere, Plaintiffs do not plead that Harvard defied their reasonable expectations in handling alleged policy violations, but rather that the University did not provide them regular updates on reports of misconduct referred for investigation.  *See id.* ¶ 218.

The Amended Complaint does not contain the type of allegations that have been held to establish breach, such as failing to follow a set of guaranteed procedural rights, *Doe v. Trustees of Bos. Coll.*, 892 F.3d 67, 80-87 (1st Cir. 2018), or neglecting to deliver educational offerings expressly promised, *Guckenberger*, 957 F. Supp. at 317.  Plaintiffs instead assert that Harvard failed to mete out unspecified discipline to certain students and faculty.  Transforming general university policies into enforceable promises to take particular disciplinary measures would rob schools of discretion on matters of discipline and seriously undermine their right to "autonomous decisionmaking."  *See Ewing*, 474 U.S. at 226 n.12.  For that reason, courts hesitate to "'interfer[e] with academic and disciplinary decisions made by private colleges and universities,'" which require "flexibility to adopt diverse approaches to student discipline matters."  *Trustees of Bos. Coll.*, 942 F.3d at 535.  Plaintiffs' breach of contract claim should be dismissed.

### B.  Plaintiffs' Implied Covenant Claim Should Be Dismissed As Duplicative

Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing must be dismissed for the additional reason that Plaintiffs "do[] not identify a distinct basis for this claim," and it is duplicative of their breach of contract and Title VI claims.  *See Doe v. Stonehill*

*College, Inc.*, 55 F.4th 302, 337-338 (1st Cir. 2022); *see also Doe v. Clark Univ.*, 624 F. Supp. 3d 1, 9 (D. Mass. 2022) ("In the Title IX context, the analysis for a claim of breach of the covenant of good faith and fair dealing is 'essentially identical' to the analysis for a claim of breach of contract.").  A claim for breach of the covenant of good faith and fair dealing cannot go forward where other contract claims based on the same facts have failed because the covenant does not "create rights and duties not otherwise provided for in the existing contractual relationship."  *Uno Restaurants, Inc. v. Boston Kenmore Realty Corp.*, 805 N.E.2d 957, 964 (Mass. 2004).  Just as they do for their Title VI and breach of contract claim, Plaintiffs baldly assert that Harvard "selectively applies" its policies in a manner motivated by discrimination without alleging how specific policies have been applied in a purportedly selective way.  AC ¶ 285.  As such, Plaintiffs' implied covenant claim should be dismissed.

## **CONCLUSION**

The Court should dismiss Plaintiffs' Amended Complaint with prejudice.

DATED:  April 12, 2024

Respectfully Submitted,

PRESIDENT AND FELLOWS OF HARVARD COLLEGE

By its attorneys,

/s/ Felicia H. Ellsworth

Mark A. Kirsch (*pro hac vice*)
Gina Merrill (*pro hac vice*)
KING & SPALDING LLP
1185 Avenue of the Americas
34th Floor
New York, NY 10036
mkirsch@kslaw.com
gmerrill@kslaw.com
Tel: (212) 790-5329
Fax: (212) 556-2222


Zachary Fardon (*pro hac vice*)
KING & SPALDING LLP
110 N. Wacker Drive
Suite 3800
Chicago, IL 60606
zfardon@kslaw.com
Tel: (312) 764-6960
Fax: (312) 995-6330


Zoe M. Beiner (*pro hac vice*)
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Suite 900
Washington, DC 20006
zbeiner@kslaw.com
Tel: (202) 626-5575
Fax: (202) 626-3737

Felicia H. Ellsworth, BBO #665232
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel:  (617) 526-6000
Fax: (617) 526-5000
felicia.ellsworth@wilmerhale.com


Seth P. Waxman (*pro hac vice*)
Bruce M. Berman (*pro hac vice*)
Jeremy W. Brinster (*pro hac vice*)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Tel:  (202) 663-6000
Fax: (202) 663-6363
seth.waxman@wilmerhale.com
bruce.berman@wilmerhale.com
jeremy.brinster@wilmerhale.com