**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

----------------------------------------------------------- X

ALEXANDER KESTENBAUM and       :
STUDENTS AGAINST ANTISEMITISM,       :
INC.,       :
      :
           Plaintiffs,       :     Civil Action No. 1:24-cv-10092-RGS
      v.       :
      :
PRESIDENT AND FELLOWS OF       :
HARVARD COLLEGE,       :
      :
           Defendant.       :

----------------------------------------------------------- X

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S**
**MOTION TO DISMISS AND STRIKE**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT .................................................................................... 1

SUMMARY OF FACTS .......................................................................................... 4

ARGUMENT ........................................................................................................ 7

I.      Plaintiffs Allege a Hostile Educational Environment Under Title VI ............................... 7

        A.      Plaintiffs Sufficiently Allege Harassment ............................................. 8

        B.      Plaintiffs Plausibly Allege Harvard's Deliberate Indifference ........................... 10

II.     Plaintiffs State a Direct Discrimination Claim Under Title VI ........................................ 14

III.    Plaintiffs Adequately Allege Breach of Contract and the Implied Covenant .................... 15

IV.     The Court Has Subject Matter Jurisdiction ................................................... 18

        A.      Harvard's Rule 12(b)(1) Arguments Are Intertwined with the Merits ............... 18

        B.      Plaintiffs Have Standing to Pursue Injunctive Claims and SAA Has
                Associational Standing ........................................................... 19

                1.      Plaintiffs Properly Allege Ongoing and Future Injury-in-Fact ............... 19

                2.      Plaintiffs' Ongoing and Future Injuries Are Traceable to Harvard ......... 21

                3.      A Favorable Decision Will Redress Plaintiffs' Injuries ..................... 23

                4.      SAA Has Standing ....................................................... 25

        C.      Plaintiffs' Claims Are Ripe Under Rule 12(b)(1) .................................. 26

                1.      Plaintiffs' Claims Are Fit for Review .................................... 27

                2.      This Case Will Impose Hardship on Plaintiffs, Not Harvard ............... 28

V.      Plaintiffs' Requested Relief Is Proper ........................................................ 29

CONCLUSION .................................................................................................... 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aguasvivas v. Pompeo,*
  984 F.3d 1047 (1st Cir. 2021)....................................................................................27

*Alexander v. Sandoval,*
  532 U.S. 275 (2001)..................................................................................................24

*Algonquin Gas Transmission, LLC v. Weymouth,*
  919 F.3d 54 (1st Cir. 2019).......................................................................................28

*Barnett v. Johnson City Sch. Dist.,*
  2005 WL 8178066 (N.D.N.Y. Feb. 2, 2005).............................................................26

*Biszko v. RIHT Fin. Corp.,*
  758 F.2d 769 (1st Cir. 1985)......................................................................................24

*Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm.,*
  89 F.4th 46 (1st Cir. 2023).........................................................................................26

*In re Bos. Univ. COVID-19 Refund Litig.,*
  511 F. Supp. 3d 20 (D. Mass. 2021)............................................................................7

*Brodeur v. Claremont Sch. Dist.,*
  626 F. Supp. 2d 195 (D.N.H. 2009)...........................................................................13

*Brown v. Hot, Sexy & Safer Productions, Inc.,*
  68 F.3d 525 (1st Cir. 1995).............................................................................8, 10, 26

*Brown v. Suffolk Univ.,*
  2021 WL 2785047 (D. Mass. Mar. 31, 2021) ...........................................................17

*Brown v. Trustees of Boston Univ.,*
  891 F.2d 337 (1st Cir. 1989).................................................................................13, 29

*Califano v. Yamasaki,*
  442 U.S. 682 (1979)...................................................................................................29

*Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp.,*
  799 F.2d 6 (1st Cir. 1986)..........................................................................................25

*Cannon v. Univ. of Chi.,*
  441 U.S. 677 (1979).....................................................................................................7

*CardioNet, LLC v. InfoBionic, Inc.*,
   2015 WL 13849810 (D. Mass. Nov. 20, 2015) ...............................................18, 22

*Concilio de Salud Integral de Loiza, Inc. v. Pérez-Perdomo*,
   551 F.3d 10 (1st Cir. 2008)................................................................................25

*Connor B. ex rel. Vigurs v. Patrick*,
   771 F. Supp. 2d 142 (D. Mass. 2011) ......................................................20, 21, 22

*Conservation L. Found., Inc. v. Jackson*,
   964 F. Supp. 2d 152 (D. Mass. 2013)................................................................23

*Czerwienski v. Harvard Univ.*,
   666 F. Supp. 3d 49 (D. Mass. 2023) ...........................................................*passim*

*Davis v. Monroe Cnty. Bd. of Educ.*,
   526 U.S. 629 (1999)..........................................................................................30

*Davis v. Wells Fargo*,
   824 F.3d 333 (3d Cir. 2016) ..............................................................................19

*Doe v. Brandeis Univ.*,
   177 F. Supp. 3d 561 (D. Mass. 2016) ................................................................17

*Doe v. Brown Univ.*,
   43 F.4th 195 (1st Cir. 2022)...............................................................................15

*Doe v. County of Centre*,
   242 F.3d 437 (3d Cir. 2001) ..............................................................................29

*Doe v. Gavins*,
   2023 WL 6296398 (D. Mass. Sept. 27, 2023) ......................................................9

*Doe v. Harvard Univ.*,
   462 F. Supp. 3d 51 (D. Mass. 2020) ..................................................................12

*Doe v. Stonehill*,
   55 F.4th 302 (1st Cir. 2002)...............................................................................18

*Doe v. Trustees of Bos. Coll.*,
   942 F.3d 527 (1st Cir. 2019)..............................................................................30

*Doe v. Univ. of Me. Sys.*,
   2020 WL 981702 (D. Me. Feb. 20, 2020) ...........................................................28

*Doe v. Univ. of Tenn.*,
   186 F. Supp. 3d 788 (M.D. Tenn. 2016)..............................................................21

*Duggan v. Martorello*,
  596 F. Supp. 3d 158 (D. Mass. 2022) ............................................................... 7

*E.E.O.C. v. Aviation Port Servs., LLC*,
  2020 WL 1550564 (D. Mass. Apr. 1, 2020) ..................................................... 30

*E.E.O.C. v. Fred Fuller Oil Co.*,
  2014 WL 347635 (D.N.H. Jan. 31, 2014) .......................................................... 9

*Ernst & Young v. Depositors Econ. Prot. Corp.*,
  45 F.3d 530 (1st Cir. 1995) ............................................................................. 28

*Felber v. Yudof*,
  851 F. Supp. 2d 1182 (N.D. Cal. 2011) ........................................................... 13

*Fitzgerald v. Barnstable Sch. Comm.*,
  504 F.3d 165 (1st Cir. 2007) ........................................................................... 12

*Franchina v. City of Providence*,
  881 F.3d 32 (1st Cir. 2018) ............................................................................... 9

*G. v. Fay Sch.*,
  931 F.3d 1 (1st Cir. 2019) ............................................................................... 17

*Garcia-Rubiera v. Fortuno*,
  727 F.3d 102 (1st Cir. 2013) ........................................................................... 25

*Gill v. Whitford*,
  585 U.S. 48 (2018) ........................................................................................... 24

*Goodman v. Bowdoin Coll.*,
  380 F.3d 33 (1st Cir. 2004) ............................................................................. 15

*Gorski v. N.H. Dep't of Corr.*,
  290 F.3d 466 ..................................................................................................... 9

*Grace v. Bd. of Trustees*,
  85 F.4th 1 (1st Cir. 2023) ..................................................................... 10, 12, 13

*Guckenberger v. Boston Univ.*,
  957 F. Supp. 306 (D. Mass. 1997) ........................................................... 10, 13

*Hayes v. McGee*,
  2011 WL 39341 (D. Mass. Jan. 6, 2011) ......................................................... 29

*Hernandez–Loring v. Universidad Metropolitana*,
  233 F.3d 49 (1st Cir. 2000) ............................................................................... 9

*Hochendoner v. Genzyme Corp.*,
    823 F.3d 724 (1st Cir. 2016) ..................................................................20

*Howard v. Feliciano*,
    583 F. Supp. 2d 252 (D. P.R. 2008) .............................................11, 13

*Index Newspapers LLC v. City of Portland*,
    2022 WL 4466881 (D. Or. Sept. 26, 2022) ...........................................23

*Johnson v. Bryson*,
    851 F. Supp. 2d 688 (S.D.N.Y. 2012) ....................................................29

*Kappa Alpha Theta Fraternity, Inc. v. Harvard Univ.*,
    397 F. Supp. 3d 97 (D. Mass 2019) ........................................................24

*Koumantaros v. City Univ. of N.Y.*,
    2007 WL 840115 (S.D.N.Y. Mar. 19, 2007) ..........................................10

*Lipsett v. Univ. of P.R.*,
    864 F.2d 881 (1st Cir. 1988) .............................................................7, 9

*Maldonado v. Cultural Care, Inc.*,
    2020 WL 4352846 (D. Mass. July 29, 2020) ...........................................7

*Marradi v. K&W Realty Inv. LLC*,
    212 F. Supp. 3d 239 (D. Mass. 2016) .....................................................18

*In re McCabe*,
    2006 WL 8462691 (D. Mass. Apr. 3, 2006) ...........................................24

*Morell v. United States*,
    185 F.R.D. 116 (D.P.R. 1999) ...............................................................29

*N.H. Lottery Comm'n v. Rosen*,
    986 F.3d 38 (1st Cir. 2021) ....................................................................27

*Nat'l Ass'n of Gov't Emps. v. Mulligan*,
    914 F. Supp. 2d 10 (D. Mass. 2012) .......................................................26

*Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist.*,
    969 F.3d 12 (1st Cir. 2020) ....................................................................13

*Nulankeyutmonen Nkihtaqmikon v. Impson*,
    503 F.3d 18 (1st Cir. 2007) ....................................................................19

*O'Rourke v. City of Providence*,
    235 F.3d 713 (1st Cir. 2001) ....................................................................8

*Pocono Mountain Charter Sch. v. Pocono Mountain Sch. Dist.*,
    908 F. Supp. 2d 597 (M.D. Pa. 2012) .......................................................................19

*Pollard v. Georgetown Sch. District*,
    132 F. Supp. 3d 208 (D. Mass. 2015) ......................................................................10

*Porto v. Town of Tewksbury*,
    488 F.3d 67 (1st Cir. 2007) .......................................................................................12

*R.I. Ass'n of Realtors, Inc. v. Whitehouse*,
    199 F.3d 26 (1st Cir. 1999) .......................................................................................29

*Reddy v. Foster*,
    845 F.3d 493 (1st Cir. 2017) .....................................................................................28

*Roe v. Healey*,
    78 F.4th 11 (1st Cir. 2023) ........................................................................................20

*Roe v. Lincoln-Sudbury Reg'l Sch. Dist.*,
    2021 WL 1132256 (D. Mass. Mar. 24, 2021) ..........................................................30

*Ruffino v. State St. Bank & Tr. Co.*,
    908 F. Supp. 1019 (D. Mass. 1995) .....................................................................9, 20

*Sauer v. Belfor USA Grp., Inc.*,
    205 F. Supp. 3d 209 (D. Mass. 2016) .....................................................................7, 9

*Schoendorf v. RTH Mech. Contractors, Inc.*,
    2012 WL 3229333 (D. Me. Aug. 6, 2012) ...............................................................13

*Sexual Minorities Uganda v. Lively*,
    960 F. Supp. 2d 304 (D. Mass. 2013) ......................................................................26

*Shulse v. W. New Eng. Univ.*,
    2020 WL 4474274 (D. Mass. Aug. 4, 2020) .......................................................15, 16

*Sinai v. New Eng. Tel. & Tel. Co.*,
    3 F.3d 471 (1st Cir. 1993) .........................................................................................14

*Snelling v. Fall Mountain Reg'l Sch. Dist.*,
    2001 WL 276975 (D.N.H. Mar. 21, 2001) ................................................................9

*Sonoiki v. Harvard Univ.*,
    37 F.4th 691 (1st Cir. 2022) ......................................................................................16

*SPARTA Ins. v. Pa. Gen. Ins.*,
    621 F. Supp. 3d 169 (D. Mass. 2022) ......................................................................28

*SPARTA Ins. v. Pa. Gen. Ins.*,
 651 F. Supp. 3d 391 (D. Mass. 2023) ....................................................................27

*Speech First, Inc. v. Fenves*,
 979 F.3d 319 (5th Cir. 2020) ..............................................................................13

*Sumpter v. Wayne County*,
 868 F.3d 473 (6th Cir. 2017) ..............................................................................23

*Susan B. Anthony List v. Driehaus*,
 573 U.S. 149 (2014) ........................................................................................27, 28

*Tuli v. Brigham & Women's Hosp., Inc.*,
 566 F. Supp. 2d 32 (D. Mass. 2008) ....................................................................13

*Valentin v. Town of Natick*,
 2023 WL 8815167 (D. Mass. Dec. 20, 2023) ......................................................16

*Van v. Am. Airlines, Inc.*,
 370 F. Supp. 3d 218 (D. Mass. 2019) ....................................................18, 21, 23

*Van Wagner Bos., LLC v. Davey*,
 770 F.3d 33 (1st Cir. 2014) ..........................................................................18, 21

*W. Coal Traffic League v. Surface Transp. Bd.*,
 998 F.3d 945 (D.C. Cir. 2021) ............................................................................24

*Warth v. Seldin*,
 422 U.S. 490 (1975) ........................................................................................25, 26

*Zeno v. Pine Plains Cent. Sch. Dist.*,
 702 F.3d 655 (2d Cir. 2012) ..........................................................................11, 30

**Constitutional Provisions, Statutes, and Rules**

U.S. Const. amend. I ..............................................................................................12, 13

42 U.S.C. § 2000d ..................................................................................................*passim*

Fed. R. Civ. P. 12(b)(1) ........................................................................................18, 26

Fed. R. Civ. P. 12(b)(6) ........................................................................................7, 18

Fed. R. Civ. P. 15 ......................................................................................................30

Fed. R. Civ. P. 53 ......................................................................................................25

**Other Authorities**

*"Dear Colleague" Letter on Shared Ancestry* (Nov. 7, 2023),
 https://www2.ed.gov/about/offices/list/ocr/letters/colleague-202311-
 discrimination-harassment-shared-ancestry.pdf ........................................................13

Holocaust Encyclopedia, *University Student Groups in Nazi Germany*,
 https://encyclopedia.ushmm.org/content/ en/article/university-student-groups-
 in-nazi-germany ........................................................................................................4

Rabbi Hirshy Zarchi (@HarvardChabad), X (Apr. 24, 2024, 10:59 PM),
 https://twitter.com/HarvardChabad/status/1783329906585194730 ..........................1

Romina Ruiz-Goiriena, *Hamas and Iran Celebrate Anti-Gaza War Protests Taking
 US Colleges by Storm*, USA Today (Apr. 25, 2024 11:28 a.m.),
 https://www.usatoday.com/story/news/politics/2024/04/24/hamas-iran-support-
 college-protests/73447123007 .....................................................................................4

Plaintiffs respectfully submit this memorandum of law in opposition to Harvard's motion to dismiss and to strike.[1]

## PRELIMINARY STATEMENT

Harvard's arguments in its meritless motion could hardly be more disingenuous. Antisemitism is sweeping our country's college campuses. In the wake of the worst attack on Jews since the Holocaust—Hamas's murder, rape, and kidnapping of hundreds of Israelis on October 7, 2023—college students and faculty at Harvard and other campuses are rallying to celebrate Hamas, a U.S.-designated terrorist organization. Jewish students are being met with genocidal chants— "one solution—Intifada revolution,"[2] "from the river to the sea, Palestine will be free [of Jews]," "go back to Poland"—and are being assaulted and blocked by student occupiers from entering their own campuses. Jewish students are afraid to identify as Jews and fear being graded by pro-Hamas faculty. College rabbis are advising Jewish students to flee campus. After Harvard Yard was occupied this past week by a pro-Hamas mob, *see* Member Decl. ¶¶ 3-14, Harvard's Chabad Rabbi posted on social media that he heard from Jewish students trying to study for exams while "confronted with terrifying chants of globalize the Intifada—a call for the murder of Jews" and from their parents who are "frightened to learn that Hamas supporters are being allowed to camp out in Harvard Yard."[3] No other student group in living memory has been made to live in such fear.

---

[1] Capitalized terms not defined herein have the meanings ascribed to them in the amended complaint. Dkt. 32 ("complaint"). "Plaintiffs" refers to Kestenbaum and the SAA members identified in the complaint. "Mem." refers to Harvard's memorandum of law in support of its motion. Dkt. 36. "¶" refers to paragraphs in the complaint. "Member Decl." refers to the declaration of SAA Member #1 filed herewith. All emphases are added.

[2] The Intifadas were murderous campaigns in 1987 to 1993 and 2000 to 2005 of suicide bombings and shootings against Israeli civilians in buses, cafes, pizza shops, markets, and Passover Seders. ¶¶ 34-35.

[3] Rabbi Hirshy Zarchi (@HarvardChabad), X (Apr. 24, 2024, 10:59 PM), https://twitter.com/HarvardChabad/status/1783329906585194730.

Meanwhile, Harvard mouths pieties about condemning antisemitism, about how it is supposedly "antithetical to Harvard's foundational values," about how "invidious and enduring" a problem it is—but, astonishingly, it does so all in service to its argument that it should evade all accountability for having facilitated the very antisemitism that has robbed plaintiffs and other Jewish students at Harvard of their educational experience. Although, as a former Harvard president has put it, antisemitism is a "cancer" with deep roots at Harvard, ¶ 130, Harvard insists that its response is "necessarily . . . a campaign in progress," that it should be left to its own devices, and that plaintiffs' claims are "premature." This argument is meritless—there is no "trust-me" defense under Title VI. But events have overtaken it; the occupation of Harvard's campus during this week has confirmed what was already clear—Harvard's response to antisemitism has been utterly insufficient.

To fully appreciate how specious Harvard's argument is and how empty Harvard's pieties are, one need only imagine (or review Harvard's history to see) what Harvard's response would have been (or has been) if even a tiny fraction of the abuse Harvard's Jews have endured had been directed against any other protected group. Harvard would not have stood for it for one minute. Just as it is impossible to conceive of Harvard's president testifying before Congress that advocating genocide against African Americans, Asian Americans, or Arab Americans does not contravene Harvard's policies—as Harvard's president did with respect to Jews—it is impossible to conceive of Harvard arguing to the Court "trust us; we're fixing" campus-wide, continuous, months' long onslaughts against any other protected group. It is impossible to conceive of Harvard arguing in a case brought by members of any other group that it should be dismissed because they were not personally present at enough of the onslaughts for the hostile campus-wide educational environment to have adversely affected them. Harvard's Jewish students, like any other victims of

discrimination, do not have the luxury of continuing to trust Harvard, or giving Harvard still more time to "fix" a problem it has permitted to fester and metastasize. Recent events—including during this week—have proven that universities like Harvard cannot and must not be trusted to comply with their Title VI obligations to protect Jewish students.

And it is no excuse to say that the antisemitism at Harvard is really anti-Zionism or mere political disagreement with the policies of Israel. Plaintiffs do not seek to deny anyone the right to criticize Israeli policies. But no other country, notwithstanding those with far worse human rights records, has been targeted with anything close to the kind of abuse as Israel, going far beyond political disagreements to calling for its destructions and denying its right to exist and defend itself. That the pro-Hamas campus mobs target Israel and no other country and deny the Jewish people, as supposedly non-indigenous "settler-colonists," the right to self-determination in their ancestral homeland—but who themselves live in Massachusetts, named after the Native Americans who lived there—would almost be amusing, were it not so outrageous. As the Obama, Trump, and Biden administrations have recognized, what the mobs are doing is antisemitism, plain and simple. Even more outrageous is Harvard's abject failure, in violation of Title VI, to put an end to the antisemitic abuse.

Nor is so-called "academic freedom" an excuse—as plaintiffs also allege, when it comes to discrimination (or even "microaggressions") against other groups, Harvard does not give a fig for academic freedom. If faculty members need to be disciplined or dismissed to stop them from creating or contributing to the anti-Jewish hostile educational environment on Harvard's campus, then that is what Title VI requires. If, on the other hand, Harvard does not wish to comply with Title VI, if it wants its faculty and students to have the "academic freedom" to spew antisemitism, its path is clear—forego receiving federal taxpayer funds and return the funds it has received.

On German university campuses, during the 1930s, "[p]aramilitary student groups often interrupted lectures, provoked skirmishes, and physically intimidated Jewish students in actions tolerated by university administrations and encouraged by the Nazi party."[4] Now, at Harvard and other American campuses, supporters of the terrorist militia Hamas are disrupting campus life and harassing Jewish students in actions tolerated and enabled by university administrations. And their efforts are being encouraged by the leading murderous antisemites in the world today, the modern-day Nazis—Hamas and Iran's Ayatollah Khamenei.[5] This must be stopped now.

As shown further below, Harvard's motion is meritless and should be denied in its entirety.

## SUMMARY OF FACTS

For at least a decade, Harvard has known of, tolerated and encouraged antisemitism,[6] paving the way for the metastasis of antisemitic harassment following Hamas's October 7 massacre. The very next day, more than thirty Harvard student groups issued a public statement blaming the "apartheid" "Israeli regime" for Hamas's massacre. ¶¶ 92-94. Soon thereafter, Harvard's then-president repeatedly refused to say during Congressional testimony that calling for the genocide of Jews is against Harvard policy—she said it depended on the "context"—after which the only rabbi on Harvard's "Antisemitism Advisory Group" ("AAG") resigned and another member sharply criticized it. ¶¶ 154-68. Harvard then shuttered the AAG with nothing to show for it and created a new "Antisemitism Task Force," but appointed as co-chair a professor who called

---

[4] Holocaust Encyclopedia, *University Student Groups in Nazi Germany*, https://encyclopedia.ushmm.org/content/en/article/university-student-groups-in-nazi-germany.

[5] Romina Ruiz-Goiriena, *Hamas and Iran Celebrate Anti-Gaza War Protests Taking US Colleges by Storm*, USA Today (Apr. 25, 2024 11:28 a.m.), https://www.usatoday.com/story/news/politics/2024/04/24/hamas-iran-support-college-protests/73447123007.

[6] *See* ¶¶ 55-87 (*e.g.*, Harvard promotes course to full credit offering, in which required readings "den[ied] Jewish ethnic identity," "call[ed] Jewish history a 'mythology,'" and "downplay[ed] antisemitism and the Holocaust"; convocation disrupted by anti-Israel agitator Harvard later endorsed for a Rhodes Scholarship).

Israel a "regime of apartheid," leading a former Harvard president to say he "lost confidence in . . . Harvard [as] a place where Jews and Israelis can flourish"; its other co-chair soon resigned, after Harvard refused to commit to acting on the task force's recommendations. ¶¶ 177-80.

Plaintiffs have been targets of repeated verbal and physical threats and harassment, as they and others are forced to confront mobs extolling the Hamas massacre and calling for death to Jews and the annihilation of Israel. Plaintiffs identify no fewer than sixty incidents of antisemitism in the five months after October 7. On October 18, for example, hundreds of students gathered for a "Die-In" on campus, at which SAA Member #1's teaching fellow and Kestenbaum's classmate physically attacked a Jewish student while screaming, "shame!" ¶¶ 107-08. The next day, hundreds stormed Harvard buildings, blocking Kestenbaum from leaving a building and causing SAA Members #1, #2, #3, and #5 to fear violent attack as they watched Harvard's police do nothing, leading students to hide under desks and remove indicia of their Jewishness. ¶¶ 109-12.

Antisemitic rallies continued. For example, on December 6, after Harvard Divinity School, because of a planned antisemitic rally, canceled the only event it holds that celebrates Judaism, students took over another event Kestenbaum attended, yelling about a "Zionist genocidal campaign." ¶¶ 137-38. On February 27, students disrupted a Harvard Chabad and Alliance for Israel event, which SAA Member #5 attended, blocking the audience and speaker in violation of Harvard's putative policies. ¶ 218. At these rallies, students chanted antisemitic slogans, such as "globalize the Intifada" or "long live the Intifada," "from the river to the sea," "Palestine will be Arab," "glory to the martyrs," "we have them outnumbered," and "there is only one solution, Intifada revolution." *E.g.*, ¶¶ 93, 107, 109, 112, 115, 121, 129, 132, 134, 139, 156, 204, 221.

Harvard faculty also engage in or promote antisemitic conduct, *e.g.*, ¶¶ 146-53, 190, 254, including, for example, when a faculty group published a "cartoon depicting a hand branded with

a Jewish star with a dollar sign in it gripping a rope connected to two nooses around the necks of an Arab and a Black man," which student groups reposted, ¶¶ 211-13, and when Harvard Divinity School published an image of a Jewish person with a stereotypical nose and Star of David greedily hoarding water from Palestinians, captioned in part: "the ways that religion is weaponized through Zionism." ¶ 101. Students and faculty groups repeatedly praise or host events with convicted terrorists, ¶¶ 136, 194; antisemites or terrorist-sympathizers, ¶¶ 72, 190, 205, 216, 223; and others who applauded Hamas's massacre or placed sole blame on Israel, ¶¶ 152, 183-84, 192, 195. The same student groups are permitted to break Harvard policies with impunity, disrupt classes and events, *e.g.*, ¶¶ 114, 126, 134, 137, 197, 207, 218; improperly take over university spaces, *e.g.*, ¶¶ 118, 121, 131, 217, 224; and harass Jewish students, *e.g.*, ¶¶ 107-08, 134, 140, 145. Harvard has required Jewish students to limit or conceal their activities and the Chabad rabbi to hide the campus Hanukkah menorah at night so it would not be vandalized, rather than make sure it was protected, ¶ 138, like Harvard does for the "Israel apartheid wall" erected annually by anti-Israel students. Meanwhile, Harvard has failed to prevent or discipline the repeated defacing and removal of posters displaying the hostages Hamas abducted from Israel, ¶¶ 125, 181-82, 210, while plaintiffs must traverse a campus and sit in classrooms defaced by antisemitic flyers and graffiti, *e.g.*, ¶¶ 106, 208-09, 224.

Plaintiffs have repeatedly sought help from Harvard—at least forty times in the months since October 7. *E.g.*, ¶¶ 97, 109-113, 115-16, 118-21, 124-26, 129, 136-37, 140, 190, 195-97, 203-05, 214, 217-18, 221, 223-26. But Harvard has consistently refused to do anything to correct its hostile environment. *E.g.*, ¶¶ 116, 121-22, 124-29, 131, 134-37, 139, 141-43, 183-84, 190, 194-96, 199, 204-18, 221-26.

**ARGUMENT**

A Rule 12(b)(6) motion must be denied when the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *In re Bos. Univ. COVID-19 Refund Litig.*, 511 F. Supp. 3d 20, 23 (D. Mass. 2021) (Stearns, J.). The court "accepts as true all well-pleaded facts and draws all reasonable inferences in favor of the plaintiff." *Duggan v. Martorello*, 596 F. Supp. 3d 158, 181 (D. Mass. 2022).[7]

## I.   Plaintiffs Allege a Hostile Educational Environment Under Title VI

To plead a Title VI hostile environment claim, a plaintiff must allege that "he or she was subject to severe, pervasive, and objectively offensive" harassment, the harassment "caused the plaintiff to be deprived of educational opportunities or benefits," "the school knew" of the harassment and "the school was deliberately indifferent to the harassment such that its response (or lack thereof) is clearly unreasonable in light of the known circumstances." *Czerwienski v. Harvard Univ.*, 666 F. Supp. 3d 49, 84 (D. Mass. 2023) (cleaned up).[8] Whether an environment is hostile "depends on a constellation of surrounding circumstances," *id.* at 87 (allegations of Harvard's "pattern and practice of indifference" to harassment of others, which enabled plaintiffs' own harassment, sufficiently pled hostile environment), and "multiple incidents" of harassment "cannot be taken in isolation but rather must be viewed as [a] whole," *Sauer v. Belfor USA Grp.*, 205 F. Supp. 3d 209, 216 (D. Mass. 2016). Plaintiffs plead all four of the hostile environment elements. Harvard challenges only two—harassment and deliberate indifference.[9]

---

[7] Because "a court looks only at the complaint when considering a motion to dismiss," Harvard's declarations, Dkts. 38 ("Weenick Decl.") and 39 ("Whelsky Decl."), and the arguments relying on them, *e.g.*, Mem. 6, should be disregarded on the Rule 12(b)(6) motion. *Maldonado v. Cultural Care, Inc.*, 2020 WL 4352846, at *2 (D. Mass. July 29, 2020) (Stearns, J.).

[8] Title VI and Title IX claims are analyzed similarly. *See Cannon v. Univ. of Chi.*, 441 U.S. 677, 694-96 (1979). Title VII cases are also instructive. *See Lipsett v. Univ. of P.R.*, 864 F.2d 881, 896-97 (1st Cir. 1988).

[9] Harvard does not contest that it knew of the alleged harassment, *e.g.*, ¶¶ 121, 125, 143, 181-83, 190, 210, 254, or that the alleged harassment deprived plaintiffs of educational opportunities or benefits, *e.g.*, ¶¶ 248-60.

A.    **Plaintiffs Sufficiently Allege Harassment**

Plaintiffs' allegations establish that they and other Jewish students at Harvard are and have been subjected to severe, pervasive, and objectively offensive harassment and discrimination. The complaint sets forth a vast "constellation" of antisemitic abuse, harassment, assaults, caricatures, incitement and interference with Jewish students' rights. *Czerwienski*, 666 F. Supp. 3d at 87. And, at bottom, these are quintessential factual issues—severity, pervasiveness, offensiveness, and effect on the environment "*must* be determined by the fact-finder." *O'Rourke v. City of Providence*, 235 F.3d 713, 728 (1st Cir. 2001).

Harvard, citing *Brown v. Hot, Sexy & Safer Productions, Inc.*, 68 F.3d 525, 540 (1st Cir. 1995) ["*Productions*"], wrongly contends that in the "absence of 'physically threatening or humiliating' speech, plaintiffs' exposure to 'offensive utterance[s]' does not create a hostile environment." Mem. 25. First, neither *Productions* nor any other case Harvard cites involves this kind of constellation—the campus-wide, months' long, incessant onslaughts and harassment alleged here—which unquestionably has created an ongoing egregiously hostile environment at Harvard. Second, plaintiffs in fact do extensively allege physically threatening and humiliating speech.[10] Third, *Productions* does not say, and the courts have not read it to say, what Harvard wishes it said. *Productions* instead makes clear that "discriminatory intimidation, ridicule, and insult" *are* actionable and that "physically threatening or humiliating" speech *is but one factor* to consider. 68 F.3d at 540, 541 n.13. The type of "offensive utterances," Mem. 25, plaintiffs have been subjected to at Harvard are more than sufficient to create actionable hostile environments.

---

[10] *E.g.*, ¶¶ 109-113, 118 ("The mob disrupted multiple classes, leading Jewish students to flee for their safety, with some removing identifying garb to avoid attack"; SAA Members #1, #2, #3, and #5 trapped in study room, fearing a physical attack, while hundreds stormed the halls with noisemakers and megaphones); 185-89 (Harvard employee targeting Kestenbaum, requiring him to obtain private security); 93, 129, 132, 134, 174, 221 (students chant "globalize the Intifada" and other slogans calling for mass murder of Jews).

*See, e.g.*, *Gorski v. N.H. Dep't of Corr.*, 290 F.3d 466, 473-74 (1st Cir. 2002) ("derogatory" and "hostile or abusive comments"); *Doe v. Gavins*, 2023 WL 6296398, at *12 (D. Mass. Sept. 27, 2023) ("name-calling and other verbal harassment"); *Snelling v. Fall Mtn. Reg'l Sch. Dist.*, 2001 WL 276975, at *1-3, *5 (D.N.H. Mar. 21, 2001) (homophobic "name-calling" and "taunting"). And the First Circuit has "explained time and again that there is no mathematically precise test that we employ to answer" whether conduct is severe or pervasive and has instead instructed courts to look "to numerous factors . . . in order to guide us in [a] resolution of these difficult situations." *Franchina v. City of Providence*, 881 F.3d 32, 46 (1st Cir. 2018) (cleaned up).

Harvard also insists that it may not be liable for harassment not "directed at or to any Plaintiff." Mem. 25. Apart from the fact that the complaint contains numerous allegations of harassment against plaintiffs themselves, that is not so. The "First Circuit has determined that '[e]vidence of the harassment of third parties can help to prove a legally cognizable claim of a hostile environment.'" *E.E.O.C. v. Fred Fuller Oil Co.*, 2014 WL 347635, at *4 (D.N.H. Jan. 31, 2014) (quoting *Hernandez–Loring v. Universidad Metropolitana*, 233 F.3d 49, 55 n.4 (1st Cir. 2000)); *see also Lipsett*, 864 F.2d at 904-05 (holding district court erred by dismissing on summary judgment "plaintiff's claim that the cumulative effect of the specific incidents of sexual harassment created a hostile environment," including "constant verbal attack" against "plaintiff and other female[s]"); *Czerwienski*, 666 F. Supp. 3d at 87 (deliberate indifference pled where Harvard maintained a "long-term pattern and practice of indifference to complaints of . . . harassment" by various "students and others"); *Sauer*, 205 F. Supp. 3d at 217 (hostile environment adequately pled even where "many of the alleged verbal acts were directed to groups of people rather than plaintiff alone"); *Ruffino v. State St. Bank & Tr. Co.*, 908 F. Supp. 1019, 1038 (D. Mass. 1995) ("When

there are multiple incidents and victims, it is the cumulative effect of the offensive behavior that creates the [] environment." (cleaned up)).[11]

Harvard argues that plaintiffs do not allege a sufficient number of incidents of physical threats. Mem. 25-26. As shown, plaintiffs need not plead such incidents, but Harvard must be addressing a different complaint in asserting that a "single incident" of harassment is not enough without a "systemic effect on educational programs or activities." Mem. 26.[12] Apart from the fact that "there is no magic number of incidents required to establish a hostile environment claim," *Czerwienski*, 666 F. Supp. 3d at 86; *Koumantaros v. City Univ. of N.Y.*, 2007 WL 840115, at *15 (S.D.N.Y. Mar. 19, 2007) ("[O]ne incident of racial harassment, if sufficiently severe, can create a hostile educational environment."), here, plaintiffs' complaint is all about the egregious "systemic effect" of the constellation of antisemitic incidents at Harvard.

### B.   Plaintiffs Plausibly Allege Harvard's Deliberate Indifference

A university acts with deliberate indifference when its response to harassment is "clearly unreasonable in light of the known circumstances," *Czerwienski*, 666 F. Supp. 3d at 84—that is, when it "fail[s] to adequately respond," and students are thereby "more vulnerable," to harassment. *Id.* at 76, 85. Deliberate indifference is usually a "fact-based question, for which bright line rules are ill-suited." *Grace v. Bd. of Trustees*, 85 F.4th 1, 11 (1st Cir. 2023). Harvard's disingenuous

---

[11] Harvard's cases do not support its position. Mem. 25. In *Productions*, 68 F.3d at 541, the court dismissed a hostile environment claim based exclusively on jests made during a one-time assembly. In *Guckenberger v. Boston Univ.*, 957 F. Supp. 306, 315 (D. Mass. 1997), the complaint focused solely on a university president's off-campus speeches, contained no allegations of any hostility toward any students, and "read in context," lacked "sharply-pointed" student harassment.

[12] Harvard cites *Pollard v. Georgetown Sch. District*, 132 F. Supp. 3d 208, 230-31 (D. Mass. 2015), but plaintiff there alleged only one incident related to Jewish ethnicity, while other allegations were based on characteristics outside Title VI's protections. Harvard also cites *Mandel v. Bd. of Trustees of Cal. State Univ.*, 2018 WL 1242067, at *18 (N.D. Cal. Mar. 9, 2018), a California case involving one protest at a state university, to make the bizarre and unsupported argument that protests can never give rise to a finding of severe and pervasive harassment. Mem. 25. *Mandel* is inapposite—the allegations there pale in comparison to those here.

argument that it was not deliberately indifferent because it did respond to some incidents of antisemitism, Mem. 22, and failed to respond to others out of a purported concern for academic freedom, Mem. 20-22, is meritless. It could not be clearer that Harvard's response has been woefully inadequate. In fact, the very allegations Harvard cites only makes Harvard's deliberate indifference undeniable—for example, Harvard failed to take disciplinary measures to harassment even following purported investigations, *e.g.*, ¶¶ 68, 84-87, 120-22; met with Jewish students, but took no steps to address their concerns, *e.g.*, ¶¶ 70-71; paid lip service that failed to meaningfully acknowledge the problem and was not coupled with actions reasonably calculated to address it, *e.g.*, ¶¶ 96-99, 128; and appointed toothless task forces composed of problematic members, ¶¶ 177-79. *See Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 669 (2d Cir. 2012) ("Where a school district has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, such district has failed to act reasonably in light of the known circumstances."); *Howard v. Feliciano*, 583 F. Supp. 2d 252, 257 (D. P.R. 2008) (deliberate indifference adequately pled where schools took some action, including verbal responses, "without any further action or results"). Here, as alleged, Harvard's response was not just ineffective but dangerous, as it led to intensified antisemitic harassment as students and faculty learned there would be no repercussions.

Harvard asserts that its responses were not "clearly unreasonable," even if they were not "ideal," because it does not have to "take heroic measures" or "perform flawless investigations." Mem. 23, 24. Harvard has had months of unrelenting antisemitic harassment to develop its response, but has failed to take any effective measures,[13] culminating in the takeover of Harvard

---

[13] To the contrary—*see, e.g.*, ¶ 119 (Harvard allowing student who attacked a Jew to remain on campus and continue antisemitic activity); ¶ 128 (no action after "concrete steps" announcement); ¶¶ 134-35 (Harvard did nothing to stop antisemitic demonstration with calls such as "globalize the Intifada," which violated Harvard's policies); ¶¶ 161-62

Yard by students this week. *See* Member Decl. ¶¶ 3-14. And the schools in the cases Harvard cites did far more than Harvard here,[14] which has been, at best, utterly ineffective. The hostile environment shows no signs of abating, just the opposite—and that means Harvard's efforts were necessarily insufficient. *Grace*, 85 F.4th at 11.

Harvard acknowledges that it "declin[es] to discipline [] expression[s]" of admittedly "offensive" antisemitism because, it argues, such harassment can be "reasonably interpreted as political." Mem. 20-22. Chants for the worldwide murder of Jews, such as "globalize the Intifada"—and that is what it means—and the other abusive antisemitic harassment to which Jewish students have been subjected at Harvard are not "political" speech. And, as the Obama, Trump, and Biden administrations have all made clear, under Title VI, schools have a responsibility to curb antisemitism, verbal or otherwise. *See* ¶¶ 23-30, 33-37. Harvard's position, if accepted, would eviscerate the protections Title VI affords—any time a school does not want to police, say, racist speech, it could characterize it as "political." Its position that it need not act against verbal harassment was wrong when its former president testified before Congress, and it is wrong when Harvard repeats it here.

Harvard's suggestion that the First Amendment prevents it from disciplining its students or professors is a red herring, *see Doe v. Harvard Univ.*, 462 F. Supp. 3d 51, 64 (D. Mass. 2020) (recognizing Harvard is not a state actor), that ignores decades of decisions by the courts and the Department of Education holding both private and public institutions accountable for failing to

---

(members of AAG resigning and decrying Harvard's failure to take real action); ¶ 180 (Antisemitism Task Force has no "authority" and its co-chair resigned because Harvard refused to commit to acting on its recommendations).

[14] In *Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165 (1st Cir. 2007), for example, the defendant "*promptly reacted* to harassment complaints, commenced *full-scale investigations*, *paid close attention* to new information and . . . concerns, offered *suitable remedial measures*, and responded reasonably *each time* there was a new development." *Grace*, 85 F.4th at 14. In *Porto v. Town of Tewksbury*, 488 F.3d 67, 73 (1st Cir. 2007), which went to a jury, the school took concrete measures designed to stop harassment, such as separating students.

stop verbal harassment. *See, e.g.*, *Grace*, 85 F.4th at 12 (school "took no corrective or remedial action against students who repeatedly used homophobic epithets"); *Howard*, 583 F. Supp. 2d at 257 (upholding jury finding of hostile educational environment based on "anti-American remarks" such as "American Jerk"); *Schoendorf v. RTH Mech. Contractors, Inc.*, 2012 WL 3229333, at *5 (D. Me. Aug. 6, 2012) (severe or pervasive harassment based on comments such as "dumb bitch"); *Brodeur v. Claremont Sch. Dist.*, 626 F. Supp. 2d 195, 213, 215 (D.N.H. 2009) (triable issue whether harassment based on comments about a student's body, including that another student would need to draw a circle "as big as [plaintiff-student's] butt was severe, pervasive, and objectively offensive)"; ¶ 30 (citing DOE letter).[15]

None of the cases Harvard cites, Mem. 21-22, supports its argument that Title VI permits it to ignore, as "political," antisemitic harassment.[16] In fact, Harvard *does* restrict speech it deems objectionable; it *chooses not to do so* only when the harassment is antisemitic. ¶¶ 228-47. For example, in mandated training, Harvard instructs freshman that it prohibits "sizeism," "fatphobia," "transphobia," "ageism," and "ableism"—but omits antisemitism—because, Harvard says, they "contribute to an environment that perpetrates violence." ¶ 229. Harvard has canceled courses and disinvited speakers because of controversial viewpoints, punished faculty members and students

---

[15] Ass't Sec'y Catherine E. Lhamon, *"Dear Colleague" Letter on Shared Ancestry* (Nov. 7, 2023), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-202311-discrimination-harassment-shared-ancestry.pdf ("Harassing conduct can be verbal *or* physical and *need not be directed at a particular individual.*").

[16] *Speech First, Inc. v. Fenves*, 979 F.3d 319, 337 n.16 (5th Cir. 2020), an out-of-circuit sexual harassment case cited for *dicta*, involved a public university. *Guckenberger*, 957 F. Supp. at 315-16, involved no student harassment at all, *see supra* Arg. § I.A note 11. *Brown v. Trustees of Boston University*, 891 F.2d 337, 359-60 (1st Cir. 1989), a jury trial appeal, involving a tenure decision—not a hostile environment—held that "[a]cademic freedom does not include the freedom to discriminate," and has been limited to its "unique context" of tenure decisions, *Tuli v. Brigham & Women's Hosp., Inc.*, 566 F. Supp. 2d 32, 49 (D. Mass. 2008), *aff'd*, 656 F.3d 33 (1st Cir. 2011). *Felber v. Yudof*, 851 F. Supp. 2d 1182, 1186-88 (N.D. Cal. 2011) also involved a public school and a public setting where tabling and leafletting are afforded First Amendment protection; unlike Harvard, the school properly made arrests during disruptive protests. *Norris ex rel. A.M. v. Cape Elizabeth School District*, 969 F.3d 12, 14, 29 (1st Cir. 2020), involved a public school suspension and recognized that even otherwise protected speech can be punished by public schools where it "cause[s] substantial disruption."

for speech it disapproves, and told a researcher that "you have no academic freedom" after she accused Harvard of stifling her free speech when she criticized a Harvard donor. ¶¶ 230, 238-44. Harvard disregards that "[r]acially charged code words [can] provide evidence of discriminatory intent by sending a clear message and carrying the distinct tone of racial motivations and implications." *Valentin v. Town of Natick*, 2023 WL 8815167, at *7 (D. Mass. Dec. 20, 2023); *Sinai v. New Eng. Tel. & Tel. Co.*, 3 F.3d 471, 474 (1st Cir. 1993) (trier of fact could find harassment or "discriminat[ion] against [plaintiffs] on the basis of [their] Hebrew/Jewish race by disparaging Israel").

## II.       Plaintiffs State a Direct Discrimination Claim Under Title VI

Plaintiffs allege that Harvard intentionally discriminates through its invidious double standard in failing to enforce its policies against antisemitism as compared to other forms of hate. *See, e.g.*, ¶¶ 227-47, 271-72, 275. Harvard contends that this claim must be dismissed because plaintiffs fail to allege two "reasonably comparable" incidents showing discrimination. Mem. 18. But plaintiffs do far more than that—as plaintiffs allege, the way Harvard responds to antisemitic speech and conduct is *a fortiori* worse than the treatment Harvard has accorded other speech. For example, Harvard has censored controversial speakers over concerns about how they will affect students, while regularly permitting those with ties to terrorist organizations and who regularly spew antisemitic views to speak to students. *See, e.g.*, ¶¶ 190, 205, 223, 226, 230. Harvard also does not hesitate to discipline students who discriminate when the targets are not Jews—such as canceling a sports season for a team's sexist remarks, putting a student group on probation for discriminating against a homosexual member, and rescinding an incoming freshman's admission because he used racial slurs online years earlier—but refuses to discipline students who attack and harass Jews. *See, e.g.*, ¶¶ 108-09, 136, 225, 244. These allegations provide far more than the

required "circumstantial evidence of racial animus" through the use of "roughly equivalent" comparisons among "similarly situated" groups. *Doe v. Brown Univ.*, 43 F.4th 195, 207-08 (1st Cir. 2022).

Harvard also contends that plaintiffs must allege "the only possible explanation for the differences in outcomes" is a racial double standard. Mem. 19 (citing *Goodman v. Bowdoin Coll.*, 380 F.3d 33, 45 (1st Cir. 2004)). Notwithstanding that plaintiffs do allege that, *e.g.*, ¶¶ 248, 268, 275, that quote is not the law, as it comes from a summary of the *Goodman* plaintiff's own mistaken argument. Moreover, the *Goodman* court evaluated plaintiff's discriminatory animus claim using a different standard not applicable to a motion to dismiss. 380 F.3d at 44 n.18, 45.

Harvard disingenuously claims, Mem. 19, that it is "struggl[ing]" to navigate "often competing claims of antisemitic and anti-Muslim discrimination" since October 7—attempting to insert a "both-sides" argument that has no support in the record. While Harvard of course should combat anti-Muslim discrimination, there has been no anti-Muslim discrimination at Harvard anything close to the allegations of antisemitism in the complaint; there have been no mobs of anti-Muslim demonstrators taking over Harvard Yard, like the encampment surrounding the John Harvard statue. Member Decl. ¶¶ 3-10, 14. Even if there were, Harvard must treat discrimination against Jews as it does (or would) treat discrimination against any other protected class.[17]

## III.   <u>Plaintiffs Adequately Allege Breach of Contract and the Implied Covenant</u>

Plaintiffs adequately allege breach of contract: "the promise, offer, or commitment that forms the basis of a valid contract can be derived from statements in handbooks, policy manuals, brochures, catalogs, advertisements, and other promotional materials." *Shulse v. W. New Eng. Univ.*, 2020 WL 4474274, at *9 (D. Mass. Aug. 4, 2020). On a motion to dismiss, courts focus on

---

[17] *See, e.g.*, ¶¶ 6, 9, 43, 228, 231-38, 243-47, 271-72.

the student's "reasonable expectation . . . of the contract's terms," and may not resolve "ambiguous" language. *Sonoiki v. Harvard Univ.*, 37 F.4th 691, 709, 711 (1st Cir. 2022).

Plaintiffs allege that at least five Harvard policies contain obligations, explicit and implicit promises, giving rise to plaintiffs' reasonable expectations. *E.g.*, ¶¶ 38-54, 278-80, 282. Harvard's failure to provide plaintiffs "'a discrimination-free environment' by 'abiding by, and adequately and appropriately enforcing'" those policies are precisely "the type of allegations that have been held to establish breach." Mem. 28-29 (quoting ¶ 282). For example, in *Shulse*, this Court held that provisions in a "Student Handbook" and "Parent's Guide," including "cites to a non-discrimination policy," "plausibly support[ed] Plaintiff's reasonable expectation that [the university] would provide an environment free from . . . discrimination." 2020 WL 4474274, at *9. In *Czerwienski*, this Court upheld a breach of contract claim against *Harvard* based on promises in its "Sexual and Gender-Based Harassment Policy" and "Whistleblowing Policy," including promises "to 'prevent incidents of sexual and gender-based harassment from denying or limiting an individual's ability to participate in or benefit from the University's programs'" and "to 'protect from retaliation members of the Harvard community who make good faith reports of suspected violations of the law or University policy.'" 666 F. Supp. 3d at 100. Plaintiffs allege that Harvard breached similar promises here.[18]

Harvard, conceding that "Plaintiffs allege that Harvard policies prohibit specific actions," argues that plaintiffs "do not plead that these policies bind the University" to respond within a certain timeframe or adopt particular disciplinary measures in response to the incidents they allege. Mem. 29. Yet plaintiffs allege that Harvard's Non-Discrimination Policy "sets forth procedures,

---

[18] *E.g.*, ¶ 40 (Harvard's Non-Discrimination Policy prohibits "discriminatory harassment," defined as "unwelcome and offensive conduct that is based on an individual or group's protected status").

including *specified timeframes* for reviewing, investigating, and acting upon complaints of violations," as well as requiring that "all those at Harvard with responsibility for implementing [the Non-Discrimination Policy] will discharge their obligations with fairness, rigor, and impartiality." ¶ 41 (cleaned up). Harvard also concedes that plaintiffs have alleged "policies that may apply to Plaintiffs," but argues that "many of the quoted provisions" are "insufficiently definite" to establish a breach. Mem. 28. But, as this Court has held, similar promises Harvard made to "'provide prompt and equitable methods of investigation and resolution to stop discrimination, remedy any harm, and prevent its recurrence,' and 'keep the community safe and [] address incidents of alleged harassment,'" were sufficiently definite "to form a contract." *Czerwienski*, 666 F. Supp. 3d at 100-01 (cleaned up). Harvard cites *G. v. Fay School*, 931 F.3d 1, 12 (1st Cir. 2019) and *Brown v. Suffolk University*, 2021 WL 2785047, at *6 (D. Mass. Mar. 31, 2021), but as this Court has held, Harvard's promises in *Czerwienski*—as here—are "are far more specific than the [] 'generalized, aspirational statements that [were] insufficiently definite" in *Fay* and *Suffolk*. 666 F. Supp. 3d at 100-01.

Plaintiffs also adequately allege breach of the implied covenant of good faith and fair dealing. Here, as in *Czerwienski*, "[b]ecause the plaintiffs have pleaded adequately that Harvard failed to meet the standard of reasonable expectations arising from its written policy statements, they also have pleaded adequately a breach of the covenant of good faith and fair dealing." *Id.* at 102. Plaintiffs' claim is not duplicative of their contract claim, because the implied covenant claim concerns Harvard's discriminatory failures to "conform to the parties' reasonable understanding of the performance obligations, as reflected in the overall spirit of the bargain, even if [Harvard] technically complied with the letter of the [written policies]." *Doe v. Brandeis Univ.*,

177 F. Supp. 3d 561, 612 (D. Mass. 2016).[19] And contrary to Harvard's contention, Mem. 29-30, plaintiffs *do* allege "how specific policies have been applied in a . . . selective way."[20]

## IV. **The Court Has Subject Matter Jurisdiction**

### A. **Harvard's Rule 12(b)(1) Arguments Are Intertwined with the Merits**

When a defendant challenges standing through an "immediate" Rule 12(b)(1) motion, courts apply Rule 12(b)(6)'s standard, whereby plaintiffs are merely required to "plausibly plead[]" standing. *Van Wagner Bos., LLC v. Davey*, 770 F.3d 33, 40 (1st Cir. 2014) (noting "low bar" to allege standing). Thus, on a standing challenge based on "sufficiency" of the allegations, the complaint is construed liberally, treating jurisdictional allegations as true and drawing all reasonable inferences in plaintiff's favor. *Marradi v. K&W Realty Inv. LLC*, 212 F. Supp. 3d 239, 242 (D. Mass. 2016). If the defendant makes a "factual challenge" to the accuracy, rather than sufficiency, of the jurisdictional facts, the defendant must present "evidentiary quality" materials. *CardioNet, LLC v. InfoBionic, Inc.*, 2015 WL 13849810, at *1-2 (D. Mass. Nov. 20, 2015).

But where, as here, Harvard's Rule 12(b)(1) arguments are "so intertwined [with the substantive claims] that the resolution of the jurisdictional question is dependent on factual issues going to the merits," dismissal may be granted "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Van v. Am. Airlines, Inc.*, 370 F. Supp. 3d 218, 224 (D. Mass. 2019) (holding that genuine factual disputes on jurisdiction must be decided by the factfinder). Harvard's standing arguments are intertwined with the merits because, among other things, Harvard puts deliberate indifference directly at issue on standing— arguing, for example, that plaintiffs cannot show "injury traceable to Harvard," or a "likelihood of

---

[19] Harvard's cases are inapposite. Mem. 29-30. Those disciplinary adjudication cases involved duplicative claims, because "the denial of [a] basic fairness [claim] is the student disciplinary adjudications' version of [] a breach of the implied covenant." *Doe v. Stonehill*, 55 F.4th 302, 337-38 (1st Cir. 2002).

[20] *See, e.g.*, ¶¶ 38-54, 58, 84-88, 124-28, 130, 137-39, 144-45, 171, 218, 227-30, 238-47.

future injury" that Harvard will cause "under a theory of 'deliberate indifference,'" because, Harvard claims, it has implemented increased security, issued new guidance, and established a "Task Force." Mem. 13-15 (citing declarations). Deliberate indifference is of course a merits question here—and, again, as the complaint alleges and the events this week in Harvard Yard demonstrate, Harvard's response to antisemitism has been utterly ineffective, *i.e.*, deliberately indifferent. *See supra* Arg § I.B; Member Decl. ¶¶ 3-14. In any case, Harvard "may not short-circuit the usual process, flip the burden of persuasion, and permit itself to submit competing facts to support its argument." *Davis v. Wells Fargo*, 824 F.3d 333, 349 (3d Cir. 2016). Accordingly, Harvard's standing motion must be rejected.

### B.     Plaintiffs Have Standing to Pursue Injunctive Claims and SAA Has Associational Standing

Harvard's arguments that plaintiffs lack standing to pursue injunctive relief and SAA lacks standing altogether, Mem. 10-17, are also meritless. Plaintiffs have standing where they have "suffered an injury in fact," "fairly traceable to the [defendant's] allegedly unlawful actions" as to which it is "likely, as opposed to merely speculative, that [it] will be redressed by a favorable decision." *Nulankeyutmonen Nkihtaqmikon v. Impson*, 503 F.3d 18, 26 (1st Cir. 2007). Plaintiffs have more than adequately alleged facts—uncontroverted by the self-serving declarations Harvard has submitted—demonstrating that they face ongoing and future imminent harm stemming from Harvard's deliberate indifference, harm which would be stopped by the injunction they request.

### 1.   Plaintiffs Properly Allege Ongoing and Future Injury-in-Fact

Harvard contends that some incidents of harassment in the complaint must be, but are not, "on their face . . . directed" at plaintiffs before they can meet the "particularized" element of standing. Mem. 11. That is not the law, as "courts have upheld standing for plaintiffs who are not the direct targets of discrimination." *Pocono Mtn. Charter Sch. v. Pocono Mtn. Sch. Dist.*, 908 F.

Supp. 2d 597, 615 (M.D. Pa. 2012); *Ruffino*, 908 F. Supp. at 1038 ("[H]ostile environment

discrimination typically is not confined to one act, directed at one individual, one time; rather, it

is a composite of [] action and inaction . . . when there are multiple incidents and victims, it is the

cumulative effect of the offensive behavior that creates the [] environment." (cleaned up)). Thus,

where, as here, the environment created by defendant's "policies and practices" have been alleged

to cause plaintiffs' injuries, *see, e.g.*, ¶¶ 248-60, plaintiffs sufficiently plead standing. *See Connor

B. ex rel. Vigurs v. Patrick*, 771 F. Supp. 2d 142, 153 (D. Mass. 2011).[21] Consequently, Harvard's

argument ignores not only incidents directed at others that contribute to plaintiffs' hostile

environment, but also myriad incidents of harassment directly against plaintiffs.[22]

Harvard challenges plaintiffs' injury-in-fact by asserting that their injuries occurred in the

past, again mischaracterizing a small selection of allegations. But prospective injunctive relief is

appropriate here because, as Harvard's own authority holds, Mem. 12, "past harm" can "confer

standing to seek forward-looking declaratory or injunctive relief" if "there is ongoing injury or a

sufficient threat that the injury will recur," *Roe v. Healey*, 78 F.4th 11, 21 (1st Cir. 2023) (finding

no ongoing injury because plaintiffs pled no facts after COVID-19 state of emergency had already

passed, indicating that school closures were not likely to recur).[23] Plaintiffs' allegations make clear

---

[21] The only case Harvard cites regarding "particularized" injuries, *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 732-34 (1st Cir. 2016), is an inapposite drug product liability putative class action in which there was "no specific information [] provided regarding the harm" the drug caused, no allegations that "any specific plaintiff took or received" a contaminated dose or "suffered an adverse reaction," the drug shortage underlying the claim had "long since ended," and one plaintiff alleged he never even took the drug during the relevant period.

[22] *See, e.g.*, ¶¶ 125, 181-82, 210 (Kestenbaum's own posters ripped down from inside Harvard Divinity, which he reports to multiple senior administrators to no avail; later, he sees antisemitic vandalism on hostage posters in Harvard Yard (including mocking a kidnapped baby) and immediately reports to senior administrators, but nothing is done); ¶¶ 137-38 (Harvard Divinity cancels the one event that celebrates Jewish culture rather than attempt to ensure its safety and success, but permits students to disrupt another event that day with chants and banners railing against a "Zionist genocidal campaign" and shrieking "free, free Palestine"; ¶ 224 (SAA Members #1 and #5 prevented from using common lounge, even after they warned administrators of students' planned unauthorized use of the space).

[23] Harvard's citations to cases that provide general standards for future injury and subjective apprehensions provide it no support. Mem. 13, citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411 (2013) (plaintiffs challenging surveillance statute were "not subject to the statute and were speculating about whether they may be targeted in the

that given their ongoing enrollment at Harvard and its continuing ineffective response to rampant antisemitism in violation of its policies designed to protect students, they will remain subject to Harvard's hostile environment.[24] *See, e.g.*, *Connor B.*, 771 F. Supp. 2d at 153 (finding standing where plaintiffs alleged defendants' "policies and practices [] continue to harm them" because "they suffer ongoing harm resulting from the alleged systemic failures"); *Doe v. Univ. of Tenn.*, 186 F. Supp. 3d 788, 813 (M.D. Tenn. 2016) (injunctive relief appropriate where plaintiffs allege ongoing deliberate indifference while still enrolled in the defendant school). Thus, even if plaintiffs had alleged only past harm (which they have not), they have adequately pled ongoing injury and imminent risk of continued injury.[25]

### 2. Plaintiffs' Ongoing and Future Injuries Are Traceable to Harvard

Harvard argues that even if plaintiffs are at risk of future injury, plaintiffs have not alleged facts tracing that risk to Harvard's deliberate indifference, Mem. 13-15, again seeking to improperly intertwine questions of standing with a merits dispute on Harvard's deliberate indifference. *See Van*, 370 F. Supp. 3d at 224. In any event, plaintiffs exceed the "low bar" necessary to allege traceability, *Van Wagner*, 770 F.3d at 40, as plaintiffs "need not prove with specificity at this stage how every harm suffered by every named Plaintiff relates to" Harvard's

---

future); *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983) (no showing plaintiff was imminently likely to be arrested and choked by police again). In contrast, plaintiffs are protected by Title VI but remain subject to unlawful antisemitic harassment, intimidation, and threats in a regularly recurring pattern of activity targeted at them as Jews. *See, e.g.*, ¶¶ 95, 98, 130, 142-44, 148, 161-63, 168-74, 177-80, 193, 199, 219, 222, 247, 250, 259, 266-70, 272, 274-76, 282, 285.

[24] *See, e.g.*, ¶¶ 38, 88, 180, 267-68, 272, 282 (alleging Harvard continuously fails to apply its own policies in a nondiscriminatory manner that causes them ongoing harm).

[25] *See, e.g.*, ¶¶ 170 (Congressional chair noted that "while Harvard was stonewalling Congress, its 'Jewish students continue[d] to endure the firestorm of antisemitism that has engulfed its campus' and reminded Harvard that if it 'is truly committed to combating antisemitism, it has had every opportunity to demonstrate its commitment with actions, not words'"); 174 ("near-daily acts of antisemitic abuse and harassment at Harvard have continued unimpeded"); 174-226; 250-51 (AAG member explains that "Jewish students [] could no longer expect to be able to study in the library, eat in dining halls, or attend class without being repeatedly told by their classmates sometimes through a bullhorn, that Jews are genocidal murderers deserving of perpetual intifada").

deliberate indifference, *Connor B.*, 771 F. Supp. 2d at 152. Instead, plaintiffs must only show a "fairly traceable" connection between their injuries and Harvard's action or inaction, which can be "indirect[]." *Id.* Here, plaintiffs more than adequately allege that Harvard's ineffective response has caused plaintiffs ongoing harm—Harvard's longstanding, continuing deliberate indifference to antisemitic harassment, including its administrators' indifference toward plaintiffs' complaints and reports, is precisely the cause of plaintiffs' injuries. *See supra* Arg. § I.B.

Harvard's self-serving conclusory declarations cannot overcome plaintiffs' well-pled detailed allegations—and the latest events in Harvard Yard, where protesters are camped out, shouting "Intifada revolution" and physically attacking Jews, Member Decl. ¶¶ 6, 10, 12, only confirm that Harvard's unlawful conduct, which has led to not just an ongoing but worsening hostile educational environment, has injured and will continue to injure plaintiffs. *See CardioNet*, 2015 WL 13849810, at *2 (in denying standing challenge, rejecting hearsay material as not "of evidentiary quality"). Harvard claims, for example, that plaintiffs lack standing because it offered a one-week event series on "facilitat[ing] discussion" and "respectful debate," Weenick Decl. ¶ 4, but nowhere explains how that was calculated to end antisemitism, how effective it was, or even how many people attended.[26] Harvard says that its task force "will provide recommendations" to "allow Harvard to consider" "interventions," but conspicuously fails to say that Harvard has actually implemented any recommendations, let alone what they are or whether they have had any results, Mem. 14; Ellsworth Ex. 7—which plainly they have not, as antisemitism only intensifies.[27]

---

[26] Likewise, Harvard proffers statements that it: "increased . . . campus security and police officers," with no figures or timeframe, Weenick Decl. ¶ 3; "is developing" educational programs, again, with no time frame, current implementation, or assertion that they will be mandatory, *id.* ¶ 6; and has issued statements that violations may be subject to discipline, without any evidence that any offenders have actually faced any discipline, Ellsworth Ex. 4.

[27] *See, e.g.*, ¶¶ 181, 194, 211 (hostage posters vandalized with "ISRAEL DID 9/11," Harvard PSC praising terrorists, including one who said "[w]hat Hitler did to you was a nothing," and a faculty group posting a cartoon showing a hand with a Jewish star and a dollar sign holding nooses around the necks of an Arab and a Black man).

The proof is in the pudding—and the events in Harvard Yard this week demonstrate that Harvard's purported efforts have been woefully ineffective and insufficient and that its antisemitism problem is not just ongoing but metastasizing.[28] At a minimum, this issue is a factual question. *See Van*, 370 F. Supp. 3d at 224 (where there is a "genuine dispute of material (jurisdictional) facts, then the case proceeds to trial, so that the factfinder can determine the facts, and the jurisdictional dispute will be reevaluated at that point").[29]

### 3. A Favorable Decision Will Redress Plaintiffs' Injuries

Harvard argues that, even if plaintiffs are at risk of future injury and even if it will result from Harvard's indifference, plaintiffs still "lack standing to seek injunctive relief because they have not established a 'likelihood that the requested relief will redress the alleged injury.'" Mem. 15. Plaintiffs have a "relatively modest" burden "of alleging redress[a]bility at the motion to dismiss stage," which needs to be more than "merely speculative." *Conservation L. Found., Inc. v. Jackson*, 964 F. Supp. 2d 152, 163 (D. Mass. 2013) (citation omitted) (plaintiff must receive "the benefit of all reasonable inferences").

Plaintiffs seek an injunction that would directly redress their injuries as it would require Harvard to cease violating its Title VI obligations to Jewish students like plaintiffs, including by enforcing Harvard's own existing policies, as well as a monitor to ensure continuing compliance. This connection between plaintiffs' injuries and Harvard's policies and practices is itself more than

---

[28] Harvard's "trust me" defense is particularly flawed, as Harvard has proven time and again that its words do not match its actions. *E.g.*, ¶¶ 161-63, 168-73, 177-80. A former president of Harvard has repeatedly called out its recent failings, ¶¶ 95, 98, 130, 148, 179; a member of the AAG resigned and another explained why it would fail, ¶¶ 161-63, 193, 250; and the former co-chair of the Antisemitism Task Force resigned when it became clear to her that Harvard would do nothing to correct the problem, ¶ 180.

[29] Harvard cites *Sumpter v. Wayne County*, 868 F.3d 473, 491 (6th Cir. 2017) to argue that changes in policy refute the likelihood of future injury, but plaintiff there had been released from jail and merely speculated that she would be exposed again to its policy. *Index Newspapers LLC v. City of Portland*, 2022 WL 4466881, at *4, 6 (D. Or. Sept. 26, 2022) found mootness where the challenged activity decreased in the year following the complaint, protests moved and were no longer unlawful, law enforcement stopped being deployed and changed tactics, and executive order was revoked. Unlike here, in neither case did the complained-of conduct increase after the supposed policy changes.

enough to show that plaintiffs' injuries from their "disparate treatment" is "likely redressable by the requested declaratory and injunctive relief." *Kappa Alpha Theta Frat., Inc. v. Harvard Univ.*, 397 F. Supp. 3d 97, 105 (D. Mass 2019).

In perhaps the height of disingenuousness (or chutzpah), Harvard contends that the requested injunction "would clearly do violence to the fundamental legislative scheme" of Title VI, without even explaining what that scheme is. Mem. 15 (quoting *Biszko v. RIHT Fin. Corp.*, 758 F.2d 769, 774 (1st Cir. 1985)). But unlike in *Biszko*—where plaintiffs sought to sever a provision from a state banking statute that would result in a change to the statutory scheme and thwart the intent of the legislature—the injunction plaintiffs seek here would compel Harvard to enforce its own policies prohibiting discrimination on the basis of protected characteristics.

Nor is Harvard correct that this Court cannot grant plaintiffs' request because it is "overbroad" and "not authorized by law." Mem. 15. Harvard's reliance on *Western Coal Traffic League v. Surface Transportation Board*, 998 F.3d 945, 950–51 (D.C. Cir. 2021) is misplaced— the asserted injury there was "not capable of resolution through a judicial decision," as the court "lack[ed] the power" to order a federal administrative agency to break its internal deadlock.[30] This Court not only has the power to issue injunctive relief, *Alexander v. Sandoval*, 532 U.S. 275, 279 (2001), but plaintiffs' request is tailored to redress their injury—Harvard's discriminatory practices against Jewish and Israeli students, *see In re McCabe*, 2006 WL 8462691, at *5 (D. Mass. Apr. 3, 2006) (recognizing the court's "broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future unless enjoined, may fairly be anticipated from the defendant's conduct in the past").

---

[30] Harvard's reliance on *Gill v. Whitford*, 585 U.S. 48, 73 (2018), a gerrymandering case, is inapposite, as that case, unlike here, involved "an unsettled kind of claim this Court has not agreed upon, the contours and justiciability of which are unresolved," and remanded to allow plaintiffs to show their injuries. Harvard's citation of *Davis* to challenge plaintiffs' prayer for relief, Mem. 16, is similarly inapposite, *see infra* Arg. § V note 35.

Harvard argues that "appointing a neutral expert monitor" to oversee its compliance with an injunction would be improper, since "Plaintiffs do not plead that such an appointment is authorized by statute or extraordinary circumstances." Mem. 16 (citing *Garcia-Rubiera v. Fortuno*, 727 F.3d 102, 114 (1st Cir. 2013) (on appeal of a permanent injunction, not addressing pleading standards)). But plaintiffs do not have to plead any such thing—the Court's authority to appoint a monitor is well established by Rule 53, the inherent power of the Court, and numerous decisions. *See, e.g.*, Fed. R. Civ. P. 53 (court authority to appoint monitor); *Concilio de Salud Integral de Loiza, Inc. v. Pérez-Perdomo*, 551 F.3d 10, 19 (1st Cir. 2008) (noting "[i]n addressing [] complex . . . issues . . ., the district court may be well-advised to [appoint a monitor]" under its "inherent power" and Rule 53). Harvard's long history of refusing to act effectively to combat antisemitism will undoubtedly require the appointment of a monitor. *See Pérez-Perdomo*, 551 F.3d at 19 ("prospect of noncompliance with a preliminary injunction" warrants the appointment of a monitor); *e.g.*, ¶¶ 84-87, 168-73.

### 4.  SAA Has Standing

SAA is a not-for-profit corporation comprised of voluntary members, including Jewish Harvard students, "formed for the purpose of defending . . . the right of individuals to equal protection and to be free from antisemitism in higher education, through litigation and other means." ¶¶ 13-14. Organizations like SAA can seek relief for their members, as "the remedy, if granted, will inure to the benefit of those members of the association actually injured." *Warth v. Seldin*, 422 U.S. 490, 515 (1975); *Camel Hair & Cashmere Inst. of Am. v. Associated Dry Goods Corp.*, 799 F.2d 6, 12 (1st Cir. 1986) ("Actions for . . . prospective relief have generally been held particularly suited to group representation.").

Harvard argues that associational standing is impermissible in all hostile educational environment cases because such claims are "necessarily individualized" and require "plaintiff-

specific showings." Mem. 17. That is not the law. Instead, "so long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members entitled to invoke the court's jurisdiction." *Warth*, 422 U.S. at 511. The SAA members are not "indispensable"—this action challenges a widespread practice and seeks injunctive relief; courts regularly find that claims seeking relief based on unlawful patterns and practices do not require the kind of participation from individual members that bars associational standing. *See Sexual Minorities Uganda v. Lively*, 960 F. Supp. 2d 304, 324, 327 (D. Mass. 2013) (organization had standing for injunctive relief "to prevent . . . continued actions to strip away and/or deprive [members] of their fundamental rights," noting that "even though a claim is intensely fact specific and plaintiff will be required to introduce proof of specific member practices and effects on specific members, we see no reason that plaintiff's members would be required to participate as parties" (cleaned up)); *Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm.*, 89 F.4th 46, 55 (1st Cir. 2023) (organization had standing even though the "requested remedy would certainly require some factual showing that [] students would have been [affected]").[31]

## C.  Plaintiffs' Claims Are Ripe Under Rule 12(b)(1)

Harvard asserts that plaintiffs' claims are not ripe because Harvard has "taken concrete steps, and is actively assessing what else it can do." Mem. 1. According to Harvard, half a year later, it "is still in the midst of investigations and proceedings related to incidents that took place

---

[31] None of the cases that Harvard cites suggest otherwise, but instead rejected standing because plaintiffs did not sufficiently allege injuries or the relief sought would not apply to all members equally. In one, the court reasoned that there were no allegations besides "conjectural [and] hypothetical injuries" to unnamed "black students" who may not have been members of the organization. *Barnett v. Johnson City Sch. Dist.*, 2005 WL 8178066, at *5 (N.D.N.Y. Feb. 2, 2005). In another, the court found that the claims of a discriminatory hiring process required addressing each individual's circumstances, and that relief could not "be granted through a declaration or injunction applicable to all members equally." *Nat'l Ass'n of Gov't Emps. v. Mulligan*, 914 F. Supp. 2d 10, 14 (D. Mass. 2012). Another did not involve associational standing. *Productions*, 68 F.3d 525.

in the aftermath of the October 7 attack," so plaintiffs' claims "are [not] fit for resolution at this juncture." *Id.* at 8, 9. Harvard goes so far as to argue that allowing plaintiffs' claims to proceed would cause *Harvard* "significant hardship." *Id.* Harvard's approach, if accepted, would allow any institution to avoid liability by claiming it is "assessing" and "investigating."

A "[r]ipeness analysis requires consideration of fitness and hardship." *N.H. Lottery Comm'n v. Rosen*, 986 F.3d 38, 52 (1st Cir. 2021) (cleaned up). "Fitness involves issues of finality, definiteness, and the extent to which resolution of the challenge depends upon facts that may not yet be sufficiently developed, while hardship typically turns upon whether the challenged action creates a direct and immediate dilemma for the parties." *Id.* at 53 (cleaned up). Harvard's arguments—which pertain to both fitness and hardship—are based solely on "prudential" considerations, the continued vitality of which has been cast into doubt by the Supreme Court and the First Circuit. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014) ("prudential" ripeness doctrine conflicts with federal courts' "unflagging" obligation to hear cases within their jurisdiction); *Aguasvivas v. Pompeo*, 984 F.3d 1047, 1053 (1st Cir. 2021) ("[I]t is unclear whether prudential ripeness concerns in particular may still be entertained."). But as shown below, even assuming the continued vitality of Harvard's arguments, plaintiffs' claims are based on past and continuing civil rights violations and are undeniably ripe for adjudication.

### 1.  Plaintiffs' Claims Are Fit for Review

As to fitness, courts consider "whether resolution of the dispute should be postponed in the name of judicial restraint from unnecessary decision of constitutional issues." *SPARTA Ins. v. Pa. Gen. Ins.*, 651 F. Supp. 3d 391, 398 (D. Mass. 2023). Harvard says that it must be allowed to "see [its] necessary work through," Mem. 9—but plaintiffs need not wait to bring civil rights claims.[32]

---

[32] The cases Harvard relies on are distinguishable. Mem. 9. In *Reddy v. Foster*, 845 F.3d 493, 500-01 (1st Cir. 2017), a pre-enforcement challenge to a statute failed to satisfy the jurisdictional component of ripeness, which Harvard does

*See Algonquin Gas Transmission, LLC v. Weymouth*, 919 F.3d 54, 63 (1st Cir. 2019) (finding ripeness where resolution of the claim "would be neither 'advisory' nor 'irrelevant'"); *Doe v. Univ. of Me. Sys.*, 2020 WL 981702, at *11 (D. Me. Feb. 20, 2020) (claim did not "hinge[] on the outcome of the university's [ongoing] investigation"). Harvard's egregiously inadequate response—*e.g.*, "engaging" with concerned students, Mem. 8—in no way shows that plaintiffs' claims are not sufficiently developed. And, again, the latest events refute any such contention.

### 2.  This Case Will Impose Hardship on Plaintiffs, Not Harvard

Harvard's suggestion that the adjudication of plaintiffs' claims will cause Harvard "significant hardship" should likewise be rejected. Mem. 9. To determine whether a case imposes a significant hardship, courts weigh "the harm to the parties *seeking relief* that would come to those parties from our withholding of a decision at this time," not whether *hearing* the case will cause hardship to Harvard. *SPARTA Ins. v. Pa. Gen. Ins.*, 621 F. Supp. 3d 169, 178 (D. Mass. 2022) (citation omitted). Harvard's significant hardship argument is irrelevant to the analysis. Indeed, Harvard cites no case supporting the proposition that a court can disregard its "virtually unflagging" obligation "to hear and decide cases" simply because a defendant will be inconvenienced by the continuance of litigation. *Susan B. Anthony List*, 573 U.S. at 167 (cleaned up). Harvard should not be permitted to avoid liability indefinitely through its self-serving assurances, particularly given that Harvard has already shown what Harvard "work[ing] in real time to address" antisemitism looks like, Mem. 9—and it is patently insufficient.[33] At best, Harvard's suggestion that it can delay resolution of any claims against it for so long as it purportedly undertakes "ongoing initiatives, investigations, or disciplinary proceedings," *id.*, only

---

not raise here. In *Ernst & Young v. Depositors Econ. Prot. Corp.*, the claims were "not rooted in the present, but depend[ed] on a lengthy chain of speculation as to what the future has in store." 45 F.3d 530, 536 (1st Cir. 1995).

[33] *See, e.g.*, ¶¶ 4, 6, 104-22, 124-25, 139, 145; Member Decl. ¶¶ 3-10, 13-14.

highlights that "delaying or denying resolution of the issue would [] work[] a substantial hardship" on *plaintiffs*. *R.I. Ass'n of Realtors, Inc. v. Whitehouse*, 199 F.3d 26, 34 (1st Cir. 1999); *see, e.g.*, *Doe v. County of Centre*, 242 F.3d 437, 453 (3d Cir. 2001) ("Withholding judicial consideration causes an immediate and significant hardship on the Does, who will be deprived of their right to present their federal statutory and constitutional claims for redress."); *Johnson v. Bryson*, 851 F. Supp. 2d 688, 702 (S.D.N.Y. 2012) (finding discrimination case ripe where the fact that "the challenged policies have been in place . . . and will likely again be applied" made it "distinguishable from cases in which courts have determined that pre-enforcement challenges to agency decisions are unripe").

## V.   Plaintiffs' Requested Relief Is Proper

Harvard's request to strike plaintiffs' request for injunctive relief should be rejected. Motions to strike are "drastic" remedies "viewed with disfavor" and "infrequently granted." *Hayes v. McGee*, 2011 WL 39341, at *2 (D. Mass. Jan. 6, 2011). Harvard must but cannot show that the "allegations being challenged are so unrelated to plaintiff's claim as to be unworthy of any consideration . . . and that their presence in the pleading throughout the proceeding will be prejudicial to the moving party." *Morell v. United States*, 185 F.R.D. 116, 117-18 (D.P.R. 1999) ("The court must deny a motion to strike if there is any question of fact or law."). Harvard argues that the relief is so overbroad that "[i]t would apply without limit to any policy, procedure, or practice." Mem. 26. But Harvard cites *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979), an inapposite case involving a nationwide injunction. Harvard incorrectly asserts that the requested relief is "tantamount to an injunction to 'obey the statute,'" Mem. 27, citing *Brown*, 891 F.2d at 361, a post-trial appeal slightly narrowing the district court's injunction, which has no bearing on

29

the pleading standard.[34] But plaintiffs' request is not an impermissibly broad request that Harvard "obey the statute" everywhere and with respect to all people, but only that it be compelled to take measures to ensure that plaintiffs and other Jewish students are treated equally and not subjected to unchecked discrimination. Finally, Harvard argues that plaintiffs impermissibly request "particular remedial measures." Mem. 16, 27. Yet plaintiffs do not request "specific remedial measures," only the relief "necessary, adequate, and appropriate" to prevent Harvard from continuing to discriminate against Jewish students. None of Harvard's cases support its argument that plaintiffs' injunctive prayer should be stricken from the outset. Mem. 27-28.[35]

## **CONCLUSION**

The Court should deny defendant's motion in its entirety.[36]

---

[34] *Brown,* where plaintiff "alone had been the victim" of discrimination, recognized that "[a]n injunction . . . is not necessarily made overbroad by extending benefit or protection to persons other than prevailing parties in . . . [a] lawsuit—even if it is not a class action—if such breadth is necessary to give prevailing parties the relief to which they are entitled." *Id*. Similarly, *E.E.O.C. v. Aviation Port Servs., LLC*, 2020 WL 1550564, at *12 (D. Mass. Apr. 1, 2020), recognized that a court may "issue an injunction in a Title VII case when necessary to prevent future discrimination of the kind contemplated in the lawsuit [and can] restrain not only the exact same act as the one found unlawful, but also acts that 'are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future, unless enjoined, may fairly be anticipated from the defendant's conduct in the past.'"

[35] *See Davis*, 526 U.S. at 648 (not addressing prayer for relief, and merely noting failure to take specific actions requested by plaintiffs does not guarantee *liability* for deliberate indifference); *Roe v. Lincoln-Sudbury Reg'l Sch. Dist.*, 2021 WL 1132256, at *28 (D. Mass. Mar. 24, 2021) (same); *Doe v. Trustees of Bos. Coll.*, 942 F.3d 527, 535 (1st Cir. 2019) (not addressing prayer for relief, reversing preliminary injunction on contract claim challenging due process during disciplinary proceedings); *cf. Zeno*, 702 F.3d at 671 n.15 (a school's "right to select among various appropriate remedies is not—by itself—a shield against liability").

[36] Should any portion of Harvard's motion be granted, plaintiffs respectfully request leave to amend the complaint. Leave to amend should be "freely give[n] . . .when justice so requires." Fed. R. Civ. P. 15.

Dated:    April 26, 2024                    Respectfully submitted,

                                           ALEXANDER KESTENBAUM and STUDENTS
                                           AGAINST ANTISEMITISM, INC.

                                           By their attorneys,

                                            /s/ Marc E. Kasowitz
                                                Marc E. Kasowitz*
                                                Daniel R. Benson*
                                                Mark P. Ressler*
                                                Andrew L. Schwartz*
                                                Joshua E. Roberts*
                                                Andrew C. Bernstein*
                                                **KASOWITZ BENSON TORRES LLP**
                                                1633 Broadway
                                                New York, New York 10019
                                                Tel: (212) 506-1700
                                                mkasowitz@kasowitz.com
                                                dbenson@kasowitz.com
                                                mressler@kasowitz.com
                                                aschwartz@kasowitz.com
                                                jroberts@kasowitz.com
                                                abernstein@kasowitz.com

                                                Timothy H. Madden (BBO #654040)
                                                **DONNELLY, CONROY & GELHAAR, LLP**
                                                260 Franklin Street, Suite 1600
                                                Boston, MA 02110
                                                Tel: (617) 720-2880
                                                thm@dcglaw.com

                                            *Admitted *pro hac vice*

31