**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

```
-------------------------------------------------- X
ALEXANDER KESTENBAUM and          :
STUDENTS AGAINST ANTISEMITISM,    :
INC.,                             :      Case No. 1:24-cv-10092-RGS
                                  :
            Plaintiffs,           :
                                  :      SECOND AMENDED
      v.                          :      COMPLAINT
                                  :
PRESIDENT AND FELLOWS OF          :
HARVARD COLLEGE,                  :
                                  :      Jury Trial Demanded
            Defendant.            :
-------------------------------------------------- X
```

Plaintiffs Alexander "Shabbos" Kestenbaum ("Kestenbaum") and Students Against

Antisemitism, Inc. ("SAA"), for their complaint against defendant President and Fellows of

Harvard College ("Harvard"), allege as follows:

## PRELIMINARY STATEMENT

1.      Harvard, America's leading university, has become a bastion of rampant anti-

Jewish hatred and harassment.  Since October 7, 2023, when Hamas terrorists invaded Israel and

slaughtered, tortured, raped, burned, and mutilated 1,200 people—including infants, children,

and the elderly—antisemitism at Harvard has been particularly severe and pervasive.  Mobs of

pro-Hamas students and faculty have marched by the hundreds through Harvard's campus,

shouting vile antisemitic slogans and calling for death to Jews and Israel.  Those mobs have

occupied buildings, classrooms, libraries, student lounges, plazas, and study halls, often for days

or weeks at a time, promoting violence against Jews and harassing and assaulting them on

campus.  Jewish students have been attacked on social media, and Harvard faculty members have

promulgated antisemitism in their courses and dismissed and intimidated students who object.

2.     Most recently, in April and May 2024—just after arguing to this Court that plaintiffs' challenges to Harvard's antisemitic hostile educational environment were "premature" and "contingent on establishing the deficiency of Harvard's ongoing response to antisemitism"— Harvard permitted hundreds of Harvard students, faculty members, and others to occupy Harvard Yard for weeks, erecting an encampment to further their antisemitic agenda, replete with calls for global intifada and other antisemitic slogans, chants, and banners, disrupting Jewish and other students living in Harvard Yard dormitories and harassing, threatening, and intimidating Jewish students walking through the Yard.

3.     What is most striking about all of this is Harvard's abject failure and refusal to lift a finger to stop and deter this outrageous antisemitic conduct and effectively penalize the students and faculty who perpetrate it.  Shockingly, instead, Harvard rewarded their conduct by capitulating to the unlawful occupiers of Harvard Yard, eschewing meaningful disciplinary consequences—and any consequence at all for the vast majority of those involved—from the three-week takeover of Harvard Yard, and promising the occupiers meetings with Harvard's governing investment body concerning their demands that Harvard "divest" from Israel.

4.     The "deficiency of Harvard's ongoing response to antisemitism" and its deliberate indifference to its antisemitic hostile environment could not be clearer.  Harvard's refusal to do anything to effectively confront, let alone solve, its antisemitism problem, which, by February 2024, its then president had acknowledged was "very serious," and its egregious double standards when it comes to protecting its Jewish students, are reflected in its May 17, 2024 public statement, entitled "Follow-up on the Ending of the Encampment in Harvard Yard." In that statement, which Harvard requested the board of the Harvard Jewish Alumni Association ("HJAA") circulate to its 3,000 members, Harvard refers to the "concerning behavior" of the

occupiers of Harvard Yard and the "significant disruption to Harvard's educational activities and operations" the occupation caused and describes the woefully inadequate disciplinary measures Harvard was supposedly taking, as well as the divestment meeting promises Harvard's president made to the occupiers.  As the HJAA board put it in response to Harvard's May 17 statement: "[T]he fact of the matter is that scores of students, faculty and administrators appear to be getting a free pass/slap on the wrist for behavior that would result in immediate administrative action including expulsion were any other minority or ethnic group targeted. What we see is leniency, supported by legalese, that would not have been afforded transgressors against any other university community."  Moreover, not once in its May 17 statement does Harvard even so much as mention antisemitism or Jews or Jewish concerns—an omission that would have been unthinkable had the target been any other group.  As the HJAA board in its response further said, what Harvard did with respect to the occupation of Harvard Yard was a "continuation of massive moral failure on the part of the University."  It was also a continuation of Harvard's massive legal failure.

5.      Harvard's antisemitism cancer—as a past Harvard president termed it—manifests itself in a double standard invidious to Jews.  Harvard selectively enforces its policies to avoid protecting Jewish students from harassment, hires professors who support anti-Jewish violence and spread antisemitic propaganda, and ignores Jewish students' pleas for protection.  Those professors teach and advocate through a binary oppressor-oppressed lens, through which Jews, one of history's most persecuted peoples, are typically designated "oppressor," and therefore unworthy of support or sympathy.  Harvard permits students and faculty to advocate, without consequence, the murder of Jews and the destruction of Israel, the only Jewish country in the world.  Meanwhile, Harvard requires students to take a training class that warns that they will be

disciplined if they engage in sizeism, fatphobia, racism, transphobia, or other disfavored behavior.

6. Harvard's double standard starts at the top. Whereas almost twenty years ago, a Harvard president was run out of his position for merely suggesting a disfavored hypothesis concerning the underrepresentation of women in the sciences—a hypothesis he said he wanted proven wrong—Harvard's president, in early December 2023, testified before Congress that calls for the genocide of the Jewish people do not necessarily violate Harvard's policies, and then received the unanimous backing of Harvard's governing body. Following that testimony on December 5, 2023, the only rabbi on Harvard's recently appointed Antisemitism Advisory Group resigned because, as he said, "both events on campus and the painfully inadequate testimony reinforced the idea that I cannot make the sort of difference I had hoped." Only after the disclosure of plagiarism allegations and a month of intense public scrutiny did Harvard's president finally resign.

7. That antisemitism is severe and pervasive at Harvard, and that Harvard has responded with at best deliberate indifference, have been unequivocally confirmed by investigatory reports issued in May 2024 by the HJAA and by the House of Representatives Committee on Education and the Workforce.

8. The HJAA report, "The Soil Beneath the Encampments: How Israel and Jews Became the Focus of Hate at Harvard," was based on interviews with fifty Jewish Harvard community members.[1] As set forth in the report, students described having been: kicked out of class for being Israeli; turned away from campus events for being recognized as a Jew; targeted by a teaching fellow saying Jews are contributing to the current "Holocaust"; compelled to hide

---

[1] A copy of the HJAA report is attached hereto as Exhibit A.

their true beliefs in class for fear of retaliation by peers or professors grading them; subjected to having their mezuzahs torn down from their dormitory doors; attacked for wearing religious items or compelled to stop wearing them; and subjected to such calls as "Zionists should be slain. Many stated that they were "scared to be a Jew here right now."  HJAA reported that the protesters are "repeating what they are taught in classrooms and at department-sponsored events," where Israel is described as "the last remaining colonial settler power embodying the world's worst evils: racism, apartheid, and genocide."  HJAA described the "unchecked antisemitism" on Harvard's Sidechat social media platform, such as "Gas the Jews," and reported that Harvard "has repeatedly ignored Jewish students' complaints despite clear violations of Harvard's non-discrimination and anti-bullying policies."  Forty-one of the forty-two students HJAA interviewed "discussed feeling alienated and excluded, if not outright harassed," and the few faculty members willing to be interviewed by HJAA reported that they were, as HJAA described it, "even more afraid of speaking with us on the record; they said it could get them fired or undermine a promotion."

9.      The House Committee report, based on interviews and Harvard's responses to the Committee's subpoena, "highlight[ed] major flaws in Harvard University's response to antisemitic events on its campus" and concluded that "[t]he consequences of Harvard's leaders' continued failure to implement a strong response to antisemitism and violations of the University's rules are evident in the chaos that has erupted at the University in recent weeks."[2] Among other things, as the Committee further reported,  Harvard's own Antisemitism Advisory Group—which it appointed ostensibly to "develop a robust strategy for confronting antisemitism on campus"—had "found antisemitic harassment to be a significant problem at Harvard" and

---

[2] A copy of the Committee's report is attached hereto as Exhibit B.

"presented Harvard's leadership with significant recommendations on goals and steps to address antisemitism" that "could have had a real impact in combating antisemitism at the University and restoring a safer environment for Jewish students," but that "Harvard's leaders failed to implement these recommendations."

10.     Kestenbaum, SAA's members, and many others have explicitly and repeatedly warned Harvard that its severe and pervasive hostile environment endangers Jewish students.  In fact, Harvard has been aware of its antisemitism problem for years, but its response has been, to say the least, clearly unreasonable and totally unacceptable in not just tolerating, but enabling antisemitism.  Harvard has abjectly failed to enforce its policies and discipline those responsible for turning Harvard's campus into a severely hostile environment for its Jewish students, including Kestenbaum and other SAA members.  Its faculty members have gone so far as to cancel classes so students can attend antisemitic rallies and harass and intimidate Jews without consequence.  When, in clear violation of Harvard policies, a mob of students took over a campus building to further their antisemitic agenda, Harvard's response was not to remove and discipline them, but to supply them with burritos and candy.

11.     Harvard's longtime practice of refusing to enforce its own policies against antisemitism ensured that the October 7 terrorist attack would enormously intensify the anti-Jewish abuse on campus.  Numerous students and faculty members at Harvard have openly endorsed Hamas's October 7 massacre, issuing public statements blaming Jews for their own murders, or otherwise excusing or supporting Hamas's actions, notwithstanding Hamas's history since its founding in 1987 of perpetrating numerous suicide bombings and other terrorist attacks, Hamas's explicit vows to kill and destroy Jews and Israel, the U.S. State Department's designation of Hamas as a foreign terrorist organization, and Hamas's repeated public

proclamations of its determination to repeat the October 7 atrocities until its genocidal aims are achieved.  In supporting Hamas and condemning Israel, Harvard students and faculty harass, discriminate against, and assault Jewish students—including on October 18, when a mob of protesters attacked a Jewish student, and the next day, when a mob trapped a group of Jewish students in a study room—but they are never heard to condemn, let alone rally against, Hamas, which has committed unspeakable atrocities in Israel, most recently on October 7; Syria and Yemen, which have killed hundreds of thousands of Arab civilians; Pakistan, which is expelling almost two million Afghan Muslims; China, which has imprisoned its Muslims in reeducation camps; countries like Somalia and Nigeria, where Christians are regularly murdered; or Darfur, where large numbers of civilians have been and are being kidnapped, sexually assaulted, and murdered.

12.     Harvard's purported excuse for refusing to take disciplinary measures and sitting idly by as the Jew-bashing on campus escalates—that antisemitic harassment is protected by free expression principles—confirms its antisemitic double standard.  Considering that Harvard aggressively enforces policies to address bias against other minorities and regularly disciplines students and faculty members who harass other groups or espouse viewpoints Harvard deems inappropriate, its refusal to discipline students attacking, harassing, or intimidating Jews is glaring.  Based on its record, it is inconceivable that Harvard would allow any group other than Jews to be targeted for similar abuse or that it would permit, without response or consequence, students and professors to call for the annihilation of any country other than Israel.

13.     Harvard's deliberate indifference to its hostile environment has worsened since this action was initiated.  As Kestenbaum recently recounted at a congressional hearing, Harvard has taken no disciplinary measures against students who have posted on social media such

antisemitic canards as "too many damn Jews run this country," or against the faculty and student groups that published a cartoon depicting a man marked with a Star of David and a dollar symbol strangling an Arab man and a Black man, or against the Harvard students and faculty who perpetrate near-daily acts of antisemitic harassment against Jews on campus. Just this month, Interim President Garber dropped the involuntary leave sanctions against students who, in flagrant violation of Harvard's policies, had organized and participated in the Harvard Yard occupation.

14.     Subjected to intense anti-Jewish vitriol, including from their own professors and Harvard administrators, Kestenbaum and other Jewish students, including SAA members, have been deprived of the ability and opportunity to fully participate in Harvard's educational and other programs and have been placed at severe emotional and physical risk. Making matters even worse for Jewish students, over the past ten years, Harvard College has instituted admissions policies that have severely reduced—from approximately 25% in 2013 to between 5.4% and 9.8% in 2023 for the most recent freshman class—the percentage of Jewish students, an enormous decline that evinces an intentional effort, much like Harvard's quotas one hundred years ago, to exclude Jews. The severe and pervasive hostile environment for Jews on campus leaves Harvard's remaining Jewish population even more isolated and unsafe against their abusers.

15.     Harvard's deliberate indifference to, and indeed enabling of, antisemitism on its campus constitutes an egregious violation of Title VI of the Civil Rights Act of 1964. Harvard has allowed endemic antisemitism to exclude Jewish students from the full and equal participation in, and to deprive them of the full and equal benefits of, their educational experience at Harvard, and has discriminated against them, by, among other things, failing to

protect them in the way Harvard protects other groups—all based on race, ethnicity, and/or national origin.  Harvard must now be compelled to implement institutional and concrete remedial measures, such as: (i) disciplinary measures, including termination, against deans, administrators, professors, and other employees responsible for antisemitic discrimination and abuse, whether because they engage in it or permit it; (ii) disciplinary measures, including suspension or expulsion, against students who engage in such conduct; (iii) declining and returning donations, whether from foreign countries or elsewhere, implicitly or explicitly conditioned on the hiring or promotion of professors who espouse antisemitism or the inclusion of antisemitic coursework or curricula; (iv) adding required antisemitism training for Harvard community members; (v) appointing a neutral expert monitor to oversee compliance with this Court's order; and (vi) payment of appropriate damages for lost or diminished educational opportunities.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 over claims arising under Title VI of the Civil Rights Act of 1964 ("Title VI") (42 U.S.C. § 2000d *et seq.*).  This Court has supplemental jurisdiction over plaintiffs' related state law claims under 28 U.S.C. § 1367(a) because those claims arise out of the same case or controversy as plaintiffs' federal claim.

17.     This Court has personal jurisdiction over Harvard because it is based and operates in Cambridge, Massachusetts.

18.     Venue in the District of Massachusetts is proper under 28 U.S.C. § 1391 because it is the judicial district in which a substantial part of the events or omissions giving rise to plaintiffs' claims occurred and where Harvard is located.

## PARTIES

19.     Plaintiff Students Against Antisemitism, Inc. is a not-for-profit corporation and 501(c)(3) tax-exempt charity organized under the laws of the State of Delaware, formed for the purpose of defending human and civil rights, including the right of individuals to equal protection and to be free from antisemitism in higher education, through litigation and other means.

20.     SAA is comprised of voluntary members, including students at higher education institutions, who support SAA's mission and who have been personally aggrieved or otherwise impacted by antisemitism and discrimination in higher education.  SAA's members, who have voting rights in the organization, include current, former, and prospective Jewish Harvard students who are experiencing (or have experienced, in the case of former students) a severe and pervasive hostile educational environment at Harvard that causes them to lose the benefits of Harvard's educational and extracurricular opportunities.

21.     Plaintiff Alexander "Shabbos" Kestenbaum is a Jewish student at Harvard University, enrolled in the Masters in Theological Studies program at Harvard Divinity School ("Harvard Divinity").  He is also a member of SAA.

22.     SAA Member #1 is a Jewish student at Harvard University, enrolled in Harvard Law School ("Harvard Law").

23.     SAA Member #2 is a Jewish student at Harvard University, enrolled in Harvard Law.

24.     SAA Member #3 is a Jewish student at Harvard University, enrolled in Harvard Law.

25.     SAA Member #4 is a Jewish Ph.D. student at Harvard University, taking courses at Harvard T.H. Chan School of Public Health ("Harvard Public Health").

26.     SAA Member #5 is a Jewish student at Harvard University, enrolled in Harvard Law.

27.     Defendant President and Fellows of Harvard College, the legal name of Harvard University, is a private educational institution based in Cambridge, Massachusetts.

28.     Despite its endowment of nearly $50.7 billion—the largest among American universities—Harvard accepts substantial direct financial assistance from the federal government through, among other things, grants and loans, including in fiscal years 2022 and 2023, at least $642 million and $676 million, respectively, and will receive substantial direct federal financial assistance in fiscal year 2024, as well as substantial indirect federal financial assistance through, among other things, tuition paid with federal financial aid.  As a recipient of federal financial assistance, Harvard is subject to Title VI.

## FACTS

### A.     Title VI Protects Jewish Students Against Antisemitism

29.     Title VI prohibits discrimination on the basis of race, color, or national origin in any program or activity that receives federal funding or other federal financial assistance, and protects all students, including Jewish students, in such programs or activities.

30.     Since at least September 2004, it has been the policy of the Office of Civil Rights ("OCR") of the U.S. Department of Education ("DOE"), the agency responsible for enforcing Title VI, to investigate claims related to antisemitism.  In an October 26, 2010 letter to federally funded schools, OCR confirmed that such schools are "responsible for addressing harassment incidents about which [they] know[] or reasonably should have known," and must address "anti-Semitic harassment," stating that such harassment violates Title VI when it creates a "hostile environment" based on "actual or perceived shared ancestry or ethnic identity as Jews," in which "the conduct is sufficiently severe, pervasive, or persistent so as to interfere with or limit a

student's ability to participate in or benefit from the services, activities, or opportunities offered by a school," or when the "harassment is encouraged, tolerated, not adequately addressed, or ignored by school employees."

31.     The Obama, Trump, and Biden Administrations have confirmed the urgent need to combat antisemitism in educational institutions.  Under President Barack Obama's administration, in June 2010, the State Department's Office of the Special Envoy to Monitor and Combat Antisemitism, which is tasked with developing and implementing policies and projects to support efforts to combat antisemitism, adopted a working definition of antisemitism developed by the European Monitoring Center on Racism and Xenophobia and adopted contemporary examples of antisemitism, which include ways that antisemitism manifests itself "with regard to the State of Israel":

- "Using the symbols and images associated with classic anti-Semitism to characterize Israel or Israelis";

- "Drawing comparisons of contemporary Israeli policy to that of the Nazis";

- "Blaming Israel for all inter-religious or political tensions";

- "Applying double standards by requiring of it a behavior not expected or demanded of any other democratic nation"; and

- "Denying the Jewish people their right to self-determination, and denying Israel the right to exist."

32.     In December 2019, President Donald Trump issued Executive Order 13899 on "Combating Anti-Semitism," directing the executive branch to enforce Title VI against discrimination "rooted in anti-Semitism as vigorously as against all other forms of discrimination prohibited by Title VI," and in doing so, to consider the definition of antisemitism promulgated by the International Holocaust Remembrance Alliance ("IHRA"), an intergovernmental organization comprised of thirty-five countries.

33.     Under the IHRA definition, the following are "contemporary examples of

antisemitism":

- "Calling for, aiding, or justifying the killing or harming of Jews in the name of a radical ideology or an extremist view of religion";

- "Making mendacious, dehumanizing, demonizing, or stereotypical allegations about Jews as such or the power of Jews as collective—such as, especially but not exclusively, the myth about a world Jewish conspiracy or of Jews controlling the media, economy, government, or other societal institutions";

- "Accusing Jews as a people of being responsible for real or imagined wrongdoing committed by a single Jewish person or group, or even for acts committed by non-Jews";

- "Denying the fact, scope, mechanisms (*e.g.* gas chambers) or intentionality of the genocide of the Jewish people at the hands of National Socialist Germany and its supporters and accomplices during World War II (the Holocaust)";

- "Accusing the Jews as a people, or Israel as a state, of inventing or exaggerating the Holocaust";

- "Accusing Jewish citizens of being more loyal to Israel, or to the alleged priorities of Jews worldwide, than to the interests of their own nations";

- "Denying the Jewish people their right to self-determination, *e.g.*, by claiming that the existence of a State of Israel is a racist endeavor";

- "Applying double standards by requiring of [Israel] a behavior not expected or demanded of any other democratic nation";

- "Using the symbols and images associated with classic antisemitism (*e.g.*, claims of Jews killing Jesus or blood libel) to characterize Israel or Israelis";

- "Drawing comparisons of contemporary Israeli policy to that of the Nazis"; and

- "Holding Jews collectively responsible for actions of the state of Israel."

34.     On January 4, 2023, DOE, citing the "rise in reports of anti-Semitic incidents,"

released a fact sheet, "Protecting Students from Discrimination Based on Shared Ancestry or

Ethnic Characteristics," which reiterated that Title VI protects "students who experience

discrimination, including harassment, based on their . . . (i) shared ancestry or ethnic

characteristics; or (ii) citizenship or residency in a country with a dominant religion or distinct religious identity."

35.     In May 2023, President Joseph Biden released the U.S. National Strategy to Counter Antisemitism, described as the "most ambitious and comprehensive U.S. government-led effort to fight antisemitism in American history," and DOE launched its Antisemitism Awareness Campaign.

36.     On November 7, 2023, OCR released a letter "remind[ing] colleges, universities, and schools that receive federal financial assistance of their legal responsibility under Title VI . . . to provide all students a school environment free from discrimination based on race, color, or national origin, including shared ancestry or ethnic characteristics."  The letter stated: "It is your legal obligation under Title VI to address prohibited discrimination against students and others on your campus—including those who are perceived to be Jewish [or Israeli] . . . in the ways described in this letter."

37.     On May 7, 2024, OCR released another letter promulgating Title VI guidance, making clear, among other things, that the "fact that harassment may involve conduct that includes speech in a public setting or speech that is also motivated by political or religious beliefs . . . does not relieve a school of its obligation to respond under Title VI . . . if the harassment creates a hostile environment in school for a student or students," "harassing conduct that otherwise appears to be based on views about a country's policies or practices [that] is targeted at or infused with discriminatory comments about persons from or associated with a particular country" may implicate Title VI, and that "[h]arassing conduct need not always be targeted at a particular person in order to create a hostile environment for a student or group of students," but "may be directed at anyone."  The letter also provided examples of the kinds of

conduct with respect to which a college's failure to take effective preventative action could give rise to a Title VI violation—namely, the very kind of harassment and intimidation that has been regularly occurring at Harvard.

38.     As the historical birthplace of the Jewish people, the land of Israel is at the core of Jewish identity, ancestral tradition, religion, and culture.  Jewish civilization has been centered for thousands of years on its homeland in Israel, where Jews have had a continuous presence since ancient times.  The movement for the reestablishment, development, and protection of the Jewish nation in the land of Israel, known as Zionism, arises from Jews' ethnic and historic roots in that land and their right to self-determination.  Zionism is a crucial component of Kestenbaum's and SAA members' Jewish identities, and many are descendants of survivors of the Nazis, with family and friends in Israel.

39.     Anti-Zionism is not merely a political movement—although many try to disguise it as such—but is a direct attack against Israel as a Jewish collectivity.  Nearly half of the Jews in the world live in Israel.  Anti-Zionism is discriminatory and antisemitic when expressed in terms of, for example: applying double standards not applicable to other countries or peoples in assessing Israel's legitimacy and conduct; denying that Jewish civilization is indigenous to the land of Israel; denying the Jewish people's right to self-determination or the right of the State of Israel to exist; denying that Israel has the right to self-defense against terrorism, invasion, or the murder, rape, and kidnapping of its citizens; accusing Israel of being inherently racist or comparable to the Nazis; or invoking classic antisemitic canards against Israel and its people. "When people criticize Zionists," Dr. Martin Luther King, Jr. explained, "they mean Jews. You're talking antisemitism."

40.     The widespread anti-Jewish hate that has gripped Harvard and other universities since October 7, 2023 confirms that in nearly all instances, anti-Zionism is rarely anything more than thinly veiled antisemitism.  Harvard's Jewish students have been threatened with antisemitic slurs and chants such as "Intifada Revolution," "from the River to the Sea," and "globalize the Intifada," and have been maligned as "murderers," "colonizers," "racists," "white supremacists," "killers and rapists of children," "genocidal," and "Zionists."

41.     Antisemitism is a core tenet of Hamas—an extreme Islamist terrorist group explicitly committed to the destruction of Israel and its Jewish inhabitants, the creation of an Islamic state in Israel's place, and the annihilation of all Jews around the world.  Hamas's 1988 charter states: "The Day of Judgment will not come about until Muslims fight the Jews and kill them."  In October 1997, the U.S. State Department designated Hamas, which has controlled Gaza since 2007, a foreign terrorist organization.

42.     In keeping with its charter and goals, since its inception, Hamas has carried out numerous indiscriminate terror attacks on Israeli civilians through methods such as bombings, rocket barrages, shootings, and stabbings, including during two Intifadas.  In fact, the Intifadas were carried out through a campaign of suicide bombs, many of which included nails dipped in rat poison.  During the Second Intifada, from approximately September 2000 through February 2005, Hamas claimed responsibility for over fifty suicide bombings, including the August 9, 2001 bombing of a Jerusalem pizzeria, which murdered seven children; the December 1, 2001 double-suicide bombing in the crowded Ben Yehuda pedestrian mall in Jerusalem, murdering eleven; and the March 27, 2002 suicide bombing at a Passover Seder at the Park Hotel in Netanya, murdering thirty.  Over the next twenty years, Hamas murdered scores more through similar suicide bombings, public bus attacks, booby traps, shootings, and other acts of terror.

43.     Hamas leaders are clear about their agenda: kill all Jews.  In December 2008, for example, Hamas spokesperson Fawzi Barhoum called for suicide attacks and warned that "Hamas will continue the resistance until the last drop of blood."  A month later, in January 2009, Hamas leader Mahmoud Al-Zahar promised that Hamas would "lay the foundation for a tomorrow without Zionists."  Ten years on, Hamas's message and purpose were still the same; in 2019, a senior Hamas terrorist, Fathi Hamad, encouraged Palestinians across the globe to kill Jews, stating, "[s]even million Palestinians outside, enough warming up, you have Jews with you in every place.  You should attack every Jew possible in all the world and kill them."

44.     In the wake of Hamas's October 7 terrorist attack against Israel (discussed in more detail below), which, as President Biden observed, contributed to an "alarming" rise in antisemitism at schools and on college campuses, OCR announced that it was expediting its processing of discrimination complaints involving antisemitism.  At least seven bills have been introduced in both houses of Congress condemning support for Hamas, Hezbollah, and other terrorist organizations at American universities which has created a hostile educational environment for Jewish students, faculty, and staff.  On October 18, 2023, the U.S. Senate passed a resolution condemning "antisemitic student activities," and on November 2, 2023, the U.S. House passed a resolution condemning support for Hamas, Hezbollah, and other terrorist organizations at American universities.

**B.      Harvard Fails to Enforce Its Own Policies to Protect Jewish Students**

45.     Harvard has issued at least five applicable sets of policies ostensibly to protect students from discrimination, harassment, and intimidation: (i) the Harvard University Non-Discrimination and Anti-Bullying Policy; (ii) the University-Wide Statement on Rights and Responsibilities; (iii) the Protest Rules; (iv) Harvard's Student Organization Policies; and (v) Harvard's various student handbooks, which often adopt and expand on University-wide

policies.  Harvard, however, refuses to apply these policies in a nondiscriminatory manner to protect Jewish students and prevent antisemitism on campus, and selectively enforces its own rules, deeming Jewish victims unworthy of the protections it readily affords non-Jewish ones. Harvard's clearly unreasonable response to antisemitic discrimination and harassment reflects an egregious double standard, as it is at odds with Harvard's aggressive enforcement of its policies concerning alleged misconduct not involving antisemitism.  This discriminatory double standard has created, contributed to, aggravated, and exacerbated Harvard's hostile educational environment and the antisemitic abuse and harassment that Kestenbaum, SAA's student members, and other Jewish students have been forced to endure at Harvard.

### i.    Non-Discrimination and Anti-Bullying Policy

46.    On September 1, 2023, Harvard adopted a University-wide Non-Discrimination Policy and an Anti-Bullying Policy (together, the "Non-Discrimination Policy"), which applies to alleged discrimination, harassment, and bullying "by any member of the Harvard community," both on- and off-campus (including on social media), that "may have the effect of creating a hostile or abusive work or learning environment for a member of the University community."

47.    The Non-Discrimination Policy prohibits "discriminatory disparate treatment" and "discriminatory harassment" on the basis of race, color, national origin, ancestry, religion, or creed, among other protected classes.  "Discriminatory disparate treatment" is defined as "singling out or targeting an individual for less favorable treatment because of their protected characteristic," which "unreasonably interfere[s] with or limit[s] the student's ability to participate in or benefit from the institution's programs and activities."  Harvard defines "discriminatory harassment" as "unwelcome and offensive conduct that is based on an individual or group's protected status" that interferes with "a student's academic performance or ability to participate in or benefit from academic/campus programs and activities."  The Non-

Discrimination Policy similarly defines "bullying" as "harmful interpersonal aggression by words or actions that humiliate, degrade, demean, intimidate, or threaten," which is "sufficiently severe or pervasive, and objectively offensive, that it creates a[n] . . . educational[] or living environment that a reasonable person would consider intimidating, hostile, or abusive and denies the individual an equal opportunity to participate in the benefits of the workplace or the institution's programs and activities."

48.     The Non-Discrimination Policy also sets forth governing principles and promises, including that all those at Harvard "with responsibility for implementing [the policy] will discharge their obligations with fairness, rigor, and impartiality" as well as timeliness and transparency, and sets forth procedures, including specified timeframes for reviewing, investigating, and acting upon complaints of violations.  Harvard promises to "respond promptly to reports of bullying" and "take appropriate action to prevent and respond to behavior" that violates these policies.  Examples of possible sanctions for violations include suspension, probation, expulsion, termination, or a recommendation that a faculty member's tenure be terminated.

49.     Harvard's constituent schools also promulgate student handbooks, which set forth misconduct policies and procedures.  For instance, the Harvard College and Harvard Divinity handbooks provide that the school retains broad rights to protect the Harvard community "as it deems necessary in extraordinary circumstances to protect the health and safety of the Harvard community," including "conditions posing broad threats to community health and safety or significantly disrupting campus life or learning."  The handbooks also adopt versions of Harvard's Non-Discrimination Policy.  Harvard Divinity's handbook "prohibit[s]," and declares "unlawful and contrary to Harvard University[] policy," acts that "discriminate on the basis of

race, color, . . . religion, creed, . . . [or] national or ethnic origin." The Harvard College handbook states that protected-class discrimination "is contrary to the principles and policies of Harvard University," and that harassment based on these protected classes is "unacceptable." Harvard Law's handbook provides notice of the Harvard Non-Discrimination Policy and confirms that all "students, faculty, staff," and others at Harvard Law are bound by it and that "[s]tudents [and] faculty . . . agree to respect the rights, dignity, and differences of others . . . and accept personal responsibility in these efforts."

50.    While these clear and unambiguous statements purport to signal Harvard's commitment to prohibiting discrimination and harassment, Harvard has treated Jews as unworthy of the respect and protection it affords other groups.

### ii.    Statement on Rights and Responsibilities

51.    Harvard's University-Wide Statement on Rights and Responsibilities ("Statement on Rights and Responsibilities") guarantees "freedom from personal force and violence, and freedom of movement," and provides, among other things, that interference with such freedoms and with any Harvard member's "performance of their normal duties and activities," or any "[t]heft or willful destruction of property" is a "serious violation" of "personal rights." The Statement on Rights and Responsibilities also notes that administrators have the responsibility to "give full and fair hearing to reasoned expressions of grievances; and to respond promptly and in good faith to such expressions and to widely expressed needs for change." The Statement on Rights and Responsibilities provides that intense personal harassment and unauthorized occupation of buildings violate Harvard policy:

> It is implicit in the language of the Statement on Rights and Responsibilities that intense personal harassment of such a character as to amount to grave disrespect for the dignity of others be regarded as an unacceptable violation of the personal rights on which the University is based.

It is implicit in the University-wide Statement on Rights and Responsibilities that any unauthorized occupation of a University building, or any part of it, that interferes with the ability of members of the University to perform their normal activities constitutes unacceptable conduct in violation of the Statement and is subject to appropriate discipline.

52.      On January 19, 2024, Harvard released additional guidance on the Statement on Rights and Responsibilities, including that "unless a particular School makes an explicit exception, demonstrations and protests are ordinarily not permitted in classrooms and other spaces of instruction; libraries or other spaces designated for study, quiet reflection, and small group discussion; dormitories, residence halls, or dining halls where students live and take their meals; offices where the work of the University is carried out; or other places in which demonstrations and protests would interfere with the normal activities of the University."  The guidance also makes clear that "blocking ingress or egress to campus buildings, classrooms, administrative offices, or other spaces is forbidden, as is blocking or otherwise interfering with the free flow of vehicular, bicycle, or pedestrian traffic," and "conduct such as assaulting, threatening, or intimidating another person or damaging, defacing, or removing a properly posted sign is not permitted."  And "community members may not protest a speech or event in a manner that interferes with the right of the speaker(s) to be heard or of the audience to hear them."

**iii.      Protest Rules**

53.      Several constituent schools have adopted protest policies in addition to the Statement on Rights and Responsibilities, including the Faculty of Arts and Sciences Free Speech Guidelines, the Harvard Public Health Guidelines for Open Debate and Protest, the Harvard Law Protest and Dissent Guidelines, and the Harvard Divinity Statement of Community Values ("Protest Rules").

54.     The Faculty of Arts and Sciences Free Speech Guidelines, "intended to supplement and clarify" the Statement on Rights and Responsibilities and to "inform students of the acceptable limits of protest," define prohibited "disruption" of a campus event as "any repeated or continuous action which effectively prevents members of the audience from adequately hearing or seeing the event" and provide that "[i]n cases of obstruction [of others' 'freedom of movement']. . . the offenders should be punished."  The Free Speech Guidelines provide, among other things, that "act[s] or threat[s] of physical violence" are "regarded as a complete lack of respect for the deepest values that unite the [Harvard] community" and "[r]acial" and "intense personal harassment," as well as "[b]ehavior evidently intended to dishonor such characteristics as race [or] ethnic group," are "contrary to the pursuit of inquiry and education" and constitute "grave disrespect for the dignity of others" which will be "punished."

55.     Harvard's constituent schools have adopted similar policies.  The Public Health Guidelines for Open Debate and Protest provide, among other things, that expression is not protected when it violates the Non-Discrimination Policy and that "[a]ny violation[]" by students, faculty, or other speakers constitutes "grounds for appropriate disciplinary action."

56.     The Harvard Law handbook warns, among other prohibitions, that students who "s[i]t in or obstruct[] access to administrative offices, faculty offices, and other school facilities as a form of protest"—conduct previously sanctioned by a "reprimand"—may now face "significant disciplinary sanction."

57.     The Harvard Law handbook also incorporates the Harvard Law Protest and Dissent Guidelines, which provide, among other things, that student "dissenter[s]" are warned that it is not "acceptable" to impede access to a speaking event, that "[u]sing or threatening force

or violence, such as defacing a sign or assaulting a speaker or a member of the audience, is never permitted," and that "interference with freedom of movement or with freedom from personal force or violence is a serious violation of personal rights."  These policies also provide that "any form of protest that disrupts the conduct of a[] class would violate the University-Wide Statement of Rights and Responsibilities' prohibition against interference with 'the performance of the normal duties and activities' of [Harvard]," that "[w]hen a meeting is closed, dissent by non-attendees is limited to activity outside the meeting that does not impede access to the meeting or substantially interfere with the communication inside," and "[c]hanting or making other sustained or repeated noise in a manner which substantially interferes with the speaker's communication is not permitted."

58.     The Harvard Divinity Statement of Community Values provides, among other things, that Harvard Divinity is committed to ensuring "that all may participate freely within a climate of openness, trust, and sensitivity" and that students are held accountable "for the impact of [their] actions on our community, our environment, and the world."

iv.     **Student Organization Policies**

59.     Harvard also has policies regulating student organizations, codified in Harvard's Student Organization Resource Guide and Harvard's handbooks (collectively, the "Student Organization Policies"), which confirm the Non-Discrimination Policy applies to Harvard-recognized student organizations—those that have registered with, and are supported by and receive benefits from, Harvard in exchange for agreeing to follow Harvard's policies—and provide that "Harvard [] does not tolerate any behavior that constitutes harassment on the basis of . . . any [] characteristic protected under applicable federal or state law" and that student organizations "may not discriminate based on race, color, national or ethnic origin, [or] religion."

60.     The Student Organization Policies also provide that unrecognized student organizations are not permitted "to conduct any activity at Harvard even though their activities involve Harvard" students, except under "special circumstances," that Harvard will not provide "access, support, or benefits" to unrecognized student organizations, and that students may not use the "Harvard" name or marks in organizations' activities without permission from a dean or the provost.

61.     Harvard nevertheless regularly permits unrecognized student groups such as Harvard Boycott, Divestment, Sanctions ("Harvard BDS") and Harvard Afro to conduct, while using Harvard's name, disruptive antisemitic protests inside Harvard buildings and on Harvard grounds without consequence.  These unrecognized groups have, in recent months, extensively engaged in discrimination against, and harassment of, Jewish and Israeli students and continue to violate numerous Harvard policies by holding unauthorized events in which they recruit hundreds of students to interrupt classes with calls for "globaliz[ing] the Intifada" and violence against Jews and Israelis, among other disruptive and harassing conduct.  Harvard takes no action to prevent these organizations from regularly harassing Jewish and Israeli students in violation of Harvard's policies.

**C.     Harvard's Recent History of Antisemitism and Civil Rights Violations**

62.     Antisemitism at Harvard is hardly a new phenomenon.  In the 1920s, it was official Harvard policy, implemented by President Abbott Lawrence Lowell and complete with quotas on admissions to "diminish the Jews" and restore Harvard as a "Gentile" college.  Over the last decade in particular, Harvard's tolerance for, and enabling of, antisemitism has caused a surge in antisemitic hate and harassment culminating in the current intolerable anti-Jewish environment at Harvard following Hamas's October 7 terrorist attack.  Rather than discipline the perpetrators of antisemitism on campus, Harvard has enabled antisemitic abuse and harassment

to intensify, forsaking its Jewish students to a hostile environment that deprives them of the educational experiences other students enjoy.

63.     This hostile environment is reflected in a 2022 study conducted by the AMCHA Initiative, a non-profit organization which investigates and documents antisemitism in higher education—finding that Harvard was the most antisemitic college in the United States—and in a Harvard student's March 2023 senior thesis, "The Death of Discourse: Antisemitism at Harvard College," for which she interviewed Jewish Harvard students, large percentages of whom (as much as eighty percent or more) reported experiencing antisemitism and anti-Zionism on campus or knowing someone who had.  The thesis provided numerous accounts reflecting the widespread, virulent antisemitism Jewish students experience on campus, including how Harvard's hostile environment has effectively made certain courses off-limits to Jewish students because of the bias and harassment they face and the "degree of censorship [they] must take on in order to protect themselves socially and academically."

### i.   Harvard's Renewed Embrace of Antisemitism Has Fostered a Hostile Environment for Jewish Students

64.     Over the past ten years, Harvard Jewish students have endured numerous antisemitic incidents, of which the following are examples.

65.     On October 15, 2015, Harvard College Palestine Solidarity Committee ("Harvard PSC")—a Students for Justice in Palestine ("SJP") affiliate and Harvard-recognized student group—hosted a "die-in" in front of Harvard Hillel, a Jewish campus organization, to protest an event featuring an Israeli soldier—according to Harvard Hillel Executive Director Jonah C. Steinberg, the "first time in my five years at Harvard that I have seen an effort to interfere with the event of another organization."  Although Harvard's Statement on Rights and Responsibilities proscribes such interference with campus activities, Harvard not only failed to

discipline Harvard PSC, but its administrators and faculty members, including Dean Stephen

Lassonde and Harvard Foundation for Intercultural and Race Relations Director S. Allen

Counter, attended and supported the violations.  On November 5, 2015, three weeks after the die-

in, a swastika was discovered on a Harvard Law classroom desk.

66.     SJP—which has a recognized chapter at Harvard Divinity in addition to its

affiliate, Harvard PSC—is one of the most vitriolic antisemitic networks on college campuses.

SJP was founded by the chairman of American Muslims for Palestine ("AMP"), the leadership of

which overlaps with the leadership of organizations that have been shut down by federal

authorities, whose assets were frozen by the U.S. Treasury Department, or that were found liable

in civil actions for providing material support to Hamas.  SJP receives funding and training from

AMP as well as from universities.  SJP and its affiliates sponsor antisemitic events, host

antisemitic speakers, and are leading organizers of Boycott, Divestment, and Sanctions ("BDS")

campaigns against Israeli businesses.  They use confrontational tactics to target Jewish students,

including disrupting Jewish events, constructing mock "apartheid walls," and disseminating anti-

Jewish propaganda laced with falsehoods and blood libels.  A recent study by the Network

Contagion Research Institute, an information verification think tank, found the presence of SJP

on campuses "significantly correlated with antisemitic activity."  Several leading universities,

but not Harvard, have banned SJP and other such hate organizations from their campuses

because of their harassment of Jewish students and support for Hamas.

67.     Harvard PSC, SJP, and similar groups have harassed Jews on campus for years

without consequence, exemplifying Harvard's deliberate indifference to its severe antisemitism

problem.  For example, on April 14, 2016, Harvard Law held an event featuring a speech by

Tzipi Livni, a leading Israeli politician.  At the event, Husam El-Quolaq, a student SJP leader,

accosted Livni, asking her, echoing anti-Jewish stereotypes promoted by, among others, the Nazis: "How is it that you are so smelly?  It's regarding your odor—about the odor of Tzipi Livni, very smelly."  Harvard did not discipline this student, but, instead, the then-dean of Harvard Law—while recognizing that "[m]any perceive [the incident] as anti-Semitic"— responded "that speech is and should be free," notwithstanding that the conduct plainly violated policies including Harvard's Statement on Rights and Responsibilities.  Not only did Harvard not punish El-Quolaq, but it rewarded him.  Harvard Law hired El-Quolaq—who has changed his name to Sam Koolaq—as a Clinical Instructor in 2020, promoted him to Director of the Entertainment Law Clinic in spring 2023, and to Lecturer on Law this spring 2024 semester. Harvard knew of Koolaq's past antisemitic conduct at Harvard when it hired and promoted him.

68.     Groups like Harvard PSC are notoriously active during "Israeli Apartheid Week," an annual worldwide program organized by virulent anti-Israel activists, which promotes BDS and targets Jewish students for harassment.  During the April 2017 Israeli Apartheid Week, a Harvard dormitory was covered with mock detention notices targeting Jewish students for their alleged mistreatment of "Palestinians in Israel-Palestine."  The mock notices were orchestrated by Harvard PSC, and co-signed by Harvard Concilio Latino, Harvard Islamic Society, and Harvard Black Students Association.  Jewish students reacted with shock and fear, but Harvard took no meaningful steps to discipline the groups responsible.

69.     In October 2017, Harvard's student-led Phillips Brooks House Association granted Nihad Awad its "Call of Service" Lecture and Award, designated for a "significant leader in public service" invited to speak at Harvard to inspire a "deeper engagement with critical social issues on campus and in the wider community"—notwithstanding that Awad had long been an open supporter of Hamas.  Awad most recently said that he was "happy to see" the

people of Gaza "break the siege . . . on October 7," a statement the White House "condemn[ed]" as "shocking" and "antisemitic."

70.     On May 10, 2018, a swastika was discovered on a bulletin board at Harvard Public Health.  A few months later, on December 2, 2018, a man intentionally toppled the menorah at Harvard Chabad, a center of Jewish life and faith.  Harvard has not disclosed what, if anything, it has done to find and discipline the perpetrators of these antisemitic incidents.

71.     In March 2019, the Harvard Undergraduate Council met to vote on whether to award university funding to Harvard PSC for its upcoming Israeli Apartheid Week.  During the meeting, Jewish students, in the words of Harvard Hillel's president, were met "with angry interjections and unfounded accusations, as well as references to age-old tropes of prejudice and bigotry," leaving her "shocked and disappointed by the way in which students were prevented from expressing their very real concerns."  The council voted to award the funding to Harvard PSC through the Open Harvard College grant, even though such grants are designed to fund student initiatives on "mental health, race, culture, [] faith relations, . . . harassment prevention, social spaces, and financial accessibility."  Harvard did not take disciplinary action against Harvard PSC, the council, or anyone who spewed antisemitism during the meeting, and it did not prevent the use of Harvard funds to support the antisemitic Israeli Apartheid Week.

72.     On April 2, 2019, during Israeli Apartheid Week, Harvard PSC hosted several speakers, including Boston College Professor Yamila Hussein, who declared that Zionism is a "white supremacist, European, patriarchal, heterosexist, you name it, movement . . . when you read Zionism, it is white supremacy," and Marc Lamont Hill, a former CNN commentator whom CNN fired for calling for a "free Palestine from the river to the sea"—a genocidal call for the destruction of Israel and its Jewish inhabitants—and who is well known for his antisemitic

views.  Harvard allowed these influential speakers and audience members, on campus and at

Harvard's expense, to spew unchecked antisemitic vitriol.  A member of the audience even

demanded discussion of the antisemitic trope that European Jews are not "real Jews" but Turkic

Khazars, a nomadic European tribe, and that the Holocaust is a "myth."  Harvard took no

disciplinary or remedial actions and did not condemn the event's antisemitism.

73.      In August 2020, Harvard PSC posted a graphic on Instagram calling Zionism, the

belief in the right of Jews to self-determination in Israel, a "racist, sectarian, exclusionary,

Jewish-supremacist political ideology," adopting the "Jewish supremacy" phrase coined by

former Ku Klux Klan Grand Wizard David Duke.

74.      In May 2021, in response to a Jewish Israeli student's post in a WhatsApp group,

a Harvard Law student, Shayaan A. Essa, messaged, "We shed your blood with stones."  A

group of Jewish Israeli students reported the incident to then-Dean Jessica Soban, Deputy Dean

I. Glenn Cohen, and Assistant Dean-appointee Catherine Peshkin.  In a meeting with the deans,

the students explained how this violent threat left them "heartbroken and humiliated" and "no

longer feel[ing] comfortable," and asked the deans to denounce Essa's call for violence.  The

deans refused to do so, instead downplaying the message and telling the students to ignore or

respond directly to such harassment.  Essa graduated without consequence.  Two of the Jewish

Israeli students, who are still enrolled at Harvard Law, report that they feel unsafe and have

trouble focusing as a result of Harvard's clearly unreasonable response to antisemitism,

including Essa's conduct, and the increased anti-Jewish hostility on campus following Hamas's

October 7 terrorist attack.  One such student told his young children not to speak Hebrew outside

their home, out of fear they will be targeted by antisemitic Harvard community members.

75.     Also in May 2021, Harvard Hillel's building was vandalized twice.  Two masked individuals tied a Palestinian flag emblazoned with an anti-police slogan to Hillel's door, after which Hillel's windows were shattered.  While Harvard purports to have investigated these incidents, nothing came of it—no one was arrested or disciplined.

76.     In October 2021, the Harvard Law Program on Law & Society in the Muslim World and numerous Harvard student groups co-sponsored a pro-BDS event, "Law and Violence in Palestine," at which a speaker was Mohammed El-Kurd, who notoriously espouses antisemitic views, has repeatedly and publicly announced his fantasy of murdering Jews and how "we must normalize massacres as the status quo," and claims that Israelis and Zionist Jews—whom he calls part of a "death cult"—"harvest organs of" dead Palestinians to "feed their warriors," a vile antisemitic blood libel.

77.     In December 2021, SAA Member #4, a Ph.D. student at Harvard, observed to Professor Bram Wispelwey that his winter semester course, The Settler Colonial Determinants of Health, in Harvard Public Health's Department of Global Health and Population, contained disturbing antisemitic topics and materials, including required readings propagating antisemitic claims and Hamas propaganda, by denying Jewish ethnic identity (which one reading calls an "invented transnational ethnic identity"), calling Jewish history a "mythology," denying Jewish indigeneity to Israel, and downplaying antisemitism and the Holocaust.  Wispelwey dismissed these concerns in an emailed response as "demonstrably false."  SAA Member #4 emailed Department Chair Marcia Castro to raise their concerns.  Castro, like Wispelwey, was dismissive of the student's concerns, but proposed a three-on-one meeting that would include Wispelwey and Professor Jackie Bhabha, who Castro said was leading the development of a new program on Palestine at Harvard's FXB Center for Health and Human Rights ("FXB Center").  SAA

Member #4 made a formal complaint in Harvard's bias reporting system and sent their concerns to Dean for Education Erin Driver-Linn and Chief Diversity, Inclusion, and Belonging ("DIB") Officer Amarildo Barbosa.  The student met with Barbosa later that month and reported this and several other incidents of antisemitism on campus.

78.     Harvard took no steps to prevent Professor Wispelwey from promulgating antisemitism in his course or to otherwise discipline him, but recently promoted his course from a truncated winter-term course to a full-length spring-semester course, which, according to Harvard Public Health's website, entailed Harvard approving the course content.  Following Hamas's October 7 terrorist attack, SAA Member #4 followed up with administrators, providing resources to explain the bias in Wispelwey's course—as Chief DIB Officer Barbosa admitted that his office lacked sufficient expertise in understanding antisemitism.

79.     SAA Member #4 also raised concerns about Harvard's continued partnership with Birzeit University in the West Bank, which openly discriminates against Jews and promotes Hamas and its terrorism.  Among other things, Birzeit's buildings and events are named after convicted terrorists; military parades on campus feature students wearing mock explosive vests while waving Hamas flags; in May 2022, Hamas won the majority of Birzeit student government seats; and, two weeks before the October 7 massacre, eight students were arrested with weapons and plans to carry out a terrorist attack.  Rather than end its affiliation with this antisemitic, terrorism-supporting university, Harvard touts its Birzeit partnership.  In fact, since October 7, Harvard's FXB Center co-sponsored a webinar with Birzeit on December 11, Harvard's Center for Middle Eastern Studies and the Birzeit University Museum have organized at least fourteen "teach-in" sessions to put "Gaza in context"—which include discussions on "Israel's onslaught against Palestinians"—and the FXB Center recently opened applications for its Summer 2024

Palestine Social Medicine course at Birzeit.  The Center has maintained its partnership even though Birzeit University's "student population voted overwhelmingly for a Hamas-affiliated bloc in its student government elections" in May 2023, leading to Hamas leader Ismail Haniyeh "prais[ing] the victory and sp[eaking] to participants at its celebrations over the phone, claiming the victory shows Hamas is 'unbreakable' in the West Bank."  In early 2024, the Harvard Dean for Communications and Strategic Initiatives acknowledged Birzeit's close connection with Hamas, but said it has not affected Harvard's partnership with the university: "Student government elections at Birzeit typically involve candidates affiliated with each of the major political parties in the region, including Hamas. . . .  These student government elections are not germane to and have not affected the FXB Center's work with the scholars and students at Birzeit's Institute of Community and Public Health."

80.    Harvard Out of Palestine ("HOOP"), another student group, led a relentless campaign against retired Israeli Major General Amos Yadlin, a senior fellow at Harvard Kennedy School of Government ("Harvard Kennedy").  For example, on February 1, 2022, HOOP organized a disruptive rally outside Yadlin's first study group of the semester.  As HOOP posted on its Instagram page, the harassment "continue[d] despite [the study group's] efforts to change rooms every week."  HOOP also shared a video that showed its members standing in two parallel rows just outside the open door of Yadlin's classroom, holding large banners and flags, so that anyone entering or exiting would be forced to walk through the gauntlet.  The video also depicts protesters chanting and disrupting Yadlin's discussion with students in the classroom.

81.    On April 7, 2022, HOOP marched through campus, including in and out of buildings, banging on drums and using a megaphone to shout further accusations at Yadlin, charging him with personal responsibility for alleged "genocide."  Throughout the semester,

Harvard did nothing to prevent HOOP from severely and pervasively harassing Yadlin and his students, notwithstanding, among other policies, Harvard's Statement on Rights and Responsibilities proscribing such conduct as "unacceptable" violations of Harvard policy.

82.     The April 2022 Israeli Apartheid Week included a display in Harvard Yard, which read: "ZIONISM IS RACISM SETTLER COLONIALISM WHITE SUPREMACY APARTHEID."  Harvard did nothing in response to these inflammatory antisemitic tropes. Similarly, when a swastika was once again found shortly after Israeli Apartheid Week—this time in the undergraduate residence Currier House—Harvard failed to publicly condemn it outside of a statement to the Currier House community or take any other steps.

83.     That same year, Harvard PSC members placed stickers on Sabra hummus (a brand co-owned by an Israeli company, and which is a common target for BDS) throughout Harvard's dining halls, which accused Israel of being an apartheid state and murdering Palestinians.  Rather than discipline the perpetrators, Harvard pulled Sabra products from the dining halls.  Later, when questioned at the December 5, 2023 hearing before the U.S. House Committee on Education and the Workforce ("House Committee"), titled "Holding Campus Leaders Accountable and Confronting Antisemitism" ("House Antisemitism Hearing"), then-Harvard President Claudine Gay refused to say whether the stickers violated Harvard's policies or to explain Sabra's disappearance from the dining halls.

84.     In August 2022, Harvard PSC members disrupted Harvard's convocation—a ceremony for incoming students that is supposed to "provide[] an understanding of the values, history, and traditions" at Harvard and help new students "develop a sense of belonging and class unity [through] inspirational messages from a current student leader and University officials"— by chanting and displaying a banner that read: "Veritas?  Here's the Real Truth: Harvard

Supports Israeli Apartheid." Harvard later shared on social media images from the convocation that prominently displayed the banner.

85.     In October 2022, Harvard PSC and other student groups brought El-Kurd back to speak on campus. Kestenbaum, who was present for the event, wrote in a February 2023 article published on the Jewish cultural and news website *Aish* about his shock and dismay that "El-Kurd's casual comparisons between the State of Israel and Nazi Germany," and his insistence that "Jews have begun 'internalizing the ways of the Nazis,'" did not preclude his appearance on campus.

86.     In spring 2023, Harvard PSC carried out its annual boycott campaign against Israel Trek—a ten-day trip to Israel sponsored by Harvard Hillel designed for non-Jewish students to learn more about Israeli history and culture and speak with high-ranking Israeli and Palestinian officials—during which participants and prospective participants are harassed and intimidated, with no response by Harvard.

87.     Harvard PSC organized another protest at the September 4, 2023 convocation, at which one of its members—who on October 7 would justify that day's massacre by saying the "oppressed have the right to resist"—interrupted Dean Rakesh Khurana mid-speech, shouting: "Here's the real truth: Harvard supports, upholds, and invests in Israeli apartheid, and the oppression of Palestinians." Harvard did not discipline that or any other protester; instead, the student who interrupted Dean Khurana was later selected as a Rhodes Scholar, after receiving Harvard's endorsement.

88.     At the 2023 convocation, which Kestenbaum attended, protesters encircled the seated freshman class and screamed "boycott Israel," "stop supporting genocide," and "boycott Israel Trek," among other things. Harvard did not make any attempt to stop the protesters, who

interrupted multiple speakers in addition to Dean Khurana.  Kestenbaum's friend, a Jewish

freshman who wears a kippah, got up and left the convocation, telling Kestenbaum he was

extremely uncomfortable with his introduction to Harvard.

89.     On September 21, 2023, Harvard Divinity invited former Palestine Liberation

Organization spokeswoman Diana Buttu to speak in Harvard Divinity's main building at a

screening of *Israelism*, a film that argues American Jews raise their children with pro-Israel

indoctrination.  Buttu claimed that Jews are trained to mistreat Palestinians, a behavior she said

they learned facing Nazi extermination at Auschwitz.  Antisemitic tropes displayed during that

screening drew applause rather than denunciation.  Kestenbaum, who attended the screening

along with Harvard Divinity Interim Dean David Holland and nearly all of Harvard Divinity's

Religion and Public Life ("RPL") Department faculty, experienced severe anxiety and

discomfort as a result of that Harvard-sponsored antisemitic event.  Buttu holds a faculty position

at Harvard.

90.     The increasing antisemitism over the last decade has coincided with a dramatic

decrease in Harvard's Jewish student population—from, in 2013, approximately twenty-five

percent of the undergraduate student body, to, in 2023, less than ten percent—a drop of nearly

sixty percent in a single decade that could only evince a deliberate effort by Harvard to minimize

its Jewish student population.

ii.    **Harvard Refuses to Discipline a Professor Who Intentionally Discriminated
       Against Jewish Students**

91.     In March 2023, as confirmed by an independent investigation Harvard itself

commissioned, Harvard Kennedy Professor Marshall Ganz—who has long railed against what he

calls the "Israeli regime," "Jewish supremacy in Israel," and Israeli "apartheid"—intentionally

discriminated against three Jewish Israeli students enrolled in his Organizing: People, Power,

Change course, the goal of which was for "students [to] learn to work as leadership teams to reach out to constituents to design an organizing campaign."

92.     For their organizing campaign class project, the three students examined ways "to harness and unite a majority of diverse and moderate Israelis to strengthen Israel's liberal and Jewish democracy."  Professor Ganz first pressured the students to change their project description so that it did not refer to Israel as a "liberal Jewish democracy," then told them to remove the word "Jewish" because, when used in connection with "Israel," it "creates an unsafe space" akin to describing the United States as led by "white supremacy," and ultimately prohibited them from using the phrase "liberal Jewish democracy" because, he said, the phrase is "highly controversial," "disrupt[s] the learning environment," and is "deeply offensive" to certain students.  Ganz threatened the students with academic consequences when they defended themselves and their project.  In retaliation for the students' refusal to capitulate to his intimidation, Ganz made the topic for the last day of class "Palestinian solidarity"—even though no student's project involved Palestine—and Ganz refused to let the Jewish students speak that day, rebuffing them for having "caused enough problems already."

93.     In response to a letter from the Brandeis Center asserting that Harvard violated Title VI based on Professor Ganz's conduct, Harvard initiated an investigation led by the law firm Kurker Paget.  Kurker Paget issued its findings in June 2023, concluding that Ganz violated Harvard's Statement on Rights and Responsibility and finding that he: subjected the students to anti-Israel and antisemitic bias and discrimination on the basis of their identities as Jewish Israelis; silenced the students' speech; treated them differently and denigrated them on the basis of their Israeli national origin and Jewish ethnicity and ancestry; prioritized others' concerns

over theirs; and interfered with their ability to participate in and benefit from an educational

program.

94.     On June 15, 2023, Harvard Kennedy Dean Douglas W. Elmendorf accepted

Kurker Paget's "findings of fact and conclusions regarding [Professor Ganz's] violations of

School policies," and acknowledged that Harvard "need[s] to ensure that the School fulfills the[]

commitments [in the Statement of Rights and Responsibilities] and that the violations of policies

that occurred this spring are addressed fully and do not recur."  Dean Elmendorf stated that he

was "convening a small group of faculty members at the School to advise" him, and he

"expect[ed] that this process of consultation will take only a few weeks, and then I will decide

how to proceed."  But after more than four months of Harvard's silence and failure to discipline

Ganz, the Brandeis Center sent another letter on October 30, 2023, demanding immediate action.

Kestenbaum and other Jewish students saw Harvard's failure to act—even after its own

investigator confirmed Ganz's Title VI violations—as more evidence of Harvard's hostility

towards Jewish students.

**D.     Harvard's Deliberate Indifference to Antisemitism Has Continued Despite Intense
        Anti-Jewish Harassment Following Hamas's Massacre**

95.     As a result of Harvard's actions and inactions alleged herein, including permitting

antisemitic events, speakers, screenings, flyers, and messages, and repeatedly failing and

refusing to enforce its own policies or take disciplinary measures against students and professors

who violate those policies, Harvard has made it clear that it will permit, tolerate, and condone

antisemitic activity.  Such deliberate indifference and discriminatory application of Harvard's

policies cultivated an environment in which antisemitic activity, and the risk to Jewish students,

drastically increased following Hamas's October 7 massacre, and continues to this day.

### i.  October 7, 2023: Hamas Terrorists Commit Horrific Atrocities Against Innocent Civilians in Israel

96.     On October 7, 2023, Hamas launched an unprovoked surprise attack on Israel, engaging in depraved acts of murder, torture, rape, violence, and kidnapping against Israeli citizens.  Thousands of armed terrorists invaded southern Israel, while others launched thousands of rockets toward Israeli civilians.  Once inside Israel, the terrorists, acting as well-armed death squads, dispersed into Israeli towns shooting, raping, torturing, burning, and mutilating unarmed civilians, including infants, children, and the elderly, taking hundreds of hostages and engaging in mass murder and rape at a music festival near Gaza's border with Israel.  The Israel Defense Forces ("IDF") eventually repelled the terrorists and regained control over the affected area.  By that time, Hamas had killed 1,200 people and abducted over 200 more.  October 7 was the single deadliest day for Jews since the Holocaust.  Since then, senior Hamas officials have hailed the slaughter and vowed that October 7 was "just the first time, and there will be a second, a third, a fourth," promising another "October 7, October 10, October one-millionth."  When the Hamas leader who used this language was asked whether he meant to call for the complete annihilation of Israel, he replied, "Yes, of course."

97.     On October 18, President Biden described the October 7 slaughter as follows:

> Scores of innocents—from infants to elderly grandparents, Israelis and Americans—taken hostage.  Children slaughtered.  Babies slaughtered.  Entire families massacred.  Rape, beheadings, bodies burned alive.  Hamas committed atrocities that recall the worst ravages of ISIS, unleashing pure unadulterated evil upon the world.  There is no rationalizing it, no excusing it.  Period.  The brutality we saw would have cut deep anywhere in the world, but it cuts deeper here in Israel.  October 7th, which was . . . a sacred Jewish holiday, became the deadliest day for the Jewish people since the Holocaust.  It has brought to the surface painful memories and scars left by a millennia of antisemitism and the genocide of the Jewish people.

98.     Shockingly, many students and faculty members at Harvard celebrate, justify, and excuse Hamas's mass rape, murder, and kidnapping.  Many have resorted to harassment and even violence against Jewish students in support of Hamas's attack and in condemnation of Israel's defensive response.  Harvard faculty members publicly support these students and oppose even the smallest measures to combat Harvard's antisemitism.  These faculty members and students falsely accuse the "Israeli regime" of: committing "genocide" and "ethnic cleansing" (even though the Arab population of Gaza has more than quadrupled since 1967); creating an "open-air prison" in Gaza (even though Israel completely removed itself in 2005 from Gaza, which also shares a border with Egypt); and "apartheid" (even though all citizens in Israel enjoy equal rights).  Further evidencing the antisemitic nature of their activities, these students and the faculty members who support them do not condemn, let alone rally against, such countries as Syria and Yemen, which have killed hundreds of thousands of Arab civilians, and Pakistan, which is now expelling almost two million Afghan Muslims, or China, which has imprisoned its Muslims in reeducation camps, or Somalia and Nigeria, where Christians are regularly murdered.

### ii.     Harvard Fails to Respond to the October 7 Atrocities, While Student Groups and Faculty Members Praise Hamas

99.     In the immediate aftermath of Hamas's October 7 massacre, Harvard failed to make a public statement about the greatest loss of Jewish life since the Holocaust.  Instead, Harvard allowed the massacre to fuel anti-Jewish discrimination and harassment, as students and faculty members were permitted to justify and celebrate the slaughter.

100.    Since October 7, student organizations including Harvard PSC, Harvard Afro, Harvard Graduate Students for Palestine ("Harvard GS4P"), Harvard Divinity's Jews for Liberation, and Harvard BDS, among others, have led near-daily antisemitic protests,

disruptions, and harassment campaigns, regularly calling for violence against Jews at campus events and on social media, employing genocidal chants to advocate "globaliz[ing] the Intifada," and eradicating Israel and its Jewish inhabitants "from the river to the sea."

101.    On October 8, 2023, the day after Hamas's attack, a coalition of more than thirty Harvard student groups calling themselves the Harvard Palestine Solidarity Groups, which includes Harvard PSC, Harvard GS4P, Harvard Divinity SJP, and Harvard Afro, among others, signed a statement, organized by Harvard PSC and publicized on its Instagram, blaming Israel for Hamas's massacre: "We, the undersigned student organizations, hold the Israeli regime entirely responsible for all unfolding violence. . . . The apartheid regime is the only one to blame."

102.    Rather than suspend the student groups—a sanction provided for in many policies these groups violated and continue to violate—Harvard remained silent.  Harvard's abject failure to address the student organizations' antisemitic statement quickly drew public criticism, including from former Harvard President Lawrence Summers, who posted the following on X on October 9:

> In nearly 50 years of @Harvard affiliation, I have never been as disillusioned and alienated as I am today.  The silence from Harvard's leadership, so far, coupled with a vocal and widely reported student groups' statement blaming Israel solely, has allowed Harvard to appear at best neutral towards acts of terror against the Jewish state of Israel.

103.    On October 9, Harvard finally broke its silence on Hamas's attack, issuing a public statement containing platitudes but avoiding any condemnation of Hamas or of the antisemitic statement signed by the Harvard student organizations, any expression of solidarity with Jewish students, or any acknowledgment of the antisemitism on campus.  Compare

Harvard's statement to that made by the president of the University of Florida following

October 7:

> I will not tiptoe around this simple fact: What Hamas did is evil and
> there is no defense for terrorism. This shouldn't be hard. Sadly, too
> many people in elite academia have been so weakened by their
> moral confusion that, when they see videos of raped women, hear of
> a beheaded baby, or learn of a grandmother murdered in her home,
> the first reaction of some is to "provide context" and try to blame
> the raped women, beheaded baby, or the murdered grandmother. In
> other grotesque cases, they express simple support for the terrorists.
> This thinking isn't just wrong, it's sickening. It's dehumanizing. It
> is beneath people called to educate our next generation of
> Americans.

104.   Later on October 9, SAA Member #2 emailed President Gay and Harvard Law

Dean John F. Manning (now Interim Harvard Provost), imploring them to condemn Hamas and

release a "comprehensive statement calling out what is happening in Israel," explaining that she

and other students "don't just want your support and understanding. . . . Our friends and families

are getting murdered, raped, and kidnapped.  We request that you condemn the murder and

abominable crimes perpetuated by Hamas."  SAA Member #2 offered to meet with Harvard's

leaders to explain her concerns in person but received no response.  President Gay waited a week

before replying by suggesting that SAA Member #2 could go to Harvard's Counseling and

Mental Health Service ("CAMHS").  Dean Manning did not respond.  SAA Member #5 also

emailed Dean Manning on October 9, telling him that "[a]s a Jewish student who wears a kippah

on campus, I feel unsupported by an administration that fails to call out evil acts of violence

against Jewish people."  Dean Manning did not respond.

105.   As Professor Summers stated in his October 10 response to Harvard's October 9

statement, "[t]he delayed @Harvard leadership statement fails to meet the needs of the moment,"

and Harvard should have given "reassurance" to "frightened students" that it "stands squarely

against Hamas terror . . . when 35 groups of their fellow students appear to be blaming all the violence on Israel."

106.     On October 10, President Gay issued another statement called "Our Choices," in which she finally "condemn[ed] the terrorist atrocities perpetuated by Hamas," but failed to condemn the students' reprehensible October 8 statement, noting only that they did not speak for Harvard or its leadership but affirming that they "have the right to speak for themselves."  Under intense criticism, President Gay later attempted to defend her failure to denounce the students: "Had I known that the statement issued by the students would have been wrongly attributed to the University, I would have spoken sooner about it."  But President Gay missed the point—the problem is not that some thought that Harvard itself sent the student statement, but that Harvard failed to condemn it or take any other actions to prevent the statement from further contributing to the hostile antisemitic environment on campus.

107.     On October 10 and 11, a billboard truck drove around Harvard displaying the identities of students affiliated with the groups that signed the October 8 statement.  On October 24, Harvard College Dean of Students Thomas Dunne emailed these students to inform them of the steps Harvard was taking to protect them from being publicly identified, including the formation of a task force—to protect the students who had publicly issued a shocking, widely condemned pro-Hamas antisemitic statement—the first step that Harvard took in response to the campus environment following October 7.  Dean Dunne referred to the public identification of these students as a "repugnant assault on our community," a harsher condemnation than Harvard issued against Hamas's massacre.  Harvard then removed student groups, like Harvard PSC, from Harvard's online student organization directory to protect their members from being further

identified and rebuked for their antisemitic statement.  Harvard PSC is still a Harvard-recognized organization.

108.    On October 11, the leadership of Harvard Divinity's RPL Department sent a statement to Harvard Divinity's student body on the "Current Spate of Violence in Palestine/Israel," signed by its associate dean, Associate Director of the Religion, Conflict, and Peace Initiative Hillary Rantisi, and Professor Atalia Omer, among others, and itself rife with antisemitic historical distortion.  Below the statement were a list of events and announcements, including the winners of the Harvard Divinity RPL's Summer Photography Competition.  One honorable mention was a student submission of a photograph of graffiti near Bethlehem, depicting a Jewish individual with a stereotypical elongated nose and wearing a shirt with a Star of David greedily hoarding water from three faucets simultaneously, while an individual wearing Palestinian garb stands nearby.  Under the photograph, the student's description read, in part: "Through my experience with RCPI [the Harvard Divinity Religion, Conflict, and Peace Initiative], I became further attuned to the ways in which Zionism, as a form of religious nationalism, impacts Palestinians living under occupation in myriad ways, such as water sovereignty.  Here, not only is the water a literal representation, but it also doubles as an allusion to the ways that religion is weaponized through Zionism, and violently denies Palestinians daily of their livelihood and humanity by taking their natural resources."  Kestenbaum was highly disturbed that his own school's leaders were directly promoting antisemitism.

109.    SAA Member #2, whose mother was in Israel on October 7 and whose cousins serve in the IDF, returned to classes on October 11.  She was distraught during her first class, unable to pay attention following the initial response at Harvard to the massacre.  Her second class was equally difficult, as news broke that Hamas was flying drones into central Israel while

she was unable to reach anyone in her family.  After class, she was accosted by a student who—rather than expressing sympathy—told her Israel should respond leniently to Hamas's attack. SAA Member #2 left school later that week.

110.    On October 13, a group of members of Congress who are Harvard alumni wrote a letter to President Gay to express their "outrage and profound disappointment over the statement made by" the Harvard student groups that "blame[d] Israel for the Hamas terrorist attacks brutally carried out against Israeli civilians."  The letter demanded, among other things, that President Gay "immediately condemn" the "abhorrent" and "heinous" statement justifying Hamas's barbaric behavior; "investigate the origins" of the "unified hate and ignorance" among students who "have such a deep hatred for Israel that they have chosen to ignore reality, celebrate ruthless terrorists, and blame innocent civilians"; and publicly clarify that Harvard "strongly opposes this dangerous antisemitism."

### iii.    Harvard Permits Increasingly Aggressive Student-Led Disruptions Targeting Jews on Campus

111.    Harvard's repeated failure to appropriately condemn or take significant steps to ameliorate antisemitism on campus has emboldened students to engage in increasingly aggressive antisemitic protests, intensifying the hostile environment Jewish students are forced to endure.

112.    On October 14, 2023, Harvard PSC and Harvard GS4P organized an "emergency rally" at Harvard's flagship Widener Library to denounce Israel.  Hundreds of students gathered on Widener's steps to block the entire length of the building while holding signs accusing Israel of "apartheid" and "genocide," and engaging in nonstop anti-Zionist chants.  Although the organizers advertised the rally as "open to all," protesters forced a photojournalist to flee after they surrounded and pushed him.

113.    On October 16, students chalked antisemitic writings at the entrance to Harvard Law, using phrases such as "from the river to the sea" and "divest from Israeli apartheid." Notwithstanding requests to administrators, no action was taken.  Soon thereafter, "free Palestine" was painted outside Harvard Chabad.  It remained for months.

114.    On October 18, Harvard PSC and Harvard GS4P organized a "die-in" and protest ("Die-In") at Harvard Business School ("Harvard Business"), heavily promoted on social media as a "demand [to] end [an] ongoing genocide," with organizers repeating Hamas falsehoods that Israel bombed al-Ahli Hospital in Gaza.  After seeing this announcement in a WhatsApp group chat called "Protests around Harvard," Kestenbaum replied to the chat, asking whether the groups would still host the event even though the report blaming Israel for the hospital bombing had been proven false.  Students responded by calling Kestenbaum "despicable" and accused him of spreading "Israeli propaganda."  Hundreds of Die-In protesters marched from outside President Gay's office to Harvard Business, where they lay on the ground playing dead while raising "from the river to the sea" signs and chanting "free, free Palestine" and other slogans.

115.    The Die-In protesters also harassed and physically assaulted Jewish students.  A video that went viral on social media shows a group of students swarming a Jewish Israeli Harvard Business student, holding their keffiyehs open to surround and physically restrain him while screaming, "shame!" over and over.  The student was struck in the neck and forced out of the area.  Ibrahim Bharmal, a Harvard Law Review editor and a Civil Procedure teaching fellow, and Elom Tettey-Tamaklo, a Harvard Divinity student and residential proctor, were among the assailants and are under FBI scrutiny for their assault.  Harvard has imposed no discipline on Bharmal and has failed to sanction Tettey-Tamaklo other than relieving him of his proctor responsibilities.

116.    On October 19, Harvard PSC and Harvard GS4P recruited hundreds of protesters to march through campus, invading the Science Center, Harvard Law's Caspersen Student Center and Wasserstein Hall buildings, the Harvard Kennedy courtyard, and Harvard Square, using noisemakers, drumsticks, buckets, and megaphones to chant "from the river to the sea," accuse Israel of "genocide," and demand that Harvard "divest[] from Israeli apartheid that is funding genocide in Gaza."  The mob disrupted multiple classes, leading Jewish students to flee for their safety, with some removing identifying garb to avoid attack.  Harvard failed to take steps to prevent the disruptions.

117.    During this upheaval, SAA Member #1, SAA Member #2, SAA Member #3, and SAA Member #5 were in a study room on the first floor of Harvard Law's main building, attending a small discussion session with a former assistant to the president during the Trump administration, Jason Greenblatt.  At the session, the students heard drumming outside the study room and found a mob at the entrance to Harvard Law with a giant banner reading "Stop the Genocide in Gaza."  SAA Member #2 watched as Harvard University Police Department ("HUPD") officers observed, but took no action against, the hundreds of protesters, including non-Harvard-issued identification ("HUID") cardholders, who were bypassing card scanners and infiltrating the building.  The group stormed Harvard Law's main building, marched down the length of the building's primary first-floor hallway, and blocked the hallway outside the study room where the SAA members and Greenblatt were hiding.  Fearing a violent attack, students in the study room removed indicia of their Jewishness, such as kippot, or hid under desks.

118.    Harvard's policies provide that students' HUID cards, which grant access to Harvard facilities, are "for University purposes only . . . [and] are not transferable; a student may not allow any other person to use their HUID card for any purpose," that "[c]ommunity members

are responsible for their identification card and for the consequences of its misuse," and that the HUPD can request any individual's HUID card "[w]henever it is necessary to ascertain whether a person is a member of the University community or an authorized visitor."

119.     Jewish students, including SAA Member #1, SAA Member #2, and SAA Member #5, immediately went to the Dean of Students and Community Engagement, Equity, and Belonging ("CEEB") offices, only to find the offices locked with staffers already safely inside. One staffer ultimately came to the door to tell the Jewish students to wait in another room until the administrators were ready to meet.  Eventually, Harvard Law's Dean of Students Stephen L. Ball and Assistant Dean for CEEB Monica Monroe met with the students very briefly and, without giving the students any opportunity to speak, stated that they were "sorry" and that they would look into the incursion.  SAA Member #2 was shocked that Harvard had effectively surrendered its campus to the mob.  SAA Member #1 had to miss his class later that day and, concerned for his safety, stopped regularly attending his classes.  Kestenbaum encountered the roving mob as he was leaving his class at Harvard Kennedy.  The mob, having moved on from Harvard Law, now blocked the exit to the Harvard Kennedy building and shouted, at anyone trying to leave, "from the river to the sea" and other chants calling for the destruction of Israel and genocide of Jews.  Kestenbaum was shaken by this experience, which has made him fear for his safety on campus.

120.     SAA Member #2 emailed Assistant Director of Student Life Jeffrey Sierra after the mob stormed Harvard Law to describe what happened.  In two previous meetings with Sierra, she had asked him what could be done to stop the rampant antisemitism on campus and explained its impact on her.  In both of these meetings, and in response to her email regarding the October 19 incursion, Sierra directed SAA Member #2 to CAMHS for mental health services

and, on several occasions, said he was "not in a position to do more."  When SAA Member #2 asked whom she could contact instead, Sierra said he would speak with more senior administrators, but SAA Member #2 never heard from anyone else about her concerns.

121.    After Harvard's failure to respond to their October 19 anti-Jewish harassment and incursion, Harvard PSC and Harvard GS4P organized a similar disruption on October 20, which they called a "global strike for Palestine," complete with a classroom walkout and protest.

122.    On October 27, during Family Weekend—when students' families visit campus—Harvard PSC and Harvard GS4P held another die-in and protest starting outside Harvard Law's library, advertising the protest as "[o]pen to non-HUID Holders."  Protesters lay on the ground at the library's entrance with "Boycott Divest Sanction" and "Harvard must recognize Genocide" signs, while chanting "from the river to the sea" and "hey hey, ho ho, the occupation has got to go."  In advance of the protest, SAA Member #1 had emailed several Harvard Law administrators, including Dean Ball, Dean Manning, and Dean Monroe, attaching the student groups' flyers advertising the protest and requesting that the administrators prevent non-HUID holders from attending, and stating: "Please protect us."  None of them responded.  SAA Member #2 left campus immediately after her last class of the day, taking a ride-share service home because she did not feel safe walking through the protest to access her usual train.

123.    These mass disturbances violated several Harvard policies, but Harvard has taken no action to prevent them—even when students, citing specific policy language and providing photographic evidence, warned administrators, including President Gay, Provost (and now-Interim President) Garber, Dean Manning, Dean Ball, Dean Soban, and Dean Monroe, of impending antisemitic disturbances.

124.    On October 27, President Gay attended a Harvard Hillel Shabbat dinner where she finally acknowledged that there had been a "surge in anti-Jewish incidents and rhetoric across the nation—and on our own campus," that she had "heard story after story of Jewish students feeling increasingly uneasy or even threatened on campus," and that "antisemitism has a very long and shameful history at Harvard," which "has done too little to confront its continuing presence."  Although President Gay promised that this indifference would continue "[n]o longer," Harvard has done nothing nearly sufficient to rectify its hostile environment.

125.    Three days later, on October 30, Harvard PSC and Harvard GS4P, in violation of Harvard's clear policies, began a takeover of Harvard Law's main common lounge in Caspersen Student Center—which would last throughout the semester—during which students orchestrated incessant antisemitic agitation and anti-Israel protests and accosted Jewish students.  Harvard ignored the pleas and concerns of Jewish students, including SAA Member #1 and SAA Member #2, who are visibly Jewish based on their religious clothing and who have been regularly stopped and targeted in the lounge.  Students like SAA Member #2 and SAA Member #5 have stopped using Caspersen lounge as a study space to avoid being harassed because they are Jewish.

126.    On October 31, SAA Member #3 was stunned to see Bharmal among the Caspersen lounge protesters, after he had assaulted a Jewish student at the October 18 Die-In, and to hear that he was unrepentant about doing so.  SAA Member #3 ran to a bathroom and cried, shaken at Bharmal's lack of remorse, and Harvard's permitting Bharmal to not only remain on campus, but to continue to participate in activities that violate Harvard's policies.  She tried to compose herself and attend her Civil Procedure class but was unable to stay more than a few minutes.

127.    The takeover of Caspersen lounge drew no Harvard intervention, for at least two weeks.  Only on November 15—when Jewish students asked Dean Ball, Dean Soban, Dean Monroe, and Title IX Program Officer Sasha Tulgan if they could also demonstrate in that same space—did Dean Ball send a Harvard Law-wide email advising that shared spaces like Caspersen lounge are only for "personal or small group study and conversation."  On November 15, the protesters ignored three separate in-person requests by administrators— prompted by repeated complaints from Jewish students that the protesters were harassing them— to stop the protest.

128.    On November 16, the next day, protesters held an unauthorized event in Caspersen lounge during class time, called a "vigil for martyrs," with a printed program outlining demands and advertised in advance on social media.  SAA Member #1, two days earlier, had emailed Dean Ball and other Harvard Law administrators warning them about this planned disruption, noting that Harvard GS4P organizers again intended to bring outsiders to the school and stating that he "and other Jewish students feel unsafe and [these unauthorized events] are directly interfering with our ability to attend [class] and focus on our coursework."  Dean Ball attended the "vigil," but did nothing to disperse the crowd or discipline the instigators.  SAA Member #1, SAA Member #2, and others participated in a counter-protest that day, but their "bring them home" chants—referring to hostages held by Hamas—were drowned out by anti-Jewish protesters, who yelled, among other things, "glory to the martyrs."  After Harvard again failed to stop these antisemitic threats, SAA Member #1 emailed Title IX Program Officer Tulgan, telling her that "campus felt so unsafe today" and that "I used to hope that the administration will do better but today I lost all hope."

129.    The protesters' prohibited takeover of Caspersen lounge continued through the end of the semester, and the perpetrators have faced no discipline.  Organizers said they would continue using Caspersen in violation of school policy.  The lounge has continued to be the site for protests and events that violate Harvard's policies.

130.    On November 3, 2023, the HJAA—formed in the wake of Harvard's clearly unreasonable response to October 7—sent Harvard a letter, signed by over 1,800 alumni, demanding immediate action to stop the incessant antisemitism and stating that they never imagined that they would "have to argue the point that terrorism against civilians demands immediate and unequivocal condemnation," or argue "for recognition of our own humanity."

131.    On or around November 5, flyers that SAA Member #5 had hung at Harvard Law, advertising an event hosted by the student group Alliance for Israel, were ripped down.  The group's members, including SAA Member #5, emailed Harvard Law Campus Safety Coordinator Collin Keyes and HUPD Lieutenant Wilmon Chipman to request video footage of the locations where the flyers had been posted.  Chipman stated that he would pass this request to "command staff"; however, the students heard nothing for several weeks despite repeated follow ups, until December 15, when Keyes informed SAA Member #5 that Harvard could not find the posters in the footage.  SAA Member #5 followed up twice with more details to help Harvard properly search for the posters, but Harvard has still failed to locate the relevant footage.

132.    Starting on November 8 and continuing through the next week, Kestenbaum put up posters of Israeli children kidnapped by Hamas on a bulletin board in Harvard Divinity's common area, all of which were ripped down.  Kestenbaum reported this vandalism to Harvard Divinity leadership, including the chaplain, the assistant and associate deans for DIB, and the director of student life, advising that he was discouraged from further using this dedicated public

space.  Harvard did nothing to address this blatant violation of its policies, instead telling Kestenbaum that the administration would explore the issue during the next semester—which proved to be nothing more than an empty platitude, given that the poster vandalism continued into the spring 2024 semester, and Harvard took no affirmative steps to investigate the issue on its own.

133.    Also on November 8, SAA Member #1 emailed several administrators, including Dean Ball and Dean Soban, notifying them of a Harvard PSC and Harvard GS4P "day of mourning" walkout event planned for November 9, the anniversary of Kristallnacht.  He noted that the last time there was an organized walkout, hundreds of people, including outsiders, stormed through the Harvard Law building.  He asked whether there was a "safe and secure location on the Harvard Law Campus for Jewish students to go through in case any demonstrators break in."  None of the administrators responded to SAA Member #1 concerning any safety measures, and the event was ultimately postponed by the student groups.

134.    On November 9, President Gay finally addressed the assault on the Jewish Harvard Business student that had occurred at the October 18 Die-In, revealing that Harvard would not open an investigation but would instead permit those responsible to remain on campus, pending the completion of "law enforcement's inquiry," when the University would "address the incident through its student disciplinary procedures to determine if University policies or codes of conduct have been violated and, if so, take appropriate action."  On May 9, 2024, Tettey-Tamaklo and Bharmal were charged with criminal assault and battery and violations of the Massachusetts Civil Rights Act—which prohibits attempts to "intimidate or otherwise interfere with . . . any other person in the free exercise or enjoyment of any right or

privilege secured to him by the constitution." There has been no word from Harvard about any disciplinary measures.

135.    After mounting pressure from students, alumni, and the school's newly formed Antisemitism Advisory Group,  President Gay issued a statement on November 9 outlining what she called "concrete steps" for "combating antisemitism" at Harvard, but offering only vague and unspecified plans to: examine antisemitism and address its complex history, educate community members on antisemitism, make students aware of how to report bias, ensure physical and psychological safety, have community sessions with the diversity office, and look for external partnerships that would assist with efforts.  Harvard failed to implement any of these actions, and the Antisemitism Advisory Group was dismantled in January 2024.

136.    Also on November 9, Harvard PSC, noting that the "future of pro-Palestinian activism at Harvard is safe," posted a video of students disrupting a faculty dinner, shouting through a megaphone to "raise awareness" of what they called "genocide."  On November 13, protesters chanted "globalize the Intifada"—that is mass murder and terrorism against all Jews— across the Harvard undergraduate campus.  SAA Member #1 reported these violent chants to Dean Manning, Dean Monroe, the Antisemitism Advisory Group, and others, who did nothing other than thank SAA Member #1 for informing them.

137.    As Professor Summers stated in a November 15 *Washington Post* Op-ed titled "The Cancer of Antisemitism is Spreading. Colleges Must Take the Right Stand": Harvard was in "a moment of moral and mortal peril"; "Harvard . . . h[as] not been swift" in its response to antisemitism, a "cancer—a lethal adversary best addressed as rapidly, thoughtfully and aggressively as possible"; Harvard's "[d]ouble standards" are "unacceptable," and no honest observer could say that its "responses to antisemitism have paralleled in vigor or volume the

responses to racism or other forms of prejudice"; and "singling out Israel with calls for its annihilation is Jew hatred."

138.    The utter inadequacy and clear unreasonableness of Harvard's response to antisemitism on campus was further exemplified on November 16 and 17 when, for twenty-four hours, students took over University Hall, demanding that "Harvard administrators release a call for a ceasefire in Gaza," announce that "antisemitism [is] not the same as anti-Zionism," and "investigate Islamophobia and suppression of pro-Palestine speech on campus."  Rather than eject or otherwise penalize those students, nine hours into the takeover, Dean Khurana and Adams House Faculty Dean Salmaan Keshavjee brought the occupying students burritos and candy.  After twelve hours, Dean Khurana gave them the chance to leave without disciplinary action; when the students refused, he allowed them to remain overnight.  When questioned at the House Antisemitism Hearing why the deans provided food to unlawful protesters and promised them no consequences, President Gay evaded the question, stating, "where conduct violates our policies . . . we have processes underway."

139.    On November 27, Harvard Afro and Harvard BDS held a rally in Harvard's Science Center plaza, where students chanted "long live the Intifada," "globalize the Intifada," "from the river to the sea, Palestine will be free," and "we have them outnumbered," among other antisemitic slogans.

140.    The next day, on November 28, President Gay declined an invitation to attend a December 4 campus screening of a video of forty-three minutes of Hamas's October 7 atrocities, because she was to be out of town, and declined a Harvard alumnus's offer to provide her private transportation to enable her to attend.

141.    On November 29, Harvard PSC, Harvard BDS, and Harvard Afro again organized self-proclaimed "disruptive" mass walkouts from classes across campus, targeting major lecture halls to disrupt the largest number of students and took over the Science Center's classrooms and lobby, among other locations.  During their takeover of the Science Center lobby—conduct prohibited by Harvard's Statement of Rights and Responsibilities—protesters surrounded and intimidated Jewish students, using megaphones to shout genocidal antisemitic chants, including "globalize the Intifada," "long live the Intifada," "from the river to the sea," and, in Arabic, "water to water, Palestine will be Arab."

142.    The disruption, like many before it, was led by a student recognized by Jewish students as among the primary instigators of antisemitic abuse on campus, whose presence causes considerable fear and alarm among the Jewish students who live in the same dormitory, Adams House, which he has turned into a base of operations for anti-Jewish activism.  Adams House Faculty Dean Keshavjee—who supplied burritos and candy to the University Hall occupiers—did nothing to ameliorate the situation.

143.    On December 3, 2023, Harvard BDS posted an Instagram story publicizing a speaking event featuring convicted terrorists and attempted murderers Marah Bakir and Shorouq Dwaiat—the former was sentenced to eight years in prison for her October 2015 attempted murder of a police officer in Jerusalem, and the latter to sixteen years in prison for her premeditated stabbing of a Jewish man in the head and attempt to stab another in Jerusalem on October 7, 2015.  Both terrorists were among those Israel released in late November 2023 in exchange for innocent Israeli civilians captured on October 7 and held as hostages by Hamas. Kestenbaum emailed the December Instagram post to President Gay, Interim Dean Holland, and the Antisemitism Advisory Group, stating that it "sends a clear, dangerous message to Jews on

campus," and asking Harvard to suspend Harvard BDS leaders, "disavow anti-Jewish rhetoric, and protect Jewish students."  Harvard did not respond.

144.    On December 6, rather than prevent protesters from disrupting Harvard Divinity's Seasons of Light celebration that evening—a "beloved annual multireligious service" and Harvard Divinity's only annual event that includes a celebration of the Jewish faith—Harvard canceled it.  That same day, Harvard GS4P students took over Harvard Divinity's "Holiday Tea," interrupting the Harvard administrators, faculty, staff, and students who had gathered there by unfurling a large banner alleging "genocide in Gaza," yelling about a "Zionist genocidal campaign," shrieking "there can be no peace without justice," "free, free Palestine," and "shame!"  The Harvard administrators did nothing to stop the students.  Kestenbaum, who was present, emailed the Antisemitism Advisory Group to report this blatant violation of Harvard policy—which occurred after President Gay publicly declared that Harvard would discipline this type of violation—but has not received a response.

145.    Rather than act to protect Jewish students, Harvard has thus required that they limit or conceal their activities.  For example, as Harvard Chabad Rabbi Hirschy Zarchi revealed, Harvard requires that he remove the Chabad Hanukkah menorah from the campus at night so that it would not be vandalized.  Rather than ensuring the safety and success of the Seasons of Light celebration and making it unequivocally clear that vandalizing the menorah was unacceptable and would be met with harsh punishment, Harvard addresses antisemitism by canceling events that include celebrations of Jewish culture and warning celebrants to hide Jewish symbols.

146.    At the same time Jewish students were being cautioned by Harvard to abandon or conceal their identity, students celebrating the October 7 massacre and advocating death to Israelis and Jews were free to do so on campus and over social media, not deterred or punished

by Harvard in any way.  On December 10, 2023, during final exam week, Harvard PSC, Harvard

BDS, and Harvard Afro oversaw a disruptive, aggressive, flag- and banner-waving takeover of

Harvard's Widener Library, and then marched to Massachusetts Hall, where students chanted

"from the river to the sea."  Kestenbaum had intended to study at Widener but abandoned his

plan, as he was concerned that his religious clothing would make him a target for abuse or

violence.  Harvard took no action to stop the Widener protest or discipline the students or

organizations that participated in it

147.    On December 31, 2023, a student promoted in the Harvard Divinity student group

chat a virtual event called "Purplewashing: Resisting Colonial Feminism Teach-In," which was

to include as a speaker a Palestinian activist named Yaffa who, on October 7, defended on social

media the massacre as a "Palestinian protest" against "our oppressors."  Kestenbaum responded

to the student in the Harvard Divinity chat that Yaffa "called the largest massacre of Jews since

the Holocaust a valid form of protest" and that he did not think "anyone would feel comfortable

promoting an event if the keynote address was given by a person who cheered on the murder of

any other minority group."  The student responded, "I'm comfortable promoting this event."

That day, Kestenbaum reported this exchange and event to the Antisemitism Advisory Group

and President Gay, telling them it was "deeply concerning" and reminding them, "when I told

you I don't feel safe at Harvard, it's precisely because of antisemitic students like this."  Harvard

has not responded.

148.    After, as a result of plagiarism accusations, President Gay resigned on January 2,

2024, antisemitic messages were plastered all over Harvard's community group on the social

media app Sidechat, which requires a Harvard email address to join.  Among the messages that

students, including Kestenbaum, saw are: "LET EM COOK" next to a Palestinian flag emoji; "I

proudly accept the label of terrorist"; "stfu pedo lover! all of you Zionists are the same. Killers and rapists of children!"; "Blondie pro-doxing, pro-genocide sophomore really thinks she is the shit for going on israeli media a couple days ago. She looks just as dumb as her nose is crooked"; "Forgot the moment where yall made it clear that the 'nova massacre' [the music festival where Hamas murdered, tortured and raped young people on October 7] that our zionist classmates were using as propaganda was carried out by the IDF."; and "I . . . support Hamas as representatives of Palestinian frustration and Oct 7 as a moment of decolonization." One student wrote a post to her classmates that said: "I'm begging you all to recognize the 'Jewish people are controlling everything' (and are the reason Gay resigned) narrative as an antisemitic conspiracy theory. It is a common white supremacist argument against Jewish people." In response, another student said, "It's not a theory if it's mostly true." Kestenbaum reported these antisemitic messages to Harvard leadership via email on January 4, 2024, including Interim President Garber, Harvard's Office for Equity, Diversity, Inclusion, and Belonging ("OEDIB"), Harvard Divinity's DIB Office, and the Antisemitism Advisory Group, warning that "[f]or every minute that Harvard does not forcefully condemn the horrific antisemitism present within the student body, the more dangerous it gets for us on campus."

149.    On January 16, Harvard, in concert with Sidechat, limited access to Harvard's Sidechat community to only undergraduate students. Rather than addressing the rampant antisemitism on the platform, the only thing this move accomplished is to block Kestenbaum and other SAA graduate students' ability to report these vile posts. Harvard knows that the offending posters are undergraduate students subject to Harvard's policies, including the Non-Discrimination Policy, which extends to misconduct on social media. Harvard has refused to disable access to Sidechat on its WiFi network or to identify and discipline offending students,

even though its Policy on Access to Electronic Information permits Harvard to "access user electronic information in connection with investigation of misconduct by students, faculty, staff, and other members of the University community."

150.    The antisemitism on Sidechat persists.  For example, on April 13, 2024, Harvard students glorified Iran's attack on Israel, claiming "Iran has the right to defend itself," and "Hezbollah, Houthis, Iraqis, Syrians[,] it's not gonna be just Iranian guns.  The intifada is rising habibti."  On April 26, a student wrote, "What I mean: Globalize the intifada, overthrow settler colonial states worldwide and free the oppressed people internationally." On May 11, a student posted, "[Interim President] Garber is a Jew who decided to be an Israeli sellout instead of use [sic] his position for good like so many other Jews, so who can be surprised?"

151.    Reflecting its deliberate indifference to the severe and pervasive hostile environment for Jewish students on campus, Harvard had actual knowledge of each of the above recent incidents of student-led antisemitic harassment, including through personal observation by administrators, student complaints and reports, and news articles, yet unreasonably failed to adequately and appropriately investigate and address a single one.

### iv.    Harvard's Acceptance of Antisemitic Discrimination and Harassment by Its Faculty and in Its Classrooms Adds to the Hostile Educational Environment

152.    Harvard's faculty and teaching fellows have joined, encouraged, and supported severe and pervasive harassment and marginalization of Jews at Harvard.  For example, rather than condemn the scores of disruptive student-led events alleged above, several professors have canceled class to encourage students to participate.  Harvard is fully aware of, yet has taken no action to prevent, these professors' and teaching fellows' discrimination against Jewish students, even though such conduct plainly violates Harvard's policies.

153.    On October 10, 2023, a Harvard Law Civil Procedure teaching fellow, Ibrahim Bharmal—the same Harvard Law Review editor who assaulted a Jewish student at the October 18 Die-In—emailed his students, comprising nearly one-third of the 561 first-year law students, calling for them to bring their "whole identities and ideologies" to class, and inviting them to that evening's Harvard PSC "vigil for all civilian lives lost and in solidarity with Palestine," with no mention of the slaughter and rape of Israelis three days earlier.  One of Bharmal's law students, SAA Member #1, immediately emailed the course professor, James Greiner, copying Dean Manning, Dean Ball, and the CEEB Office, asking Professor Greiner to respond to Bharmal's email, explaining that it was "deeply inappropriate" given Jewish students' pain and fear following October 7, and that Bharmal made him and other students feel even more afraid of antisemitism at Harvard, given Bharmal's official position at Harvard Law.  Three weeks later, after Bharmal was recorded assaulting a Jewish student on October 18, Professor Greiner afforded Bharmal what is considered the honor of hosting a review session for his students, which SAA Member #1 and other Jewish classmates did not attend because they were afraid of him.  SAA Member #1 asked administrators at the Dean of Students Office if Jewish students would have to be killed before Harvard deemed it appropriate to finally act to protect them. SAA Member #1 filed a formal complaint with the Dean of Students on October 12, met with Director Sierra about his complaint, and repeatedly followed up, imploring them to act to stop the constant antisemitic protests and other hostile activities at Harvard Law, but contrary to its ostensible procedures, Harvard has not provided him with updates or taken any other action.  At the time of this filing, Bharmal has faced no discipline by Harvard for his assault—he is still a Harvard Law student, still on the Harvard Law Review, and remained employed by Harvard as a teaching fellow—despite his being criminally charged.

154.     SAA Member #1 and other Jewish students have also been targeted by his Torts professor, Jon Hanson, who: on October 7, promoted a podcast inviting listeners to "learn more about Israeli apartheid + occupation," and defended the Hamas attack by claiming "people on the underside of power who resist state violence and occupation will always be called terrorists"; on October 17, said, "I'm honestly stunned by how openly bigoted both Israeli and American Zionists have been since October 7th"; on November 2, maligned Israeli Jews as "colonizers" who "blow[] up" babies; on December 9, asserted there was a "depopulation campaign" in Gaza; and on December 10, derided the December 5 House Antisemitism Hearing as a "master class in bad-faith culture war bullshit."

155.     On October 19—after taking a break because of the disruptive mob charging through the halls—Professor Hanson required the class to participate in a blind vote about whether to discuss the Israel-Hamas conflict during Torts class, which he declared a tie, and granted himself sole discretion whether to facilitate such discussion at a later time.  During a Zoom meeting, Professor Hanson shared his anti-Israel/Jewish views and told SAA Member #1 that he would not rule out discussing the Israel-Hamas conflict during class.  At another meeting less than two weeks later, Hanson discouraged SAA Member #1 from escalating his complaint against Bharmal and advised that he supported the students who had recently taken over Caspersen lounge.  Professor Hanson also planned his final exam for the fall 2023 semester to require students to write about Israel and Gaza but changed it at the last minute—after the Registrar's Office intervened.

156.     On October 17, the Executive Committee of Harvard's Center for Middle Eastern Studies endorsed a statement published by the board of the Middle East Studies Association which demonized Israel.  The statement listed the atrocities caused by Hamas's October 7 attack

on Israel—namely, Hamas's murder of over 1,000 Israelis, the injuring of over 3,600 Israelis, and the kidnapping of (at that time) 150 Israelis—but argued that Israel still has no right to respond in self-defense.  As former Harvard President Summers explained in a January 30, 2024 statement, it is not academic freedom to use one's official Harvard capacity to endorse a discriminatory and prejudiced position.

157.    On October 20, Professor Clio Takas emailed her students stating, "[a]s many of you know, [Harvard PSC] and [Harvard GS4P] are organizing a class walk-out and general strike . . . .  I have decided to cancel section today in solidarity."  Similarly, Harvard Public Health Professor Nancy Krieger accommodated students who wanted to participate in the October 20 global strike by permitting the vast majority of students to leave class to protest. Krieger then excused the remaining seven (which included several Jewish students) and asked them to return along with the protesting students at noon.  As it turned out, Krieger and the protesting students returned to the classroom some forty minutes earlier than the professor had said class would resume and, in the absence of the Jewish students, Krieger resumed her lecture.

158.    On November 13, over 120 Harvard professors posted a public letter to President Gay, titled "Harvard Faculty Response to 'Combating Antisemitism'" framing Harvard's Antisemitism Advisory Group appointed by President Gay as an assault on academic freedom. The signatories include Professor Diana L. Eck who, as alleged further below, had previously demanded an Indian professor's courses be canceled because of his "call[] for violence against" mosques; Professor Walter Johnson, the most recent faculty advisor for Harvard PSC, who regularly participates in disruptive student groups' activities; and Harvard Divinity Professors Rantisi and Omer, who had previously signed the October 11 RPL statement defending Hamas's terrorist attack.  Reflecting Harvard's antisemitic environment, the faculty letter:

- Stated the professors were "profoundly dismayed" by President Gay's November 9 "Combating Antisemitism" message;

- Demanded Harvard resist calls to suspend and/or decertify Harvard PSC, even though it has regularly engaged in activities that violate numerous Harvard policies and is a key instigator of campus antisemitism;

- Defended students' use of the antisemitic phrase "from the river to the sea," as "complicated" and worthy of protection; and

- Omitted any mention of the deliberate targeting of Jewish civilians for murder, rape, torture, and kidnapping or the intense discrimination, harassment, and violence Jewish students face on campus.

159.    SAA Member #4 emailed one signatory, Professor Jesse Bump, who had tweeted in spring 2021 (during another Israel-Hamas conflict) that Zionists could not work in public health, asking Bump whether he understood the implications of what he had signed and how it would impact the Jewish and Israeli students required to take his courses.  Rather than respond, Bump reported SAA Member #4 to Dean Driver-Linn and Department Chair Castro.  Driver-Linn accused SAA Member #4 of failing to uphold Harvard's values by "extrapolating views and assuming intent" concerning the statement Professor Bump signed.

160.    On November 14, Harvard's Center for Middle Eastern Studies hosted a conversation, "The Ongoing Nakba," in the Science Center, which included Columbia University Professor Rashid Khalidi who, on October 9, had blamed Jews for Hamas's attack and was a Palestine Liberation Organization spokesperson in the 1970s and 1980s, when that group regularly committed terrorist acts, such as the Lod Airport massacre in which twenty-six people were killed, including seventeen Christian pilgrims from Puerto Rico.

161.    On December 5, the same day President Gay testified before Congress, Harvard Faculty and Staff for Justice in Palestine ("Harvard FSJP") released a statement falsely characterizing the October 18 Die-In and related events as "peaceful," minimizing the assault on a Jewish student as not even a "scuffle."  Despite video evidence to the contrary, the faculty

members defended Tettey-Tamaklo and other Die-In assaulters' actions as "de-escalation tactics," even though, as the video shows, such actions clearly violated Harvard's policies to protect "freedom from personal force and violence, and freedom of movement."  Harvard FSJP even went so far as to assert that Harvard should not have cooperated with the FBI's investigation of the assault, and demanded that Harvard "establish an investigative committee on anti-Palestinian racism," even while many of these same faculty members, in their November 13 statement, had criticized President Gay's announcement of the Antisemitism Advisory Group.

### v.   President Gay's December 5 House Antisemitism Hearing Testimony Confirms Harvard's Deliberate Indifference to Its Hostile Anti-Jewish Environment

162.    On December 5, 2023, President Gay, along with the presidents of Massachusetts Institute of Technology ("MIT") and University of Pennsylvania ("Penn"), testified at the House Antisemitism Hearing.  President Gay did not consult the Antisemitism Advisory Group when preparing for her testimony.

163.    At the hearing, President Gay's repeated refusal to acknowledge that calling for the genocide of the Jewish people on campus is against Harvard policy shocked people across the nation.  Representative Elise Stefanik asked President Gay: "[D]oes calling for the genocide of Jews violate Harvard's rules of bullying and harassment?"  President Gay responded, "it depends on the context."  Representative Stefanik asked several more times whether calling for genocide of the Jewish people violates Harvard's policies, yet each time President Gay refused to give a definitive answer, offering falsely that "antisemitic rhetoric, when it crosses into conduct that amounts to bullying, harassment, intimidation, that is actionable conduct, . . . we do take action."

164.    President Gay also testified that she understood the meaning of the phrases "globalize the Intifada" and "from the river to the sea," calling them "hateful speech [that is]

personally abhorrent" to her, but not necessarily to Harvard.  Representative Stefanik asked President Gay about the multiple protests and rallies on Harvard's campus where students were permitted to engage in such chants as "there is only one solution, Intifada revolution" and "globalize the Intifada," without any repercussions.  President Gay admitted hearing "that thoughtless, reckless and hateful language on our campus," and admitted "it is at odds with the values of Harvard," but refused to say such "hateful" incitements to violence were contrary to Harvard's policies.  Similarly, when asked if Harvard would want an "avowed Neo-Nazi" or someone who "has called for the elimination of the state of Israel" as part of the Harvard community, President Gay repeated that such a person is "not consistent with Harvard values" and admitted that such conduct is "antisemitism," but added, "we allow a wide berth for free expression."  Yet as alleged further below, Harvard only allows a wide berth for antisemitism, but not other forms of hateful "expression."

165.    Representative James Comer asked President Gay about Harvard's acceptance of funding from "sources that support Hamas or have links to terrorist organizations, like Qatar, Lebanon, and the Palestinian Authority."  President Gay testified that "Harvard has policies that govern the acceptance of gifts and contracts beginning with respecting federal law . . . then we go further and only accept gifts that align with our mission."

166.    Apparently, it is consistent with Harvard's mission to accept gifts from Qatar, where, to name only a few outrages, same-sex activity is criminalized, and the government permits and utilizes indentured servants and exploits migrant workers, thousands of whom died building the infrastructure for the 2022 FIFA World Cup.

167.     Watching the testimony, Kestenbaum was appalled that Harvard's president refused to say under oath that calling for the genocide of his people violated Harvard policy, and considered leaving Harvard because he felt he was in physical danger.

## vi.     The House Education Committee Announces a Full Investigation into Harvard's Antisemitism, and Public Backlash Against President Gay's Testimony Intensifies

168.     President Gay's December 5 testimony at the House Antisemitism Hearing caused enormous public backlash.  That night, Harvard Hillel President Jacob M. Miller and Campus Rabbi Getzel Davis wrote that "President Gay's failure to properly condemn this speech calls into question her ability to protect Jewish students on Harvard's campus," and that she "fail[ed] to reassure us that the University is seriously concerned about the antisemitic rhetoric pervasive on campus."

169.     President Gay's testimony also betrayed the purposeful impotence of the Antisemitism Advisory Group, which was later revealed through contemporaneous meeting notes and the House Committee's investigative report released in May 2024 based on Harvard's internal documents and an interview with member Dara Horn—materials Harvard had not made public. Ex. B.  By the time of Gay's testimony, the Antisemitism Advisory Group and Harvard leadership understood the sheer scope of the antisemitic environment at Harvard. For example, at its first meeting on October 23, 2023, then-Provost Garber noted that the "shunning of Israeli students" was a "pervasive problem" in Harvard College and possibly other schools even before October 7. In November, the Antisemitism Advisory Group met and discussed antisemitic incidents—including that a student wearing a yarmulke was "spat upon," but "had not received answers from Harvard reporting channels or from" HUPD; that a professor told an Israeli student she was making people "uncomfortable" because of she was from Israel (the student filed two

complaints with Harvard); and that a Jewish student was "chased" and "screamed at by a Resident Tutor."

170.    The Antisemitism Advisory Group found that for each incident, Harvard had taken no action.  The group was also included on many emails reporting antisemitic discrimination and harassment.  But members of the Antisemitism Advisory Group were not empowered to do anything about it.  Over the course of its short tenure, the group identified numerous concerns, including the "dramatic decline in Jewish enrollment" at Harvard, Harvard's failure to share "information on disciplinary outcomes publicly," the "importance of condemning antisemitic rhetoric," the need to investigate the potential influence of funders of terrorism on Harvard, the "need to address masked protest," and more generally, Harvard's inadequate response to antisemitic incidents.  Harvard refused the group's request to share information publicly on disciplinary actions taken in response to antisemitic incidents, citing privacy concerns, despite the group explaining to the president and provost that there were ways—such as those Harvard uses to report Title IX violation—to offset privacy concerns while still informing the community that serious action was being taken.

171.    On November 5, concerned with Harvard's lack of "concrete actions," more than half of the Antisemitism Advisory Group's members wrote to then-President Gay and then-Provost Garber, calling out Harvard's "deeply unsatisfactory" response to "widespread harassment of our Jewish students across schools," requesting immediate and longer-term remedial measures, and warning that if not acted on, the members would resign from the group. A day later, President Gay joined the group's meeting with Harvard Corporation Senior Fellow Penny Pritzker and Provost Garber, pleading with the members to refrain from "resigning en

masse." The next day, she released a statement on antisemitism, not to support Harvard's Jews, but to attempt to quell the mounting disquiet and stave off embarrassment.

172.    One of Gay's promises in her November 9 statement—that the Antisemitism Advisory Group would work with Harvard's constituent school deans—was never fulfilled in any meaningful way. In fact, at the one meeting that took place with school deans, at which the deans outlined their schools' approaches to antisemitic incidents, Horn found "extremely disturbing" that several of the deans "didn't really seem disturbed" by the antisemitic events they described. Members of the group were not given any opportunity at this meeting to respond substantively to the deans' presentations, and a promised second meeting with the deans was never scheduled.

173.    President Gay's testimony at the House Antisemitism Hearing made clear to members of the Antisemitism Advisory Group that they would never be taken seriously by Harvard's leadership. On December 7, two days after the hearing, the group met, noting how "troubl[ing]" it was that President Gay had not them for advice before her testimony. They also found the testimony itself to be "extremely disappoint[ing]," as Horn put it, as President Gay did not acknowledge the "pervasive" and "systemic" scope of the antisemitism problem and merely presented it "as though this were about . . . this difficult line with rallies and free speech, and that sort of there were maybe some individual incidents where things had crossed a line." That day, Rabbi David Wolpe, rabbinic fellow for the Anti-Defamation League and visiting scholar at Harvard Divinity, resigned from the group, stating:

> Without rehashing all of the obvious reasons that have been endlessly adumbrated online, and with great respect for the members of the committee, the short explanation is that both events on campus and the painfully inadequate testimony reinforced the idea that I cannot make the sort of difference I had hoped.

> However, the system at Harvard along with the ideology that grips
> far too many of the students and faculty, the ideology that works
> only along axes of oppression and places Jews as oppressors and
> therefore intrinsically evil, is itself evil.  Ignoring Jewish suffering
> is evil. Belittling or denying the Jewish experience, including
> unspeakable atrocities, is a vast and continuing catastrophe.
> Denying Israel [] self-determination as a Jewish nation accorded
> unthinkingly to others is endemic, and evil.

Rabbi Wolpe elaborated on CNN: "I resigned because I came to the conclusion that I was not going to be able to make the kind of changes that I thought Harvard needed" through the Antisemitism Advisory Group, which he described as having "accountability without authority." On December 20, Rabbi Wolpe stated that Jewish students are the target of a "deliberate attempt" at intimidation, and that Harvard has "no sense of urgency, no sense of anger, no sense of disgust" regarding the "crisis" of "so many incidents of antisemitism" on campus.  During a December 22 podcast, he stated that he could not keep giving "legitimacy to an enterprise" that was "fruitless," as the committee was not going to "make a change," while Harvard's antisemitism "crisis" was "getting worse, not better."

174.   Rabbi Wolpe was not the only member of the Antisemitism Advisory Group to express grave concerns about its inability to effect meaningful change.  Horn said:

> [T]he reality is that the things on my list of asks are very large things
> that will not make them popular and will make half the faculty and
> students enraged.  It will require firing a lot of people. Right now
> they have open Hamas apologists on the faculty. . . . Harvard is
> actively teaching the antisemitism it claims it wants to fight.  There
> are entire Harvard courses and programs and events that are
> premised on antisemitic lies. . . . They would have to get rid of that.
> And get rid of a lot of other things . . . . [E]veryone will hate them
> and call them evil racist colonizers if they actually do what would
> be required for real change.  So I don't think they will do it.

175.   As would be revealed in the House Committee's May 2024 report, on December 18, 2023, Horn and the other remaining members of the group presented Harvard's president and provost with detailed findings and recommendations that Harvard did not make public.  Its

recommendations included renewed commitments towards holding student groups accountable for flouting university rules and protecting shared learning environments; rectification of "selective or unequal" enforcement of university policy; a "zero tolerance" policy for disruptions of learning environments; a review of OEDIB's inadequacy in addressing antisemitism; a review of the "academic rigor" of programs with antisemitic content; and otherwise countering antisemitic rhetoric on campus. Harvard failed to act on these recommendations. Also included was a recommendation to "[i]nvestigate the flow and impact of external 'dark money' (from Iran, Qatar, or individuals, or entities associated with terrorist groups as identified by the State Department) to Harvard" thus "ensur[ing] free and rigorous inquiry and independence of the university from outside control by donors, regardless of their identities, or disruption of activities and mission of the university by outside actors." Provost Garber told the group that he would have Harvard's Office of General Counsel investigate this particular issue, but the results of any such investigation, if any occurred, were not communicated to the group. Only in response to the House Committee's questioning regarding Harvard's foreign funding did Harvard's counsel answer generically that "no issues were identified."

176. In a February 15, 2024 piece in *The Atlantic*, Horn publicly clarified what changes Harvard needs to make to address antisemitism, which tracked what the Antisemitism Advisory Group had told Harvard privately months before, including:

> [E]nforcing existing codes of conduct regarding harassment; protecting classroom buildings, libraries, and dining halls as zones free from advocacy campaigns (similar to rules for polling places); tracking and rejecting funding from entities supporting federal designated terror groups (a topic raised in recent congressional testimony regarding numerous American universities); gut-renovating diversity bureaucracies to address their obvious failure to tackle anti-Semitism; investigating and exposing the academic limitations of courses and programs premised on anti-Semitic lies;

and expanding opportunities for students to understand Israeli and Jewish history and to engage with ideas and with one another.

177.    On December 8, 2023, seventy-four members of Congress wrote to the boards of Harvard, MIT, and Penn, demanding that they remove their presidents from office over their failures to act against antisemitism.  The letter noted that "[a]ntisemitism has been allowed to fester on campuses for years, and in the wake of the October 7th attack, the world is witnessing the consequences."  It also cited President Gay's testimony as "show[ing] a complete absence of moral clarity and illuminat[ing] the problematic double standards and dehumanization of the Jewish communit[y] that [President Gay] enabled."  The letter also recognized that Jewish and Israeli students do not feel safe at Harvard: "It is hard to imagine any Jewish or Israeli student, faculty, or staff feeling safe when [President Gay] could not say that calls for the genocide of Jews would have clear consequences on [Harvard's] campus."

178.    On December 12, Harvard's governing body issued a "unanimous" statement "reaffirm[ing] [its] support for President Gay's continued leadership of Harvard University" because of its "confidence that President Gay is the right leader to help our community heal and to address the very serious societal issues we are facing."

179.    Despite its unwavering confidence in President Gay, Harvard's governing body admitted that her "initial statement should have been an immediate, direct, and unequivocal condemnation" of Hamas.  And it promised that it is "united in [its] strong belief that calls for violence against our students and disruptions of the classroom experience will not be tolerated."  Yet calls for violence against Harvard's Jewish and Israeli students are amplified across campus regularly, and those responsible often disrupt classes and other educational programming without repercussion.

180.     Despite having Harvard's governing body's full support regarding her clearly deficient response to antisemitism on campus, President Gay ultimately resigned on January 2, 2024, once allegations that she plagiarized academic papers surfaced.  Harvard's email announcing President Gay's resignation condemned attacks against President Gay "in the strongest possible terms," even though it has not used similar language to condemn the antisemitism plaguing campus.  Provost Garber succeeded Gay as Interim President.

181.     On January 9, the House Committee sent a letter to Harvard that required Harvard to produce materials relating to antisemitism in its community.  In issuing its demand letter, the House Committee cited its "grave concerns regarding the inadequacy of Harvard's response to the antisemitism on its campus," something that "has been pervasive at Harvard since well before the October 7, 2023 terrorist attack."  The House Committee flagged two of the "numerous statements that further called into question the university's willingness to seriously address antisemitism":

> When asked whether calling for the genocide of Jews would violate Harvard's code of conduct, Dr. Gay replied that "it depends on the context."  When questioned if she could look a Jewish student's family in the eyes and "tell them their son or daughter would be safe and feel safe and welcome on your campus," Dr. Gay repeatedly refused to answer the question directly.

182.     Yet Harvard failed to produce any substantive documents, instead providing several redacted documents the House Committee described as "useless," and thousands of pages of publicly available documents.  After Harvard did not meet the first deadline, on February 7, the House Committee sent a second letter to Harvard giving Harvard until February 14 to produce the requested documents or face a subpoena.

183.     On January 10, the House Committee on Ways and Means ("Ways and Means Committee") also sent Harvard a letter explaining that Harvard's "actions, inconsistencies, and

lack of a substantive response raise several questions, including whether [it is] fulfilling [its]

educational purposes as required to receive 501(c)(3) tax-exempt status, and whether [it is]

adequately protecting Jewish students from harassment and acts of violence in compliance with

antidiscrimination laws."  It pointed not only to former President Gay's testimony at the House

Antisemitism Hearing, but to the many signs of Harvard's antisemitic environment.  For

example, it discussed Harvard's double standard:

> It is also perplexing given how your institutions have had no
> problem condemning other behavior in the past.  For example, the
> University of Pennsylvania had no problem issuing a warning
> threatening    action    against    students    for    violating    its
> antidiscrimination policy by failing to use their classmates'
> preferred pronouns.  Students at Harvard University were told that
> similar conduct could violate its harassment policies as well.  In
> addition, Harvard disinvited a feminist philosopher last year for
> comments critical of transgender ideology, and former President
> Gay's institution fired a political science instructor for inviting
> renowned social scientist Charles Murray to speak at their class. . . .

The Ways and Means Committee continued:

> You have found your voices before on numerous other topics, but
> not on this one.  If antisemitic speech crosses the line into
> unprotected conduct, it must be punished severely.  If disgusting
> antisemitic speech remains in the protected category, it should be
> condemned, not coddled.  Your words and actions matter.
> Condemning barbaric terrorism against Israel and disgusting
> antisemitism should not be difficult.  Protecting Jewish students on
> campus as you protect other students, should not be a challenge.
> This is not that hard.

184.    The Ways and Means Committee requested certain information including, but not

limited to, how Harvard "evaluates the difference between free speech and harassment, threats,

and incitement"; whether Harvard's "diversity, equity, and inclusion departments serve Jewish

students on campus"; and what, if anything, Harvard is doing "to address the poor ratings [it has]

received from [the Foundation for Individual Rights and Expression] on protecting free speech

on campus."

185.     On February 16, the House Committee Chairwoman Virginia Foxx issued a statement announcing that Harvard's failure to comply with the committee's document requests forced the House Committee to subpoena Interim President Garber, the Senior Fellow of Harvard's governing body, and the chief executive officer of Harvard's endowment.  This marks the first time the House Committee has ever subpoenaed a university.  Chairwoman Foxx noted that while Harvard was stonewalling Congress, its "Jewish students continue[d] to endure the firestorm of antisemitism that has engulfed its campus" and reminded Harvard that if it "is truly committed to combating antisemitism, it has had every opportunity to demonstrate its commitment with actions, not words"—a fact Kestenbaum and SAA members have spent months trying to impress upon the university, to no avail.

186.     On March 21, the Ways and Means Committee sent another letter to Harvard concerning its failure to protect Jewish students and the "hostile environment for Jews on Harvard's campus stemming from antisemitic rhetoric and discrimination" that "has gone unaddressed for years."  It noted that, as many Americans knew, especially Jewish Americans, "these eruptions [] reveal[ed] a culture of antisemitism that developed and grew beneath the surface for decades."  Among other requests, it asked Harvard to "explain the choice, including key stakeholders who were consulted and the decision-making process, to appoint Derek J. Penslar as co-chair of Harvard's antisemitism task force."

187.     On May 16, the House Committee on Education in the Workforce released an "Investigative Update" detailing "major flaws" in Harvard's response to antisemitism, including that Harvard received, but did not act on, its Antisemitism Advisory Group's December 2023 recommendations and findings, which identified areas of serious concerns about Harvard's antisemitism problem.

vii.     **Harvard Allows Antisemitic Harassment to Continue Throughout the Spring 2024 Semester**

188.     Despite congressional hearings, federal investigations, and the initiation of this lawsuit, the near-daily acts of antisemitic abuse and harassment at Harvard have continued unimpeded.

189.     On January 5, 2024, for example, Harvard Afro posted its "Statement on Claudine Gay's Resignation," in which it said, "Zionist forces have grown fearful of the strength of our movement."  The student group further praised its successful intimidation campaign, claiming that it and other student groups' current campaign has made an "anti-Zionist, pro-Palestinian campus achievable.  And it will be through that collective pressure against the tenets of white supremacy that we actualize lasting change."  Other groups like Harvard PSC and Jews 4 Palestine ("J4P") echoed Harvard Afro's statement, and called former President Gay "a necessary casualty in a Zionist attack."

190.     In January 2024, the newly formed Harvard Faculty and Staff for Justice in Palestine ("FSJP"), a "collective of Harvard[] faculty and staff committed to supporting the cause of Palestinian liberation," including Harvard Divinity Associate Dean for RPL Diane L. Moore, Professor Wispelwey, Harvard FXB Center Visiting Scholar Sawsan Abdulrahim, and Professor Omer, accused the "Israeli occupation" of "colonial, racial violence" and "genocide." FSJP endorsed the BDS movement, encouraging Harvard to boycott the world's sole Jewish state:

> We call on the university to withdraw investments from the State of Israel and all companies that sustain Israeli apartheid, settler colonialism, and systematic human rights abuses against Palestinians.  As educational workers, we are focused on boycotts of Israeli academic institutions that support apartheid and colonial occupation.

191.    On January 19, Interim President Garber announced the creation of the Presidential Task Force on Combating Antisemitism ("Antisemitism Task Force") and the Presidential Task Force on Combating Islamophobia and Anti-Arab Bias.  President Garber cited a "need to understand why and how" the "[i]ncidents of bias and hate against Jews and against Muslims, Palestinians, and other people of Arab descent have risen across the country."  He assigned two co-chairs to lead each task force: Professors Derek J. Penslar and Raffaella Sadun for the Antisemitism Task Force, and Professors Wafaie W. Fawzi and Asim Ijaz Khwaja for the Islamophobia task force.  Garber decommissioned President Gay's Antisemitism Advisory Group, which was shuttered without making any public recommendations for addressing Harvard's antisemitism epidemic.

192.    Much like its predecessor, the new Antisemitism Task Force's mandate did not include implementing any measures to combat antisemitism.  This iteration was to be led by Professor Penslar, whose appointment triggered an immediate public outcry, as he had publicly minimized antisemitism at Harvard and engaged in antisemitic canards regarding Israel.  Nearly two years ago, well before October 7 and Penslar's appointment as co-chair, Penslar's teachings were analyzed in determining what Harvard teaches its students to "excuse mainstream Palestinian Arab terrorism"—including referring to Hamas attacks as Palestinian "resistance" efforts instead of acts of terror.  In September 2022, Penslar gave a lecture arguing that "polite antisemitism"—antisemitism that does not involve Jews being "attacked physically"—must be generally acceptable.  In his 2023 book, *Zionism: An Emotional State*, Penslar stated that "veins of hatred run through Jewish civilization."  In August 2023, Penslar signed a letter claiming that "Jewish supremacism has been growing for years" in Israel and that Israel's "long standing occupation . . . has yielded a regime of apartheid."  Penslar also led the December 2023 faculty

letter in support of then-President Gay after her congressional testimony.  At a December 4, 2023 event at Harvard, Penslar advocated for using the term "settler colonialism" to define Zionism.

193.     On January 30, former Harvard President Summers published a statement on X outlining the reasons Penslar was unfit to lead the Antisemitism Task Force.  Summers explained how he had "lost confidence in the determination and ability of the Harvard Corporation and Harvard leadership to maintain Harvard as a place where Jews and Israelis can flourish."  And in its March 21 letter, the Ways and Means Committee requested information concerning how Harvard selected Penslar, citing how this appointment "only increased[] concerns" about Harvard's approach to protecting Jewish students: "Appointing someone who has previously called Israel a 'regime of apartheid' and called on Congress to restrict aid to Israel is an odd way to combat antisemitism on campus."  Despite clear evidence that Penslar is unsuitable to lead the Antisemitism Task Force, Penslar remains co-chair.

194.     On February 25, just five weeks after her appointment as co-chair, Professor Sadun resigned from the Antisemitism Task Force.  Sadun's resignation came after weeks of frustration with the Antisemitism Task Force—that its mandate did not include the swift implementation of measures to combat antisemitism.  According to *The Harvard Crimson*, Professor Sadun had "sought a commitment from the University that they would act on the task force's recommendations, in advance of any being issued, instead of treating them as optional advice," but Harvard refused to make such a commitment.  Harvard's creation of these advisory groups and task forces only reinforces that it pays, at most, lip service to dealing with its antisemitism problem and has no intention of taking any meaningful action to ameliorate the ongoing antisemitic hostile environment its Jewish students face.

195.    On January 21, Kestenbaum returned to campus to find that antisemitic vandalism and graffiti had been plastered across several posters hanging in Harvard Yard dedicated to the Jewish hostages taken by Hamas.  At least two posters were of ten-month-old baby, Kfir Bibas, who was kidnapped by Hamas; on that poster, someone had written, "HEAD STILL ON." Written on several other posters were messages that "ISRAEL DID 9/11" and "GOOGLE THE DANCING ISRAELIS," with a URL for a website called "911 TRUTH NOW," which is a forum dedicated to the antisemitic conspiracy theory that Israel was behind the September 11, 2001 terrorist attacks.  Others were defaced by comparisons of victims to pedophile Jeffrey Epstein.  Dozens of students, including Kestenbaum, immediately sent emails reporting the vandalism to Interim President Garber, the Antisemitism Task Force, the Antisemitism Advisory Group, OEDIB, and Harvard Divinity DIB, along with pictures and videos.

196.    When Kestenbaum next passed through Harvard Yard over fourteen hours later, not only were the graffitied posters still there but even more antisemitic graffiti had been scribbled across the same posters.  Kestenbaum immediately sent another video of the vandalism to the same group of Harvard administrators.  Rather than embrace the start of a new semester, Kestenbaum spent his first day missing class to attend to these horrific posters.

197.    On January 24, Kestenbaum saw in a Harvard dining hall an announcement for an upcoming panel hosted by Harvard University's Weatherhead Center for International Affairs with Leila Farsakh as one of the panelists.  Kestenbaum reported the panel and its guest to Interim President Garber, DIB, the Diversity Office, the DIB Leadership Council, Harvard Divinity DIB Care Team, Harvard Divinity DIB, and Harvard Divinity Associate Dean for Enrollment and Student Services Timothy Whelsky.  He reminded them that in response to October 7, Farsakh made a public statement celebrating the Hamas murderers:

> The courage of those who broke through the barbed wire, sailed by
> boat to return to their ancestral homes, or flew with their hang-
> gliders over the wall of the largest open-air prison has shown that
> Palestinians will continue to defy the gravity of settler colonialism
> to be free, whatever the cost.

Kestenbaum did not receive a response, and on January 31, Farsakh came to campus as Harvard planned.

198.    On January 25, Harvard GS4P hosted an event with Rabab Abdulhadi, a founding member of the U.S. Campaign for the Academic and Cultural Boycott of Israel and the keynote speaker at two of the annual National SJP conferences.  On October 7, she wrote: "#PalestineUnderAttack are merely defending themselves.  Are you saying that #Palestinians should be exceptionalized from the right to defend themselves against colonial & racist violence? Check your facts!  #FreePalestine #IsraeliCrimes."  Three days before the event, Kestenbaum warned Interim President Garber, the Antisemitism Task Force, the Antisemitism Advisory Group, OEDIB, Harvard Divinity DIB, and the Diversity Office and provided sources explaining Abdulhadi's history of antisemitism.  Again, not one of these recipients responded to Kestenbaum, nor did they prevent the student group from hosting Abdulhadi.

199.    On January 25, Kestenbaum was horrified to open his Harvard email account to see an email from Gustavo Espada, a Financial and Systems Coordinator at Harvard, with the subject line "invitation to debate Israeli role in 9/11."  Espada's email implicitly took responsibility for the vandalism on hostage posters in Harvard Yard, which Kestenbaum had posted about on X on January 21, 22, and 23.  In his email, Espada interpreted Kestenbaum's tweets about the vandalism as if they were directed at Espada:

> Your tweet on X [regarding the vandalized posters] is getting a lot
> of attention!  That's fantastic.  As such, I invite you to debate me
> today at the Cambridge Street overpass 12-1, don't miss it!  If you
> don't show up I will use a puppet or potted plant to represent you!

79

[smiley face emoji]  We can always schedule a more formal one in large venue on campus. . . .

PS stop saying I hate Jews unless that is something you want.  I hate Israel and Zionism with a passion and you know full well they are two different things.  The Crimson is already too far gone and will probably be defunded by lawsuits in due course.  Perhaps you and your allies want to start acting in better faith, starting with a public correction of the false claims you have made about the posters, and an apology to the community for inflaming passions at this difficult time with false statements?

200.    Throughout that day, Espada replied to Kestenbaum's posts on X about the vandalism from his verified account, "9/11 Guy."  One such reply encouraged others to come to campus: "Claudine was being pressured to fly the Israeli flag outside of [University] Hall and refused, after which plagiarism allegations coincidentally emerged.  We have witnesses lined up for depositions, what about you? . . .  Those wishing to examine evidence of the plagiarism and the false exoneration are invited to the science center from 12-1 today!"  Another read: "you didn't show up for our debate!" with a frowny face emoji.

201.    Even a cursory review of Espada's social media history demonstrates his anti-Jewish obsession, that he poses a serious risk to Jews, and that he should not be permitted on Harvard's campus or to interact with students.  For instance, on January 20, he posted from his "9/11 Guy" X account:

Why, because I think Israel should be wiped off the map for what it's done around the world?  I think what I am is an "anti-Semite" because I have no problem with Jews per se, just the ones who think there's a different set of rules for them.

On January 21, he wrote: "What if any part of 10/7 is real?"  On January 25, in a TikTok post titled "ENDGAME!", Espada issued the following threat against Jews: "there's enough of you out there who see what an opportunity we have to bring down the Zionist mafia once and for all. . . .  [I]f we have to break some eggs or snowflakes to make this omlette [*sic*] so be it.  We

didn't start this $hit but we're going to end it."  On January 26, Espada posted on TikTok a video on Harvard's campus standing among Harvard students while brandishing a plastic machete, and then a video of Harvard police approaching him as he was harassing two community members with signs reading "free the hostages."

202.    Later that day, several Jewish students at Harvard alerted Kestenbaum that Espada had posted a threatening video on his TikTok account where Espada showed off his machete, and said:

> [I]t sends the messages that we are ready to fight, win . . . anyways, nothing, I won't enter into more details, but everything is going according to the plan.  So stay with us cause things are happening here.

The end of Espada's video features a series of superimposed images of prominent Jews like Justice Elena Kagan and Alan Dershowitz, and concludes with images of Kestenbaum's X posts concerning the vandalized Israeli hostage posters.

203.    Kestenbaum was deeply concerned about his physical safety as a direct result of this unhinged Harvard employee, who has direct access to Kestenbaum's and other students' personal information, and engaged personal security for several days.  Harvard was notified of Espada's dangerous social media commentary and targeted harassment of Kestenbaum, but failed to inform Kestenbaum of any steps it would take to protect him—even though Espada continued to harass Kestenbaum on social media throughout the semester.  On April 27, Espada posted on X, "Introducing a site dedicated to @shabbosk [Kestenbaum's X username] for fans and foes alike to discuss this important public figure's past, current, and future work on behalf of Zionism, to be preserved in perpetuity," with a link to a website called, "Thoughts on Shabbos Kestenbaum."  On May 4, Espada posted on Twitter, "@ShabbosK, watch your back . . . I'm

coming for much more than blood—I'm coming for Zionism, and I have a posse[.] . . . We are burying you."

204.    Kestenbaum immediately reported this threat to Harvard Divinity Dean of the Faculty Marla Frederick, Dean Whelsky, OEDIB, and other administrators, and told them that "not a single person on this email thread or anyone from Harvard has confirmed his employment status, whether he's allowed in campus, or what Harvard will do to protect me from their own employees threatening my life." He followed up on his inquiry on May 7, but again received no response. As Kestenbaum later discovered, Espada had already been terminated. Kestenbaum was extremely distressed that no one at Harvard told him of this.

205.    On January 27 and 28, Professor Hanson held a conference about corporate influence over the legal system at Harvard Law and invited his students, including SAA Member #1. One of the event's speakers was Rhiannon Hamam whose social media accounts are filled with antisemitism. On October 7 and the days following, Hamam reposted several posts including: "what did y'all think decolonization meant?  vibes?  papers?  essays?  losers.";  and "Glory to the resistance and the people of Palestine. . . .  I could not be more proud of my people who continue to demonstrate unthinkable bravery in their struggle for liberation"; "Tfw you are with your homies and you realize that you are all hamas." SAA Member #1 reported both the upcoming conference and Hamam's posts to Sasha Tulgan and Deans Manning, Soban, Claypoole, and Coates the day before the event started, but received no response. After the event, Professor Hanson posted a photo of himself smiling with Hamam, and noting how "grateful" he felt.

206.    On or about January 27, a Harvard Divinity student, one of Kestenbaum's classmates, posted a barrage of Instagram stories filled with antisemitism and thinly veiled

threats against Jewish and Israeli people.  One such story encouraged and justified Hamas's use of violence: "When all other efforts in a cause fall short, It is just righteous to the sword to resort."  Another read:  "DECOLONIZATION IS NOT A METAPHOR AND PALESTINE WILL BE FREE BY ANY MEANS NECESSARY."  Several students reported these messages to Harvard.

207.    On January 30, Harvard's Center for Middle Eastern Studies invited Rashid Khalidi—the former Palestine Liberation Organization spokesperson who blamed Jews for Hamas's October 7 attack—to speak at Harvard once again, this time on "Gaza: A Colonial War?"

208.    On February 1, Harvard Interim President Garber admitted that Harvard has "a very serious [antisemitism] problem."  Former Antisemitism Advisory Group member Horn has admitted the same, claiming that the problem is "clear from the avalanche of documentation deposited at [her] feet."

209.    On February 2, in an Instagram post, Harvard PSC praised and "commemorate[d]" Ahed Tamimi—who was arrested for inciting violence and terrorist activities—and Hanan Ashrawi—a former member of the Intifada Political Committee—for their "resistance" and "deep resiliency and fight for a Free Palestine."  After the October 7 massacre, Ahed Tamimi had stated on Instagram: "Come on settlers, we will slaughter you.  We are waiting for you in all the cities of the West Bank.  What Hitler did to you was a nothing.  We will drink your blood and eat your skulls.  We are waiting for you."  Hanan Ashrawi, former Minister of Education of the Palestinian National Authority, similarly praised October 7 on her X account.  That day, Kestenbaum reported the post to Interim President Garber, the Antisemitism Task Force, the Antisemitism Advisory Group, and OEDIB but received no response.

210.     In early February, Professor Tarek E. Masoud, the director of the Middle East Initiative at Harvard Kennedy's Belfer Center for Science and International Affairs, announced that Dalal Saeb Iriqat was scheduled to speak at the Center's "Middle East Dialogue" event on March 7.  The announcement was met with intense criticism, not only from inside the Harvard community—Kestenbaum filed a report with Interim President Garber, the Antisemitism Task Force, the Antisemitism Advisory Group, and OEDIB on February 4—but from the public as well.  While the October 7 massacre was still ongoing, Iriqat, a professor at the Arab American University Palestine, posted several hateful messages on X: "Today is just a normal human struggle 4 #Freedom"; "we will never forgive the Israeli right wing extreme government for making us take their children and elderly as hostages"; and the "Israeli public need to realize that their own government had caused all this bloodshed and they remain the ones responsible for this escalatin [*sic*] and losses of civilians lives."  Rather than prevent Iriqat from coming to its campus and jeopardizing Harvard's Jewish and Israeli communities, Harvard disclaimed responsibility for the event, emphasizing that Professor Masoud  "chose and invited the speakers for the series himself."  Despite Harvard's awareness of the event and of Iriqat's hateful history, Harvard allowed the event to proceed as planned.

211.     On February 5, Kestenbaum notified Interim President Garber, the Antisemitism Task Force, the Diversity Office, Harvard Divinity DIB, and the Diversity Inclusion & Belonging Leadership Council about an upcoming rally on February 8.  Harvard PSC, HOOP, Harvard GS4P, Harvard BDS, and Harvard Afro scheduled and promoted the event in Science Center Plaza calling for an end to "Israel's genocide of Palestinians," "Israel's "occupation of historic Palestine," and "Harvard's financial and intellectual investment in Israel."  Kestenbaum explicitly told the administrators that he will have to pass the rally on his way to class and

begged them to do something to prevent the antisemitism he would inevitably be forced to endure.  He explained that not only do these on-campus rallies impact his ability to focus in class due to the stress of being openly discriminated against, but often make him fear for his physical safety.  But by February 7, Harvard failed to respond to Kestenbaum, let alone take any preventive measures, so Kestenbaum notified the same administrators that he and other Jewish students had made plans to avoid the event set for the following day.

212.    On February 7, HOOP posted stickers of its logo all over Harvard Yard on Harvard property.  The group claimed responsibility for the vandalism on its Instagram, posting photos of its logo plastered on a Harvard Hall sign, on HUID card tap boxes, on doorways, and other locations.  Kestenbaum reported this to Interim President Garber, the Antisemitism Task Force, the Diversity Office, Harvard Divinity DIB, and the DIB Leadership Council that day.

213.    On February 7, Harvard GS4P sent its first newsletter of the spring semester, in which it called Israel an apartheid regime, and advertised the February 8 rally in Science Center Plaza and a February 11 rally demanding that Elizabeth Warren stop accepting money from "the Zionist lobby."

214.    Despite his many reports and requests for intervention, Kestenbaum did not receive a response to any of the emails he sent during the first week of February until February 8, when only the "OEDIB team" responded to inform Kestenbaum that OEDIB was unable to assist him because it is "not the appropriate place at Harvard to lodge complaints."  Yet when Kestenbaum asked on February 9 for clarification as to who that might be, no one offered a response.  Kestenbaum has still not received an answer.

215.    On February 10, a Harvard Divinity student and graduate assistant at the Harvard Religion and Spiritual Life Department ("RSL") removed Kestenbaum from the Harvard

Divinity "All Students" WhatsApp group chat after Kestenbaum responded to a student's message that promoted an event at which participants were encouraged to call congressional representatives to demand a ceasefire from Israel.

216.    Later that day, Kestenbaum reported this exclusion to Harvard Divinity Dean Frederick, Harvard Divinity DIB, Harvard Divinity Assistant Dean for Diversity, Equity, Inclusion, and Belonging Steph Grayson Gauchel, the Antisemitism Task Force, Interim President Garber, and the Diversity Office.  In a series of messages, Kestenbaum made it clear he wanted to understand what the administration will do to combat antisemitism, but no one provided him a substantive response.

217.    On February 10, a video was posted of Elom Tettey-Tamaklo—the Harvard Divinity proctor who assaulted a Jewish student during the October 18 Die-In—quoting a Nazi theologian, sharing a poem with blood libels accusing Israelis of being "vipers [] who siphon the lifeblood of the innocent," and inciting violence against Israel.  Kestenbaum was deeply disturbed by this video, of which Harvard was made aware, but Harvard has taken no action.

218.    On February 12, a Harvard Divinity student posted a flyer promoting an "emergency die-in" in the Harvard Divinity '22 WhatsApp group chat to demand Israel stop the "ongoing genocide" in Gaza.  Kestenbaum responded, asking students to call on Hamas to both surrender and release the Jewish babies they kidnapped.  In a group chat of all Kestenbaum's classmates, the Harvard Divinity student responded: "I believe that we're kind-of taking a 'don't engage with Shabbos' approach now-a-days . . . .  Shame on you for believing and sharing this." Kestenbaum emailed Associate Dean Gauchel, Interim President Garber, the Antisemitism Task Force, and others, sharing screenshots of these messages to show how Harvard has "created an atmosphere where Jewish students are bullied, intimidated, and ostracized."

219.    As scheduled, Harvard PSC, Harvard BDS, HOOP, and other student groups held the February 12 "emergency die-in."  Hundreds of Harvard students laid down on the Widener Library steps displaying massive banners reading, "STOP THE GENOCIDE IN GAZA," among others, and chanting in Arabic, "Palestine will be Arab."  Kestenbaum submitted video evidence of this to Dean Frederick, OEDIB, Assistant Dean Gauchel, the Antisemitism Task Force, Interim President Garber, and the Diversity Office.  He also sent in a screenshot of messages from a fellow Jewish student asking whether anyone knew if it was safe to leave Widener Library.  To date, Kestenbaum has not received a response from Harvard.

220.    Also on February 12, for the second time this academic year, Harvard hosted Francesca Albanese.  Albanese has made a number of  public antisemitic statements, including comparing Israel to the Nazis and the war in Gaza to the Holocaust, and claiming that the Jewish people's connection to the land of Israel is a "fake identit[y]."  In February 2024, after an interviewer played a recorded call from a Hamas terrorist during the October 7 massacre gleefully telling his father, "Your son killed Jews!", Albanese remarked that the October 7 attack was not motivated by "aggression against the Jews."  She has perpetuated antisemitic tropes, including a 2014 public statement that "America is subjugated by the Jewish lobby."  Albanese refers to Israel as a settler-colonial enterprise and has repeatedly justified violence against Israelis, sympathized with terror groups, and dismissed Israel's right to self-defense.  Before the February 12, 2024 event, Kestenbaum notified several Harvard administrators of Albanese's antisemitic statements, but he received no response, and the event went on as planned.

221.    On February 13, several student groups, including HOOP, posted to Instagram "an early valentine's love letter" targeting "Zionists on Harvard's campus," and singling out students who have spoken up against antisemitism on campus.  The post, rife with sarcasm and

intended to inflame, suggested these students should "get a life."  This post was reported to Harvard administrators, but Harvard has taken no action.

222.    On February 14, Harvard Law Justice for Palestine hosted an event in Caspersen Lounge for students to "write a message of love + solidarity."  In reality, messages written at the event included "Harvard loves genocide."  Harvard Law Justice for Palestine was warned by administrators before the event that "the lounge is not a reservable space, and events may not be held there."  Nonetheless, on February 14, Harvard PSC posted photos of the event on Instagram, and promised that their and similar groups' members would continue ignoring Harvard's policies and warnings.

223.    On or around February 14, a whiteboard in Emerson Hall was defaced with "Liquidate the Gaza ghetto," and a reference to the Israeli Prime Minister as "Führer Netanyahu."  Kestenbaum reported this antisemitic graffiti to Interim President Garber, the Antisemitism Task Force, the Antisemitism Advisory Group, and various diversity offices at Harvard, among others, asking "[w]hat specifically will Harvard do[] to prevent Jewish students from walking into classrooms and seeing horrific antisemitism as just happened this morning in Emerson Hall," and explaining that Jewish students "feel neither included or a sense of belonging at Harvard in the face of such persistent and vicious."  Kestenbaum did not receive a response.

224.    Around that same time, HOOP hung posters throughout campus, in violation of Harvard policies, stating "no Valentine's day under brutal occupation" and accusing Harvard of "pinkwashing," a reference to a disingenuous strategy employed by the BDS movement to accuse Israel of false progressiveness.

225.     On February 15, Kestenbaum emailed Harvard administrators to report more antisemitic vandalism in Harvard Yard—yet again in the form of the defacement of hostage posters with red paint.  Again, Kestenbaum received no response.

226.     On February 19, the newly created Harvard FSJP Instagram page posted an antisemitic cartoon depicting a hand branded with a Jewish star with a dollar sign in it gripping a rope connected to two nooses around the necks of an Arab and a Black man.  The cartoon originally appeared in a 1967 Student Nonviolent Coordinating Committee newsletter, in which it appeared in a feature that promoted various antisemitic conspiracy theories, such as "the famous European Jews, the Rothschilds, who have long controlled the wealth of many European nations, were involved in the original conspiracy with the British to create the 'state of Israel' and are still among Israel's chief supporters," and "THE ROTHSCHILDS ALSO CONTROL MUCH OF AFRICA'S MINERAL WEALTH."  The post was shared by Harvard PSC and Harvard Afro.

227.     Rabbi Wolpe commented on the post that day, writing: "This was posted today by 'Harvard faculty and staff for justice in Palestine.'  The cartoon is despicably, inarguably antisemitic.  Is there no limit?"  Also that day, SAA Member #4 reported the post by submitting a bias report and uploading a list of Harvard FSJP's members.  SAA Member #4 did not receive a response until nine days later, when Chief DIB Officer Barbosa reached out to a schedule a meeting to obtain more information about the incident.  SAA Member #4 pointed out that any such information should already be known to Harvard and noted that Barbosa ignored SAA Member #4's request for updates about the many complaints they had already initiated.  Kestenbaum also reported the post.

228.    Facing backlash, on February 21, Harvard PSC and Harvard Afro reshared the post with the antisemitic cartoon removed.  However, the groups replaced the cartoon with a picture of Kwame Ture, who often inveighed that "the only good Zionist is a dead Zionist."  The backlash was so severe that Harvard PSC's faculty advisor, Professor Johnson, resigned from that position—although he continues to regularly attend these groups' events.

229.    On February 19, SAA Member #4 reported unrecognized student and faculty organizations that were "posting on social media with the word 'Harvard' in their name and organizing and holding events on campus" to the Harvard Trademark Program, a program in the Office of the Provost charged with protecting Harvard's trademarks.  Nevertheless, organizations like HOOP have continued using the official Harvard name.

230.    On February 19, a person held a poster that said, "Free America From AIPAC" with a swastika during a rally in Harvard Square co-sponsored by Harvard Afro.

231.    On February 22, Harvard Graduate Student Union-Boycott, Divestment, Sanctions and Harvard Afro hosted an online event featuring Marc Lamont Hill, who has spoken in support of antisemites, such as Louis Farrakhan (who called Adolf Hitler "a very great man" and Judaism a "dirty religion"), whom Hill refers to as "my brother," and terrorists such as Ali Jiddah (who was convicted of planting bombs in downtown Jerusalem), whom Hill hailed as a "true revolutionary and a beautiful spirit."

232.    On February 27, Harvard Graduate Students for Palestine hosted an unsanctioned phone banking event in the Harvard Divinity Commons, calling for Harvard to "end all academic partnerships with Israeli universities."  Kestenbaum reported the planned event to the Antisemitism Task Force, Interim President Garber, Harvard Divinity DIB, among others, before it occurred, but did not receive a response until well-after the scheduled start time, once

Kestenbaum had made arrangements to avoid the Commons.  Harvard took no preventive measures to stop the event from happening.

233.     On February 27, Harvard Chabad and Harvard Law Alliance for Israel hosted an event at Harvard Law on "reporting on the Israel-Hamas war" that was disrupted by anti-Israel students who blocked the audience's view of the invited speaker with signs.  SAA Member #5 attended this event.  Even though the event was for law students only and thus "closed" under Harvard Law policies, at least one of the disruptors was a Harvard Divinity student.  SAA Member #1 reported the violation to various administrators and the Antisemitism Task Force and Antisemitism Advisory Group, identifying the student disruptors by name, citing to the specific Harvard policies violated—including Harvard Law's Protest and Dissent Guidelines, which prohibit "substantial[] interfere[nce] with a speaker's ability to communicate or an audience's ability to see and hear the speaker," and protests inside "closed" meetings—and noting that Harvard's "failure to discipline these students adequately is interfering with Jewish students' ability to host events and be students."  SAA Member #1 merely received a response stating that the report would be referred to the Harvard Law Administrative Board.  SAA Member #1 has received no update on the status of the report.

234.     On February 29, the House Committee held a "Bipartisan roundtable with Jewish students to discuss antisemitism at postsecondary institutions."  Jewish students from nine universities, including Harvard, the University of Pennsylvania, and Columbia University, participated in the discussion.  Chairwoman Foxx stated that "[t]hese students are dealing with antisemitism at their respective universities on a daily basis."  Among the students "dealing with antisemitism . . . on a daily basis" was Kestenbaum.

235.     During the roundtable, Kestenbaum shared some of his experiences with antisemitism at Harvard, including social media posts from his peers such as "too many damn Jews run this country," defacement of hostage posters, rampant antisemitic conspiracy theories, including that the Jewish people orchestrated the September 11 terrorist attacks, and targeted threats against Jews.  Kestenbaum stated that he is aware of "Jewish students at Harvard who do not wear their kippahs publicly anymore, who have changed their major due to hostile anti-Zionist and anti-Jewish environments, and have been spat on for their religious identity."

236.     On March 2, 2024, Harvard student groups, including Harvard PSC, Harvard Afro, and Harvard GS4P, co-organized a rally near campus, during which thousands of rally goers chanted "resistance is justified," "globalize the Intifada," and, in Arabic, "from water to water, Palestine will be Arab."  Kestenbaum reported the event and the student groups' role to Interim President Garber, the Antisemitism Task Force, the Antisemitism Advisory Group, and various Harvard diversity offers, among others, but received no response, and Harvard has taken no action.

237.     On March 3, after Kestenbaum noted at the House Committee roundtable that he reported antisemitic incidents to the Antisemitism Task Force on more than forty occasions without response, the task force finally contacted Kestenbaum, not to provide updates on his reports but to disclaim responsibility for addressing antisemitic incidents, writing: "It's important to note that the task force's charge does not extend to investigating or commenting on specific incidents on or off campus, nor does the task force possess the authority to enforce University policies."

238.     On March 4, the Harvard Center for Middle Eastern Studies hosted an event in the Science Center titled "We Charge Genocide: The Potential and Limits of International Law,"

featuring Noura Erakat.  In 2020, Erakat participated in a workshop with a Hamas leader who has since promised an "October 7, October 10, October one-millionth" until Israel's eradication. On February 25, 2024, Kestenbaum reported the event to Interim President Garber, the Antisemitism Task Force, the Antisemitism Advisory Group, Harvard diversity offices, and others, but received no response.

239.     On March 5, a number of student organizations hosted an event in Caspersen Lounge, promising "radical student activism" about Palestine.  SAA Member #1 reported the event on March 4 to various administrators and the Antisemitism Task Force, and reminded them that Harvard "has made it clear that [Caspersen Lounge] is not a space for demonstrations." SAA Member #1 expressed concerns about classes being disrupted by the event, but did not receive a response, and Harvard did not prevent the event from proceeding as planned.  Instead, a large group of students and faculty members, including Harvard Law Professors Nikolas Bowie—several SAA Members' Constitutional Law professor—and Ryan D. Doerfler, occupied Caspersen Lounge, with students flouting Harvard's policies by posing for photos in front of a sign stating: "This space is for personal or small group study and conversation only."  Attendees also covered the walls of the lounge with sticky notes with antisemitic messages and their demands, including a demand that a Jewish Israeli professor be fired.  SAA Member #1 and SAA Member #5 were in the Caspersen Lounge at the time, and were prevented from using the lounge as a study space because of the protest.

240.     On March 8, Harvard J4P, an unrecognized student group, shared a post "honoring women in the history of Palestinian resistance," including Fatima Bernawi who in 1967 was convicted for attempting to bomb a Jerusalem movie theater.  The post also honored the Palestinian women involved in the First and Second Intifadas.  Kestenbaum reported this post

to Interim President Garber, the Antisemitism Task Force, the Antisemitism Advisory Group, and diversity offices at Harvard, among others.  Three days later, Harvard Divinity's DIB office responded to Kestenbaum's email, discussing the "We Charge Genocide: The Potential and Limits of International Law" event, which was not the subject of the email, and incorrectly suggesting the event was permissible because "it was not mandatory for any student."

241.    From March 20 to March 22, the Bell Collective for Critical Race Theory at Harvard Law held its Censorship & Consciousness conference.  The conference featured "a conversation with the incredible" Adnan Barq.  On March 18, 2024, Kestenbaum followed up on his unanswered email to express concern about Barq's role at the conference, noting that Barq "was on the 'Long Live the Intifada' podcast to glorify violent armed resistance, discuss how Jews study Nazis to oppress Palestinians, and are 'fucking creepy.'"  This report went unanswered.  During the conference, Ryna Workman was also a featured panelist on "repression and resistance."  Workman, as president of the New York University School of Law Student Bar Association, posted on its online newsletter on October 10, 2023 that "Israel bears full responsibility for this tremendous loss of life."  Soon after, on October 24, Workman was caught defacing Israeli hostage posters.

242.    On March 29, Harvard PSC, Harvard GS4P, and others held an unsanctioned event in Caspersen Lounge to celebrate the passing of a secret BDS resolution by Harvard Law's student government designed to urge Harvard Corporation to divest from Israel.  SAA Member #5 and others warned Harvard administrators including Deans Soban and Ball before the planned demonstration, but they did nothing to prevent it from occurring.  During the event, one student speaker yelled that by refusing to divest from Israel—which she called a "death machine"—Harvard is a "breeding ground for profiteers of global oppression" that needs to "step

away from its blood lust." SAA Member #5 was horrified as he listened to this student's speech and the audience cheering.

243.    On March 30, Harvard PSC was allowed to install its annual "Wall of Resistance"—more commonly referred to as an "apartheid wall"—a twelve-panel installation full of discriminatory messaging accusing Israel of apartheid and genocide. The wall stood in Science Center Plaza for one week as planned, but rather than taking it down after, the group moved it to Harvard Divinity to "celebrate their recent divestment resolution win" for another week. The freestanding panels, which stood at least eight feet high and three feet wide each, were dedicated to "the ongoing genocide and ethnic cleansing of Palestinians." One panel featured a quote from Ghassan Kanafani, a well-known terrorist from the Popular Front for the Liberation of Palestine (a foreign terrorist organization), who was linked to the massacre of twenty-six civilians at Israel's Ben Gurion Airport in 1972. Another panel depicted an Israeli soldier, with the Harvard crest painted on his uniform, holding a machine gun over a man kneeling with an infant. Many Jewish students felt even more isolated and abandoned that Harvard allowed—and actively protected—the apartheid wall, like Kestenbaum, who explained to Harvard administrators the "deep pain and brokenness over Harvard's failure to act to stop this hatred." Harvard responded by providing 24/7 security to protect the apartheid wall—which stands in stark contrast with Harvard forcing Harvard Chabad to hide its menorah at night because it could not guarantee its safety.

244.    On April 5, Harvard PSC, Harvard Afro, HOOP, Harvard GS4P, and other recognized and unrecognized groups co-sponsored a student rally outside Harvard Yard to celebrate Al Quds Day—an annual day of resistance first celebrated forty-five years ago by Islamic revolutionaries in Iran, when Ayatollah Khomeini prayed for "the victory of the Muslims

over the infidels."  Hundreds gathered in Science Center Plaza, chanting "from the river to the sea, Palestine will be free," among other familiar chants.  Many gave speeches, including students and outsiders like Cornel West—who has compared the IDF to Hamas and argued that Israel was founded because "Jews jumped out of the burning buildings of Europe in a Jew-hating Europe led by a gangster named Hitler [and] landed on the backs of some Arabs in 1948 when they founded their state."  Harvard failed to do anything to stop the Harvard Yard rally, nor discipline the groups involved.  Harvard Afro co-sponsored another event later that same day, the advertisements for which read, "ZIONISTS ARE NOT WELCOME HERE!"

245.    On April 8, Harvard PSC posted an Instagram story praising Walid Daqqa, who had been convicted in 1987 of commanding a terrorist cell that mutilated a 19-year-old Israeli Jew, Moshe Tammam, before killing him.  Harvard PSC's post read, "glory to the revolutionary Palestinian political prisoner and martyr," with the caption "Rest in power."  This post was detailed in *The Harvard Crimson*.

246.    On April 18, Harvard's Center for Middle Eastern Studies hosted an event on campus, "Gaza As Epicenter: An Alternative Reading," featuring Tareq Baconi, a professor who regularly blames Israel for October 7 and denies that Hamas is a terrorist group.  In November 2023, he hosted a teach-in on "Palestinian Resistance," at which he argued that calling for the destruction of Hamas is calling for a genocide, and that "Jews, Israeli Jews, [can't] feel safe while apartheid persists."  Just two weeks before Harvard's event, he argued for a "single state from the river to the sea" and called a two-state solution "unjust."  Yet Harvard granted Baconi a platform on its campus.

247.    On April 22, Harvard purportedly suspended Harvard PSC.  Yet this suspension was limited to the rest of the "Spring 2024 Term," ending a mere few weeks later, and limited to

the group itself instead of its leaders or individual members—many of whom belong to or have leadership positions in the other problematic student groups.  As a result, Harvard PSC's nominal suspension has done nothing to stem the tide of antisemitism on campus.

248.    On April 25, the Harvard Divinity RSL Department sent its weekly email to Harvard Divinity students, which included a "Reflection" written by an RSL graduate assistant. In it, the student quoted Alice Walker, who endorses the views that Jews are "lizard people" who funded the Holocaust, are pedophiles, and control the KKK.  Concerned Jewish students notified Harvard Divinity administrators, but no apology or retraction was ever made.

**viii.    Pro-Hamas Antisemitic Demonstrators Occupy Harvard Yard**

249.    In April 2024, Kestenbaum, SAA's Jewish student members, and other Jewish Harvard students' fears for their physical safety increased, when a new wave of highly organized antisemitic protests at college campuses around the country began, involving tent encampments students and others erected in outdoor public spaces.  These encampments were hotbeds of flagrant conduct policy violations and intimidation, harassment, and physical assault of Jewish students, including blocking Jewish students from access to those spaces and campus buildings.

250.    Harvard was aware of the risk that an encampment would be erected on its campus, as reflected by its email announcement that Harvard Yard would remain restricted indefinitely to only Harvard affiliates, and signs Harvard affixed on April 22, 2024, to the gates of Harvard Yard that read:

> Harvard Yard will be closed today. . . .  Harvard affiliates must produce their ID card when requested.  Structures, including tents and tables, are not permitted in the Yard without prior permission.  Blocking pedestrian pathways or access to building entrances is prohibited.  Students violating these policies are subject to disciplinary action.

SAA Member #1 saw these signs on April 22 as he passed through Harvard Yard on his way to Harvard Chabad. On April 24—the first day of the Jewish holiday of Passover—the purportedly suspended Harvard PSC, HOOP, and other groups announced on Instagram an "emergency rally" in Harvard Yard that day at 12:00 p.m.  By 12:30 p.m., approximately 500 students and faculty had gathered in front of the John Harvard statue in Harvard Yard.  They lined the walkways through Harvard Yard before revealing their true intentions: to establish the Harvard encampment.  People with backpacks, tents, suitcases, and carts of food dove under the ropes that outline the grassy areas of Harvard Yard and began setting up tents, yelling, cheering, and utilizing noisemakers.  The demonstrators, now inside the ropes designed to keep people off the grass, designated the area the "Liberated Zone," and began policing entry right away.

251.    Near the John Harvard statute, SAA Member #1 saw HUPD officers standing by, watching but never intervening—much like SAA Member #1's experience at the October 19 stampede.  As reported by *The Harvard Crimson*, HUPD officers were "instructed to keep students safe and allow protests to proceed unless they become violent or destructive." However, they did nothing when a visibly Jewish teaching fellow at Harvard College was charged by one of the occupiers, who proceeded to physically push him away from the area. Several HUPD officers were protecting the entrance to Massachusetts Hall, where Interim President Garber and other top administrators have offices.  But Jewish community members on the ground were left unprotected.

252.    Hundreds of students and faculty were participating in the rally, and about thirty to forty had set up tents in front of the John Harvard statue.  Several posters had been hung, including a massive banner that read, "from the river to the sea, Palestine will be free."  SAA Member #1 was particularly concerned after seeing three people in the crowd: Bharmal and

Tettey-Tamaklo, who had physically assaulted a Jewish Israeli student on October 18, and Sadaf

Kahn, a Harvard College senior who had recently taken to Instagram to call himself a "terrorist"

and post a picture of himself holding a knife.

253.    On the first day of the encampment, students and faculty members put up twenty-

two tents in Harvard Yard.  Attendees chanted, "there is only one solution, Intifada revolution,"

and "Intifada revolution, Intifada revolution." Despite the blatant disregard of Harvard policies

prohibiting the encampment and evidence that an extended takeover was planned, Harvard

allowed demonstrators to continue entering the Yard.  HOOP continued to recruit people on

social media: "Today was just the beginning.  Keep showing up.  Support the campers."

254.    Many members of Harvard's faculty and staff participated in the encampment.

One of the first tents was labeled the "Faculty Tent."  Harvard FSJP published a statement,

"Solidarity with Harvard Gaza Solidarity Encampment," offering the disruptors its "unwavering

support."  A Harvard Divinity dean wore her full regalia and clapped proudly while the occupiers

erected the encampment—which Kestenbaum reported to Harvard Divinity administrators; they

took no action.  Another Harvard professor, Vijay Iyer, delivered a statement on Harvard FSJP's

behalf to the 500-person crowd through a bullhorn, urging the "administration to refrain from

any retaliation against the students" and rejecting its "use of . . . safety to stifle protest."

Professor Johnson, whom SAA Member #1 saw in those first few minutes, was "acting as the

police liaison on behalf of the protestors," despite his resignation from his position as Harvard

PSC's faculty advisor.  Professor Bowie was also among the attendees.

255.    At the end of the first day, Dean Dunne told the campers at nearly 10:00 p.m. that

they must abide by "quiet hours," should notify him if non-Harvard affiliates arrive so he can

"work to address" the situation, and may not light open flames, but otherwise said nothing to

indicate Harvard would do anything to stop the encampment.  SAA Member #1 and other SAA student members rightly feared that Harvard did not intend to enforce its own policies and would let the encampment continue to grow.

256.    On April 24, Kestenbaum notified Dean Frederick, OEDIB, and others that the campers included Harvard Divinity students, told them the encampment put his physical safety at risk, and informed them that Jewish Harvard community members had already reported being physically confronted and verbally harassed.  Kestenbaum asked how Harvard would ensure his and his classmates' safety, but the administrators refused to respond.

257.    By April 26, the encampment had expanded to over thirty tents.  The campers, making clear their intentions to restrict free access to the campus, posted a large sign at the encampment entrance which read: "Welcome to the liberated zone!  Make sure to talk to one of us before entering."  The organizers designated student "safety marshals," who patrolled the encampment and refused visibly Jewish people access to the grounds it occupied.  These "marshals" wore bright neon vests and repeatedly followed and harassed Jews walking through or around Harvard Yard.

258.    Every time Kestenbaum tried to walk through Harvard Yard since the encampment began, he was followed closely by the "marshals."  For example, when, on May 2, Kestenbaum walked through Harvard Yard to go to Widener Library, no fewer than seven marshals followed him, including four Harvard Divinity students he recognized.  One of the Harvard Divinity students—who participated in the assault on the Jewish student at the October 18 Die-In—was given the honor in early May of being named by Harvard Divinity as "class marshal" for commencement, and was awarded an academic prize on May 8 by Harvard Divinity.  Kestenbaum reported the incident to Dean Frederick, Professor Holland, Dean

Whelsky, and OEDIB, among others, on May 4, and asked what would be done to prevent this sort of harassment.  He received no response.

259.    Various Harvard administrators confirmed that the encampment violated Harvard policy.  Harvard Graduate School of Arts and Sciences Dean Bill Stackman and the Harvard Law Dean of Students Office emailed students, confirming that the encampment's unauthorized actions "[were] a violation of rules" and stating that: "Interference with the academic mission or business functions of the University will not be tolerated.  Disruption or interference that hinder members of our community from performing their normal duties and activities will be regarded as an unacceptable obstruction of the essential processes of the University and will lead to disciplinary consequences[.]"  In blatant violation of this warning, on May 8, the occupiers refused to submit to HUID checks and surrounded the administrators chanting "shame!" and banging on drums and buckets.

260.    On April 27, Dean Dunne emailed Harvard College students confirming that "the encampment in Harvard Yard has continued and grown in direct violation of Harvard policies," and that their "[m]aintaining and participating in this extensive encampment of tents in Harvard Yard constitutes an ongoing violation of University rules," and stating that the "[a]mplified sound and other noise regularly coming from the encampment has disrupted the living spaces of first-year students in adjacent dormitories during . . . a critical juncture in the academic year when students study and prepare for examinations and complete end-of-term projects."  Dunne's email was forwarded to Harvard Law students by the Dean of Students Office on April 28.

261.    On May 2, SAA Member #2 and other Jewish students met with Title IX Officer Tulgan and the Senior Director of Student Affairs Lakshmi Clark to discuss the possibility of

taking their exams remotely because of safety concerns from the encampment.  The administrators informed them that they would be unable to do so.

262.     On May 2, Kestenbaum and other Jewish Harvard students placed 1,200 small Israeli and American flags near Harvard Divinity to honor the 1,200 victims of October 7.  The installation also included a poster of those kidnapped by Hamas.  Though HUPD had taken no steps to stop hundreds of student protesters and those camping on Harvard Yard, HUPD officers quickly approached Kestenbaum while he was placing flags and took a photo of his identification.  Kestenbaum reported this incident to Professor Holland, Dean Frederick, Dean Whelsky, and others, and requested information on "who called the police [on him,] for what purpose, and what will be done as a result."  Kestenbaum has not received a response.

263.     Over the next two days, vandals ripped the flags out of the ground and scattered them across campus and destroyed the hostage poster.  Kestenbaum reported this to several administrators on May 4, and included a video of one of the vandals in action, but no one acknowledged his complaint.

264.     On May 3, the encampment expanded to the side of Harvard Yard in front of Widener Library—where commencement is scheduled to take place on May 23—and set up another eight tents there.

265.     Also on May 3, SAA Member #2, who is visibly Jewish based on her Star of David necklace and similar jewelry, was denied entry to Harvard Yard by a Harvard security guard.  She was trying to get to Professor Bowie's final exam review session and followed the same route she had traveled all year, from the subway exit through Harvard Yard to the Harvard Law building.  She watched a Harvard security guard stationed at the gate allow someone else into the Yard just moments before she handed that guard her HUID card.  However, the security

guard told her she was not permitted to enter.  SAA Member #2 had to walk outside the
perimeter of the Yard to get to her review session.  Despite reporting this incident to Title IX
Officer Tulgan, SAA Member #2 has not been given any explanation for why she was denied
entry.  SAA Member #2 later left the review session through Harvard Yard but was followed by
one of the encampment "marshals" until she exited the Yard.  Shaken by this experience, she
avoided walking through Harvard Yard when she returned to campus to take her final exams.

266.    On May 3, Kestenbaum and Harvard Hillel Rabbi Davis met with Dean Whelsky
to discuss the numerous incidents of antisemitism he had been reporting for months.  Whelsky
refused to tell Kestenbaum what, if anything, Harvard was doing about the Harvard Divinity
students who had published an article in which they called Kestenbaum a "Zionist doxxing
crybaby," or identify any concrete step anyone at Harvard had taken or would take to address the
antisemitism he had been long reporting to Harvard.  When Kestenbaum asked what the
administration would do to combat antisemitism, Whelsky responded in *faux* ignorance of
months of widely reported antisemitism at Harvard and Kestenbaum's own reports: "How have
you seen antisemitism manifesting?"  Whelsky also told Kestenbaum that there was "no
problem" with faculty members, even deans, participating in the encampment, which Harvard
administrators had already admitted violated Harvard policy, or with chanting "globalize the
Intifada."  Whelsky also dismissed Kestenbaum's concerns regarding FSJP's publication of the
antisemitic cartoon on February 19.

267.    On May 6, Holocaust Remembrance Day, Interim President Garber addressed the
encampment for the first time.  He sent a University-wide email in which he "call[ed] on those
participating . . . to end the occupation of Harvard Yard," and acknowledged that the
"continuation of the encampment presents a significant risk to the educational environment of

the University." He then explained that those who "participate in or perpetuate [the encampment's] continuation will be referred for involuntary leave from their Schools." In response, Professor Johnson—the former Harvard PSC faculty advisor who resigned after allowing them to post the blatantly antisemitic cartoon—gave a speech in support of the students during which he spewed harmful and false rhetoric. Using a megaphone, for example, Johnson falsely claimed that "the International Court of Justice has declared that there is plausible evidence that a genocide is occurring in Gaza." Hours later, HOOP organized a rally of over 400 Harvard students and Cambridge residents to march from the gates of Harvard Yard to Garber's house. Before beginning the march, organizers made speeches, including one by a student who posed the question: "Does Harvard think this is going to stop? The student Intifada has engulfed the entire country."

268.    The following day, on May 7, over 300 faculty members signed a public letter urging Garber to negotiate with the students.

269.    On May 8, Interim President Garber met with members of HOOP to ask that they end the encampment in exchange for a meeting with more top Harvard officials. They rejected his offer. On May 10, at the end of the encampment's second week, Garber offered to waive the disciplinary actions against participants if they ended the occupation. The students again refused, demanding confirmation that Harvard would disclose and divest from all investments in Israel.

270.    Even as Garber offered to let the student campers off scot-free in exchange for ending their occupation of Harvard Yard, their violations of Harvard's policies continued to mount. For example, on May 7, the encampment students gathered to chant "there is only one solution, Intifada revolution," as they banged drums and other noisemakers. Kestenbaum

watched as HUPD officers in Harvard Yard allowed the disruptive event to occur on the eve of final examinations.  On May 8, the protestors removed the American flag flying above the John Harvard statue and replaced it with a Palestinian flag—something they had already gotten away with on April 27.

271.    On May 9, the campers hung a large banner over the encampment, which depicted Interim President Garber, who is Jewish, as a devil with horns and a tail—a classic antisemitic trope—sitting on a toilet, with a caption stating, "Alan Garbage funds genocide."  One of the Antisemitism Task Force members, Professor Boaz Barak, stated that he was "embarrassed for Harvard" that such an antisemitic trope had been used by its students.  He also stated: "There is certainly antisemitism and hate among that movement."  Kestenbaum reported this banner to Dean Frederick, DIB, OEDIB, and other administrators that day, but again received no response.

272.    On May 10, more than 200 students, faculty, and staff gathered at the encampment.  Kestenbaum saw that several protestors were wearing neon orange vests reading "FACULTY AND STAFF."  The protestors chanted, among other things, "Intifada! Intifada!"  Kestenbaum placed a single sign next to the encampment protestors' signs near the John Harvard statute.  Within a few seconds, Kestenbaum turned to see a "marshal" throwing his sign away.  Kestenbaum asked the marshal to put it back, but the "marshal" refused.  Professor Rantisi watched but refused to intervene.  Kestenbaum reported this theft to OEDIB, Dean Frederick, among others, but again received no response.

273.    On May 11, someone with a HUID (*i.e.*, a student or Harvard employee) used bolt cutters to cut a lock securing Johnston Gate to allow roughly 150 protesters access to Harvard Yard for a Saturday afternoon protest.  Harvard confirmed that "persons not affiliated and affiliated with the University" attended.  On May 12, a crowd of protesters gathered at one of the

Harvard gates.  At least five students climbed to the top of the gate to hang a banner reading "Welcome to the Liberated Zone."  By May 13, the encampment still had nearly fifty tents.

274.    On May 14, Harvard capitulated to the unlawful occupiers, entering into an agreement with protest organizers from HOOP, an unrecognized student organization not permitted to conduct any activities on campus at all, let alone stage an occupation of Harvard's main public space.  Interim President Garber announced that Harvard schools should begin reinstating demonstrators who had been placed on involuntary leave, that Harvard would expedite Administrative Board hearings in line with "precedents of leniency," and that HOOP would be offered meetings with Harvard's governing boards about divestment from Israel.

275.    HOOP announced that it will "re-group and carry out this protracted struggle through other means," and that supporters should "rest assured" that the concessions it gained from Harvard would not "pacify" it.  HOOP continued, "we can only come back stronger in our fight for Palestine," and "Our fight for Palestinian liberation does not begin nor end with this encampment."  A key encampment organizer said: "This action, this movement, wasn't just the finale of a semester, it was the beginning."

E.    **Harvard's Double Standard Towards Addressing Antisemitism**

276.    Harvard's deliberate indifference in response to the egregiously hostile environment to which its Jewish and Israeli students are subjected stands in stark contrast to its swift and decisive actions to address bias-related incidents when the victims are not Jewish.  This discriminatory double standard has created and exacerbated the discrimination and harassment that Kestenbaum, SAA's Jewish student members, and other Jewish students are forced to endure at Harvard.  Such deliberate indifference is demonstrated by Harvard's choice to not address anti-Jewish harassment on campus—on the ground that Harvard values open expression above all else—even though Harvard moves decisively to address discrimination, harassment,

106

and bigotry when perpetrated against non-Jewish groups.  Harvard's invidious and egregious double standard is reflected in, among other things, its: selective application of free expression principles, official statements and programs addressing bias or important social issues, disciplinary actions against faculty, and disciplinary actions against students and student groups.

277.    Harvard's double standard in its enforcement of its own policies was highlighted in HJAA's May 2024 report (*see* Exhibit A), which encompassed reports from fifty Jewish members of Harvard's community.  The report found that Harvard's hostile environment for Jews was already well-established before October 7, 2023, including numerous examples in classrooms and Harvard-sponsored speakers and events—such as the speaker who said that "American Jewish immigrants have always been a foundational building block for the white supremacist infrastructure."

278.    The report described Harvard "repeatedly ignor[ing] Jewish students' complaints despite clear violations of" policy, so that there were "few to no consequences for the perpetrators of [antisemitic] hate speech and bullying," and an example of Harvard's double standard, when Harvard Law sent an email the same day a "gay law school student was assaulted by another law school student" announcing that the attacker had been suspended, but Harvard failed to do the same thing when a Jewish student was assaulted by another student.  The report quoted students on the "psychological effects" of the antisemitic rallies at Harvard, where repeated shouts of "Globalize the Intifada," and "there is only one solution, Intifada revolution," led them to feel that other students "want dead Jews," and that they could not go into Harvard Yard or to Widener library because of a "stampede of people" shouting for death to Jews. Students recounted having to "be in class with someone who posted the day before that they are supportive of the murder and rape of my people."  Students talked about their intense fear at

Harvard: "I am scared to be a Jew here right now"; "I feel more safe in Israel than here"; "It's pretty scary to walk around campus knowing someone who is comfortable physically assaulting a religious Jew is potentially still on campus"; "I was afraid to leave my [Harvard Yard dormitory] because there were people outside chanting [] 'Globalize the Intifada.'"

i. **Harvard Only Embraces Free Expression Principles When It Can Use Them to Protect and Permit Antisemitic Harassment**

279.    At the heart of Harvard's double standard is its discriminatory application of free expression and other principles.  Harvard's campus is a safe space for students of all protected minority groups other than Jews.

280.    Harvard's invocation of free expression principles to justify permitting antisemitic harassment is both hypocritical and false, especially given that Harvard is ranked dead last on free speech—an "abysmal" rating—out of the 248 colleges assessed by the Foundation for Individual Rights and Expression.  Harvard protects speech only when it espouses positions Harvard supports and prohibits speech adverse to the interests of other groups Harvard deems worthy of protection.  Harvard's double standard is apparent when one compares Harvard's failure to discipline anti-Jewish harassment with its warning to freshmen—during the Title IX training—that "sizeism," "fatphobia," "cisheterosexism," "racism," "transphobia," "ageism," and "ableism" are prohibited because they "contribute to an environment that perpetrates violence." Indeed, Interim President Garber has acknowledged this double standard exists, describing the "social shunning" of Jewish students and their complaints "that in some classes, only certain points of view on controversial issues are presented and seen as welcome."

281.    Harvard also has no problem censoring controversial speakers or discussions— unless they espouse antisemitic views, in which case Harvard insists it is obligated to permit them on free expression grounds.  In 2021, for example, Harvard School of Engineering and

Applied Sciences canceled a course on a policing strategy involving military tactics after student organizations expressed concerns about the subject matter. And in 2022, the Harvard English Department disinvited Dr. Devin Buckley from speaking on campus because she is on the board of an organization that opposes incarcerating biological males with biological females or permitting them to participate in women's sports. But, as alleged above, Harvard readily permitted El-Kurd and Hill to appear on campus spewing anti-Jewish rhetoric, Holocaust denial, and calls for Israel's extermination.

### ii. Harvard Takes Decisive Action to Address Hate, Violence, and Harassment Unless Jews Are the Targets

282.    When bigotry impacts protected minority groups other than Jews—even when there is no actual harassment or violence—Harvard has issued forceful condemnations. For example, in 2016, Harvard Law abandoned its longstanding shield because it displayed the family crest of Isaac Royall, Jr., a slaveholder. Harvard Law leadership oversaw a public campaign to denounce the shield as a painful reminder of slavery, including forming a special committee, soliciting community involvement, providing regular updates, and seeking approval from Harvard's governing body to retire the shield. That same year, Harvard changed the title of "house masters" to "faculty deans" because, it said, the former evoked slavery. In 2022, Harvard released "Harvard & the Legacy of Slavery," a 132-page report on Harvard's racist history that provided recommendations for combating its institutional racism, and committed $100 million towards amelioration efforts.

283.    Neither the recommendations in the "Harvard & the Legacy of Slavery" report, nor then-President Lawrence S. Bacow's announcement of a plan to "address the persistent corrosive effects of those historical practices" identified therein, mentions an exception for "freedom of expression." Yet Harvard now invokes free expression principles as a pretext to

retroactively justify tolerating antisemitism and marginalizing its Jewish community.  For example, in Harvard's November 9 statement announcing the Antisemitism Advisory Group—as in many of its other statements concerning Hamas's October 7 terrorist attack and its aftermath— President Gay emphasized that Harvard is "at [its] strongest when [its members] commit to open inquiry and freedom of expression as foundational values of [Harvard's] academic community." Even though the Antisemitism Advisory Group is toothless, over one hundred faculty members signed a November 13 letter criticizing Harvard's decision to create it as an attack on "intellectual freedom."

284.    Harvard has gone to great lengths to make its campus more "inclusive" over the last few years.  Harvard's OEDIB, formed in 2021 as a "relaunch[]" of its 2018 precursor office, for example, purportedly strives "to guide Harvard's culture toward inclusive excellence." According to its website, "OEDIB views diversity, equity, inclusion, and belonging as the pathway to achieving inclusive excellence and fostering a campus culture where everyone can thrive."  Jewish students, however, are excluded from those efforts.

285.    Harvard has selectively taken forceful stands on global conflict and social justice issues that it deems worthy.  As a recent study by the AMCHA Initiative concluded, "there is a flagrant double standard in how the vast majority of school leaders treat Jewish students as compared to members of other student minority groups in the aftermath of group trauma."  Harvard embodies that double standard.  For example, Harvard has regularly issued numerous strong statements and sponsored numerous events condemning racist police killings and Russia's invasion of Ukraine.

286.    Harvard's response to Hamas's October 7 massacre was quite different.  Rather than cancel its partnership with offending foreign institutions, as the Davis Center for Russian

and Eurasian studies did at the start of Russia's invasion of Ukraine, Harvard's FXB Center maintains its partnership with Birzeit University, which is inextricably intertwined with Hamas. When asked during the House Antisemitism Hearing about her denial of a request to fly Israel's flag in Harvard Yard following October 7, despite then-President Bacow's earlier decision to fly Ukraine's flag, President Gay merely demurred that the Ukrainian flag decision was "made by [her] predecessor as an exception to a long-standing rule."

287.    Harvard's commitment to DIB and anti-racism initiatives does not include protecting or supporting Jewish students.  Harvard's DIB efforts deem Jews to be "oppressors," rather than "oppressed," which explains why anti-Israel and anti-Jewish hate speech and harassment on campus is treated far differently than similar conduct against other groups.  As Harvard Chabad Rabbi Zarchi has noted, Harvard has a "beautiful culture" where community members "don't remain silent when we experience or witness the slightest form of discrimination," but it is a "double culture in which, when it comes to matters of the Jewish community, there's nothing being said."

288.    Harvard Medical School Professor Gabriel Kreiman recently echoed this sentiment when he told the *Washington Free Beacon* on March 19, 2024, that Harvard's "current version of DEI is full of double standards and is in many cases almost openly anti-Semitic." Professor Kreiman organized an Israel solidarity mission, and expressed that many Harvard faculty members were hesitant to participate for concerns of "being harassed or attacked or losing [career] opportunities."  Others only joined on the condition of anonymity because of similar fears.

iii.    **Harvard Does Not Hesitate to Discipline Faculty Members Who Make Racist or Unpopular Statements, Except When the Statements Are Antisemitic**

289.    Harvard regularly disciplines faculty members who appear to support discrimination or harassment against groups other than Jews.  For example, in 2011, Harvard removed courses taught by Professor Subramanian Swamy after he wrote an op-ed advocating that to "negate the political goals of Islamic terrorism in India," India should "[e]nact a national law prohibiting conversion from Hinduism to any other religion," "[r]emove . . . 300 masjids [mosques]," and "declare India a Hindu Rashtra [nation] in which non-Hindus can vote only if they proudly acknowledge that their ancestors were Hindus.  Professor Eck, who would later sign the November 13, 2023 faculty letter attacking President Gay's statement against antisemitism, called for Professor Swamy's discipline, arguing that his "op-ed clearly crosses the line by demonizing an entire religious community and calling for violence against their sacred places," and that "[t]here is a distinction between unpopular and unwelcome political views."

290.    In 2020, Professor David Kane invited Charles Murray, a libertarian political scientist and sociologist whose controversial books and articles are viewed by many as racist, to give an online lecture.  Backed by student campaigns against Professor Kane, then-Dean Gay announced an investigation into Kane and temporarily removed him from his position before he was ultimately ousted from Harvard.

291.    Starting in March 2023, Harvard Public Health Professor Tyler VanderWeele faced extensive scrutiny after X users resurfaced his 2015 participation in an amicus brief urging the Supreme Court not to set forth a federal constitutional view on gay marriage.  Harvard's response was swift and decisive.  Following student complaints, Professor VanderWeele's department hosted "listening sessions," and the dean of education and chief DIB officer made him participate in a "restorative practices process" to explain his views to the community.

Harvard Public Health's deans and administrators sent multiple emails to department chairs, Harvard's Council on Academic Freedom (a faculty organization devoted to promoting free inquiry, intellectual diversity, and civil discourse), and students, noting students' feelings of harm and betrayal and setting eight "listening sessions."

292.     Harvard Public Health administrators sent more emails to large lists of community members, referring to Professor VanderWeele's views as "reprehensible," having "cause[d] deep hurt, undermine[d] the culture of belonging, and ma[d]e other members of the community feel less free and less safe," and as being "in conflict with our . . . stated goals of advancing Equity, Diversity, Inclusion, and Belonging as well as our commitment to sound public health policy."  The Harvard Public Health dean defended his remedial approach as necessary to avoid upsetting the students.

293.     Similarly, on November 28, 2023, Dr. Joan Donovan, an expert on social media disinformation, submitted a whistleblower declaration to Harvard, DOE, and the Massachusetts Attorney General's Office, accusing Harvard of terminating her position as a Harvard Kennedy research director because she sought to publish internal Facebook messages that purported to show Facebook's knowledge of the public harm it allegedly causes.  Dr. Donovan alleged that when Harvard learned of her plan, it was processing its largest donation ever: $500 million from the founder of Facebook's philanthropic organization.  Harvard thereafter began to systematically restrict Dr. Donovan and her work until ousting her in August 2023.  Dr. Donovan accused Harvard of stifling her free speech and abusing its commitment to academic freedom to protect Facebook, as Dean Elmendorf told her: "I want you to know that you have no academic freedom. . . .  I want to remind you that you're staff here."

294.    But Harvard does nothing to protect Jews in response to complaints concerning its faculty, including Harvard Public Health professors' antisemitic coursework and tweets, or Professors Wispelwey's and Krieger's exclusion of Jewish students from the benefits of class. Professor Wispelwey went so far as to co-author an article, "As Genocide Rages, Doctors Must Choose: Care or Collaborationism," published on November 25, 2023, in which he argues that "we should refuse to nuance or debate preventable atrocity or to permit the fantasy of a middle ground for those who wish to abstain from 'taking a side' . . . .  The only ethical stance for physicians—or anyone else—is to demand a permanent ceasefire, an immediate end to ethnic cleansing in both Gaza and the West Bank, and the dismantling of the apartheid system that ensures an unending stream of both perpetual and punctuated violence."  Even after receiving countless reports through Harvard's anonymous bias reporting hotline, including one against Harvard FXB Center's Abdulrahim—who tweeted a graphic glorifying a Hamas terrorist paraglider a day after Hamas's massacre and who continues to tweet messages glorifying the Intifada—Harvard continues to do nothing.  Nor has Harvard acted to protect Jewish students from Professor Johnson, the former faculty advisor for Harvard PSC, who, in addition to his active participation in many students' acts of discrimination and policy violations, was the first signatory of the November 13 faculty letter, signed a 2022 statement supporting BDS, and signed a 2014 letter urging speakers to avoid the University of Illinois which had rescinded an offer to a professor because of his antisemitic tweets.

   iv.    **Harvard Punishes Students for Policy Violations That Do Not Involve Antisemitism**

295.    Harvard does not hesitate to discipline students who engage in discrimination or otherwise violate its policies when the targets are not Jews.  For example, while Harvard ejected students who stormed University Hall during a 1969 building takeover in protest of the Vietnam War, and arrested many participants, the students who took over University Hall in November

2023 have faced no true consequences; in fact, they were feted with burritos and candy.  In 2016, Harvard canceled the remainder of one of its men's soccer team's seasons for producing sexist "scouting reports" rating female soccer recruits.  In 2018, Harvard placed a Christian student group on administrative probation for asking a female student leader to resign after she started dating another woman.  In 2019, Harvard rescinded the acceptance of a mass-shooting survivor because of his past use of racial slurs.  In 2020, Harvard dismissed three freshmen for hosting a party in their campus house in violation of COVID-19 social distancing rules.  And in 2022, Harvard warned its freshmen class that "sizeism" and "fatphobia," among other harmful discriminatory behavior, perpetuate "violence" in violation of Harvard policy.

296.    On January 23, 2023, Harvard Law Deans Ball and Monroe sent out an email to all Harvard Law students informing them about a "security incident that occurred" on campus that day, where an "individual affiliated with [Harvard Law] entered our campus and is reported to have punched a student while also uttering a homophobic slur."  The deans demonstrated Harvard's ability to take swift action when they told all students that "[t]he individual is no longer at large and is barred from our campus," further noting that "[w]e condemn unconditionally all violence, hatred, and homophobia."

297.    On March 1, 2024, climate protesters disrupted a talk by Senator Joe Manchin at a Harvard Institute of Politics event.  According to a Harvard spokesperson, "[a] Harvard University police officer ordered the protesters to leave the Kennedy School campus."  Yet Harvard and HUPD have done virtually nothing to prevent antisemitic students and faculty from disrupting events and academic activities.  For instance, on October 19, 2023, SAA Member #2 watched as HUPD officers observed, but took no action against, protesters, including non-HUID

cardholders, who bypassed card scanners and infiltrated a Harvard Law building to engage in an antisemitic takeover.

298.    Meanwhile Harvard tolerates not just the incitement of violence against Jewish and Israeli students, but actual violence.  Harvard has not taken any meaningful disciplinary action against students for their repeated use of antisemitic tropes or participation in antisemitic harassment and intimidation.  For example, though Harvard purportedly began to issue disciplinary notices to students involved in the Harvard Yard encampment, it soon capitulated, with the president announcing that constituent schools should begin reinstating demonstrators who had been placed on involuntary leave, that Harvard would expedite Administrative Board hearings in line with "precedents of leniency," and that HOOP would be offered meetings with Harvard's governing boards about divestment from Israel.

**F.    Plaintiffs Are Being Denied Equal Access to Harvard's Educational Opportunities**

299.    Kestenbaum and SAA's Jewish student members at Harvard are acutely aware that, solely because of their Jewish identities, Harvard views and treats them as second-class citizens in the Harvard community, undeserving of the protections that Harvard affords non-Jewish students.  Because of Harvard's persistent refusal to comply with its obligations to stop discrimination and harassment against Jewish students, Kestenbaum, SAA's Jewish student members, and other Jewish students are deprived of the benefits that non-Jewish students enjoy, including, but not limited to, physical protection; emotional support; a sense of inclusion and belonging; participation in educational, extracurricular, and Harvard-sanctioned social activities; the ability to freely express their Jewish identity in class, written coursework, and on campus; and their right to express their support for and attachment to Israel, their ancestral homeland, where many, including Kestenbaum and SAA's Jewish Harvard student members, have friends and family.

300.    To the contrary, as a result of Harvard's actions and inactions alleged herein, Kestenbaum and SAA's Jewish student members at Harvard are treated differently from, and made to feel less important than, other non-Jewish students.  Students, along with Harvard faculty members, are able to taunt, demonize, assault, harass, intimidate, ostracize, and discriminate against Kestenbaum, SAA's Jewish Harvard student members, and other Jews with impunity.  Kestenbaum, SAA's Jewish Harvard student members, and other Jewish students do not feel physically safe on Harvard's campus or in its classrooms and other facilities and avoid certain areas of campus.  Harvard permits Kestenbaum's and SAA's Jewish Harvard student members' classmates to praise Hamas, celebrate the slaughter of Israeli citizens, deny the rape and abduction of Israeli women, and call for the annihilation of Israel and its citizens.

301.    As Antisemitism Advisory Group member Horn has acknowledged, since October 7, "Jewish students [at Harvard] could no longer expect to be able to study in the library, eat in dining halls, or attend class without being repeatedly told by their classmates sometimes through a bullhorn, that Jews are genocidal murderers deserving of perpetual intifada."  Horn has further admitted that "[t]he mountain of proof at Harvard revealed a reality in which Jewish students' access to their own university (classes, teachers, libraries, dining halls, public spaces, shared student experiences) was directly compromised."

302.    Kestenbaum and SAA's Jewish Harvard student members also justifiably fear the harassment, discrimination, and intimidation they face, on any given day, from professors and Harvard leadership—who are supposed to teach and guide them—and from their fellow students, all of whom are required to treat them with respect and dignity pursuant to Harvard's policies. As a result of Harvard's deliberate indifference to its hostile educational environment, Kestenbaum and SAA's Jewish Harvard student members are often unable to focus, study, or

perform their course work to the best of their ability, thereby inhibiting their ability to take full advantage of their Harvard education.

303.    Harvard's refusal to stand against antisemitism has also inhibited Kestenbaum, SAA's Jewish Harvard student members, and other Jewish students' ability to take full advantage of non-classroom activities.  As the sole Orthodox Jewish student at Harvard Divinity, Kestenbaum made it his mission when he joined Harvard to be a model representative of Orthodox Jews and an active citizen of the Harvard community.  For example, Kestenbaum often attended events hosted by groups with different beliefs, including the weekly Halaqa hosted by one of the Muslim Harvard Divinity professors, where students and faculty would gather to read Islamic poetry and engage with the Quran.  Harvard's refusal to stand against antisemitism has left Kestenbaum too afraid to continue to participate in Jewish activities, much less those of other cultures; many of the classmates and professors he tried so hard to befriend now shun him because he is Jewish; and he has been driven to avoid public spaces like Widener Library, fearful of unregulated antisemitic rallies and disruptions.  Harvard has abandoned Kestenbaum, treating him as a second-class citizen and an appropriate target of abuse and harassment because he is Jewish.  Kestenbaum—who regularly wears recognizably Jewish garb—never hid his Jewish identity and should not need to do so now (as many of his Jewish friends have done, trading kippot for baseball hats).  But he is followed through Harvard Yard by the encampment attendees, harassed on social media, and bullied by his classmates for being proud of his Jewishness and standing up for what he believes in.

304.    SAA's Jewish student members are also not shy about their Jewish identities. SAA Member #5 always wears, and SAA Member #1 often wears, a kippah, and SAA Member #2 proudly wears a Star of David necklace and an Israel bracelet, and displays pro-

Israel pins and stickers on her backpack and laptop cover.  SAA Member #3 used to frequently

speak in Hebrew and discuss Israel with classmates.  But during their time at Harvard, their

Jewish identities have made Kestenbaum and SAA's Jewish student members targets for

harassment, physical violence, and other acts of antisemitism perpetrated by students and faculty

members.

305.    SAA Member #1 has been deeply affected by the antisemitism on campus and the

administration's failure to respond.  As a Jew with family in Israel, and who has lived and

worked there as an emergency medical technician, he fears for his safety at Harvard, and has

withdrawn from his classmates and schoolwork.  He is ostracized for being Jewish, with some of

his classmates encouraging others to shun him.  Since October 7, SAA Member #1 has not been

able to fully engage in his studies or Harvard's social experiences, because nearly every day, he

is forced to confront his fears concerning uncontrolled antisemitic mobs on campus or the

antisemitic ravings of his teaching fellow or professor.  As he has reported to his professors and

the Dean of Students Office, he missed approximately half of his classes during the fall 2023

semester, and could not participate in many class discussions for the lectures he did attend.

Rather than focus on his studies, SAA Member #1 had to argue with Professor Hanson and the

administration about whether his Torts final exam would require students to take an anti-Israel

stance.  To make matters worse, Professor Hanson threatened SAA Member #1 for having to

miss class, even though Hanson's refusal to avoid discussions of the war during his Torts class

was a large contributor to the student's fear of, and inability to focus on, school.  Not only that,

but because of the administration's refusal to remove Bharmal from his teaching fellow position,

SAA Member #1 could not take advantage of the review session and educational resources in yet

another one of his first-year courses, Civil Procedure.  When SAA Member #1 reported specifics

on how he had been denied those educational opportunities, Harvard not only dismissed his concerns, but refused to pass his complaint to the Harvard Law Administrative Board.

306.    SAA Member #2 feels extremely isolated on campus, as her only connections now are to Harvard's small Jewish community.  She feels vulnerable walking on campus by herself because she knows at any given moment, a protest could turn violent and she could become a victim of harassment or worse.  SAA Member #2 missed nearly ten lectures during the fall 2023 semester out of safety concerns over antisemitic protests.  Her fears continued into the spring 2024 semester, so much so that she remained off campus even after Passover ended because of her and her family's concerns over the encampment.  She was followed by a student "marshal" simply for being a Jew in Harvard Yard, causing her to change the path she took to get to the law school.  The encampment—and Harvard's failure to address it—led to a constant stream of harassment of her fellow Jewish classmates, which was extremely distracting during finals.  When the administration refused to allow her to take her finals remotely, avoiding the fallout from the encampment became impossible.

307.    SAA Member #3 likewise feels isolated because of Harvard's lack of interest in protecting Jewish students from the daily antisemitic disturbances and harassment.  The incessant antisemitic protests have caused SAA Member #3 to miss classes and change her study locations, which previously included Caspersen lounge.  When she cannot avoid being on campus, SAA Member #3 is forced to wear headphones to drown out the noise from the protests lest the genocidal chants interfere with her ability to focus on schoolwork.

308.    SAA Member #4 has faced years of inaction by the administrators to whom they have repeatedly reported incidents of anti-Jewish bias.  They have now given up hope that

Harvard will ameliorate antisemitism after being told by Chief DIB Officer Barbosa that his office does not have expertise in antisemitism.

309.     SAA Member #5, who considers himself an outgoing and approachable person, has been marginalized, as many classmates refuse to speak to or engage with him since the October 7 massacre.  He feels ostracized for wearing a kippah, fears for his physical safety, and has missed nearly a dozen lectures because of the antisemitic climate on campus.  His isolation has been made even more pointed since the encampment.  As he walks through Harvard Yard, the student "marshals" watch him intently and take notes on his movements, despite the fact that he completely ignores them.  He is targeted so heavily because of his kippah or other indicia of his Jewishness.

310.     These students have had to spend their time at Harvard fearing for their physical safety, enduring anti-Jewish abuse and harassment, and communicating with Harvard administrators over antisemitism that Harvard is doing nothing to stop.  They have been unable to focus on their coursework or otherwise enjoy their Harvard experience.  SAA Member #1 summed up the student experience in a November 16, 2023 email to Harvard Law's Title IX program officer, following Harvard's repeated failure to stop unauthorized antisemitic student protesters from "blatantly ignor[ing]" the deans: "I'm having a really hard time attending this school as are many other Jewish students.  I used to hope that the administration will do better but today I lost all hope. . . .  [The administration] should know that [its] failure to do so is deeply hurting so many of the Jewish students on this campus."

311.     Harvard's actions and inactions described above not only deprive Kestenbaum and SAA's Jewish Harvard student members of their right to the educational and extracurricular opportunities afforded other students—which have led and will continue to lead to academic,

social, and professional consequences—but also severely impact their health, mental well-being, and sense of security.

## COUNT I
### Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*
### (Intentional Discrimination and Hostile Environment Towards Jewish Students)

312.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs as though fully stated herein.

313.    Harvard receives financial assistance from the United States Department of Education and is therefore subject to suit under Title VI of the Civil Rights Act of 1964.

314.    Discrimination against Jews and/or Israelis—including based on actual or perceived ancestry, race, ethnic characteristics, or national origin—is prohibited under Title VI, as reflected not only in decades of Title VI jurisprudence, but also in the written policies of the Office of Civil Rights of the United States Department of Education.

315.    Kestenbaum is and identifies as Jewish, and his status and identification as a Jew brings him within the scope of Title VI's protections.  SAA's members include Jewish students at Harvard, who are also within the scope of Title VI's protections.

316.    Title VI prohibits a recipient of federal funds from intentionally treating any individual worse, even in part, because of his or her ancestry, race, ethnic characteristics, or national origin.

317.    The acts and omissions of Harvard and its administrators subjected, and continue to subject, Kestenbaum and SAA's Jewish student members at Harvard to discrimination and harassment on the basis of their actual and/or perceived Jewish ancestry, race, ethnic characteristics, or national origin.

318.    Harvard and its administrators had actual notice that such discrimination and harassment, over which Harvard has substantial control and the authority to remediate, was and

continues to be so severe, pervasive, and objectively offensive that it created and continues to create a hostile environment based on Jewish ancestry, race, ethnic characteristics, or national origin that deprives Kestenbaum and SAA's Jewish Harvard student members of full access to Harvard's educational programs, activities, and opportunities.

319.    Harvard and its administrators intentionally discriminate against Kestenbaum and SAA's Jewish Harvard student members on the basis of their actual and/or perceived Jewish ancestry, race, ethnic characteristics, or national origin, as exhibited by Harvard and its administrators' deliberate indifference to the antisemitic abuse, harassment, and intimidation of Kestenbaum and SAA's Jewish Harvard student members, in violation of Title VI.  Specifically, Harvard and its administrators clearly and unreasonably failed, and continue to fail, to cure or otherwise adequately, appropriately, and meaningfully address, ameliorate, or remedy the discrimination against Kestenbaum and SAA's Jewish Harvard student members and the hostile environment that they and other Jewish students are forced to endure at Harvard because of their race, ethnic characteristics, or national origin.  Additionally, Harvard continues to grossly fail to take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment, and prevent the harassment from recurring.  Such unlawful deliberate indifference causes Kestenbaum and SAA's Jewish student members to be subjected to a hostile educational environment.

320.    The environment at Harvard, which has been rendered hostile for Kestenbaum and SAA's Jewish members as a result of their Jewish ancestry, race, ethnic characteristics, or national origin, is sufficiently severe, pervasive, persistent, and offensive such that it deprives Kestenbaum and SAA's Jewish Harvard student members of equal access to the educational opportunities and benefits that Harvard provides to non-Jewish students.

321.    Harvard and its administrators actively and intentionally engage in this pattern of severe and/or pervasive discrimination.

322.    Harvard and its administrators also directly and intentionally discriminate against Kestenbaum and SAA's Jewish Harvard student members, with their actual or perceived Jewish ancestry, race, ethnic characteristics, or national origin a substantial or motivating factor in Harvard's actions.

323.    Harvard continues to unreasonably fail to act, or to act grossly inadequately and discriminatorily, and with leniency, tolerance, deliberate indifference, and/or unjustifiable delay, in applying its policies to known or reported incidents involving antisemitism or where the victim or complainant is a Jewish and/or Israeli student, including Kestenbaum and SAA's Jewish Harvard student members.  As detailed above, Harvard's actions, inactions, and conduct were, and continue to be, intended to treat Kestenbaum and SAA's Jewish Harvard student members differently as Jewish students as compared to other similarly situated non-Jewish and/or non-Israeli students.

324.    Harvard's acts and omissions were the actual, direct, and proximate causes of Kestenbaum and SAA's Jewish student members' injuries.

325.    As a result of the foregoing, Kestenbaum and SAA's Jewish Harvard student members have suffered, and continue to suffer, substantial damages, in amounts to be determined at trial.

326.    Kestenbaum and SAA's Jewish Harvard student members have been and will continue to be injured because Harvard has and will continue to deny them equal access to the educational opportunities, benefits, and full value provided to other students, and has and will

continue to intentionally discriminate against them on the basis of Jewish ancestry, race, ethnic characteristics, or national origin.

327.    Plaintiffs are entitled to appropriate injunctive relief under Title VI, because Harvard has knowledge of, and has been and continues to be deliberately indifferent to, a hostile environment that is severe, persistent, and pervasive; there is no adequate or speedy remedy at law to prevent Harvard from continuing to discriminate against its students on the basis of Jewish ancestry, race, ethnic characteristics, or national origin in violation of Title VI; and the harm Kestenbaum and SAA's Jewish Harvard student members will otherwise continue to suffer is irreparable.

328.    Plaintiffs are entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT II
### Breach of Contract

329.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs as though fully stated herein.

330.    At all relevant times, an express contractual relationship existed between Harvard, on the one hand, and each of Kestenbaum and SAA's Jewish Harvard student members, on the other hand, by virtue of their enrollment at Harvard and as defined by and through Harvard's written codes, policies, and procedures governing student and faculty conduct, including, but not limited to, the: Non-Discrimination Policy, Statement on Rights and Responsibilities, Protest Rules, Student Organization Policies, and Harvard's various student handbooks, which often adopt and expand on University-wide policies.  Through the documents and materials it publishes and provides to students, Harvard makes contractual commitments to its students concerning safety, bias-related abuse, harassment, intimidation, and discrimination.

331.    Under those contracts, Kestenbaum and each of the SAA Jewish Harvard student members agreed, among other things, to pay Harvard tuition, and Harvard agreed, among other things, to provide them a discrimination-free environment to be achieved by Harvard abiding by, and adequately and appropriately enforcing Harvard's policies.

332.    Kestenbaum and SAA's Jewish Harvard student members have complied and continue to comply with their obligations under these contracts.

333.    Harvard breached and continues to breach its contracts with Kestenbaum and SAA's Jewish Harvard student members by, among other things, its continued failure to comply with its obligations under these contracts, including by, among other things, failing to take measures to ameliorate, prevent, and punish the discriminatory and harassing conduct that Kestenbaum and SAA's Jewish Harvard student members have endured and continue to endure, failing to enforce numerous provisions of Harvard's policies, failing to meet Kestenbaum and SAA's Jewish Harvard student members' reasonable expectations of the educational benefits to which they are entitled, all of which includes Harvard's failure to comply with the following provisions, among others:

- "Discrimination on the basis of . . . any [] legally protected basis[] is unlawful and is prohibited by this Policy."  (Non-Discrimination Policy.)

- "Bullying, hostile and abusive behavior, and power-based harassment directly threaten the ability of community members to engage in the free exchange of ideas and pursue their educational and professional goals.  Such behaviors, as defined in this Policy, are prohibited at Harvard."  (Non-Discrimination Policy.)

- "Interference with [freedom of speech, academic freedom, freedom from personal force and violence, and freedom of movement] must be regarded as a serious violation of the personal rights upon which the community is based."  (Statement on Rights and Responsibilities.)

- "[I]nterference with members of the University in performance of their normal duties and activities must be regarded as unacceptable obstruction of the essential processes of the University."  (Statement on Rights and Responsibilities.)

- "Theft or willful destruction of the property of the University or its members must also be considered as unacceptable violation of the rights of individuals or of the community as a whole."  (Statement on Rights and Responsibilities.)

- "It is implicit in the language of the Statement on Rights and Responsibilities that intense personal harassment of such a character as to amount to grave disrespect for the dignity of others be regarded as an unacceptable violation of the personal rights on which the University is based."   (Statement on Rights and Responsibilities.)

- "It is implicit in the University-wide Statement on Rights and Responsibilities that any unauthorized occupation of a University building, or any part of it, that interferes with the ability of members of the University to perform their normal activities constitutes unacceptable conduct in violation of the Statement and is subject to appropriate discipline."  (Statement on Rights and Responsibilities.)

- "[I]t is the responsibility of officers of administration and instruction to be alert to the needs of the University community; to give full and fair hearing to reasoned expressions of grievances; and to respond promptly and in good faith to such expressions and to widely expressed needs for change."  (Statement on Rights and Responsibilities.)

- "Any act or threat of physical violence must be regarded as a complete lack of respect for the deepest values that unite the community."  (Faculty of Arts and Sciences Free Speech Guidelines.)

- "A disrupter who resists removal and persists in causing disruption should be subject to severe disciplinary measures."  (Faculty of Arts and Sciences Free Speech Guidelines.)

- "In cases of obstruction, . . . the offenders should be punished for breaking the law of trespassing or rules against interfering with freedom of movement."  (Faculty of Arts and Sciences Free Speech Guidelines.)

- "Yet our commitment to freedom of expression by its nature entails tolerating some speech that members of the community may receive as offensive or harmful. Although this expression may feel deeply injurious to some who hear it, it is nevertheless protected and permissible speech, unless it takes on a character that violates University or School policies on harassment, discrimination, or bullying." (Public Health Guidelines for Free Expression, Open Debate, Protest, and Dissent.)

- "Using or threatening force or violence, such as defacing a sign or assaulting a speaker or a member of the audience, is never permitted.  Any interference with freedom of movement or with freedom from personal force or violence is a serious violation of personal rights."  (Harvard Law Protest and Dissent Guidelines.)

- "[A]ny form of protest that disrupts the conduct of a[] [] class would violate the University-Wide Statement of Rights and Responsibilities' prohibition against interference with 'the performance of the normal duties and activities' of [Harvard]." (Harvard Law Protest and Dissent Guidelines.)

- "When a meeting is closed, dissent by non-attendees is limited to activity outside the meeting that does not impede access to the meeting or substantially interfere with the communication inside." (Harvard Law Protest and Dissent Guidelines.)

- "Chanting or making other sustained or repeated noise in a manner which substantially interferes with the speaker's communication is not permitted." (Harvard Law Protest and Dissent Guidelines.)

- "[A]ll may participate freely within a climate of openness, trust, and sensitivity." (Harvard Divinity Statement of Community Values.)

- "[I]n seeking the long-term welfare of all, we endeavor to accept responsibility for the impact of [their] actions on our community, our environment, and the world. We hold ourselves and each other accountable for our behavior and our use of resources." (Harvard Divinity Statement of Community Values.)

- "Organizations defined as non-Harvard or as unrecognized organizations are not permitted to conduct any activity at Harvard even though their activities involve Harvard undergraduates." (Student Organization Policies.)

- "Student organizations may not co-sponsor on-campus events with external or unrecognized organizations." (Student Organization Policies.)

334.    As a direct, proximate, and foreseeable consequent of the foregoing breaches, Kestenbaum has been damaged and continue to sustain substantial damages, in amounts to be determined at trial.

<u>**COUNT III**</u>
**Breach of the Implied Covenant of Good Faith and Fair Dealing**

335.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs as though fully stated herein.

336.    Harvard has breached the implied covenant of good faith and fair dealing implied in its contracts with students, including Kestenbaum and SAA's Jewish Harvard student members. Among other things, Harvard selectively applies or enforces its student handbooks,

guidelines, policies, procedures, course catalogs, registration materials, bulletins, circulars, and

regulations in bad faith and in a discriminatory way—improperly motivated by shared ancestry,

race, ethnic characteristics, or national origin bias—treating incidents of abuse, harassment,

intimidation, or discrimination against Jewish students, including Kestenbaum and SAA's Jewish

Harvard student members, in a more lenient, tolerant, forgiving, and nonchalant manner than it

treats similar incidents against other minority groups.

337.    As a direct, proximate, and foreseeable consequence of the foregoing breaches,

Kestenbaum has been damaged, and continue to sustain substantial damages, in amounts to be

determined at trial.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a jury trial for all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray and request that a judgment be entered in their favor, and

against Harvard awarding them:

A.    Injunctive relief enjoining Harvard and its agents from establishing,

implementing, instituting, maintaining, or executing policies, practices,

procedures, or protocols that discriminate against Jewish students on the basis of

their Jewish ancestry, race, ethnic characteristics, or national origin, including

Kestenbaum and SAA's members, and ordering Harvard to take all necessary and

appropriate remedial and preventive measures against antisemitic discrimination

and harassment, such as the following: (i) disciplinary measures, including

termination, against deans, administrators, professors, and other employees

responsible for the antisemitic abuse permeating the school that Kestenbaum and

SAA members experience, whether because they engage in it or permit it; (ii)

disciplinary measures, including suspension or expulsion, against students who engage in such conduct; (iii) declining and returning donations, whether from foreign countries or elsewhere, implicitly or explicitly conditioned on the hiring or promotion of professors who espouse antisemitism or the inclusion of antisemitic coursework or curricula; (iv) adding required antisemitism training for Harvard community members; and (v) appointing a neutral expert monitor to oversee compliance with this Court's order.

B.      Compensatory and consequential damages in amounts to be determined at trial;

C.      Reasonable attorneys' fees, costs of suit, and expenses;

D.      Pre-judgment interest and post-judgment interest at the maximum rate allowable by the law; and

E.      Such other and further relief as the Court deems just and proper.

Dated:    May 28, 2024                    Respectfully submitted,

ALEXANDER KESTENBAUM and STUDENTS
AGAINST ANTISEMITISM, INC.

By their attorneys,

 /s/ Marc E. Kasowitz
      Marc E. Kasowitz*
      Daniel R. Benson*
      Mark P. Ressler*
      Andrew L. Schwartz*
      Joshua E. Roberts*
      Andrew C. Bernstein*
      **KASOWITZ BENSON TORRES LLP**
      1633 Broadway
      New York, New York 10019
      Tel:  (212) 506-1700
      mkasowitz@kasowitz.com
      dbenson@kasowitz.com
      mressler@kasowitz.com
      aschwartz@kasowitz.com
      jroberts@kasowitz.com
      abernstein@kasowitz.com

      Timothy H. Madden (BBO #654040)
      **DONNELLY, CONROY & GELHAAR, LLP**
      260 Franklin Street, Suite 1600
      Boston, MA 02110
      Tel:  (617) 720-2880
      thm@dcglaw.com

      *Admitted *pro hac vice*