**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ALEXANDER KESTENBAUM and STUDENTS AGAINST ANTISEMITISM, INC., <br><br>          Plaintiffs, <br><br> v. <br><br> PRESIDENT AND FELLOWS OF HARVARD COLLEGE, <br><br>          Defendant. | Case No. 1:24-cv-10092-RGS |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
MOTION TO DISMISS AND MOTION TO STRIKE
<u>PLAINTIFFS' SECOND AMENDED COMPLAINT</u>**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................4

STANDARD OF REVIEW ....................................................................................................7

ARGUMENT .........................................................................................................................8

I. Plaintiffs' Serial Complaints About Harvard's Ongoing Response To Antisemitism Demonstrate That Their Claims Are Premature ..............................................8

II. SAA Lacks Standing.................................................................................................11

III. Kestenbaum And SAA Both Lack A Justiciable Claim For Injunctive Relief.................12

 A. Plaintiffs Face No Certainly Impending Future Injury Traceable to Harvard .......13

 B. Plaintiffs' Requested Injunction Is Unavailable As A Matter of Law..................16

IV. Plaintiffs' Request For Injunctive Relief Should Be Struck ...............................................17

V. Plaintiffs' Title VI Claim Should Be Dismissed Under Rule 12(b)(6)............................19

 A. Plaintiffs Do Not Plausibly Allege Discriminatory Animus.................................20

 B. Plaintiffs Do Not Plausibly Allege That Harvard Intentionally Acquiesced In A Hostile Environment Through Deliberate Indifference .........................................21

  1. Plaintiffs do not plausibly allege that Harvard's response to the alleged harassment was deliberately indifferent....................................................22

  2. Plaintiffs do not plausibly allege that they were subject to severe, pervasive harassment ............................................................................27

VI. Plaintiffs' Contract Claims Should Be Dismissed Under Rule 12(b)(6) ..........................28

 A. Plaintiffs Do Not Plausibly Allege A Breach Of Contract .................................28

 B. Plaintiffs' Implied Covenant Claim Should Be Dismissed...................................30

CONCLUSION.....................................................................................................................30

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labrotories v. Gardner*,
387 U.S. 136 (1967)......................................................................................................9

*Alexander v. Sandoval*,
532 U.S. 275 (2001)....................................................................................................19

*Algonquin Gas Transmission, LLC v. City of Weymouth*,
919 F.3d 54 (1st Cir. 2019)..........................................................................................9

*Allen v. Wright*,
468 U.S. 737 (1984)....................................................................................................16

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)......................................................................................................8

*Aulson v. Blanchard*,
83 F.3d 1 (1st Cir. 1996)...............................................................................................8

*Barnett v. Johnson City School District*,
2005 WL 8178066 (N.D.N.Y. Feb. 2, 2005) ...........................................................11

*Beaudreau v. Berryhill*,
2017 WL 2656104 (D.N.H. June 20, 2017)..................................................................7

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)......................................................................................................8

*Biszko v. RIHT Financial Corp.*,
758 F.2d 769 (1st Cir. 1985)......................................................................................17

*Brown v. Hot, Sexy & Safer Productions, Inc.*,
68 F.3d 525 (1st Cir. 1995)...................................................................................12, 27

*Brown v. Suffolk University*,
2021 WL 2785047 (D. Mass. Mar. 31, 2021)......................................................28, 29

*Brown v. Trustees of Boston University*,
891 F.2d at 351 .................................................................................................18, 19, 24

*Christensen v. Kingston School Committee*,
360 F. Supp. 2d 212 (D. Mass. 2005) .......................................................................30

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983) ................................................................................................13, 15

*Clapper v. Amnesty International USA*,
    568 U.S. 398 (2013) ..............................................................................................13, 15

*Clark v. Martinez*,
    543 U.S. 371 (2005) ....................................................................................................22

*DaimlerChrysler Corp. v. Cuno*,
    547 U.S. 332 (2006) ....................................................................................................16

*Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc.*,
    958 F.3d 38 (1st Cir. 2020) .........................................................................................16

*Davis v. Monroe County Board of Education*,
    526 U.S. 629 (1999) ............................................................................................. *passim*

*Doe v. Amherst College*,
    238 F. Supp. 3d 195 (D. Mass. 2017) ..................................................................20, 21

*Doe v. Brandeis University*,
    177 F. Supp. 3d 561 (D. Mass. 2016) ........................................................................30

*Doe v. Brown University*,
    43 F.4th 195 (1st Cir. 2022) .............................................................................19, 20, 21

*Doe v. Clark University*,
    624 F. Supp. 3d 1 (D. Mass. 2022) .............................................................................30

*Doe v. Stonehill College, Inc.*,
    55 F.4th 302 (1st Cir. 2022) ........................................................................................30

*Doe v. Trustees of Boston College*,
    892 F.3d 67 (1st Cir. 2018) .........................................................................................29

*Doe v. Trustees of Boston College*,
    942 F.3d 527 (1st Cir. 2019) .................................................................................19, 30

*Doe v. Wentworth Institute of Technology, Inc.*,
    2022 WL 1912883 (D. Mass. June 3, 2022) ..............................................................21

*Dynamic Image Technologies., Inc. v. United States*,
    221 F.3d 34 (1st Cir. 2000) ...........................................................................................7

*Equal Employment Opportunity Commission v. Aviation Port Services, LLC*,
    2020 WL 1550564 (D. Mass. Apr. 1, 2020) ..............................................................19

*Ernst & Young v. Depositors Economic Protection Corp.*,
  45 F.3d 530 (1st Cir. 1995) ..........................................................................10, 11

*Felber v. Yudof*,
  851 F. Supp. 2d 1182 (N.D. Cal. 2011) ....................................................24, 27, 28

*Fitzgerald v. Barnstable School Commission*,
  504 F.3d 165 (1st Cir. 2007) ............................................20, 25, 26, 28

*Food & Drug Administration v. Alliance for Hippocratic Medicine*,
  2024 WL 2964140 (June 13, 2024) ....................................12, 13, 14, 15

*G. v. Fay School*,
  931 F.3d 1 (1st Cir. 2019) ..........................................................................29

*Garcia-Rubiera v. Fortuno*,
  727 F.3d 102 (1st Cir. 2013) ....................................................................17, 18

*Gebser v. Lago Vista Independant School District*,
  524 U.S. 274 (1998) ....................................................................................21

*Gill v. Whitford*,
  585 U.S. 48 (2018) ..................................................................................16, 17

*Gonzalez v. United States*,
  284 F.3d 281 (1st Cir. 2002) ........................................................................7

*Guckenberger v. Boston University*,
  957 F. Supp. 306 (D. Mass. 1997) ..........................................................23, 27, 29

*Harris v. University of Massachusettes Lowell*,
  43 F.4th 187 (1st Cir. 2022) ..........................................................................12

*Healy v. James*,
  408 U.S. 169 (1972) ....................................................................................22

*Hunt v. Washington State Apple Advertising Commission*,
  432 U.S. 333 (1977) ....................................................................................11

*John Hancock Life Insurance Co. v. Abbott Labrotories., Inc.*,
  183 F. Supp. 3d 277 (D. Mass. 2016) ........................................................8, 18

*Justiniano v. Walker*,
  986 F.3d 11 (1st Cir. 2021) ..........................................................................8

*Lewis v. Casey*,
  518 U.S. 343 (1996) ....................................................................................16

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ........................................................................................13

*Madsen v. Women's Health Center, Inc.*,
    512 U.S. 753 (1994) ........................................................................................18

*Mandel v. Board of Trustees of California State University*,
    2018 WL 5458739 (N.D. Cal. Oct. 29, 2018) ......................................................28

*Mangual v. Rotger-Sabat*,
    317 F.3d 45 (1st Cir. 2003) ............................................................................10

*Massachusetts Association of Afro-American Police, Inc. v. Boston Police
    Department*, 973 F.2d 18 (1st Cir. 1992) ..........................................................11

*Merlonghi v. United States*,
    620 F.3d 50 (1st Cir. 2010) ..............................................................................8

*National Association of Governmentt Employees v. Mulligan*,
    914 F. Supp. 2d 10 (D. Mass. 2012) ............................................................11, 12

*New Hampshire Motor Transport Association v. Rowe*,
    448 F.3d 66 (1st Cir. 2006) ............................................................................11

*Norris v. Cape Elizabeth School District*,
    969 F.3d 12 (1st Cir. 2020) ............................................................................24

*Pollard v. Georgetown Sch. Dist.*,
    132 F. Supp. 3d 208 (D. Mass. 2015) ......................................................21, 27, 28

*Porto v. Town of Tewksbury*,
    488 F.3d 67 (1st Cir. 2007) ........................................................................22, 26

*Regents of University of Michigan v. Ewing*,
    474 U.S. 214 (1985) ..................................................................................17, 30

*Roe v. Healey*,
    78 F.4th 11 (1st Cir. 2023) ........................................................................13, 15

*Roe v. Lincoln-Sudbury Regional School District*,
    2021 WL 1132256 (D. Mass. Mar. 24, 2021) ....................................................19

*Sheffield v. City of Boston*,
    319 F.R.D. 52 (D. Mass. 2016) ......................................................................8, 18

*Shin v. Massachusettes Institute of Technology*,
    2005 WL 1869101 (Mass. Super. Ct. June 27, 2005) ..........................................29

*Sindi v. El-Moslimany*,
    896 F.3d 1 (1st Cir. 2018) ................................................................................19

*Sonoiki v. Harvard University*,
    37 F.4th 691 (1st Cir. 2022) ............................................................................28

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ........................................................................................12

*The Louis D. Brandeis Center for Human Rights Under Law v. President and*
    *Fellows of Harvard College*,
    1:24-cv-11354-RGS (D. Mass. filed May 22, 2024) ........................................12

*Thomas v. Anchorage Equal Rights Commission*,
    220 F.3d 1134 (9th Cir. 2000) .........................................................................10

*Texas v. United States*,
    523 U.S. 296 (1998) ..........................................................................................9

*Western Coal Traffic League v. Surface Transportation Board*,
    998 F.3d 945 (D.C. Cir. 2021) .........................................................................17

*Warth v. Seldin*,
    422 U.S. 490 (1976) ........................................................................................11

*Webb v. Injured Workers Pharmacy LLC*,
    72 F.4th 365 (1st Cir. 2023) ............................................................................13

*Zurich American Insurance Co. v. Watts Regul. Co.*,
    796 F. Supp. 2d 240 (D. Mass. 2011) ..............................................................18

## Rules

Fed. R. Civ. Proc. 12(b)(1) ....................................................................................7

Fed. R. Civ. Proc. 12(b)(6) ......................................................................8, 19, 28

Fed. R. Civ. Proc. 12(f) .................................................................................8, 18

## Other Authorities

2 Moore's Federal Practice § 12.37[3] ................................................................18

**INTRODUCTION**

Harvard condemns antisemitism, as it does all forms of discrimination based on race, national origin, or shared ancestry.  Conduct that targets Harvard's Jewish students, faculty, or staff for discrimination or harassment is not just unacceptable but antithetical to Harvard's foundational values.  Tackling a problem as invidious and enduring as antisemitism requires a considered, multidimensional effort.  Harvard has marshaled the expertise and resources required to undertake this effort, which is in progress, and is committed to completing it.  In response to the rise in reports of antisemitism following Hamas' October 7, 2023, terrorist attack and the ensuing war in Gaza, Harvard has taken concrete steps to protect its Jewish students, vindicate their right to pursue their education free from harassment and discrimination, and make clear that the scourge of antisemitism has no place at Harvard.  Harvard continues to engage with Jewish community members, enhance mechanisms for reporting discrimination, enforce policies to prevent and address harassment, and embark on a sustained, comprehensive approach to fighting antisemitism.  Harvard's response necessarily is a campaign in progress:  Antisemitism cannot be eliminated with a presidential proclamation or a court order.

This lawsuit is neither an effective nor legally appropriate vehicle to address antisemitism at Harvard.  It is brought by Alexander "Shabbos" Kestenbaum, an alumnus of Harvard Divinity School, Declaration of Timothy Whelsky ¶ 3 ("Whelsky Decl."), and Students Against Antisemitism, Inc. ("SAA"), incorporated by Plaintiffs' counsel shortly before filing this suit, suing on behalf of five unnamed Harvard graduate students in law and public health, *id.* ¶¶ 19, 21-26.[1]  The 130-page Second Amended Complaint invites the Court to superintend through a Court-appointed monitor the "termination" of "deans, administrators, professors, and other

---

[1] Citations to "SAC" refer to Plaintiffs' Second Amended Complaint.  Dkt. 63.

1

employees," the "suspension or expulsion" of students, and the return of donations purportedly conditioned on the "hiring or promotion of professors who espouse antisemitism or the inclusion of antisemitic coursework," and other relief. *Id.* Prayer for Relief. While demanding this Court to, in effect, review and approve assigned class reading, Plaintiffs fail to plead that Harvard has fallen short of its legal obligations.

The Second Amended Complaint instead strings together discrete incidents—many of which Plaintiffs did not experience themselves—into an attenuated theory of institutional liability: It tries, for example, to link offensive, antisemitic remarks by a Harvard official more than a century ago to the University's alleged failure to respond to events that took place just weeks before the Second Amended Complaint was filed. In an institution dedicated to principles of academic freedom and free speech, grappling with the limits of dissent and protest across a dozen undergraduate and graduate schools enrolling more than 20,000 students takes serious work, thoughtful consideration, and time. Without minimizing at all the imperative to address energetically antisemitism at the University, Plaintiffs' dissatisfaction with the strategy and speed of Harvard's essential work does not state a legally cognizable claim. Consequently, the Second Amended Complaint should be dismissed.

*First*, Plaintiffs' claims are premature and must be dismissed because they are contingent on establishing the deficiency of Harvard's ongoing response to antisemitism. Plaintiffs speculate that the actions Harvard is taking will prove inadequate, but that is not a proper basis for this Court's jurisdiction. Their claims are not ripe.

*Second*, SAA's claims must be dismissed because, as an associational plaintiff, it lacks standing to pursue individualized claims on behalf of its members.

*Third*, threshold issues defeat both Kestenbaum's and SAA's claims for injunctive relief. Kestenbaum's request for injunctive relief must be dismissed as moot because he is no longer enrolled at Harvard.  And Plaintiffs' injunctive claims must be dismissed because allegations of past harm do not plead an ongoing or certainly impending future injury traceable to Harvard, and do not establish that the sweeping relief requested is available to them as a matter of law.

*Fourth*, even if  Plaintiffs have standing to seek injunctive relief, they request an impermissibly broad injunction that the Court must strike.  If the Court permits any aspect of the claim for injunctive relief to go forward, it must strike the demand that Harvard take particular disciplinary measures, as such relief is foreclosed by binding precedent and principles of deference to university decision-making.

*Fifth*, Plaintiffs fail to state a claim for intentional discrimination under Title VI.  They do not plausibly allege a discriminatory double standard, and Harvard's efforts to address harassment while also safeguarding free expression and open academic discourse negate any allegations that the University has acted with deliberate indifference.  That alone defeats Plaintiffs' claim under *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999).  Nor does the conduct Plaintiffs allege amount to "severe and pervasive" harassment actionable under the statute.

*Finally*, Plaintiffs' contract claims must be dismissed because Plaintiffs do not identify any contractual commitment that Harvard has breached.

Harvard is responding to the unprecedented and unanticipated rise in campus tensions following the October 7 attack, and its response continues to evolve.  From the beginning, Harvard has sought to combat antisemitism; prioritize the safety and wellbeing of its students, faculty, and staff; and make its community stronger and more secure.  The steps the University

has taken to address reports of antisemitism, its work to clarify the rights and responsibilities of students and to enforce its policies regarding campus protests, and the sustained initiatives it has launched all demonstrate that Harvard remains committed to tackling antisemitism.

## BACKGROUND

Harvard strives to ensure that every member of the University community is safe, valued, and free to speak openly, whether in class or in the public square. *See* SAC ¶¶ 46-50, 54. No Harvard community member should experience discrimination or harassment, much less be subjected to physical force or violence on campus. Community members must also be empowered to speak out, advocate, and demonstrate on matters of public concern. Harvard has therefore adopted policies aimed to prevent "discrimination, harassment, and bullying 'by any member of the Harvard community,'" *id.* ¶ 46, and to affirm the rights of community members to speak on important issues through appropriate and respectful means, *see id.* ¶ 52. Those policies include the Non-Discrimination and Anti-Bullying Policy ("Non-Discrimination Policy"), which explicitly addresses, among other issues, harassment on the basis of religion and national origin, the University-wide Statement on Rights and Responsibilities, and student handbooks and free speech and protest guidelines issued by Harvard's individual schools. *See id.* ¶¶ 45-60.

Harvard's policies formalize its commitment to ensuring student safety and well-being while preserving the University's discretion to address improper conduct through appropriate, case-specific measures. The Non-Discrimination Policy establishes procedures for reviewing, investigating, and resolving formal complaints and outlines possible sanctions for policy violations, *see* SAC ¶ 48, while entrusting designated officials at Harvard's individual schools to determine whether disciplinary measures are warranted, Declaration of Felicia Ellsworth Ex. 1 ("Ellsworth Decl."). The Statement on Rights and Responsibilities, which governs speech, demonstrations, and on-campus protest activity, makes clear that threats of violence, personal

4

harassment, and hateful conduct in the guise of free speech violate University policy.  *See* SAC ¶ 51; Ellsworth Decl. Ex. 2.  And as clarified by guidance released on January 19, 2024, "demonstrations and protests are ordinarily not permitted" in certain spaces, such as libraries, classrooms, dormitories, residence halls, and dining halls, where they would "interfere with the normal activities of the University."  SAC ¶ 52; Ellsworth Decl. Ex. 4.  These University policies are supplemented by school-specific guidelines, which state that discrimination, harassment, and violence are "unacceptable" at Harvard.  SAC ¶ 49.  And while the University is committed to addressing harassment, it cannot and does not protect community members from experiencing, encountering, or learning secondhand of a demonstration, protest, or speech they may find objectionable.

Events since October 7 have revealed that Harvard's commitment to combating discrimination and harassment has not immunized the University from the rise of antisemitism that has roiled campuses and communities across the country.  Like other universities, Harvard has experienced incidents of antisemitic vitriol and vandalism.  SAC ¶¶ 145, 148, 195, 226, 230.  And like many other schools, Harvard has seen passionate political debates lapse into offensive rhetoric.  *Id.* ¶¶ 136, 139, 141, 146.  Fear, outrage, and grief following October 7 have unearthed new tensions in communities across the country, including at Harvard.  *See id.* ¶¶ 112, 114, 122, 138, 157, 211.  Against the backdrop of this unprecedented moment on university campuses and throughout the world, community members, including Plaintiffs, have criticized Harvard for not acting more swiftly and forcefully to address rapidly unfolding events on campus in the immediate aftermath of October 7.  The University acknowledges that its initial responses left some feeling unheard and unprotected.  Since those initial days, however, Harvard has engaged

with its Jewish community to address the challenges this turmoil has produced and, in some cases, laid bare.

At the University level and in individual schools, Harvard has focused on providing supportive measures, including care and support to victims of harassment, and on preventing future incidents of harassment through education on protest and debate.  Ellsworth Decl. Ex. 3; Declaration of Meredith Weenick  ¶¶ 3-4 ("Weenick Decl.").  Harvard has undertaken extensive efforts to increase on-campus security, Weenick Decl. ¶ 3, and published and adhered to clear policies governing the conduct of on-campus events, including rallies and demonstrations, SAC ¶ 52; Ellsworth Decl. Ex. 4.  Harvard also has made available multiple avenues to report harassment, bolstered resources for students making complaints, and redoubled efforts to process complaints and take necessary disciplinary or remedial actions.  Ellsworth Decl. Ex. 3.  And when concerns about antisemitism have been raised by community members, Harvard has responded.  For example, when Harvard Hillel informed the University of antisemitic posts on the messaging platform Sidechat (which Harvard does not control), Harvard quickly met with Sidechat leadership and secured assurance from Sidechat to engage in 24/7 content moderation.  Weenick Decl. ¶ 5.  When student groups and a faculty and staff group shared an antisemitic cartoon on social media, Interim President Garber swiftly issued a statement "unequivocally condemning the posting and sharing of the cartoon."  Ellsworth Decl. Ex. 6.  And when protesters organized an unsanctioned encampment in Harvard Yard, Harvard increased security, referred dozens of participants for involuntary leave to abate the disruption, cleared the encampment, and pursued disciplinary proceedings against many participants that are still on appeal.  *Id.* Exs. 9-13.  Harvard also repeatedly responded to concerns about antisemitism raised by Kestenbaum, providing him opportunities to address his concerns with administrators and

directing him to supportive and remedial resources that were available to him while he was a student.  Whelsky Decl. ¶¶ 4-15.

Harvard's efforts have also extended beyond the important task of preventing and responding to specific instances of harassment, to undertaking structural initiatives to uncover and eliminate antisemitism at Harvard.  Ellsworth Decl. Ex. 5.  The University is developing and has begun implementing educational and training opportunities for students, faculty, and staff that focus on antisemitism generally and at Harvard specifically.  *Id.* Ex. 3; Weenick Decl. ¶ 6.  Harvard has continued to build upon and expand these efforts by launching a Presidential Task Force on Combating Antisemitism at the start of the spring semester with a mandate to examine the recent history and current manifestations of antisemitism on Harvard's campus; identify the root causes of, and contributing factors to, antisemitic behaviors; evaluate the evidence regarding the characteristics and frequency of antisemitic incidents; and recommend approaches to combating antisemitism and mitigating its impact on campus.  Ellsworth Decl. Exs. 5, 14.  In carrying out these duties, the Task Force has reached out broadly to students, faculty, and staff to understand the causes, forms, and effects of antisemitism on Harvard's community, and will issue preliminary recommendations shortly and its final recommendations next academic year.  These crucial efforts are necessary, and they are not advanced by this lawsuit.

## **STANDARD OF REVIEW**

On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), the Court may "consider materials outside the pleadings."  *Gonzalez v. United States*, 284 F.3d 281, 288 (1st Cir. 2002); *see, e.g.*, *Beaudreau v. Berryhill*, 2017 WL 2656104, at *1 n.1 (D.N.H. June 20, 2017) (considering declaration).  In addition to "consider[ing] extrinsic materials," the Court "is free to test the truthfulness of the plaintiff's allegations" when engaging in jurisdictional fact-finding.  *Dynamic Image Techs., Inc. v. United States*, 221 F.3d 34, 37 (1st Cir. 2000).

Plaintiffs' allegations concerning the Court's subject-matter jurisdiction may accordingly be challenged by competing evidence. *Merlonghi v. United States*, 620 F.3d 50, 54 (1st Cir. 2010).

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plaintiffs must plead facts that permit the Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* If the Court cannot "infer from the well-pleaded facts 'more than the mere possibility of misconduct,' then the complaint has not shown 'that the pleader is entitled to relief.'" *Justiniano v. Walker*, 986 F.3d 11, 19 (1st Cir. 2021). The Court need not credit a "'legal conclusion couched as a factual allegation.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Nor must it accept "bald assertions" or "unsupportable conclusions." *Aulson v. Blanchard*, 83 F.3d 1, 3 (1st Cir. 1996).

Under Rule 12(f), the Court may strike requests for remedies to which plaintiffs are not entitled. *See John Hancock Life Ins. Co. v. Abbott Labs., Inc.*, 183 F. Supp. 3d 277, 303 (D. Mass. 2016), *aff'd in relevant part*, 863 F.3d 23, 49 (1st Cir. 2017). Courts may strike such "unnecessary pleadings" even without a showing of prejudice to the moving party. *Sheffield v. City of Boston*, 319 F.R.D. 52, 55 (D. Mass. 2016).

## ARGUMENT

### I. PLAINTIFFS' SERIAL COMPLAINTS ABOUT HARVARD'S ONGOING RESPONSE TO ANTISEMITISM DEMONSTRATE THAT THEIR CLAIMS ARE PREMATURE

Plaintiffs' claims should be dismissed under the ripeness doctrine because they demand that this Court prejudge Harvard's efforts to address complaints about antisemitism while the facts on the ground continue to change and the University's response efforts are still underway. Like its precursors, the Second Amended Complaint hinges on assertions that Harvard will not respond adequately to alleged incidents of antisemitism. *See, e.g.*, SAC ¶¶ 3, 323, 326. But in

8

paragraph after paragraph, Plaintiffs are compelled to acknowledge that events have not unfolded as they feared.  For example, Plaintiffs have conceded that Harvard has cleared the encampment in Harvard Yard, *id.* ¶¶ 274-275; fired the employee who harassed Kestenbaum, *id.* ¶ 204; initiated disciplinary proceedings and investigations related to incidents at the center of Plaintiffs' claims, *id.* ¶¶ 4, 269, 298; and repeatedly engaged with Plaintiffs about their concerns, *id.* ¶¶ 77, 119-120, 153, 261 266; *see also* Whelsky Decl. ¶¶ 4-15.  Plaintiffs' own actions demonstrate the issues are unripe: their insistence on repeatedly amending their complaint to describe new developments that they concede Harvard is reacting to in real time confirms that this lawsuit is premature.

Both jurisdictional and prudential ripeness factors militate in favor of dismissing Plaintiffs' claims to ensure the "avoidance of premature adjudication."  *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-149 (1967).  Article III requires dismissal because Plaintiffs' claims "rest[] upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all."  *Texas v. United States*, 523 U.S. 296, 300 (1998); *accord, Algonquin Gas Transmission, LLC v. City of Weymouth*, 919 F.3d 54, 62 (1st Cir. 2019).  From the outset of this litigation, Plaintiffs have insisted that Harvard would fail to act on complaints of antisemitism, and they have been proven wrong.  Harvard has taken concrete steps to prevent and address harassment while protecting free speech rights, including through its established disciplinary processes, direct engagement with students who raise concerns about discrimination or may be affected by it, and the development and rollout of new initiatives to combat antisemitism on campus—actions on which progress is being made.  Weenick Decl. ¶¶ 3-8.  The guesswork that would be required to evaluate the sufficiency of Harvard's in-progress efforts at this stage poses a jurisdictional bar to Plaintiffs' claims.

Prudential considerations also favor dismissal on ripeness grounds.  To say the least, Plaintiffs' claims are "likely to be significantly affected by further factual development."  *Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 536 (1st Cir. 1995).  Indeed, if developing facts were not of significant importance to the success or failure of Plaintiffs' claims, Plaintiffs would not have needed repeatedly to revise their complaint in response to shifting events on the ground.  Yet Plaintiffs ask this Court to intervene now, and to appoint a monitor to oversee the firing of deans, faculty, and administrators; the suspension and expulsion of students; and the reevaluation of class curricula and course materials, all while Harvard is in the process of responding to the concerns that, Plaintiffs assert, justify these extreme measures.  This Court should decline that invitation, as "issuing opinions based on speculative facts or a hypothetical record is … at best difficult and often impossible."  *See id.*  Until ongoing investigations and disciplinary proceedings conclude, and initiatives such as the Task Force complete their work, Plaintiffs cannot present a sufficient factual picture to enable the Court to resolve their claims. Because it is just as likely that "delay may see the dissipation of the legal dispute without need for decision," "'resolution of the dispute should be postponed.'"  *Mangual v. Rotger-Sabat*, 317 F.3d 45, 59 (1st Cir. 2003).  While Plaintiffs want Harvard to act on their preferred timeline and terms, that desire does not render their claims ripe.  Harvard's work is—and must be—well-considered and fair to all involved.

Moreover, Harvard will experience significant hardship if a federal court intervenes to "second-guess[] the … decisions made by school administrators"—particularly while the University works to address the concerns Plaintiffs and others have raised.  *See Davis*, 526 U.S. at 648.  Where, as here, defendants are asked to defend themselves against premature claims, they suffer hardship that supports dismissal on ripeness grounds.  *See Thomas v. Anchorage*

10

*Equal Rights Comm'n*, 220 F.3d 1134, 1142 (9th Cir. 2000).  Withholding adjudication while facts critical to assessing Plaintiffs' claims continue to unfold does not impose the kind of hardship courts look to under the ripeness doctrine.  Allegations that Harvard's response to antisemitism will prove ineffective do not establish "direct and immediate harm," *Ernst & Young*, 45 F.3d at 536, nor do they raise a concern that Plaintiffs "will lose [their] right to contest the issues presented" by the time their claims ripen.  *Massachusetts Ass'n of Afro-Am. Police, Inc. v. Boston Police Dep't*, 973 F.2d 18, 21 (1st Cir. 1992).

## II.   SAA LACKS STANDING

Plaintiff SAA's claims also should be dismissed because SAA—which alleges no injury of its own—lacks standing to sue on behalf of its members.  An association has standing to sue for its members when "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  Certainly there is no doubt that SAA cannot seek damages because an association that "alleges no monetary injury to itself" "has no standing to claim damages on [members'] behalf."  *Warth v. Seldin*, 422 U.S. 490, 515-516 (1976).  Nor can SAA establish standing for injunctive relief.  As the First Circuit recognizes, "representational standing is inappropriate if adjudicating the merits of an association's claim requires the court to engage in a 'fact-intensive-individual inquiry.'"  *New Hampshire Mot. Transp. Ass'n v. Rowe*, 448 F.3d 66, 72 (1st Cir. 2006).  SAA's Title VI claims rest on "the application of the law to a series of different factual scenarios" and so depend on "'the particularized circumstances of each individual member.'"  *National Ass'n of Gov't Emps. v. Mulligan*, 914 F. Supp. 2d 10, 14 (D. Mass. 2012).  Courts have rejected associational standing for "claims of intentional discrimination" under Title VI absent an explanation of how those claims "could be prosecuted without the participation of the individual members."  *Barnett v. Johnson City Sch. Dist.*, 2005

11

WL 8178066, at *5 n.6 (N.D.N.Y. Feb. 2, 2005).  And Title VI hostile environment claims are necessarily individualized because they require, among other plaintiff-specific showings, that the plaintiff herself "subjectively perceive[d] the environment to be abusive."  *See Brown v. Hot, Sexy & Safer Prods., Inc.*, 68 F.3d 525, 540-541 (1st Cir. 1995), *abrogated on other grounds by Martinez v. Cui*, 608 F.3d 54 (1st Cir. 2010).  As in *Mulligan*, the Court "cannot resolve the case without individualized consideration" of each SAA member's experience, because "a finding of discrimination against representative members will be an insufficient basis on which to ground … a judgment that all of the aggrieved [SAA] members were discriminated against."  914 F. Supp. 2d at 14.  And determining the existence, scope, or breach of any contract between Harvard and SAA members would require an inquiry specific to each student claiming breach.[2]

## III. KESTENBAUM AND SAA BOTH LACK A JUSTICIABLE CLAIM FOR INJUNCTIVE RELIEF

The Court also should dismiss Plaintiffs' injunctive claims because they suffer from multiple threshold defects.  Having now graduated from Harvard, Kestenbaum's injunctive claims are "inescapably moot."  *Harris v. Univ. of Mass. Lowell*, 43 F.4th 187, 192 (1st Cir. 2022); Whelsky Decl. ¶ 3.  And SAA cannot establish standing to obtain injunctive relief.  Standing requires that Plaintiffs "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  Plaintiffs bear the burden to

---

[2] Moreover, as Justice Thomas recently observed, an association claiming standing for injunctive relief also "may have very different interests from the individuals whose rights [it] is raising," creating "obvious concerns" about its standing to sue on behalf of individuals.  *Food & Drug Admin. v. Alliance for Hippocratic Med.*, 2024 WL 2964140, at *17 n.3 (June 13, 2024) (Thomas, J., concurring).  Those concerns are especially pronounced here, where SAA seeks relief on behalf of every Jewish student at Harvard, *see* SAC, Prayer for Relief (A), and where another association seeks injunctive relief against Harvard based on similar allegations in a competing lawsuit, *see* Complaint, *The Louis D. Brandeis Center for Human Rights Under Law v. President and Fellows of Harvard College*, 1:24-cv-11354-RGS (D. Mass. filed May 22, 2024), Dkt. 1.

establish standing for each claim asserted and each form of relief sought.  *Webb v. Injured Workers Pharmacy LLC*, 72 F.4th 365, 372 (1st Cir. 2023).  Taken separately or together, the allegations in the Second Amended Complaint and the evidence in Harvard's declarations confirm Plaintiffs have not met their burden.

**A.   Plaintiffs Face No Certainly Impending Future Injury Traceable to Harvard**

To obtain injunctive relief, Plaintiffs "must demonstrate a "certainly impending" future injury.  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).  Mere ""[a]llegations of *possible* future injury' are not sufficient," there must be "a causal connection between the injury and the conduct complained of," such that the injury is "fairly … trace[able] to the challenged action of the defendant, and not … th[e] result [of] the independent action of some third party not before the court."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

1. Plaintiffs rely on allegations relating to past incidents that, even if theoretically relevant to a claim for damages, "cannot support standing to seek an injunction against *future* harm."  *Roe v. Healey*, 78 F.4th 11, 21 (1st Cir. 2023) (emphasis added).  The bulk of the Second Amended Complaint constitutes a laundry list of events that Plaintiffs do not allege they were injured by or experienced themselves, including speeches and statements that were not directed to any individual member of the Harvard community, let alone Plaintiffs.  *See, e.g.*, SAC ¶¶ 69, 72, 73, 76, 101, 158-161, 189-190, 197-198, 205, 207, 210, 213, 220, 224, 231, 241, 244-246, 248.  The Supreme Court has "long made clear that distress at or disagreement with the activities of others is not a basis" for standing to challenge conduct "allowing those activities."  *See Alliance for Hippocratic Med.*, 2024 WL 2964140, at *17 n.3.  Even for the incidents in which Plaintiffs allege they were involved, Plaintiffs at most describe only "past harm," *id.*, and fail to establish "a sufficient likelihood that [they] will again be wronged in a similar way," *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983).

Kestenbaum is no longer enrolled at Harvard, so any possible future injury to him would be wholly speculative and barred by the principle that litigants may not "roam" around "in search of … wrongdoing" to manufacture standing.  *Alliance for Hippocratic Med.*, 2024 WL 2964140, at *6.  Nor do Kestenbaum's allegations about incidents that took place while he was enrolled suggest that his peers face a certainly impending future injury.  For example, Kestenbaum alleges that he was harassed by a Harvard staff member, but that employee promptly was placed on leave and fired.  SAC ¶ 204.  And he alleges that he was followed by a student participating in the Harvard Yard encampment, but the encampment was cleared and its leaders subject to disciplinary proceedings.  *See id.* ¶¶ 274-275.

SAA's allegations also fail to establish standing for injunctive relief.  SAA alleges that Members 1, 2, 3, and 5 "[f]ear[ed] a violent attack" during a protest last October where Harvard safety officials supposedly let individuals into a school building without checking for Harvard University ID cards, SAC ¶ 116-117, but SAA does not allege that any violence ensued or that any similar incident has taken place since, and in fact acknowledges that Harvard enforced ID requirements surrounding subsequent protests, *id.* ¶¶ 250, 259, 265.  SAA alleges that two student groups engaged in a "takeover" of a Law School lounge last Fall, during which students engaged in "antisemitic agitation and anti-Israeli protests" and "regularly stopped and targeted" SAA Members 1 and 2, *see id.* ¶ 125; but it acknowledges that SAA Members 1 and 2 later "participated in a counter-protest" in the same space, *id.* ¶ 128; and the Complaint itself shows that use of the lounge for protest activity dropped sharply after Harvard administrators responded to their concerns, *see* SAC ¶¶ 222, 239, 242 (describing only three events during Spring semester).  SAA alleges that Member 5 attended a single event that was "disrupted by anti-Israel students," *id.* ¶ 233, but it acknowledges that this incident was referred to the appropriate

14

disciplinary process.  And SAA alleges that Member 2 was denied entry to Harvard Yard by a security guard on one occasion, but it acknowledges that she was able to enter Harvard Yard later that same day.  SAC ¶ 265.

Harvard has addressed, and will continue to address, incidents like these as appropriate under its policies, but these allegations of discrete past injuries do not establish an "ongoing injury or a sufficient threat that the injury will recur."  *Roe*, 78 F.4th at 21.  The tangible steps Harvard has taken to investigate and combat antisemitic conduct on campus provide further evidence that Plaintiffs face no "certainly impending" injury.  Harvard's response to reports of antisemitism, including messages on Sidechat and social media posts; its clarification of the rights and responsibilities of students who wish to speak out about the Israel-Hamas war through updated guidelines explaining time, place, and manner limitations governing on-campus protests; and the ongoing work of the Presidential Task Force on Combating Antisemitism all refute Plaintiffs' allegations that the incidents Plaintiffs describe or the University responses they allege to be deficient are likely to repeat themselves—much less "certainly impending."  *See supra* pp.4-7.  Plaintiffs' "subjective apprehensions" of future harm do not establish standing to seek injunctive relief—only "the *reality* of the threat of repeated injury … is relevant to the standing inquiry."  *Lyons*, 461 U.S. at 107 n.8.  This limitation helps ensure "'the legal questions presented to the court will be resolved … in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action.'"  *Alliance for Hippocratic Med.*, 2024 WL 2964140, at *5.

2. Plaintiffs also have not plausibly alleged that any impending injury they might suffer would be traceable to Harvard.  *See Clapper*, 568 U.S. at 413.  Traceability requires a "sufficiently direct causal connection between the challenged action and the identified harm."

*Dantzler, Inc. v. Empresas Berrios Inventory & Ops., Inc.*, 958 F.3d 38, 47 (1st Cir. 2020).  No

such "direct causal connection" exists here.  Plaintiffs' own allegations—which identify the

myriad ways in which Harvard has been responding to complaints of antisemitism, *e.g.*, SAC

¶¶ 91-94, 103-104, 106, 108, 124, 127, 131, 134-135, 155, 191, 232, 240—demonstrate that the

"line of causation between" Harvard's alleged "illegal conduct" and the harassment Plaintiffs

allege at the hands of third parties is "attenuated at best."  *See Allen v. Wright*, 468 U.S. 737, 757

(1984).  And the evidence of Harvard's continuing efforts to deter and prevent harassment,

Weenick Decl. ¶¶ 3-8, disprove their conclusory assertions that Harvard "will continue" to

violate their rights.  SAC ¶ 326; *id.* ¶ 333.  In stark contrast to Plaintiffs' attempt to portray the

University's response to antisemitism as static, Harvard has increased campus security and

police presence at locations and events where members of Harvard's Jewish community gather,

Weenick Decl. ¶ 3; planned for new educational sessions on antisemitism for more than 200

faculty and administrators who may participate in disciplinary processes at each of Harvard's

schools, *id.* ¶ 6; published new, specific guidance on permitted protest and dissent activities,

Ellsworth Decl. Ex. 4; clarified that violations of Harvard's protest and dissent policies will be

subject to appropriate process, *id.*; organized community support and listening sessions,

Ellsworth Decl. Exs. 3, 8; and established new initiatives to facilitate discussion and build

community through civil discourse and respectful debate, Weenick Decl. ¶ 4.  The Task Force

has met with Jewish students, faculty, and staff, *see supra* p.7, and committed to delivering to

University leadership final recommendations in the coming academic year.  Ellsworth Decl. ¶ 14.

    **B.**    **Plaintiffs' Requested Injunction Is Unavailable As A Matter of Law**

    To satisfy the requirements of standing, Plaintiffs must seek relief that is "tailored to

redress [their] particular injury."  *Gill v. Whitford*, 585 U.S. 48, 73 (2018); *see also*

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006); *Lewis v. Casey*, 518 U.S. 343, 357

16

(1996).  The remedy requested must be "'limited to the inadequacy that produced [the] injury in fact.'"  *Gill*, 585 U.S. at 66.  Plaintiffs' requested injunction flouts this principle.  Plaintiffs request a vastly overbroad injunction that would install a monitor to superintend every policy and practice at every Harvard school to ensure its compliance with Title VI, and would force Harvard to expel and terminate students and faculty and return donations, remedies that are not remotely tailored to address Plaintiffs' alleged harm.

Many of the specific items of relief Plaintiffs request as part of an injunction also fail to establish redressability because they are "unavailable" as a matter of law.  *See Biszko v. RIHT Fin. Corp.*, 758 F.2d 769, 774 (1st Cir. 1985).  An injunction requiring Harvard to terminate, suspend, discipline, or expel unspecified administrators, faculty, or students, *see* SAC, Prayer for Relief (A)(i)-(ii), would be improper under the Supreme Court's decision in *Davis*.  *See infra* pp.19.  Nor can Harvard be forced to "declin[e] and return[] donations … conditioned on the hiring or promotion of professors who espouse antisemitism," SAC, Prayer for Relief (A)(iii)— an allegation devoid of any factual support—without intruding on the University's own First Amendment rights, *see Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 226 n.12 (1985).  Finally, "appointing a neutral expert monitor" to oversee Harvard's compliance with a hypothetical injunction, SAC, Prayer for Relief (A)(v), is patently improper because Plaintiffs do not plead that such an appointment is authorized by statute or extraordinary circumstances.  *Garcia-Rubiera v. Fortuno*, 727 F.3d 102, 114 (1st Cir. 2013).  Redressability is therefore lacking, as the "requested relief" invokes "an authority [the Court] do[es] not possess."  *W. Coal Traffic League v. Surface Transp. Bd.*, 998 F.3d 945, 951 (D.C. Cir. 2021).

## IV.  PLAINTIFFS' REQUEST FOR INJUNCTIVE RELIEF SHOULD BE STRUCK

Even if Plaintiffs have standing to seek prospective injunctive relief, the Court should strike their requested injunction because they cannot establish that they are entitled to the remedy

they request.  Courts use Rule 12(f) to strike requests for remedies to which plaintiffs are not entitled.  2 Moore's Federal Practice § 12.37[3]; *e.g.*, *John Hancock Life Ins.*, 183 F. Supp. 3d at 303.  Such "unnecessary pleadings" may be struck even without a showing of prejudice to the moving party.  *Sheffield v. City of Boston*, 319 F.R.D. 52, 55 (D. Mass. 2016); *see Zurich Am. Ins. Co. v. Watts Regul. Co.*, 796 F. Supp. 2d 240, 246 (D. Mass. 2011).

Plaintiffs' requested injunction should be struck for several reasons.  First, as noted, it is fatally overbroad, wresting control over core academic, employment, and student-life decisions central to Harvard's self-governance.  An injunction of that scope would violate the black-letter principle that "'injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.'"  *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994).  The same is true of the request that the Court "appoint[] a neutral expert monitor" to superintend Harvard's university-wide response to antisemitism, SAC, Prayer for Relief—a measure only justifiable under narrow circumstances not alleged here.  *Fortuno*, 727 F.3d at 114.

Next, the requested relief is "tantamount to an injunction to 'obey the statute,' which the Supreme Court [has] rejected as too broad."  *Trustees of Boston Univ.*, 891 F.2d at 361. Plaintiffs seek to enjoin "Harvard and its agents from establishing, implementing, instituting, maintaining, or executing policies, practices, procedures, or protocols that discriminate against Jewish students on the basis of their Jewish ancestry, race, ethnic characteristics, or national origin,"  SAC, Prayer for Relief (A).  But precisely because an injunction "should be narrowly tailored to give only the relief to which plaintiffs are entitled," an injunction that broadly enjoins Harvard "from discrimination" on the basis of ancestry, race, ethnic characteristics, or national origin, "has the potential to further embroil the courts in the University's internal affairs."  *See*

*Trustees of Boston Univ.*, 891 F.2d at 361.  Courts must not enter an injunction that "'sweeps …

more broadly than necessary'" by restraining the defendant in ways not necessary to afford

plaintiffs complete relief.  *Sindi v. El-Moslimany*, 896 F.3d 1, 33-34 (1st Cir. 2018).  Because the

requested injunction "essentially command[s]" Harvard to "obey the law concerning …

discrimination," it should be struck.  *EEOC v. Aviation Port Servs., LLC*, 2020 WL 1550564, at

*12 (D. Mass. Apr. 1, 2020).

Lastly, Plaintiffs' request that the Court require Harvard to take particular remedial

measures should be struck because such relief is barred by the Supreme Court's holding in

*Davis*.  Plaintiffs seek, among other far-reaching remedies, to compel Harvard to "take all

necessary and appropriate remedial and preventative measures" including terminating deans and

professors, suspending or expelling students, and declining or returning donations.  SAC, Prayer

for Relief (A).  But Title VI does not require that "administrators must engage in particular

disciplinary action" to avoid liability.  *See Davis*, 526 U.S. at 648.  Victims of harassment have

no Title VI "right to make particular remedial demands."  *Id.*; *accord Roe v. Lincoln-Sudbury*

*Reg'l Sch. Dist.*, 2021 WL 1132256, at *27 (D. Mass. Mar. 24, 2021) ("[A] plaintiff does not

have the right to make particular remedial demands, and courts 'should refrain from second-

guessing' the decisions of school administrators when assessing their responses.").  And in

evaluating contract claims, "'courts are chary about interfering with academic and disciplinary

decisions made by private colleges and universities.'" *Doe v. Trustees of Boston Coll.*, 942 F.3d

527, 535 (1st Cir. 2019).

## V.     PLAINTIFFS' TITLE VI CLAIM SHOULD BE DISMISSED UNDER RULE 12(B)(6)

Title VI "prohibits only intentional discrimination."  *Alexander v. Sandoval*, 532 U.S.

275, 280 (2001).  Intentional discrimination can be established by showing a school acted with

discriminatory animus, *see Doe v. Brown Univ.*, 43 F.4th 195, 208 (1st Cir. 2022), or that the

19

school's "deliberate indifference caused the student to be subjected to the harassment" alleged, *see Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165, 171 (1st Cir. 2007), *rev'd on other grounds*, 555 U.S. 246 (2009).  Plaintiffs do not plead a Title VI violation under either theory.

## A.    Plaintiffs Do Not Plausibly Allege Discriminatory Animus

Plaintiffs fail to plead that Harvard has intentionally discriminated against Jewish students by selectively applying its policies to disadvantage them.  Harvard has stood steadfast by its Jewish community, and Plaintiffs' allegations show Harvard has condemned antisemitism promptly, forcefully, and repeatedly.  *See, e.g.*, SAC ¶¶ 103, 106, 124, 134-145, 169, 191, 208.

To plead intentional discrimination under Title VI using comparator evidence, Plaintiffs must plausibly allege that Harvard's disparate treatment of "reasonably comparable" incidents demonstrates that Harvard "acted with discriminatory intent" or a "racial motive."  *Brown Univ.*, 43 F.4th at 208-209.  Under this standard, Plaintiffs must compare apples to apples, and establish that "the nature of the infraction and knowledge of the evidence by college officials [were] sufficiently similar" to show that Harvard acted inconsistently.  *Id.* at 207.  They fail to do so.  Instead, Plaintiffs make scattershot reference to past occasions on which Harvard issued statements, canceled speaking events, or disciplined students and faculty, SAC ¶¶ 278, 281, 285, 286, 289-292, 295-296, all without explaining how those incidents are analogous to recent events in which Harvard has assertedly taken a different approach.  And Plaintiffs lean on strained comparisons that do not suggest a double standard, equating Harvard's decision to confront institutional racism by "chang[ing] the title of 'house masters' to 'faculty deans,'" *id.* ¶ 282, to the University's declining to end an academic collaboration with Birzeit University, *id.* ¶ 286.

Neither those allegations nor any others come close to showing that Harvard intentionally discriminates against Jewish students by deliberately allowing antisemitic conduct to go unaddressed while penalizing other forms of bias under comparable circumstances.  *See Doe v.*

*Amherst Coll.*, 238 F. Supp. 3d 195, 224 (D. Mass. 2017).  There is no allegation, for example,

that the individuals Plaintiffs accuse of antisemitism were found to have violated similar policies,

but "received lesser punishments," than others Harvard has disciplined.  *Id.*  Nor do Plaintiffs

allege that Harvard has the same evidence of policy violations now as it did on past occasions.

More fundamentally, none of the previous incidents Plaintiffs cite involved the exceptional

levels of internecine struggle that have roiled Harvard since October 7, with deep and corrosive

divisions between both students and faculty members that have required Harvard to address often

competing claims of antisemitic and anti-Muslim discrimination.  Certainly, Plaintiffs fall far

short of the required showing that any alleged differences in Harvard's handling of recent events

show it "selectively enforced its rules … due to" Plaintiffs' race.  *Brown Univ.*, 43 F.4th at 207.

> **B.** **Plaintiffs Do Not Plausibly Allege That Harvard Intentionally Acquiesced In A Hostile Environment Through Deliberate Indifference**

Plaintiffs also fail plausibly to allege that Harvard intentionally discriminated against

them through "deliberate indifference" to antisemitic conduct "so severe, pervasive, and

objectively offensive" that it "ha[s] the systemic effect of denying the victim equal access to an

educational program or activity."  *Davis*, 526 U.S. at 651-652.  The same deliberate-indifference

standard applies in both Title VI and Title IX cases.  *See Gebser v. Lago Vista Indep. Sch. Dist.*,

524 U.S. 274, 286 (1998); *Pollard v. Georgetown Sch. Dist.*, 132 F. Supp. 3d 208, 230 (D. Mass.

2015).  Universities can be held liable "only where their own deliberate indifference effectively

'cause[d]' the discrimination."  *Davis*, 526 U.S. at 642-643.  Deliberate-indifference plaintiffs

must therefore overcome a "high" bar.  *Doe v. Wentworth Inst. of Tech., Inc.*, 2022 WL 1912883,

at *6 (D. Mass. June 3, 2022).  They must plead that the university's response to "severe,

pervasive, and objectively offensive" harassment was "clearly unreasonable in light of the

known circumstances." *Porto v. Town of Tewksbury*, 488 F.3d 67, 72-73 (1st Cir. 2007).

Allegations that the university "could or should have done more" do not suffice. *Id.* at 73.

Plaintiffs fall far short of that standard. Stripped of its allegations involving First-

Amendment-protected expression concerning rallies, statements, speaker invitations, and

academic decisions, the Second Amended Complaint recounts a handful of incidents that even

collectively do not show that Harvard's ongoing response has been "clearly unreasonable."

*Davis*, 526 U.S. at 648. That alone forecloses Plaintiffs' deliberate-indifference claim. And

while offensive remarks and disruptive actions are contrary to Harvard's "dual commitment to

free expression and mutual respect," Ellsworth Decl. Ex. 4—they do not amount to "severe,

pervasive, and objectively offensive" harassment under Title VI. *Davis*, 526 U.S. at 651.

       1.     Plaintiffs do not plausibly allege that Harvard's response to the alleged harassment was deliberately indifferent

Plaintiffs' allegations of deliberate indifference fail because they do not establish that

Harvard's response has been "clearly unreasonable in light of the known circumstances." *Davis*,

526 U.S. at 648. Courts can, "on a motion to dismiss … identify a response as not 'clearly

unreasonable' as a matter of law," *id.* at 649, and the Court should do so here.

At the outset, Plaintiffs cannot plead that Harvard has intentionally discriminated against

them because the University declined to restrict speech they oppose. Title VI does not require

Harvard to censor student or faculty speech that may be protected by the First Amendment.

Public universities of course may not infringe upon the First Amendment rights of faculty,

students, and staff. *See Healy v. James*, 408 U.S. 169, 180-181 (1972). Accordingly, Title VI

must be read to impose liability on universities—public or private—only when consistent with

constitutionally protected expression. *See Clark v. Martinez*, 543 U.S. 371, 380-381 (2005)

(statute must be read to avoid constitutional problems "whether or not those constitutional

problems pertain to the particular litigant before the Court").  Indeed, the Department of

Education has long held Title VI "should not be interpreted in ways that would lead to the

suppression of protected speech on public or private campuses."  Gerald A. Reynolds, Assistant

Sec'y, Off. for Civ. Rts., U.S. Dep't of Educ., Dear Colleague Letter (July 28, 2003); *see also*

Catherine E. Lhamon, Off. for Civ. Rts., U.S. Dep't of Educ., Dear Colleague Letter (May 7,

2024) ("Nothing in Title VI or regulations implementing it requires or authorizes a school to

restrict any rights otherwise protected by the First Amendment to the U.S. Constitution.").

 Yet Plaintiffs seek to hold Harvard liable for intentional discrimination by alleging its

deliberate indifference to an environment created in large part by students engaged in protected

speech.  They rely heavily on allegations that Harvard should have prevented or punished rallies,

boycotts, and protests, *see* SAC ¶¶ 65, 68, 71, 80-84, 86-88, 100, 107, 112, 114, 121-122, 125-

129, 133, 136, 138-139, 141-142, 144, 146, 211, 219, 222, 232, 233, 236, 239, 242, 243, 244,

and statements by students or faculty that Plaintiffs found offensive, *id.* ¶¶ 73, 101, 108, 143,

158-159, 161, 189-190, 213, 224, 245, 248, 271.  They assert that Harvard should have

intervened to stop student groups or faculty members from inviting controversial speakers to

campus.  *See id.* ¶¶ 69, 72, 76, 85, 89, 147, 160, 197-198, 205, 207, 210, 220, 231, 238, 241, 244,

246.  And they claim Harvard should have acted on, or overruled, academic decisions by

university professors, including the assignment of particular reading materials.  *See id.* ¶¶ 63,

138, 154-157.  Allegations of a hostile environment premised on student and faculty speech raise

"serious First Amendment implications."  *See Guckenberger v. Boston Univ.*, 957 F. Supp. 306,

316 (D. Mass. 1997).  Allegations based on remarks by professors or administrators similarly

seek to force Harvard to take action that could have a "chilling effect ... on academic freedom,"

leading faculty to "avoid topics … for fear that one or two sentences might later be used as evidence of alleged discriminatory animus." *Brown v. Trustees of Boston Univ.*, 891 F.2d at 351.

However ill-considered or offensive one might find the views expressed, settled free speech principles allow Harvard to determine whether to discipline or otherwise coerce members of the University community to shield Plaintiffs from exposure to speech that offended them. "[S]peech that can be reasonably interpreted as political," such as much of the speech Plaintiffs point to in their Second Amended Complaint, "is protected in schools." *Norris v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 23 (1st Cir. 2020). Plaintiffs urge the Court to adopt a rigid and expansive definition of unprotected antisemitic speech and to hold Harvard liable for declining to discipline any expression Plaintiffs believe crosses this line. SAC ¶¶ 31-33, 39-40. But the Court should not step into the role of an academic institution and second-guess decisions Harvard may make to refrain from punishing student and faculty speech. On the contrary, "school administrators must be permitted to exercise discretion in determining when certain speech crosses the line from merely offensive to more severe or pervasive bullying or harassment." *Norris*, 969 F.3d at 29 n.18. Here, as in other cases dismissing deliberate indifference claims alleging flawed responses to antisemitism, "a very substantial portion of the conduct to which plaintiffs object represents pure political speech and expressive conduct." *See Felber v. Yudof*, 851 F. Supp. 2d 1182, 1187-1188 (N.D. Cal. 2011). Because Title VI does not require Harvard to punish such speech, Harvard's response is "not 'clearly unreasonable' as a matter of law." *Davis*, 526 U.S. at 649.

In any case, the Second Amended Complaint confirms that Harvard did respond to many of the incidents on which Plaintiffs center their claims. In paragraph after paragraph, Plaintiffs acknowledge that Harvard officials reacted by condemning antisemitic conduct, listening to

student concerns, offering supportive measures, enforcing policies, launching investigations and disciplinary proceedings, and making long-term commitments to addressing antisemitism. *See*, *e.g.*, SAC ¶¶ 75, 77, 91-94, 103-104, 106, 108, 124, 127, 131, 134-135, 155, 191, 211, 232, 240. For example, Plaintiffs acknowledge that allegations that a professor at the Kennedy School discriminated against Jewish students in class resulted in Harvard initiating a formal investigation, conducted by outside counsel, into the allegations, and issuing a report censuring that professor. *See id.* ¶¶ 91-94. Plaintiffs describe how, in the immediate aftermath of October 7, Harvard issued multiple statements condemning Hamas' attacks, expressing support for Jewish students, and making clear that student groups assigning blame to Israel spoke only for themselves and not for the institution. *See id.* ¶¶ 101-106. And Plaintiffs themselves explain that Harvard secured a peaceful end to the encampment in Harvard Yard after referring participants for involuntary leave. *See id.* ¶¶ 267, 274. While Plaintiffs allege that actions taken by Harvard did not "constitute[] an ideal response" to antisemitism on campus, what Harvard said and did "cannot plausibly be characterized" as "so deficient as to be clearly unreasonable" and thus intentionally discriminatory. *See Fitzgerald*, 504 F.3d at 174.

Plaintiffs also do not plausibly allege that Harvard's response to any of the incidents involving Plaintiffs was deliberately indifferent. As explained, many of these allegations involve expression that Harvard may reasonably consider protected speech. *E.g.*, SAC ¶¶ 85, 88-89, 114, 116, 144, 147, 218, 233. Kestenbaum asserts that when he was removed from a WhatsApp group created by Divinity School students in February 2024, Harvard did not "provide[] a … substantive response" to his complaint, *id.* ¶ 216—but he nowhere alleges that Harvard controlled access to the group or had authority to reinstate his access. Nor does he plausibly allege that Harvard's actions in response to an employee who harassed him were clearly

unreasonable; instead, he acknowledges that the individual was placed promptly on leave and fired, and merely alleges that he was not immediately informed of the termination. *Id.* ¶ 204. And Kestenbaum concedes that Divinity School Associate Dean Tim Whelsky met with him and reached out to him multiple times to discuss his concerns in detail. *Id.* ¶ 266.

Plaintiffs further acknowledge that several University officials spoke to SAA Members about their concerns after the October 19 protest in the Law School. *Id.* ¶¶ 119-120. And Plaintiffs admit Harvard safety officials investigated an alleged incident in which flyers hung by the Alliance for Israel student group were removed. *Id.* ¶ 131. As for the announced lounge "takeover" in Fall 2023, Plaintiffs acknowledge that University officials intervened and took measures to address Plaintiffs' concerns, *id.* ¶¶ 125, 127-128, and nowhere assert that the lounge—where some Plaintiffs participated in their own counter-protest, *id.* ¶ 128—was not accessible to everyone even during those brief times when individuals leafleted or protested. While Plaintiffs do not allege they attended the October 18 "die-in" protest, they do allege that Harvard relieved a protestor who confronted a Jewish student there from his role as residential proctor, *id.* ¶ 115, and announced it would allow the law enforcement investigation into the incident to proceed before considering further disciplinary measures, *id.* ¶ 134.

Although Harvard is committed resolutely to the elimination of antisemitism at the University, Title VI does not require that Harvard "'ensur[e] that … students conform their conduct' to certain rules." *See Davis*, 526 U.S. at 648. Nor does the statute require that Harvard "take heroic measures" or "perform flawless investigations." *See Fitzgerald*, 504 F.3d at 174. Insistence that Harvard "could or should have done more" to address Plaintiffs' concerns does not state a deliberate-indifference claim. *Porto*, 488 F.3d at 73.

2.      Plaintiffs do not plausibly allege that they were subject to severe, pervasive harassment

Because schools must have flexibility to address on-campus conduct in a manner consistent with their obligations to all community members—including their obligation to safeguard protected expression—a Title VI claim "will lie only for harassment that is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Davis*, 526 U.S. at 633.  Plaintiffs' factual allegations "do not meet the high standard of severity or pervasiveness" required to trigger liability for deliberate indifference under Title VI.  *Pollard*, 132 F. Supp. 3d at 230-231.

Harvard in no way condones hurtful speech, but courts routinely conclude that "offensive utterance[s]"—especially those that were not directed at or to any Plaintiff, or made within the context of any program or activity in which Plaintiffs were participating—do not rise to the level of "severe, pervasive, and objectively offensive" harassment.  *See Brown*, 68 F.3d at 541 (comments "were not directed specifically at the plaintiffs"); *see also Guckenberger v. Boston Univ.*, 957 F. Supp. 306, 315 (D. Mass. 1997) (statements critical of disability-rights movement did not create hostile environment when they were "not focused on or addressed to particular … students").  Likewise, Plaintiffs' allegations involving "acts occurring years before [they] ever enrolled" at Harvard have at most "extremely marginal relevance to [P]laintiffs' contention that they perceived a hostile environment."  *See Felber*, 851 F. Supp. 2d at 1188.

Nor does the Second Amended Complaint describe an environment in which an objectively reasonable person would fear physical violence.  While Plaintiffs allege that they "[f]ear[ed] a violent attack" during an October 19 protest at the Law School, their allegations clarify that the event involved protestors holding a "Stop the Genocide in Gaza" banner entering the building and "march[ing] down the length of the building's primary first-floor hallway,"

27

blocking "the hallway outside the study room" where Plaintiffs were located.  SAC ¶ 117.

Plaintiffs do not allege that the protesters engaged with Plaintiffs in any way—let alone

threatened physical violence—and in fact they concede that police were on scene.  *Id.*  The same

is true of Plaintiffs' allegations regarding the encampment in Harvard Yard, which was closed to

the public and monitored by security guards.  *Id.* ¶¶ 250-251.  Courts have indicated that similar

protest activity does not constitute severe and pervasive harassment.  *See Mandel v. Board of

Trustees of Cal. State Univ.*, 2018 WL 5458739, at *21 (N.D. Cal. Oct. 29, 2018); *Felber*, 851 F.

Supp. 2d at 1184-1185.  Kestenbaum alleges that he received harassing messages from a Harvard

employee that left him "concerned about his physical safety," SAC ¶¶ 199, 203, but a "single

incident of harassment" may be actionable only when it has "produce[d] a 'systemic effect on

educational programs or activities.'"  *Fitzgerald*, 504 F.3d at 173 n.3; *see Davis*, 526 U.S. at

652-653; *Pollard*, 132 F. Supp. at 230.  Plaintiffs do not plausibly allege such an effect.

## VI.   PLAINTIFFS' CONTRACT CLAIMS SHOULD BE DISMISSED UNDER RULE 12(B)(6)

### A.   Plaintiffs Do Not Plausibly Allege A Breach Of Contract

Plaintiffs fail to plead a breach of contract because they do not plausibly allege either that

any policy they cite created an enforceable contract between them and Harvard or that Harvard

"breached [their] reasonable expectations based on the explicit and implicit promises in the

contract" that those policies purportedly created.  *Sonoiki v. Harvard Univ.*, 37 F.4th 691, 713

(1st Cir. 2022).  A student's "reasonable expectations" must be tethered to the "express terms of

the contract" with the university.  *Id.* at 709.  To plead a breach, Plaintiffs are required to identify

"definite and certain promises about the university's environment or services" that Harvard has

broken. *Brown v. Suffolk Univ.*, 2021 WL 2785047, at *6 (D. Mass. Mar. 31, 2021).  Claims like

Plaintiffs' that do not allege the existence of a definite contractual term are regularly dismissed.

*See id.*; *see also G. v. Fay Sch.*, 931 F.3d 1 (1st Cir. 2019); *Shin v. Mass. Inst. of Tech.*, 2005 WL 1869101 (Mass. Super. Ct. June 27, 2005)

Rather than plead that Harvard breached any express contractual commitment, Plaintiffs assert in conclusory fashion that Harvard failed to "provide them a discrimination-free environment" by "abiding by, and adequately and appropriately enforcing" its policies.  SAC ¶ 331.  They block-quote a number of Harvard policies without alleging that any particular policy provision required Harvard to act in any particular circumstance.  *See id.* ¶ 333.  Some of the policies cited are not even alleged to apply to Plaintiffs or any specific incidents they describe.  As to the policies that may apply to Plaintiffs, many of the quoted provisions point to "generalized, aspirational statements that are insufficiently definite" to establish a breach of an enforceable term.  *Fay Sch.*, 931 F.3d at 12; *see* SAC ¶ 333.  Even where Plaintiffs allege that Harvard policies prohibit specific actions, they do not plead that these policies bind the University to respond within a certain timeframe or adopt particular disciplinary measures in response to the incidents they allege.  Elsewhere, Plaintiffs do not plead that Harvard defied their reasonable expectations in handling alleged policy violations, but rather that the University did not provide them regular updates on reported misconduct referred for investigation.  SAC ¶ 218.

The Second Amended Complaint does not contain the type of allegations that establish breach.  Plaintiffs do not allege a failure to follow a set of guaranteed procedural rights, *Doe v. Trustees of Boston Coll.*, 892 F.3d 67, 80-87 (1st Cir. 2018), or to deliver educational offerings expressly promised, *Guckenberger*, 957 F. Supp. at 317.  Plaintiffs instead assert that Harvard failed to mete out unspecified discipline to certain students and faculty.  Transforming general policies into enforceable promises to take particular disciplinary measures would rob universities of discretion on matters of discipline and seriously undermine their right to "autonomous

29

decisionmaking." *Ewing*, 474 U.S. at 226 n.12.  For that reason, courts hesitate to "'interfer[e] with academic and disciplinary decisions made by private colleges and universities,'" which require "flexibility to adopt diverse approaches to student discipline matters." *Trustees of Boston Coll.*, 942 F.3d at 535.  The breach of contract claim should be dismissed.

### B.      Plaintiffs' Implied Covenant Claim Should Be Dismissed

Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing must be dismissed as well.  Implied covenant claims are "distinct from simple breach of contract claims and require additional factual allegations." *Christensen v. Kingston Sch. Comm.*, 360 F. Supp. 2d 212, 229 (D. Mass. 2005).  Plaintiffs offer none.  Instead, they baldly assert that the same actions by which Harvard violated Title VI and breached their contract also breached the implied covenant.  *Compare* SAC ¶¶ 319, 323, *and id.* ¶¶ 331, 333, *with id.* ¶ 336.  Because Plaintiffs "do[] not identify a distinct basis for this claim," or "explain … how the facts supporting the [various] claims differ," the implied covenant claim must be dismissed.  *See Doe v. Stonehill Coll., Inc.*, 55 F.4th 302, 337-338 (1st Cir. 2022); *see also Doe v. Clark Univ.*, 624 F. Supp. 3d 1, 9 (D. Mass. 2022) ("In the Title IX context, the analysis for a claim of breach of the covenant of good faith and fair dealing is 'essentially identical' to the analysis for a claim of breach of contract.").  Moreover, "[t]he essential inquiry" in an implied covenant claim "is whether the challenged conduct conformed to the parties' reasonable understanding of performance obligations." *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 612 (D. Mass. 2016).  This mirrors the "reasonable expectation" standard that applies to alleged contracts between students and universities and forecloses Plaintiffs' claim for breach.  *See id.*

### CONCLUSION

The Court should dismiss Plaintiffs' Second Amended Complaint with prejudice.

DATED:  June 18, 2024

Respectfully Submitted,

PRESIDENT AND FELLOWS OF HARVARD COLLEGE

By its attorneys,

/s/ Felicia H. Ellsworth

Mark A. Kirsch (*pro hac vice*)
Gina Merrill (*pro hac vice*)
KING & SPALDING LLP
1185 Avenue of the Americas
34th Floor
New York, NY 10036
mkirsch@kslaw.com
gmerrill@kslaw.com
Tel: (212) 790-5329
Fax: (212) 556-2222

Zachary Fardon (*pro hac vice*)
KING & SPALDING LLP
110 N. Wacker Drive
Suite 3800
Chicago, IL 60606
zfardon@kslaw.com
Tel: (312) 764-6960
Fax: (312) 995-6330

Zoe M. Beiner (*pro hac vice*)
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Suite 900
Washington, DC 20006
zbeiner@kslaw.com
Tel: (202) 626-5575
Fax: (202) 626-3737

Felicia H. Ellsworth, BBO #665232
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel:  (617) 526-6000
Fax: (617) 526-5000
felicia.ellsworth@wilmerhale.com

Seth P. Waxman (*pro hac vice*)
Bruce M. Berman (*pro hac vice*)
Jeremy W. Brinster (*pro hac vice*)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Tel:  (202) 663-6000
Fax: (202) 663-6363
seth.waxman@wilmerhale.com
bruce.berman@wilmerhale.com
jeremy.brinster@wilmerhale.com