**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

--------------------------------------------------------- X
ALEXANDER KESTENBAUM and       :
STUDENTS AGAINST ANTISEMITISM,       :
INC.,       :
       :
             Plaintiffs,       :       Civil Action No. 1:24-cv-10092-RGS
      v.       :
       :
PRESIDENT AND FELLOWS OF       :
HARVARD COLLEGE,       :
       :
             Defendant.       :
--------------------------------------------------------- X

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS AND MOTION TO STRIKE
THE SECOND AMENDED COMPLAINT**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................. 1

SUMMARY OF FACTS ......................................................................................... 5

ARGUMENT ...................................................................................................... 9

I.   THIS COURT HAS SUBJECT MATTER JURISDICTION............................................ 9

    A.   Plaintiffs' Claims Are Ripe............................................................... 10

    B.   SAA Has Standing to Seek Injunctive Relief ....................................... 13

        1.   Plaintiffs Properly Allege Ongoing and Future Injury-in-Fact................. 13

        2.   Plaintiffs' Ongoing and Future Injuries Are Traceable to Harvard ......... 14

        3.   A Favorable Decision Will Redress Plaintiffs' Injuries ......................... 16

        4.   SAA Has Associational Standing ................................................... 17

II.   PLAINTIFFS' REQUESTED RELIEF IS PROPER ..................................................... 18

III.   PLAINTIFFS ALLEGE HARVARD'S RESPONSIBILITY FOR ITS HOSTILE
     EDUCATIONAL ENVIRONMENT.................................................................... 19

    A.   Plaintiffs Sufficiently Allege Harassment .......................................... 20

    B.   Plaintiffs Plausibly Allege Harvard's Deliberate Indifference ............... 22

IV.   PLAINTIFFS STATE A DIRECT DISCRIMINATION CLAIM UNDER TITLE VI ... 27

V.   PLAINTIFFS ADEQUATELY ALLEGE BREACH OF CONTRACT AND THE
     IMPLIED COVENANT ................................................................................. 28

CONCLUSION.................................................................................................. 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abbott Lab'ys v. Gardner*,
   387 U.S. 136 (1967).........................................................................................11

*Aguasvivas v. Pompeo*,
   984 F.3d 1047 (1st Cir. 2021)........................................................................10

*Algonquin Gas Transmission, LLC v. City of Weymouth*,
   919 F.3d 54 (1st Cir. 2019)............................................................................11

*Allen v. Wright*,
   468 U.S. 737 (1984)........................................................................................15

*Barnett v. Johnson City Sch. Dist.*,
   2005 WL 8178066 (N.D.N.Y. Feb. 2, 2005)................................................18

*Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm.*,
   89 F.4th 46 (1st Cir. 2023).............................................................................18

*In re Bos. Univ. COVID-19 Refund Litig.*,
   511 F. Supp. 3d 20 (D. Mass. 2021)..............................................................19

*Brodeur v. Claremont Sch. Dist.*,
   626 F. Supp. 2d 195 (D.N.H. 2009)...............................................................24

*Brown v. Hot, Sexy & Safer Prods., Inc.*,
   68 F.3d 525 (1st Cir. 1995).......................................................................20, 21

*Brown v. Suffolk Univ.*,
   2021 WL 2785047 (D. Mass. Mar. 31, 2021) ...............................................30

*Brown v. Trs. of Boston Univ.*,
   891 F.2d 337 (1st Cir. 1989)......................................................................18, 19

*City of Los Angeles v. Lyons*,
   461 U.S. 95 (1983)..........................................................................................14

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013)........................................................................................14

*Concilio de Salud Integral de Loiza, Inc. v. Pérez-Perdomo*,
   551 F.3d 10 (1st Cir. 2008).............................................................................17

*Connor B. ex rel. Vigurs v. Patrick,*
    771 F. Supp. 2d 142 (D. Mass. 2011) ................................................................ 13, 14

*Conservation L. Found., Inc. v. Jackson,*
    964 F. Supp. 2d 152 (D. Mass. 2013) ..................................................................... 16

*Council for Life Coal. v. Reno,*
    856 F. Supp. 1422 (S.D. Cal. 1994) ........................................................................ 25

*Counterman v. Colorado,*
    600 U.S. 66 (2023) ................................................................................................... 25

*Czerwienski v. Harvard Univ.,*
    666 F. Supp. 3d 49 (D. Mass. 2023) ................................................................ *passim*

*DaimlerChrysler Corp. v. Cuno,*
    547 U.S. 332 (2006) ................................................................................................. 16

*Davis v. Monroe Cnty. Bd. of Educ.,*
    526 U.S. 629 (1999) ........................................................................................... 15, 19

*Davis v. Wells Fargo,*
    824 F.3d 333 (3d Cir. 2016) .................................................................................... 10

*Doe v. Brandeis Univ.,*
    177 F. Supp. 3d 561 (D. Mass. 2016) .................................................................... 30

*Doe v. Brown Univ.,*
    43 F.4th 195 (1st Cir. 2022) .................................................................................... 28

*Doe v. Gavins,*
    2023 WL 6296398 (D. Mass. Sept. 27, 2023) ....................................................... 21

*Doe v. Harvard Univ.,*
    462 F. Supp. 3d 51 (D. Mass. 2020) ...................................................................... 24

*Doe v. Stonehill,*
    55 F.4th 302 (1st Cir. 2002) .................................................................................... 30

*Doe v. Trs. of Bos. Coll.,*
    942 F.3d 527 (1st Cir. 2019) ................................................................................... 19

*Doe v. Univ. of Me. Sys.,*
    2020 WL 981702 (D. Me. Feb. 20, 2020) .............................................................. 12

*Doe v. Univ. of Tenn.,*
    186 F. Supp. 3d 788 (M.D. Tenn. 2016) ................................................................ 14

*Duggan v. Martorello*,
  596 F. Supp. 3d 158 (D. Mass. 2022) ...................................................................19

*E.E.O.C. v. Aviation Port Servs., LLC*,
  2020 WL 1550564 (D. Mass. Apr. 1, 2020) .........................................................19

*E.E.O.C. v. Fred Fuller Oil Co.*,
  2014 WL 347635 (D.N.H. Jan. 31, 2014) .............................................................21

*Ernst & Young v. Depositors Econ. Prot. Corp.*,
  45 F.3d 530 (1st Cir. 1995)...................................................................................12

*FDA v. Alliance for Hippocratic Med.*,
  144 S.Ct. 1540 (2024)...........................................................................................13

*Felber v. Yudof*,
  851 F. Supp. 2d 1182 (N.D. Cal. 2011) ..........................................................22, 26

*Feminist Majority Found. v. Hurley*,
  911 F.3d 674 (4th Cir. 2018) ................................................................................25

*Fitzgerald v. Barnstable Sch. Comm.*,
  504 F.3d 165 (1st Cir. 2007)................................................................................24

*Franchina v. City of Providence*,
  881 F.3d 32 (1st Cir. 2018)...................................................................................20

*G. v. Fay Sch.*,
  931 F.3d 1 (1st Cir. 2019) .....................................................................................30

*Gill v. Whitford*,
  585 U.S. 48 (2018).................................................................................................16

*Gorski v. N.H. Dep't of Corr.*,
  290 F.3d 466 (1st Cir. 2002).................................................................................20

*Grace v. Bd. of Trs.*,
  85 F.4th 1 (1st Cir. 2023)................................................................................23, 24

*Guckenberger v. Boston Univ.*,
  957 F. Supp. 306 (D. Mass. 1997).................................................................21, 26

*Hayes v. McGee*,
  2011 WL 39341 (D. Mass. Jan. 6, 2011) .............................................................18

*Howard v. Feliciano*,
  583 F. Supp. 2d 252 (D. P.R. 2008) ...............................................................23, 24

*Kappa Alpha Theta Frat., Inc. v. Harvard Univ.*,
  397 F. Supp. 3d 97 (D. Mass 2019) ...................................................................16

*Koumantaros v. City Univ. of N.Y.*,
  2007 WL 840115 (S.D.N.Y. Mar. 19, 2007) .......................................................22

*Lipsett v. Univ. of P.R.*,
  864 F.2d 881 (1st Cir. 1988) ...............................................................................21

*Madsen v. Women's Health Ctr., Inc.*,
  512 U.S. 753 (1994) .............................................................................................18

*Maldonado v. Cultural Care, Inc.*,
  2020 WL 4352846 (D. Mass. July 29, 2020) .......................................................19

*Mandel v. Bd. of Trs. of Cal. State Univ.*,
  2018 WL 1242067 (N.D. Cal. Mar. 9, 2018) .......................................................22

*Mass. Ass'n of Afro-Am. Police, Inc. v. Bos. Police Dep't*,
  973 F.2d 18 (1st Cir. 1992) ...............................................................................12

*In re McCabe*,
  2006 WL 8462691 (D. Mass. Apr. 3, 2006) .......................................................16

*Morell v. United States*,
  185 F.R.D. 116 (D.P.R. 1999) .............................................................................18

*N.H. Mot. Transp. Ass'n v. Rowe*,
  448 F.3d 66 (1st Cir. 2006) .................................................................................18

*NAACP v. Alabama ex rel. Patterson*,
  357 U.S. 449 (1958) .............................................................................................17

*Nat'l Ass'n of Gov't Emps. v. Mulligan*,
  914 F. Supp. 2d 10 (D. Mass. 2012) ...................................................................18

*Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist.*,
  969 F.3d 12 (1st Cir. 2020) .................................................................................25

*Nulankeyutmonen Nkihtaqmikon v. Impson*,
  503 F.3d 18 (1st Cir. 2007) .................................................................................13

*O'Rourke v. City of Providence*,
  235 F.3d 713 (1st Cir. 2001) ...............................................................................20

*Papish v. Bd. of Curators of Univ. of Mo.*,
  410 U.S. 667 (1973) .............................................................................................25

*Pocono Mtn. Charter Sch. v. Pocono Mtn. Sch. Dist.*,
    908 F. Supp. 2d 597 (M.D. Pa. 2012) ................................................... 13

*Pollard v. Georgetown Sch. Dist.*,
    132 F. Supp. 3d 208 (D. Mass. 2015) .................................................... 22

*Porto v. Town of Tewksbury*,
    488 F.3d 67 (1st Cir. 2007) .................................................................... 24

*R.I. Ass'n of Realtors, Inc. v. Whitehouse*,
    199 F.3d 26 (1st Cir. 1999) .................................................................... 12

*Roe v. Healey*,
    78 F.4th 11 (1st Cir. 2023) ..................................................................... 14

*Roe v. Lincoln-Sudbury Reg'l Sch. Dist.*,
    2021 WL 1132256 (D. Mass. Mar. 24, 2021) ....................................... 19

*Ruffino v. State Bank & Tr. Co.*,
    908 F. Supp. 1019 (D. Mass. 1995) ...................................................... 13

*Samuels v. Mackell*,
    401 U.S. 66 (1971) ................................................................................. 25

*Sauer v. Belfor USA Grp.*,
    205 F. Supp. 3d 209 (D. Mass. 2016) .............................................. 20, 21

*Schoendorf v. RTH Mech. Contractors, Inc.*,
    2012 WL 3229333 (D. Me. Aug. 6, 2012) ............................................ 24

*Sexual Minorities Uganda v. Lively*,
    960 F. Supp. 2d 304 (D. Mass. 2013) .................................................... 18

*Shin v. M.I.T.*,
    2005 WL 1869101 (Mass. Super. Ct. June 27, 2005) ............................ 30

*Shulse v. W. New Eng. Univ.*,
    2020 WL 4474274 (D. Mass. Aug. 4, 2020) ..................................... 28, 29

*Sinai v. New Eng. Tel. & Tel. Co.*,
    3 F.3d 471 (1st Cir. 1993) ...................................................................... 21

*Sindi v. El-Moslimany*,
    896 F.3d 1 (1st Cir. 2018) ...................................................................... 19

*Snelling v. Fall Mtn. Reg'l Sch. Dist.*,
    2001 WL 276975 (D.N.H. Mar. 21, 2001) ............................................ 21

*Sonoiki v. Harvard Univ.*,
    37 F.4th 691 (1st Cir. 2022)...................................................................29

*SPARTA Ins. v. Pa. Gen. Ins.*,
    621 F. Supp. 3d 169 (D. Mass. 2022) ....................................................12

*SPARTA Ins. v. Pa. Gen. Ins.*,
    651 F. Supp. 3d 391 (D. Mass. 2023) ....................................................12

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014)..........................................................................10, 12

*Texas v. United States*,
    523 U.S. 296 (1998)................................................................................11

*Thomas v. Anchorage Equal Rts. Comm'n*,
    220 F.3d 1134 (9th Cir. 2000) ...............................................................12

*Tuli v. Brigham & Women's Hosp., Inc.*,
    566 F. Supp. 2d 32 (D. Mass. 2008) ......................................................26

*United States v. Daley*,
    378 F. Supp. 3d 539 (W.D. Va. 2019)....................................................25

*Valentin v. Town of Natick*,
    2023 WL 8815167 (D. Mass. Dec. 20, 2023).........................................21

*Van v. Am. Airlines, Inc.*,
    370 F. Supp. 3d 218 (D. Mass. 2019) .......................................10, 14, 15

*Virginia v. Black*,
    538 U.S. 343 (2003)................................................................................25

*W. Coal Traffic League v. Surface Transp. Bd.*,
    998 F.3d 945 (D.C. Cir. 2021)................................................................16

*Warth v. Seldin*,
    422 U.S. 490 (1975)................................................................................17

*Zeno v. Pine Plains Cent. Sch. Dist.*,
    702 F.3d 655 (2d Cir. 2012) .............................................................19, 23

## Constitutional Provisions, Statues, and Rules

U.S. Const. amend. I...........................................................18, 24, 25, 26

42 U.S.C. § 2000d..........................................................................*passim*

Fed. R. Civ. P. 12(b)(1) ........................................................................................9, 10

Fed. R. Civ. P. 12(b)(6) ......................................................................................10, 19

Fed. R. Civ. P. 15(a)(2) .............................................................................................30

Plaintiffs respectfully submit this memorandum of law in opposition to Harvard's motions to dismiss and to strike the second amended complaint (Dkt. 63).[1]

## PRELIMINARY STATEMENT

By accepting federal funds, Harvard obligates itself under Title VI to protect its students from discrimination—including, no less than any others, its Jewish and Israeli students. Plaintiffs allege that Harvard has failed to comply with Title VI because it has failed and refused to take the appropriate steps necessary to remedy the antisemitic hostile educational environment to which its Jewish and Israeli students have been subjected—which intensified in the wake of Hamas's October 7, 2023 terrorist attack, the deadliest day for Jews since the Holocaust. Particularly since October 7, students and faculty at Harvard have been rallying to support Hamas, a U.S.-designated terrorist organization whose charter and spokesmen call for the destruction of Israel, the sole Jewish country in the world, and the murder of Jews everywhere. Jewish students have been met with genocidal chants—"one solution—Intifada revolution," "from the river to the sea, Palestine will be free [of Jews]"—and are being assaulted and blocked from entering their own campus. When Harvard Yard was occupied by a pro-Hamas mob for weeks, ¶¶ 249-75, Jewish students trying to study for exams were, as Harvard's Chabad Rabbi described it, "confronted with terrifying chants of globalize the Intifada—a call for the murder of Jews."[2] No other group has been made to live in such fear. Notwithstanding its hollow and irrelevant pieties, Harvard, as plaintiffs allege, is not merely deliberately indifferent to its antisemitic hostile environment, it tolerates, and indeed enables, that hostile environment and treats anti-Jewish and anti-Israeli

---

[1] "Plaintiffs" refers to Kestenbaum and the SAA members referred to in the complaint. "Mem." refers to Harvard's memorandum in support of its motion. Dkt. 74. "¶" refers to paragraphs in, and "Ex. A" and "Ex. B" refer to exhibits to, the complaint. All emphases added.

[2] https://x.com/HarvardChabad/status/1783329906585194730.

discrimination differently from and far more leniently than discrimination it does not tolerate against other protected groups. Plaintiffs' detailed allegations make this all but undeniable—but, at a minimum, there are material questions of fact precluding the granting of Harvard's motion.

Harvard's motion boils down to the assertion that because Harvard is doing something, that is, anything, about antisemitism, plaintiffs' claims are not ripe and, as a matter of law, Harvard was not and is not deliberately indifferent to its antisemitic hostile environment. The prudential ripeness doctrine is all but defunct and should be defunct, given, as the Supreme Court and the First Circuit have put it, the federal courts' "virtually unflagging" obligation to "hear and decide cases." But even assuming ripeness were still viable here, and it is not, its application should be rejected. Under Harvard's theory, which finds no support in Harvard's cases or otherwise, so long as any institution says it is doing something, the courts would refrain from enforcing Title VI, and Title VI would be eviscerated. Moreover, as shown below, what Harvard says it is doing about antisemitism is at best grossly misleading. Among numerous other things, Harvard did not meaningfully punish or deter the Harvard Yard occupiers; it rewarded them with concessions. There is thus no justification for dismissing the complaint based on Harvard's say-so. At a minimum, there are hotly contested issues of fact as to what Harvard is doing—and what it should be, but is not, doing.

In fact, what Harvard is doing shows no sign of working; its antisemitic hostile environment has only worsened. After Harvard argued on its first motion to dismiss, as it does now, that this case should be dismissed because it should be trusted to deal with its antisemitism problem, Jewish and Israeli students at Harvard were met with an even greater onslaught. Harvard has all but admitted this. On its first motion, Harvard said it was "proud" of its efforts in a sentence it now has wisely but tellingly dropped. Dkt. 36 at 5. Harvard should also have dropped its illogical

argument that what Harvard calls plaintiffs' "serial complaints" show that the case is "premature." Mem. 8. Had Harvard's efforts been at all successful, instead of demonstrably failing, there would have been no cause for any amended complaints. The "serial complaints" arise from Harvard's serial and worsening Title VI violations and confirm why this case is not premature.

Likewise, whether Harvard has been deliberately indifferent cannot be resolved on this motion. Plaintiffs allege that the at best half- and ineffective measures Harvard disingenuously touts instead prove its deliberate indifference—they show that it is aware of the problem but is deliberately indifferent to, or deliberately refuses to fulfill, its Title VI obligations to protect Jewish and Israeli students. Harvard would have the Court infer from its supposed efforts that it is not deliberately indifferent. But, again, this is a quintessential issue of fact, and on this motion all inferences must be drawn in favor of plaintiffs. And, contrary to Harvard's misdirected argument, plaintiffs' allegations are plainly more than sufficient to state a claim for Harvard's invidious direct discrimination against Jews and Israelis—its disparate treatment when it comes to remedying and preventing antisemitic discrimination. Harvard's response to antisemitism, including its failure and refusal to enforce its own conduct codes and its going so far as to reward rather than punish antisemitic protestors, unquestionably raises factual issues. None of the inapposite cases Harvard cites involved anything close to the kind of severe and pervasive hostile environment and discrimination plaintiffs allege here.

Harvard mouths pieties about how antisemitism is supposedly "antithetical to Harvard's foundational values," about how "invidious and enduring" a problem it is, Mem. 1—but, astonishingly, it does so all in service to its argument that it should evade all accountability for having facilitated the very antisemitism that has robbed plaintiffs and other Jewish students at Harvard of much of their educational experience.

The occupation of Harvard's campus during finals period confirmed what was already clear: Harvard's response to antisemitism has been woefully insufficient. Rather than promptly end the encampment, Harvard negotiated with the perpetrators, reversed disciplinary sanctions, and offered concessions on their Israel-divestment demands. ¶¶ 269-74. After Harvard's refusal to punish and deter antisemitism, commencement also featured antisemitic protests,[3] as well as a keynote address in which, echoing antisemitic tropes, the speaker dismissed those who objected to her prior antisemitic comments as motivated by "power and money."[4] Except for the Chabad rabbi, no one present, not Harvard's interim president or anyone else, objected.

To fully appreciate how specious Harvard's motion is and how empty Harvard's pieties are, one need only imagine (or review Harvard's history) to see what Harvard's response would have been (or has been) if even a fraction of the abuse Harvard's Jews have endured had been directed against any other protected group. Harvard would not have stood for it for one minute. Just as it is impossible to imagine Harvard's president testifying before Congress that advocating genocide of African Americans or Arab Americans would not contravene Harvard's policies—as Harvard's president did with respect to Jews—it is impossible to imagine Harvard arguing to the Court, "trust us; we're fixing" campus-wide, continuous, months' long onslaughts against any other protected group. It is impossible to imagine Harvard arguing in a case brought by members of any other group that it should be dismissed because they were not personally present at enough of the onslaughts for the hostile campus-wide educational environment to have adversely affected them. Harvard's Jewish students do not have the luxury of continuing to trust Harvard or giving Harvard still more time to fix a problem it has permitted to fester and metastasize.

---

[3] https://x.com/HarvardJews/status/1793786455367512450; https://x.com/ShabbosK/status/1793656095455789417.

[4] https://www.thecrimson.com/article/2024/5/24/zarchi-confronts-maria-ressa-harvard-commencement.

And it is no excuse to say that the antisemitism at Harvard is "political," Mem. 24, that it is, say, disagreement with the policies of Israel. Plaintiffs do not seek to deny anyone the right to criticize Israeli policies. But Harvard's campus mobs have targeted no other country, including those with far worse human rights records, with anything close to the kind of abuse they direct at Israel, going far beyond political disagreements to calling for its destruction and denying its right to defend itself. As the Obama, Trump, and Biden administrations have recognized, what the mobs are doing is antisemitism, plain and simple. Even more outrageous is Harvard's abject failure, in violation of Title VI, to stop it.

Nor is so-called "academic freedom" an excuse—as plaintiffs also allege, when it comes to discrimination (or even "microaggressions") against other groups, Harvard does not give a fig for academic freedom. ¶¶ 276-98. If students or faculty need to be disciplined or dismissed to stop them from contributing to Harvard's anti-Jewish hostile educational environment, then that is what Title VI requires. Harvard's meritless contention that the injunctive relief outlined in the complaint is too broad because it is designed to ensure Harvard's compliance with Title VI is, to say the least, premature. If Harvard does not wish to comply with Title VI, and if it wants its faculty and students to have the "academic freedom" to spew antisemitism and continue to harass Jewish students, Harvard's path is clear: forego receiving federal taxpayer funds and return the funds it has received.

## SUMMARY OF FACTS

For at least a decade, Harvard has known of, tolerated, and enabled antisemitism, paving the way for a metastasis of antisemitic harassment since Hamas's October 7 massacre. ¶¶ 62-94. The day after the attack, over thirty Harvard student groups issued a public statement blaming Israel. ¶¶ 101-03.

Plaintiffs have been targets of repeated verbal and physical threats and harassment and are forced to confront mobs extolling the Hamas massacre and calling for death to Jews and the

annihilation of Israel. Plaintiffs allege dozens of incidents of antisemitism at Harvard over the seven months following October 7. On October 18, for example, hundreds of students gathered for a "Die-In" on campus, at which SAA Member #1's teaching fellow and Kestenbaum's classmate physically attacked a Jewish student while screaming, "shame!" ¶¶ 114-15, 153. Harvard did nothing to stop them from harassing Jews on campus. ¶ 134. The next day, hundreds stormed Harvard buildings, blocking Kestenbaum from leaving a building and causing SAA Members #1, #2, #3, and #5 to fear violent attack as Harvard's police did nothing, leading students to hide and remove indicia of their Jewishness. ¶¶ 116-17, 119.

By November, antisemitic student groups began a semester-long takeover of Harvard Law's Caspersen lounge, and regularly harassed visibly Jewish students, including SAA members. ¶¶ 125-29. On November 13, over 120 professors signed a letter deeming Harvard's newly formed Antisemitism Advisory Group ("AAG") as an assault on academic freedom and defending students' use of genocidal chants. ¶ 158. On December 5, Harvard's then-president repeatedly refused to say during Congressional testimony that calling for the genocide of Jews is against Harvard policy. ¶ 163; Ex. B at 23. One AAG member called it "extremely disappoint[ing]," ¶ 173; Harvard's Hillel rabbi questioned Harvard's "ability to protect Jewish students," ¶ 168; and the only rabbi on the AAG realized he would not be able "to make the kind of changes that [he] thought Harvard needed," and resigned from the committee, ¶ 173.

On December 6, after Harvard Divinity canceled the only event it holds that celebrates Judaism because of a planned antisemitic rally, students took over another event Kestenbaum attended, yelling about a "Zionist genocidal campaign." ¶¶ 144-45. On February 27, students disrupted a Harvard Chabad and Alliance for Israel event SAA Member #5 attended. ¶ 233. At these rallies and others, students chanted antisemitic slogans, such as "globalize the Intifada" or

"long live the Intifada," "from the river to the sea," "Palestine will be Arab," "glory to the martyrs," "we have them outnumbered," and "there is only one solution, Intifada revolution." *E.g.*, ¶¶ 128, 136, 139, 141, 219, 236, 253, 270.

Harvard faculty regularly espouse antisemitism, *e.g.*, ¶¶ 152-61, 205, 305, including, for example, a course an SAA member attended in which the professor taught that, among other things, Jewish history is a "mythology," Jewish ethnic identity is "invented," and Jews are not indigenous to the land of Israel, ¶¶ 77-78. A speaker at a Harvard-sponsored event stated that "American Jewish immigrants have always been a foundational building block for the white supremacist infrastructure." ¶ 277, Ex. A at 33. A faculty group published a "cartoon depicting a hand branded with a Jewish star with a dollar sign in it gripping a rope connected to two nooses around the necks of an Arab and a Black man," which student groups reposted. ¶¶ 226-28. Harvard Divinity published an image of a Jewish person with a stereotypical nose and a Star of David greedily hoarding water from Palestinians, captioned in part: "the ways that religion is weaponized through Zionism." ¶ 108. Faculty published statements condemning the AAG and supporting those who attacked a Jewish Israeli student. ¶¶ 158, 161. Harvard faculty "make Israel the top perpetrator of the world's evils while omitting facts disputing their claims," and "Harvard's students accept that one-sided narrative." Ex. A at 24.

Students and faculty groups regularly praise or host events with convicted terrorists, ¶¶ 143, 209; antisemites or terrorist-sympathizers, ¶¶ 79, 205, 220, 231, 238; and others who applauded Hamas's massacre, ¶¶ 160, 197-98, 207, 210. The same students and student groups are permitted to break Harvard policies with impunity and disrupt classes and events, ¶¶ 121, 133, 141, 144, 212, 222, 233; improperly take over university spaces, ¶¶ 125, 128, 138, 232, 239, 249-75; and harass Jewish students, ¶¶ 114-15, 141, 147, 153, 249-75. Harvard required the Chabad

rabbi to hide the campus Hanukkah menorah at night so it would not be vandalized, rather than make sure it was protected, as Harvard does for the Israel "apartheid wall" erected annually by anti-Israel students. ¶¶ 145, 243. Meanwhile, Harvard has failed to prevent or discipline the repeated defacing and removal of posters displaying the hostages Hamas abducted from Israel, ¶¶ 132, 195-96, 225, while plaintiffs must traverse a campus and sit in classrooms defaced by antisemitic flyers and graffiti, ¶¶ 113, 223-24, 239.

Most recently, Harvard allowed hundreds of students, faculty, and others to take over Harvard Yard for weeks. ¶¶ 2, 249-75. The occupiers, among other things: engaged in calls for Intifada (among other antisemitic chants); displayed antisemitic signs, including of Harvard's Jewish interim president depicted as a devil, an age-old antisemitic trope; disrupted the campus environment for Jewish students who lived in the nearby dorms and who had to pass through the Yard; and harassed, threatened, intimidated, and physically attacked Jews in the Yard, including plaintiffs. *Id.* Rather than enforcing its conduct codes and stopping the occupation and harassment, Harvard negotiated with the instigators, offering them concessions. ¶¶ 3, 269, 274. Harvard claims it "referred dozens of participants for involuntary leave," Mem. 6, 25, but neglects to tell the Court that Harvard's president directed constituent schools to reinstate those placed on leave, ¶ 274, and ultimately very few students faced any disciplinary process.

Harvard contends that it is engaged in a "considered, multidimensional effort" to "tackl[e]" antisemitism, including the formation of a task force, that it has "engaged with its Jewish community to address the challenges that this turmoil has produced and, in some cases, laid bare," and that it is "focused on providing supportive measures, including care and support to victims of harassment, and on preventing future incidents of harassment through education on protest and debate." Mem. 1, 5-6. But these contentions are contradicted by the allegations in the complaint,

*e.g.*, ¶¶ 104, 116-20, 122-23, 125, 127-29, 131-36, 138, 141-44, 146-51, 197-98, 203-05, 209-12, 214, 218-29, 232-33, 236-41, 248, 256, 258, 262-63, 265-66, 271-72 (alleging Harvard's dismissive and utterly insufficient response to plaintiffs' complaints), and the reasonable inferences that may be drawn from them, and accordingly at most raise contested issues of fact. Harvard asserts, for example, that it directed Kestenbaum to "supportive and remedial resources," Mem. 6-7 (citing Whelsky Decl.), but does not address, let alone deny, the allegations that when Kestenbaum met with Dean Whelsky, he feigned ignorance of campus antisemitism, asking Kestenbaum how he experienced antisemitism despite Kestenbaum's dozens of emails explaining it, ¶ 266. Harvard also neglects to mention what happened with its original "task force"—the AAG—or its current one. The only rabbi on the AAG, a visiting professor at Harvard Divinity, resigned, more than half of its other members threatened to do so, and another member sharply criticized Harvard publicly and in interviews with Congress. ¶¶ 162-76. As a House Committee report revealed, the AAG had provided Harvard with numerous concrete recommendations for action against what the AAG called the "significant problem" of "antisemitic harassment" at Harvard. Ex. B. Harvard, however, shuttered the AAG and created a new "Antisemitism Task Force," appointing as co-chair a professor who had defamed Israel as a "regime of apartheid" and stated that "veins of hatred run through Jewish civilization," ¶¶ 186, 191-94, leading a former Harvard president to say he had "lost confidence" in Harvard as a "place where Jews and Israelis can flourish"; the other co-chair soon resigned, ¶¶ 6-7, 9, 169-72, 191-94.

## ARGUMENT

### I.      This Court Has Subject Matter Jurisdiction

Because Harvard's Rule 12(b)(1) jurisdictional arguments are "so intertwined" with plaintiffs' substantive claims that their "resolution" is "dependent on factual issues going to the merits," dismissal may be granted "only if the material jurisdictional facts are not in dispute and

the moving party is entitled to prevail as a matter of law." *Van v. Am. Airlines, Inc.*, 370 F. Supp. 3d 218, 224 (D. Mass. 2019). Here, Harvard's Rule 12(b)(1) arguments depend exclusively on Harvard's contentions as to the merits, and there are material issues of fact with respect to all of those contentions. Harvard, for example, argues that plaintiffs lack standing to seek injunctive relief because Harvard has taken "tangible steps" to "investigate and combat antisemitic conduct" and has responded in "myriad ways" to "antisemitism." Mem. 13-16. But not only have those alleged tangible steps and myriad ways been, as Harvard all but acknowledges, ineffective, *see infra* Arg § III.B., they do not come close to establishing that Harvard is entitled to prevail as a matter of law. Harvard's arguments must be assessed under Rule 12(b)(6), because Harvard "may not short-circuit the usual process, flip the burden of persuasion, and permit itself to submit competing facts to support its argument." *Davis v. Wells Fargo*, 824 F.3d 333, 349 (3d Cir. 2016).

### A.     Plaintiffs' Claims Are Ripe

Harvard asserts that this action is "premature" because its "response efforts are still underway," Mem. 8-9, going so far as to argue that allowing plaintiffs, who have endured unrelenting and intensifying antisemitic harassment, to proceed with their claims would cause *Harvard* "significant hardship," Mem. 10. The prudential ripeness doctrine, however, is all but defunct and should be defunct—given, as the Supreme Court and First Circuit have made clear, the federal courts' "virtually unflagging" "obligation to hear and decide cases." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014); *Aguasvivas v. Pompeo*, 984 F.3d 1047, 1053 (1st Cir. 2021) ("[I]t is unclear whether prudential ripeness concerns in particular may still be entertained."). But even assuming ripeness were still viable in a case like this, and it is not, its application should be rejected here. Under Harvard's theory, so long as it or any other institution says it is doing something, or anything, the courts should refrain from enforcing Title VI—which

would eviscerate Title VI. Moreover, what Harvard says it is doing about antisemitism is at best grossly misleading. Among numerous other things, Harvard did not meaningfully punish or deter the vast majority of Harvard Yard occupiers; it rewarded them with concessions. There is no justification for dismissing the complaint based on Harvard's say-so; at a minimum, there are hotly contested issues of fact as to what Harvard is doing—and what it should be, but is not, doing. *See supra* Facts; *infra* Arg. §§ I.B.2, III.B.

Harvard argues plaintiffs' claims are "jurisdictionally" unripe because they depend on "contingent future events" and "guesswork [] would be required to evaluate the sufficiency of Harvard's in-progress efforts at this stage." Mem. 9. Here, plaintiffs allege and seek relief from concrete past and threatened future injury, and their claims in no way depend on the outcome of Harvard's efforts, such as they are, particularly given the allegations that those efforts have been utterly unsuccessful and, if anything, have made things worse—not to mention the entirely reasonable inference that they evidence Harvard's deliberate indifference. And as *Algonquin Gas Transmission, LLC v. City of Weymouth*, 919 F.3d 54, 62-63 (1st Cir. 2019), confirms, jurisdictional ripeness is concerned with whether there is a future contingency—such as contractual or regulatory approval—that could render a decision merely advisory.[5] As in *Algonquin*, here there is no such future contingency, and Harvard does not and cannot show otherwise.[6]

Harvard raises "prudential" ripeness considerations of "fitness" and "hardship." As to

---

[5] Harvard's other entirely inapposite cases, Mem. 9, in no way support its position. *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 149, 151-53 (1967), found ripe a pre-enforcement review of federal drug label regulations, finding a "sufficiently direct and immediate" risk to plaintiffs because the regulation impacted plaintiffs' businesses. In *Texas v. United States*, 523 U.S. 296, 298-302 (1998), the court found unripe a request to declare that the Voting Rights Act did not interfere with Texas sanctioning public schools, because the alleged risk was too speculative in light of the myriad hypothetical steps that would need to occur first. No such speculative risk exists here.

[6] Harvard meritlessly argues that plaintiffs, by filing amended complaints, concede that the matter is not ripe. Mem. 9-10. As shown, *supra* Prelim. Statement, that argument is illogical and counter-factual.

fitness, courts consider "whether resolution of the dispute should be postponed in the name of judicial restraint from unnecessary decision of constitutional issues." *SPARTA Ins. v. Pa. Gen. Ins.*, 651 F. Supp. 3d 391, 398 (D. Mass. 2023). Plaintiffs do not and should not have their day in court delayed to accommodate their harassers and their enablers.[7] *Doe v. Univ. of Me. Sys.*, 2020 WL 981702, at *10 n.13, *11 (D. Me. Feb. 20, 2020) (due process claim ripe because it did not "hinge[] on the outcome of the university's [ongoing] investigation," and hostile environment claim ripe because it "allege[d] past patterns of conduct by the Defendants and [was] not contingent on future factual development").

Harvard's meritless argument that the adjudication of plaintiffs' claims will cause Harvard "hardship," Mem. 10, ignores that in considering hardship, courts weigh "the harm to the parties *seeking relief*," not hardship to Harvard. *SPARTA Ins. v. Pa. Gen. Ins.*, 621 F. Supp. 3d 169, 178 (D. Mass. 2022). Harvard cites no case supporting that defendant's purported hardship could outweigh a court's "virtually unflagging" obligation "to hear and decide cases."[8] *Susan B. Anthony List*, 573 U.S. at 167. Harvard's argument—for indefinite delay—only highlights that "delaying or denying resolution of the issue would [] work[] a substantial hardship" on *plaintiffs*' ability to seek justice. *R.I. Ass'n of Realtors, Inc. v. Whitehouse*, 199 F.3d 26, 34 (1st Cir. 1999).

---

[7] Harvard's citation to *Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 538 (1st Cir. 1995), to argue that a delay is appropriate is inapposite, as there the claims were "not rooted in the present, but depend[ed] on a lengthy chain of speculation as to what the future has in store."

[8] *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1142 (9th Cir. 2000), Mem. 10-11, was a pre-enforcement action brought by landlords against the government, where the court found no hardship to the plaintiff in delaying litigation because there was no "real or imminent threat of enforcement," and defendant would have to defend the law in a vacuum with only "hypothetical tenants" to consider. Harvard absurdly suggests that plaintiffs will not face any hardship from a delay because they will not lose the right to contest the issues later. Mem. 11 (citing *Mass. Ass'n of Afro-Am. Police, Inc. v. Bos. Police Dep't*, 973 F.2d 18, 21 (1st Cir. 1992)). Unlike *Mass. Ass'n*, this case is not a "hypothetical dispute" where the alleged injury "cannot yet be proven and may never occur." 973 F.2d at 20-21. Here, SAA's members are students facing ongoing harm to their educational experience while enrolled at Harvard for a limited (and very expensive) period.

**B.      SAA Has Standing to Seek Injunctive Relief**

Harvard's arguments that SAA lacks standing, Mem. 11-17, are meritless.[9] Plaintiffs have

standing where they have "suffered an injury in fact," "fairly traceable to the [defendant's]

allegedly unlawful actions" as to which it is "likely, as opposed to merely speculative, that [it] will

be redressed by a favorable decision." *Nulankeyutmonen Nkihtaqmikon v. Impson*, 503 F.3d 18,

26 (1st Cir. 2007). Plaintiffs have more than adequately alleged facts—uncontroverted by

Harvard's conclusory declarations—demonstrating that they face ongoing and future imminent

harm stemming from Harvard's deliberate indifference, harm which would be redressed and

prevented by the relief they request.

**1.   Plaintiffs Properly Allege Ongoing and Future Injury-in-Fact**

Harvard contends that plaintiffs may allege injury only based on harassment directed at the

plaintiffs themselves. Mem. 13. That is not the law: "courts have upheld standing for plaintiffs

who are not the direct targets of discrimination." *Pocono Mtn. Charter Sch. v. Pocono Mtn. Sch.

Dist.*, 908 F. Supp. 2d 597, 615 (M.D. Pa. 2012); *see also Ruffino v. State Bank & Tr. Co.*, 908 F.

Supp. 1019, 1038 (D. Mass. 1995) ("[H]ostile environment discrimination typically is not confined

to one act, directed at one individual, one time; rather, it is a composite of [] action and inaction . . .

when there are multiple incidents and victims, it is the cumulative effect of the offensive behavior

that creates the [] environment."). Thus, where, as here, the environment created by defendant's

"policies and practices" has been alleged to cause plaintiffs' injuries, plaintiffs (here, SAA on

behalf of SAA members) sufficiently plead standing for injunctive relief. *Connor B. ex rel. Vigurs

v. Patrick*, 771 F. Supp. 2d 142, 153 (D. Mass. 2011); *e.g.*, ¶¶ 299-311.[10]

---

[9] Kestenbaum continues to seek damages but does not contest that his request for injunctive relief is moot. Harvard does not contest Kestenbaum's standing to seek damages.

[10] Harvard cites *FDA v. Alliance for Hippocratic Med.*, 144 S.Ct. 1540, 1561 n.3 (2024), for the proposition that "distress or disagreement with the activities of others is not a basis" for standing. Mem. 13. But there, pro-life doctors

Harvard also argues that plaintiffs may not rely on allegations of past incidents. Mem. 13-14. But as Harvard's own authority holds, "past harm *can* "confer standing to seek forward-looking declaratory or injunctive relief" where, as here, "there is ongoing injury or a sufficient threat that the injury will recur," *Roe v. Healey*, 78 F.4th 11, 21 (1st Cir. 2023).[11] Plaintiffs' allegations make clear that given the SAA members' ongoing enrollment at Harvard and Harvard's continuing inadequate response to rampant antisemitism—which escalated over the year, through commencement, with the antisemitic protesters promising that their actions were only "the beginning," ¶ 275—they will remain subject to Harvard's hostile environment. *See, e.g.*, *Connor B.*, 771 F. Supp. 2d at 153 (standing where plaintiffs alleged defendants' "policies and practices []" continue to harm them" because "they suffer ongoing harm resulting from the alleged systemic failures"); *Doe v. Univ. of Tenn.*, 186 F. Supp. 3d 788, 813 (M.D. Tenn. 2016) (injunctive relief appropriate where enrolled plaintiffs allege ongoing deliberate indifference).

### 2.   Plaintiffs' Ongoing and Future Injuries Are Traceable to Harvard

Harvard argues that plaintiffs have not traced their risk of future injury to Harvard's "illegal conduct," *i.e.*, its deliberate indifference, Mem. 15-16, again intertwining standing issues with a merits dispute. *Van*, 370 F. Supp. 3d at 224. But plaintiffs "need not prove with specificity at this stage how every harm" relates to Harvard's deliberate indifference; instead they must only show a "fairly traceable" connection between their injuries and Harvard's actions, which can be "indirect[]." *Connor B.*, 771 F. Supp. 2d at 152. Here, plaintiffs plead more than enough—

---

lacked standing to challenge relaxed regulation of an abortion drug because they could refuse to participate in abortions. *Id.* at 1559-60. Here, plaintiffs cannot be expected to refuse to participate in their own education to avoid antisemitism at Harvard.

[11] Harvard's cases are inapposite. Mem. 13-15. In *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411 (2013), the plaintiffs challenging a statute were not subject to it and speculated about whether they might be targeted in the future. In *City of Los Angeles v. Lyons*, 461 U.S. 95, 105, 107 n.8 (1983), there was no showing plaintiff was imminently likely to be arrested and choked by police again. Here, enrolled plaintiffs are protected by Title VI but remain subject to unlawful antisemitic harassment in a regularly recurring pattern of antisemitic activity.

Harvard's longstanding, continuing deliberate indifference is precisely the cause of plaintiffs' injuries. Harvard's blaming "third parties" ignores that those third parties are under its control and that it is liable under Title VI when it is deliberately indifferent to peer-on-peer or teacher-on-student harassment. *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 645 (1999) (school liable if its conduct "*cause[d]* students to undergo harassment or ma[de] them liable or vulnerable to it"). Were Harvard correct, injunctive relief would never be available in hostile environment cases.[12]

Harvard's conclusory declarations cannot overcome plaintiffs' detailed allegations that Harvard's unlawful conduct has created a worsening hostile educational environment that will continue to injure plaintiffs, which are further supported by the recent end-of-semester incidents and HJAA and House reports. ¶¶ 8, 9, 187, 249-75. Harvard claims, for example, that plaintiffs lack standing because Harvard offered a one-week event series to the community on "facilitat[ing] discussion" and "respectful debate," Mem. 16 (citing Weenick Decl. ¶ 4), but nowhere explains how that was calculated to end antisemitism, how effective it was, or even how many people attended.[13] Harvard says that its Antisemitism Task Force, announced over six months ago, will provide "final recommendations in the coming academic year," Mem. 16 (citing Ellsworth Ex. 14), but plaintiffs do not have the luxury of waiting even longer for mere recommendations while antisemitism intensifies. *See* ¶¶ 209, 226, 249-275. At a minimum, the efficacy of Harvard's response and potential future response is a factual question. *Van*, 370 F. Supp. 3d at 224.

---

[12] Harvard cites *Allen v. Wright*, 468 U.S. 737 (1984), to argue causation is "attenuated at best." Mem. 16. There, parents lacked standing to bring a nation-wide class action alleging the IRS injured their children by failing to deny tax exemptions to racially discriminatory private schools. The case has nothing to do with Harvard's culpability here.

[13] Harvard says it: "increased . . . campus security and police officers," with no figures or timeframe, Weenick Decl. ¶ 3; "is developing" educational programs, with no timeframe or assertion that they will be mandatory, *id.* ¶ 6; and has issued statements that violations may be subject to discipline, Ellsworth Ex. 4; *see also* Mem. 16, but has proven that it will virtually always decline to discipline antisemitic offenders, Mem. 22-24.

### 3. A Favorable Decision Will Redress Plaintiffs' Injuries

SAA has the "relatively modest" burden "of alleging redress[a]bility at the motion to dismiss stage" beyond the "merely speculative" level. *Conservation L. Found., Inc. v. Jackson*, 964 F. Supp. 2d 152, 163 (D. Mass. 2013). SAA seeks an injunction that would redress its members' injuries, requiring Harvard to enforce its own policies equally and to treat antisemitism with the same severity and seriousness it treats other forms of discrimination. That plaintiffs' injuries derive from Harvard's policies and practices of ignoring escalating antisemitic conduct (and ignoring its own disciplinary policies when Jews are victims) is sufficient to show that plaintiffs' injuries from their "disparate treatment" is "likely redressable by the requested declaratory and injunctive relief." *Kappa Alpha Theta Frat., Inc. v. Harvard Univ.*, 397 F. Supp. 3d 97, 105 (D. Mass 2019).

Harvard argues that plaintiffs' injunctive relief request is "overbroad" and "unavailable." Mem. 16-17.[14] But SAA's request is tailored to redress its members' injuries—Harvard's discrimination against Jewish students. *In re McCabe*, 2006 WL 8462691, at *5 (D. Mass. Apr. 3, 2006) (recognizing the court's "broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future unless enjoined, may fairly be anticipated from the defendant's conduct in the past").

Harvard also argues that "appointing a neutral expert monitor" to oversee its compliance with an injunction would be improper, since "Plaintiffs do not plead that such an appointment is authorized by statute or extraordinary circumstances." Mem. 17 (citing *Garcia-Rubiera v.*

---

[14] Harvard's cases, Mem. 16-17, are far afield. For example, *Gill v. Whitford*, 585 U.S. 48, 73 (2018) is a gerrymandering case involving "an unsettled kind of claim this Court has not agreed upon, the contours and justiciability of which are unresolved," that was remanded to allow plaintiffs to show their injuries. In *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 344 (2006), the injury was "hypothetical" and required "speculating" as to tax officials' and legislators' conduct. In *W. Coal Traffic League v. Surface Transp. Bd.*, 998 F.3d 945, 950–51 (D.C. Cir. 2021), the court "lack[ed] the power" to order a federal administrative agency to break its internal deadlock.

*Fortuno*, 727 F.3d 102, 114 (1st Cir. 2013) (not discussing pleading standards)). But plaintiffs do not have to plead any such thing—the Court's authority to appoint a monitor is well established by Rule 53, the inherent power of the Court, and numerous decisions. *See, e.g.*, Fed. R. Civ. P. 53 (court authority to appoint monitor); *Concilio de Salud Integral de Loiza, Inc. v. Pérez-Perdomo*, 551 F.3d 10, 19 (1st Cir. 2008) (noting "[i]n addressing [] complex . . . issues . . ., the district court may be well-advised to [appoint a monitor]" under its "inherent power" and Rule 53). Given that Harvard touts its efforts, it should welcome a monitor.

### 4. SAA Has Associational Standing

SAA is a not-for-profit corporation comprised of voluntary members, including Jewish Harvard students, "formed for the purpose of defending . . . the right of individuals to equal protection and to be free from antisemitism in higher education, through litigation and other means." ¶¶ 19-20. Organizations like SAA can seek relief for their members, as "the remedy, if granted, will inure to the benefit of those members of the association actually injured." *Warth v. Seldin*, 422 U.S. 490, 515 (1975). Associational standing has long allowed injured minorities to band together in organizations equipped to defend their rights. *See, e.g.*, *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958).

Harvard argues that associational standing is impermissible because hostile educational environment claims are "fact-intensive" and require "plaintiff-specific showings." Mem. 11-12. That is not the law. Instead, "so long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members entitled to invoke the court's jurisdiction." *Warth*, 422 U.S. at 511. The SAA members are not "indispensable"; this action challenges a widespread unlawful pattern and practice and seeks injunctive relief, which courts regularly find does not require the kind of participation from individual members that bars

associational standing. *See Sexual Minorities Uganda v. Lively*, 960 F. Supp. 2d 304, 324, 327 (D. Mass. 2013); *Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm.*, 89 F.4th 46, 55 (1st Cir. 2023).[15]

## II.   Plaintiffs' Requested Relief Is Proper

Harvard's motion to strike—a "drastic" remedy "viewed with disfavor" and "infrequently granted"—plaintiffs' injunctive request should be rejected. *Hayes v. McGee*, 2011 WL 39341, at *2 (D. Mass. Jan. 6, 2011). Harvard must, but cannot, show that the "allegations being challenged are so unrelated to plaintiff's claim as to be unworthy of any consideration . . . and that their presence in the pleading throughout the proceeding will be prejudicial to the moving party." *Morell v. United States*, 185 F.R.D. 116, 117-18 (D.P.R. 1999). Harvard argues that the injunctive prayer is "fatally overbroad." Mem. 18 (citing *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994)). But *Madsen*, on a First Amendment challenge to a state-court-issued injunction against protesters on a public street, upheld the injunction with some modifications. Harvard makes no attempt to explain why plaintiffs' mere request in a complaint for an injunction is prejudicial. Harvard incorrectly asserts that the requested relief is "tantamount to an injunction to 'obey the statute,'" Mem. 18, citing *Brown v. Trs. of Boston Univ.*, 891 F.2d 337, 361 (1st Cir. 1989), a post-trial appeal slightly narrowing the district court's injunction, which has no bearing on the pleading standard. Plaintiffs' request is not an impermissibly broad request that Harvard "obey the statute"

---

[15] None of the cases that Harvard cites suggest otherwise, Mem. 11-12, but instead rejected standing because plaintiffs did not sufficiently allege injuries or the relief sought would not apply to all members equally. In *Barnett v. Johnson City Sch. Dist.*, 2005 WL 8178066, at *5 (N.D.N.Y. Feb. 2, 2005), there were no allegations besides "conjectural [and] hypothetical injuries" to unnamed "black students" who may not have been members of the organization. In *Nat'l Ass'n of Gov't Emps. v. Mulligan*, 914 F. Supp. 2d 10, 14 (D. Mass. 2012), the claims of a discriminatory hiring process required addressing each individual's circumstances, and the relief sought—directing examination and rescission of job appointments based on "political association," and reopening "tainted positions" could not "be granted through [an] injunction applicable to all members equally." SAA members do not seek individualized relief, but policy-level changes that will affect all students equally. *N.H. Mot. Transp. Ass'n v. Rowe*, 448 F.3d 66, 72-73 (1st Cir. 2006), upheld associational standing because, as here, a result for one member would similarly affect others.

everywhere and with respect to all people, but only that it be compelled to take measures to ensure that its Jewish students are treated equally and not subjected to severe and pervasive discrimination.[16] Harvard argues that plaintiffs impermissibly request "particular remedial measures." Mem. 19. Yet plaintiffs seek only relief "necessary and appropriate" to prevent Harvard from continuing to discriminate against Jewish students. Compl. at 129. None of Harvard's cases support its argument that plaintiffs' injunctive prayer should be stricken at the outset.[17] Mem. 17-19.

### III.   Plaintiffs Allege Harvard's Responsibility for Its Hostile Educational Environment

A Rule 12(b)(6) motion must be denied where, as here, the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *In re Bos. Univ. COVID-19 Refund Litig.*, 511 F. Supp. 3d 20, 23 (D. Mass. 2021) (Stearns, J.). The court "accepts as true all well-pleaded facts and draws all reasonable inferences in favor of the plaintiff." *Duggan v. Martorello*, 596 F. Supp. 3d 158, 181 (D. Mass. 2022).[18] To plead a Title VI hostile environment claim, a plaintiff must allege that "he or she was subject to severe, pervasive, and objectively offensive" harassment, the harassment "caused the plaintiff to be deprived of

---

[16] *E.E.O.C. v. Aviation Port Servs., LLC*, 2020 WL 1550564, at *12 (D. Mass. Apr. 1, 2020), held courts may "issue an injunction in a Title VII case when necessary to prevent future discrimination" against "not only the exact same act as the one found unlawful, but also acts that 'are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future, unless enjoined, may fairly be anticipated from the defendant's conduct in the past.'" *See Brown*, 891 F.2d at 361 (injunction "is not necessarily made overbroad by extending benefit or protection to persons other than" plaintiffs).

[17] *Davis*, 526 U.S. at 648 (not addressing prayer for relief, and merely noting failure to take specific actions requested by plaintiffs does not guarantee *liability*); *Roe v. Lincoln-Sudbury Reg'l Sch. Dist.*, 2021 WL 1132256, at *28 (D. Mass. Mar. 24, 2021) (same); *Doe v. Trs. of Bos. Coll.*, 942 F.3d 527, 535 (1st Cir. 2019) (not addressing prayer for relief); *Sindi v. El-Moslimany*, 896 F.3d 1, 33-34 (1st Cir. 2018) (not addressing prayer for relief, reversing issued injunction imposing prior restraint on speech that swept in non-defamatory statements); *cf. Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 671 n.15 (2d Cir. 2012) (a school's "right to select among various appropriate remedies is not—by itself—a shield against liability").

[18] Because "a court looks only at the complaint when considering a motion to dismiss," *Maldonado v. Cultural Care, Inc.*, 2020 WL 4352846, at *2 (D. Mass. July 29, 2020) (Stearns, J.), Harvard's declarations, Dkts. 76 ("Whelsky Decl.") and 77 ("Weenick Decl."), and the arguments relying on them, *e.g.*, Mem. 1, 6-7, should be disregarded on the Rule 12(b)(6) motion.

educational opportunities or benefits," "the school knew" of the harassment and "the school was deliberately indifferent to the harassment such that its response (or lack thereof) is clearly unreasonable in light of the known circumstances." *Czerwienski v. Harvard Univ.*, 666 F. Supp. 3d 49, 84 (D. Mass. 2023). Whether an environment is hostile "depends on a constellation of surrounding circumstances," *id.* at 87 (allegations of Harvard's "pattern and practice of indifference" to harassment of others, which enabled plaintiffs' own harassment, pled hostile environment), and "multiple incidents" of harassment "cannot be taken in isolation but rather must be viewed as [a] whole," *Sauer v. Belfor USA Grp.*, 205 F. Supp. 3d 209, 216 (D. Mass. 2016). Harvard challenges only two of the elements—harassment and deliberate indifference.

A.    **Plaintiffs Sufficiently Allege Harassment**

The complaint sets forth a vast "constellation" of antisemitic abuse, harassment, and interference with Jewish students' rights. *Czerwienski*, 666 F. Supp. 3d at 87. The First Circuit has "explained time and again that there is no mathematically precise test" to determine whether the elements of severity, pervasiveness, offensiveness, and effect on the environment have been met, *Franchina v. City of Providence*, 881 F.3d 32, 46 (1st Cir. 2018), and that these issues "*must* be determined by the fact-finder," *O'Rourke v. City of Providence*, 235 F.3d 713, 728 (1st Cir. 2001).

Harvard first wrongly contends that plaintiffs' exposure to "offensive utterance[s]" does not create a hostile environment. Mem. 27 (citing *Brown v. Hot, Sexy & Safer Prods., Inc.*, 68 F.3d 525, 541 (1st Cir. 1995) ["Productions"]. But neither *Productions* nor any other case Harvard cites involves the campus-wide, months' long, incessant onslaughts, and racial harassment alleged here, which unquestionably has created an ongoing egregiously hostile environment at Harvard. The "offensive utterance[s]" plaintiffs have been subjected to are more than sufficient to create actionable hostile environments. *Gorski v. N.H. Dep't of Corr.*, 290 F.3d 466, 473-74 (1st Cir.

2002) ("derogatory" and "hostile or abusive comments"); *Doe v. Gavins*, 2023 WL 6296398, at

*12 (D. Mass. Sept. 27, 2023) ("name-calling and other verbal harassment"); *Snelling v. Fall Mtn.*

*Reg'l Sch. Dist.*, 2001 WL 276975, at *1-3, *5 (D.N.H. Mar. 21, 2001) (homophobic "name-

calling" and "taunting").[19] Harvard insists that it may not be liable for harassment not "directed at

or to any Plaintiff." Mem. 27.[20] While the complaint contains numerous allegations of harassment

against plaintiffs themselves, that is not so: the "First Circuit has determined that '[e]vidence of

the harassment of third parties can help to prove a legally cognizable claim of a hostile

environment.'" *E.E.O.C. v. Fred Fuller Oil Co.*, 2014 WL 347635, at *4 (D.N.H. Jan. 31, 2014).[21]

Harvard argues that plaintiffs do not "describe an environment in which an objectively

reasonable person would fear physical violence."[22] Mem. 27-28. Harvard ignores plaintiffs'

allegations of *actual violence* that contribute to plaintiffs' reasonable fears, ¶¶ 115, 251, 256, and

ignores the context of other allegations it seeks to distinguish. For example, Harvard misleadingly

---

[19] Harvard disregards that "[r]acially charged code words [can] provide evidence of discriminatory intent by sending a clear message and carrying the distinct tone of racial motivations and implications." *Valentin v. Town of Natick*, 2023 WL 8815167, at *7 (D. Mass. Dec. 20, 2023); *Sinai v. New Eng. Tel. & Tel. Co.*, 3 F.3d 471, 474 (1st Cir. 1993) (trier of fact could find "discriminat[ion]" against plaintiffs' "Hebrew/Jewish race by disparaging Israel").

[20] Harvard's cases do not support its position. Mem. 27. In *Productions*, 68 F.3d at 541, the court dismissed a hostile environment claim based exclusively on jests made during an assembly. *Guckenberger v. Boston Univ.*, 957 F. Supp. 306, 315 (D. Mass. 1997), focused solely on a university president's off-campus speeches, contained no allegations of hostility toward any students, and "read in context," lacked "sharply-pointed" student harassment.

[21] S*ee also Lipsett v. Univ. of P.R.*, 864 F.2d 881, 904-05 (1st Cir. 1988) (district court erred by dismissing on summary judgment "plaintiff's claim that the cumulative effect of the specific incidents of sexual harassment created a hostile environment," including "constant verbal attack" against "plaintiff and other female[s]"); *Czerwienski*, 666 F. Supp. 3d at 87 (deliberate indifference pled where Harvard maintained a "long-term pattern and practice of indifference to complaints of . . . harassment" by various "students and others"); *Sauer*, 205 F. Supp. 3d at 217 (hostile environment adequately pled even where "many of the alleged verbal acts were directed to groups of people rather than plaintiff alone").

[22] *Productions* does not say, and the courts have not read it to say, what Harvard wishes it said; it instead makes clear that "discriminatory intimidation, ridicule, and insult" *are* actionable and that "physically threatening or humiliating" speech *is but one factor* to consider. 68 F.3d at 540, 541 n.13. Regardless, plaintiffs extensively allege physically threatening and humiliating speech. *E.g.*, ¶¶ 116-19 ("The mob disrupted multiple classes, leading Jewish students to flee for their safety, with some removing identifying garb to avoid attack"; SAA Members #1, #2, #3, and #5 trapped in study room, fearing a physical attack, while hundreds stormed the halls with noisemakers and megaphones); 199-204 (Harvard employee targeting Kestenbaum, requiring him to obtain private security); 100, 136, 139, 141, 236, 253, 270, 272 (students chant "globalize the Intifada" and other slogans calling for mass murder of Jews).

argues that for the October 19 protest in which plaintiffs "[f]ear[ed] a violent attack," "Plaintiffs do not allege that the protesters engaged with Plaintiffs in any way—let alone threatened physical violence," Mem. 27-28, while omitting the reason they did not engage: plaintiffs had to hide in the study room, as their escape was blocked by the hundreds of stampeding protestors.[23] ¶ 117.

Harvard also argues that a "single incident" of harassment is not enough without a "systemic effect on educational programs or activities." Mem. 28.[24] But Harvard must be addressing a different complaint; apart from the fact that "there is no magic number of incidents required to establish a hostile environment claim," *Czerwienski*, 666 F. Supp. 3d at 86; *Koumantaros v. City Univ. of N.Y.*, 2007 WL 840115, at *15 (S.D.N.Y. Mar. 19, 2007) ("[O]ne incident of racial harassment, if sufficiently severe, can create a hostile educational environment."), plaintiffs plainly allege the egregious "systemic effect" of the constellation of Harvard's antisemitic incidents. *E.g.*, ¶¶ 299-311.

**B.    Plaintiffs Plausibly Allege Harvard's Deliberate Indifference**

A university acts with deliberate indifference when its response to harassment is "clearly unreasonable in light of the known circumstances"—that is, when it "fail[s] to adequately respond," and students are thereby "more vulnerable," to harassment. *Czerwienski*, 666 F. Supp. 3d at 76, 84-85, 90. Deliberate indifference is usually a "fact-based question, for which bright line

---

[23] Harvard says the "same is true of Plaintiff's allegations regarding the encampment in Harvard Yard, which was closed to the public and monitored by security guards." Mem. 28. But plaintiffs allege that at the encampment, HUPD officers "did nothing when a visibly Jewish teaching fellow at Harvard College was charged by one of the occupiers, who proceeded to physically push him away from the area." ¶ 251. Harvard also cites *Mandel v. Bd. of Trs. of Cal. State Univ.*, 2018 WL 1242067 (N.D. Cal. Mar. 9, 2018), and *Felber v. Yudof*, 851 F. Supp. 2d 1182 (N.D. Cal. 2011), both involving a single protest at state universities, to make the unsupported argument that protests cannot give rise to a finding of actionable harassment. Mem. 28. But the allegations in *Mandel* pale in comparison to those here, 2018 WL 1242067, at *18, and *Felber*'s protest activity involved tabling and leafletting before the school, unlike Harvard, made arrests when those demonstrations became disruptive, 851 F. Supp. 2d at 1186-88.

[24] Harvard cites *Pollard v. Georgetown Sch. Dist.*, 132 F. Supp. 3d 208, 230-31 (D. Mass. 2015), but the *Pollard* plaintiff alleged only one incident related to their ethnicity.

rules are ill-suited." *Grace v. Bd. of Trs.*, 85 F.4th 1, 11 (1st Cir. 2023).

Harvard's disingenuous argument that it was not deliberately indifferent because it responded to some incidents of antisemitism, and failed to respond to others out of a purported concern for academic freedom, Mem. 22-26, is meritless. It could not be clearer that Harvard's response has been unreasonably inadequate. ¶¶ 162-87; Ex. B. In fact, the very allegations Harvard cites only make Harvard's deliberate indifference undeniable—for example, Harvard failed to take disciplinary measures against harassment even following purported investigations and criminal charges, ¶¶ 75, 91-94, 134, 274; met with Jewish students a few times, but took no steps to address their concerns, pretended there was "no problem" on campus, and largely ignored students, ¶¶ 77-78, 203-04, 209, 211, 219, 223-25, 233, 236-38, 248, 256, 258, 262-63, 265-66, 271-72; paid lip service that failed to acknowledge the problem and was not coupled with actions reasonably calculated to address it, ¶¶ 103-06, 135, 208, 259-60, 267, 274; and appointed the toothless AAG and Antisemitism Task Force, ¶¶ 135, 169-76, 191-94. *Zeno*, 702 F.3d at 669 ("Where a school district has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, such district has failed to act reasonably in light of the known circumstances."); *Howard v. Feliciano*, 583 F. Supp. 2d 252, 257 (D. P.R. 2008) (deliberate indifference adequately pled where schools took some action, including verbal responses, "without any further action or results"). Here, as alleged, Harvard's response was not just ineffective, as it led to intensified antisemitic harassment.

Harvard asserts that its responses were not "clearly unreasonable," even if they were not "ideal," because it does not have to "take heroic measures" or "perform flawless investigations." Mem. 25-26. But since October 7, Harvard has had months of unrelenting antisemitic harassment

to develop its response, and years before that, but has failed to take any effective measures.[25] And the schools in the cases Harvard cites did far more.[26] The hostile environment shows no signs of abating, just the opposite—and that means Harvard's efforts were necessarily insufficient. *Grace*, 85 F.4th at 11; ¶ 275 (encampment organizer: "This action, this movement, wasn't just the finale of a semester, it was the beginning.").

Harvard acknowledges that it "declined" to discipline incidents of antisemitic harassment because, it argues, they could be "reasonably interpreted as political." Mem. 22-24. Chants for the worldwide murder of Jews, such as "globalize the Intifada"—and that is what it means—and the other abusive antisemitic harassment to which Jewish students have been subjected at Harvard are not "political" speech. Harvard's suggestion that the First Amendment prevents it from stepping in or disciplining its students or professors is a red herring, *Doe v. Harvard Univ.*, 462 F. Supp. 3d 51, 64 (D. Mass. 2020) (Harvard is not a state actor), that ignores decades of decisions by the courts and the Department of Education holding both private and public institutions accountable for failing to stop verbal harassment.[27] Harvard's position, if accepted, would eviscerate the Title

---

[25] ¶¶ 126 (Harvard allowed student who attacked a Jew to remain on campus and continue antisemitic activity); 135 (no action after "concrete steps" announcement); 141-42 (Harvard did nothing to stop antisemitic demonstration which violated Harvard's policies); 169-76, Ex. B (members of AAG resigning and decrying Harvard's failure to take action as Harvard ignores its recommendations).

[26] In *Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165 (1st Cir. 2007), for example, the defendant "*promptly reacted* to harassment complaints, commenced *full-scale investigations*, *paid close attention* to new information and . . . concerns, offered *suitable remedial measures*, and responded reasonably *each time* there was a new development." *Grace*, 85 F.4th at 14. In *Porto v. Town of Tewksbury*, 488 F.3d 67, 73 (1st Cir. 2007), which went to a jury, the school took concrete measures designed to stop harassment, such as separating students.

[27] *See Grace*, 85 F.4th at 12 (school "took no corrective or remedial action against students who repeatedly used homophobic epithets"); *Howard*, 583 F. Supp. 2d at 257 (upholding jury finding of hostile educational environment based on "anti-American remarks" such as "American Jerk"); *Schoendorf v. RTH Mech. Contractors, Inc.*, 2012 WL 3229333, at *5 (D. Me. Aug. 6, 2012) (severe or pervasive harassment based on comments such as "dumb bitch"); *Brodeur v. Claremont Sch. Dist.*, 626 F. Supp. 2d 195, 213, 215 (D.N.H. 2009) (triable issue whether harassment based on comments about a student's body was severe, pervasive, and objectively offensive). As the Obama, Trump, and Biden administrations have all made clear, under Title VI, schools have a responsibility to curb antisemitism, verbal or otherwise. ¶¶ 29-37; Dep't of Educ. "Dear Colleague" Ltr. (May 7, 2024); Dep't of Educ. "Dear Colleague" Ltr. (Nov. 7, 2023) ("Harassing conduct can be verbal *or* physical and *need not be directed at a particular individual*.").

VI—any time a school does not want to police, say, racist harassment, it could characterize it as "political."

In making the claim that "Title VI does not require Harvard to censor student or faculty speech that may be protected by the First Amendment," Mem. 22, Harvard ignores relevant Title VI law. The First Amendment does not conflict with schools' Title VI obligations to rein in verbal harassment. Principles of "academic freedom," Mem. 23, do not protect incitement, threats, assault, vandalism, trespassing, or destruction of property, even if the conduct "occurs within the broader context of a political demonstration" that would otherwise consist of protected expression. *United States v. Daley*, 378 F. Supp. 3d 539, 559 (W.D. Va. 2019), *aff'd sub nom. United States v. Miselis*, 972 F.3d 518 (4th Cir. 2020).[28] Moreover, universities have an "undoubted prerogative to enforce reasonable rules governing student conduct." *Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 669-70 (1973).

Harvard argues that "school administrators must be permitted to exercise discretion in determining when certain speech crosses the line…." Mem. 24.[29] But here, as plaintiffs' allegations make clear, Harvard's administrators have abused whatever discretion they have, discretion which under Title VI is anything but unfettered, and they have exercised that discretion in a manner invidiously discriminatory against Jews and Israelis compared with other groups. In *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 690-93 (4th Cir. 2018), which involved online harassment at a public university, the Fourth Circuit rejected an argument much like the one

---

[28] *See also Counterman v. Colorado*, 600 U.S. 66, 81 (2023) (incitement and threats); *Virginia v. Black*, 538 U.S. 343, 359-60 (2003) (threats); *Samuels v. Mackell*, 401 U.S. 66, 75 (1971) (Douglas, J., concurring) ("[V]iolence has no sanctuary in the First Amendment, and the use of weapons, gunpowder, and gasoline may not constitutionally masquerade under the guise of 'advocacy.'") (assault); *Council for Life Coal. v. Reno*, 856 F. Supp. 1422, 1426 (S.D. Cal. 1994) (vandalism).

[29] *Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 29 n.18 (1st Cir. 2020) involved a public-school suspension and recognized that even otherwise protected speech can be punished by public schools whether or not it "cause[s] substantial disruption."

Harvard makes here, holding that where speech is unprotected, like "threats," or where a school has a variety of "remedial options," the school cannot hide behind the First Amendment in refusing to take effective actions.

None of the cases Harvard cites, Mem. 22-24, supports its argument that it can ignore, as "political," antisemitic harassment.[30] In any event, Harvard *does* restrict speech it deems objectionable; it *chooses not to do so* only when the harassment is antisemitic. ¶¶ 276-98. For example, Harvard instructs freshman that it prohibits "sizeism," "fatphobia," "transphobia," "ageism," and "ableism"—but omits antisemitism—because, Harvard says, they "contribute to an environment that perpetrates violence." ¶ 280. Harvard cares about free speech and "academic freedom" only when convenient for it: Harvard has canceled courses and disinvited speakers because of controversial viewpoints, punished faculty and students for speech it disapproves, and told a researcher that "you have no academic freedom" after she accused Harvard of stifling her free speech when she criticized a Harvard donor.[31] ¶¶ 281, 289-95. Harvard cannot use its purported respect for academic freedom and speech to repudiate its Title VI obligations, and it cannot willfully ignore harassment and discrimination only against Jews. Harvard's tolerance of antisemitism, but not other forms of harassment, not only reflects Harvard's deliberate indifference, but also demonstrates its direct discriminatory animus. *See infra* Arg. § IV.

---

[30] *Guckenberger*, 957 F. Supp. at 315-16, did not involve student harassment. *Brown v. Trs. of Boston Univ.*, 891 F.2d 337, 359-60 (1st Cir. 1989), a jury trial appeal involving a tenure decision—not a hostile environment—held that "[a]cademic freedom does not include the freedom to discriminate," and has been limited to its "unique context" of tenure decisions, *Tuli v. Brigham & Women's Hosp., Inc.*, 566 F. Supp. 2d 32, 49 (D. Mass. 2008), *aff'd*, 656 F.3d 33 (1st Cir. 2011). *Felber* involved a public school and a public setting where tabling and leafletting were protected, but the school properly made arrests during disruptive protests. 851 F. Supp. 2d at 1186-88.

[31] Harvard's purported respect for academic freedom does not appear to extend to criticism of Harvard itself by its faculty members, including its Jewish former president, who criticized Harvard's response to antisemitism, as evidenced by the title and content of a recent article by Dean of Social Science Lawrence D. Bobo. *Faculty Speech Must Have Limits*, The Harvard Crimson (June 15, 2024), https://www.thecrimson.com/article/2024/6/15/bobo-faculty-speech-limits; *see also* ¶¶ 5, 102, 105, 137, 156, 193.

**IV.**   **Plaintiffs State a Direct Discrimination Claim Under Title VI**

Plaintiffs allege that Harvard intentionally discriminates through its invidious double standard in failing to enforce its policies against antisemitism as compared to other forms of hate. ¶¶ 276-98. Harvard contends that this claim must be dismissed because plaintiffs fail to allege "reasonably comparable" incidents showing discrimination. Mem. 20. But plaintiffs do far more than that—they allege that the way Harvard responds to antisemitic acts is *a fortiori* worse than the treatment Harvard has accorded other discrimination. For example, Harvard has censored controversial speakers over concerns about how they will affect students, while regularly permitting those with ties to terrorist organizations and who spew antisemitic views to speak to students. *E.g.*, ¶¶ 205, 220, 238, 241, 281. Harvard also does not hesitate to discipline students and faculty who discriminate or violate policies when the targets are not Jews—such as canceling a sports season for a team's sexist remarks, putting a student group on probation for discriminating against a homosexual member, rescinding an incoming freshman's admission because he used racial slurs online years earlier as a teen, and dispersing climate protesters who disrupt speakers— but broadly refuses to discipline students and faculty who attack and harass Jews. *E.g.*, ¶¶ 91-94, 108, 115-16, 190, 233, 254, 272, 289-98. Harvard argues that plaintiffs do not allege the precise details of which policies those students violated or the "evidence" Harvard had against these students compared to others, Mem. 20-21, but these details—to the extent they are not already obvious—are in Harvard's control and will be revealed in discovery.

Plaintiffs' allegations provide far more than the required "circumstantial evidence of racial animus" through the use of "roughly equivalent" comparisons among "similarly situated" groups, and lead to the inevitable conclusion that Harvard administrators have acted with "discriminatory

intent." *Doe v. Brown Univ.*, 43 F.4th 195, 207-08 (1st Cir. 2022).[32] The House investigative update and HJAA report have shown that Harvard's racial animus is behind its special treatment of Jewish discrimination. *See* ¶¶ 4, 7-14, 169-87, 277-78; Compl., Exs. A & B. For example, the House report noted that the "swift and sympathetic reaction by the school to assist students promoting hatred against their peers stood in stark contrast to Harvard's conspicuous failure in addressing antisemitic incidents." Compl., Ex. B at 28-29.

Harvard disingenuously claims that it must navigate "often competing claims of antisemitic and anti-Muslim discrimination"—attempting to insert a "both-sides" argument that has no support in the complaint. Mem. 21. While Harvard of course should combat any anti-Muslim discrimination, there has been none that is remotely comparable to the levels of rampant antisemitism at Harvard. There have been: no mobs of demonstrators calling for the murder of Muslims worldwide; no anti-Muslim demonstrators taking over Harvard Yard or buildings; no professors falsely teaching that Muslim nations are engaged in apartheid or are illegitimate; no harassing campaigns against faculty or speakers who support Muslim nations or Islam; and no Muslim students barred entry through Harvard's gates. *Cf.* ¶¶ 77-78, 80-81, 91-94, 138, 154-55, 190, 205, 233, 239, 249-75, 294. Regardless, Harvard must, but does not, treat anti-Jewish discrimination as it would treat any other discrimination.

**V.    Plaintiffs Adequately Allege Breach of Contract and the Implied Covenant**

Plaintiffs adequately allege breach of contract: "a valid contract can be derived from statements in handbooks, policy manuals, brochures, catalogs, advertisements, and other promotional materials." *Shulse v. W. New Eng. Univ.*, 2020 WL 4474274, at *9 (D. Mass. Aug. 4,

---

[32] Harvard has dropped its incorrect contention from its first motion that plaintiffs must allege that racial animus is "the *only* possible explanation" for Harvard's actions. *Compare* Mem. 20-21 *with* Dkt. 36 at 19 *and* Dkt. 43 at 15.

2020). On a motion to dismiss, courts focus on the student's "reasonable expectation . . . of the contract's terms." *Sonoiki v. Harvard Univ.*, 37 F.4th 691, 709, 711 (1st Cir. 2022).

Plaintiffs allege that at least five Harvard policies contain obligations, explicit and implicit promises, giving rise to plaintiffs' reasonable expectations. ¶¶ 45-61, 118, 149, 329-31, 333. Harvard's failure to provide plaintiffs "'a discrimination-free environment' by 'abiding by, and adequately and appropriately enforcing'" those policies are precisely "the type of allegations that have been held to establish breach." Mem. 29 (quoting ¶ 331). In *Shulse*, 2020 WL 4474274, at *9, this Court held that a "Student Handbook" and "Parent's Guide," "plausibly support[ed] Plaintiff's reasonable expectation that [the university] would provide an environment free from . . . discrimination." In *Czerwienski*, 666 F. Supp. 3d at 100, this Court upheld a breach of contract claim against Harvard based on promises in its "Sexual and Gender-Based Harassment Policy" and "Whistleblowing Policy." Plaintiffs allege that Harvard breached similar promises here.

Harvard, conceding that "Plaintiffs allege that Harvard policies prohibit specific actions," argues they "do not plead that these policies bind the University to respond within a certain timeframe or adopt particular disciplinary measures in response to the incidents they allege." Mem. 29. That is not so. Plaintiffs allege that Harvard's Non-Discrimination Policy "sets forth procedures, including *specified timeframes*," and requires that "all those at Harvard with responsibility for implementing [the Non-Discrimination Policy] will discharge their obligations with fairness, rigor, and impartiality." ¶ 48; ¶¶ 51 (requiring Harvard to respond "promptly" to grievances), 153. Harvard concedes that plaintiffs have alleged "policies that may apply to Plaintiffs," but argues that "many of the quoted provisions" are "insufficiently definite" to establish a breach. Mem. 29. But this Court has held that similar promises Harvard made to "'provide prompt and equitable methods of investigation and resolution to stop discrimination,

remedy any harm, and prevent its recurrence,' and 'keep the community safe and [] address incidents of alleged harassment,'" were sufficiently definite "to form a contract." *Czerwienski*, 666 F. Supp. 3d at 100-01 (cleaned up). Harvard cites *G. v. Fay Sch.*, 931 F.3d 1, 12 (1st Cir. 2019), *Brown v. Suffolk Univ.*, 2021 WL 2785047, at *6 (D. Mass. Mar. 31, 2021), and *Shin v. M.I.T.*, 2005 WL 1869101 (Mass. Super. Ct. June 27, 2005), but as this Court has held, Harvard's promises in *Czerwienski*, 666 F. Supp. 3d at 100-01—as here—are "are far more specific than the [] 'generalized, aspirational statements that [were] insufficiently definite" in *Fay* and *Suffolk. Shin* similarly provides no help to Harvard.

Plaintiffs also adequately allege breach of the implied covenant of good faith and fair dealing. Here, as in *Czerwienski*, "[b]ecause the plaintiffs have pleaded adequately that Harvard failed to meet the standard of reasonable expectations arising from its written policy statements, they also have pleaded adequately a breach of the covenant of good faith and fair dealing." *Id.* at 102. Plaintiffs' claim is not duplicative of their contract claim, because the implied covenant claim concerns Harvard's discriminatory failures to "conform to the parties' reasonable understanding of the performance obligations, as reflected in the overall spirit of the bargain, even if [Harvard] technically complied with the letter of the [written policies]." *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 600, 612 (D. Mass. 2016).[33] And contrary to Harvard's contention, Mem. 30, plaintiffs "distinct[ly]" allege "how specific policies have been applied in a . . . selective way."

## CONCLUSION

The Court should deny defendant's motion in its entirety.[34]

---

[33] Harvard's cases are inapposite. Mem. 30. Those disciplinary adjudication cases involved duplicative claims, because "the denial of [a] basic fairness [claim] is the student disciplinary adjudications' version of [] a breach of the implied covenant." *Doe v. Stonehill*, 55 F.4th 302, 337-38 (1st Cir. 2002).

[34] Should any portion of Harvard's motion be granted, plaintiffs respectfully request leave to amend, which should be "freely give[n] . . . when justice so requires." Fed. R. Civ. P. 15(a)(2).

Dated:    July 2, 2024                    Respectfully submitted,

ALEXANDER KESTENBAUM and STUDENTS
AGAINST ANTISEMITISM, INC.

By their attorneys,

 /s/ Marc E. Kasowitz
        Marc E. Kasowitz*
        Daniel R. Benson*
        Mark P. Ressler*
        Andrew L. Schwartz*
        Joshua E. Roberts*
        Andrew C. Bernstein*
        **KASOWITZ BENSON TORRES LLP**
        1633 Broadway
        New York, New York 10019
        Tel: (212) 506-1700
        mkasowitz@kasowitz.com
        dbenson@kasowitz.com
        mressler@kasowitz.com
        aschwartz@kasowitz.com
        jroberts@kasowitz.com
        abernstein@kasowitz.com

        Timothy H. Madden (BBO #654040)
        **DONNELLY, CONROY & GELHAAR, LLP**
        260 Franklin Street, Suite 1600
        Boston, MA 02110
        Tel: (617) 720-2880
        thm@dcglaw.com

        *Admitted *pro hac vice*

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Marc E. Kasowitz*
Marc E. Kasowitz